## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FRIENDS OF THE EARTH U.S.,**
1101 25th St NW Fl. 11
Washington, DC 20005,

*and*

**JUSTIÇA AMBIENTAL,**
Address in notice under seal,

   Plaintiffs,

v.

**EXPORT-IMPORT BANK OF THE
UNITED STATES,**
811 Vermont Avenue NW
Washington, DC 20571,

**ACTING PRESIDENT AND CHAIRMAN
JAMES CRUSE,**
811 Vermont Avenue NW
Washington, DC 20571,

**ACTING FIRST VICE PRESIDENT AND
VICE CHAIRMAN JAMES BURROWS,**
811 Vermont Avenue NW
Washington, DC 20571,

*and*

**BOARD MEMBER SPENCER BACHUS
III,**
811 Vermont Avenue NW
Washington, DC 20571

   Defendants.

Civil Action No._____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

JURISDICTION AND VENUE ....................................................................................... 4

 PARTIES ........................................................................................................................ 5

STATUTORY FRAMEWORK........................................................................................ 8

I.    The Export-Import Bank Act of 1945 ....................................................................... 8

    A.    EXIM's Board must be appointed by the President of the United States with the
advice and consent of the Senate. ................................................................. 8

    B.    The Bank Act requires notice and comment before final approval of large loans. ...... 9

    C.    The Bank Act limits EXIM's ability to finance projects that have adverse
economic impacts in the United States. ...................................................... 10

    D.    Under the Bank Act, EXIM may only provide support on rates, terms and
conditions that approximate those being offered by foreign export credit
agencies........................................................................................................ 12

    E.    EXIM and its Board must consider a transaction's adverse environmental and
social effects and provide an opportunity for public comment.................... 13

II.   The National Environmental Policy Act............................................................... 16

III.  The Administrative Procedure Act. ...................................................................... 17

FACTS ............................................................................................................................ 8

I.    Background of the Mozambique LNG project. .................................................... 18

II.   EXIM's prior approvals of funding for the Mozambique LNG Project. ............. 19

III.  The Project area has been engulfed in an armed conflict with alleged abuses. .................. 21

    A.    The Project repeatedly suspended operations and ultimately declared *force
majeure.* ....................................................................................................... 22

    B.    There are reports of egregious abuses committed by the Mozambican security
forces............................................................................................................ 25

    C.    There are official investigations underway into Total's actions during the Palma
massacre and into the massacre at the Project site...................................... 26

    D.    The conflict is ongoing. ............................................................................... 27

    E.    The ongoing conflict has taken a devastating toll on the people of Cabo Delgado.... 29

    F.    The Project and the conflict are interconnected.......................................... 30

IV.  EXIM's "acting" Board unlawfully provided final approval for the 2025 loan .................. 30

A.  EXIM's "acting" Board approved the 2025 loan without a quorum. ......................... 30

B.  EXIM approved the 2025 loan without providing any of the statutorily required notifications and comment periods. ............................................................. 31

C.  EXIM approved the 2025 loan without conducting the required economic analysis to ensure that the Project does not harm domestic producers and the U.S. economy ................................................................................................ 33

    1. Global Oversupply ...................................................................................... 33

    2. Competition with U.S. Producers. .............................................................. 36

    3. Substantial Injury ...................................................................................... 36

D.  EXIM approved a loan that was not necessary to "neutralize" foreign ECA support, and over subsidized local costs. ........................................................ 37

E.  EXIM's "acting" Board failed to consider the risks from the ongoing conflict and humanitarian crisis, staff failed to consider most of these issues, and EXIM provided no public notice or comment opportunity. ........................................ 40

    1. EXIM's Board rushed the Project through final approval without considering the Project's security, humanitarian, and human rights risks. ........................................ 41

    2. EXIM's staff did not adequately assess the risks and impacts from the Project's security situation and the conflict. ................................................................ 43

        a. Reviewing the Project's physical security is not sufficient. .............................. 44

        b. The new operating environment renders prior assessments obsolete. ............... 47

F.  EXIM and its "acting" Board failed to consider additional environmental and social effects. ........................................................................................... 49

    1. EXIM was informed of substantial environmental and social issues connected with the Project that it should have evaluated. ........................................................ 49

    2. EXIM failed to evaluate the Project's climate risks and impacts. ........................... 50

    3. Neither EXIM nor the "acting" Board considered the Project's impacts on the critical habitats of the endangered species, including the whale shark, as required by EXIM policy. ................................................................................................ 50

    4. EXIM failed to properly consider other critical impacts on biodiversity and the health of local ecosystems because the Environmental Impact Assessment produced by the Project Sponsors was flawed and inadequate. ............................... 50

G.  EXIM and its Board failed to share statutorily mandated information with the public. ........................................................................................................ 58

V.    EXIM's final approval has caused, and will continue to cause, actual, imminent and irreparable harm to Plaintiffs, their members, and the local residents and communities they serve ................................................................................................ 59

    A.    Plaintiff Organizations. .................................................................................. 59

        1. Friends of the Earth. ................................................................................. 60

            *a. Facilitating community participation in feedback and redress mechanisms.* .... 60

            *b. Sharing information with local organizations and communities.* ..................... 64

        2. Justiça Ambiental. .................................................................................... 65

            *a. Gathering and disbursing information.* .............................................................. 65

            *b. Accessing due diligence, grievance, and redress mechanisms.* ........................ 66

        3. Impact of EXIM's decision to fund the Project on FOE and JA's activities. .......... 68

            *a. Preventing FOE and JA from sharing information with communities.* .............. 70

            *b. Denying communities a means of redress.* ........................................................ 72

            *c. Implementing a more harmful Project.* .............................................................. 74

            *d. Exacerbating risks from the conflict.* ................................................................ 74

        4. Informational injury. ................................................................................ 77

    B.    Plaintiff FOE's Members. ............................................................................... 77

    C.    Community Members. ..................................................................................... 78

I.    The Project would not go forward without EXIM's approval of a new loan. ..................... 79

CLAIMS FOR RELIEF ....................................................................................................... 80

REQUESTED RELIEF ........................................................................................................ 89

**INTRODUCTION**

1.      Plaintiffs Friends of the Earth U.S. and Justiça Ambiental bring this action against Defendants Export-Import Bank of the United States ("EXIM") and its "acting" Board of Directors. Plaintiffs challenge the unlawfully constituted "acting" Board's March 13, 2025 final approval of a $4.7 billion loan—one of the largest in EXIM's history—to a foreign consortium led by French oil giant TotalEnergies SE ("Total"), to subsidize construction of a massive liquefied natural gas ("LNG") project ("the Project") in Mozambique.

2.      The Project is in an area of active conflict between a brutal insurgency and the Mozambican government. In 2021, the insurgents, known as Al-Shabab, attacked the nearby town of Palma, the base of operations for many Total construction workers, reportedly killing hundreds of residents, including Project contractors. Many victims were beheaded. Thousands were forced to flee. Total declared *force majeure*, halting construction, and has not lifted *force majeure* to this day.

3.      A few months after the Palma attack, Mozambican forces securing the Project allegedly offered local civilians refuge from the conflict at the Project site, then sexually assaulted women, imprisoned and tortured hundreds of men in shipping containers at Total's facility and eventually killed nearly all of them.

4.      The security and humanitarian situation remains precarious. Insurgents are still conducting attacks and are still a threat to the Project. There are reports that Mozambican security forces are still committing abuses. Indeed, EXIM approved the loan even though its own employees cannot travel to the area due to the ongoing danger.

5.      The Project will exacerbate the ongoing conflict, devastate the local environment, contribute to climate change, and unleash foreign LNG production that would cause economic injury to United States companies and workers.

6.      Because of these and other impacts, EXIM financing is opposed by a wide array of parties from across the political spectrum who would otherwise agree on very little. These parties include: local Mozambicans; human rights, humanitarian, and anti-poverty organizations; environmentalists; Members of Congress from both political parties; The Wall Street Journal editorial board; the former Republican Governor of Texas and President Trump's first Energy Secretary; and those who believe the U.S. government should not subsidize oil companies or foreign corporations.

7.      Now that Total wants to restart the Project, EXIM rushed this loan through final Board approval, in violation of numerous restrictions in its governing statute, the Export Import Bank Act of 1945 ("Bank Act"), 12 U.S.C. §§ 635-635t.

8.      First, EXIM's newly minted "acting" Board of Directors approved the loan without the statutorily required quorum of Senate-confirmed members.

9.      Second, the "acting" Board dispensed with multiple mandatory notice and comment periods, which required opportunity for input from the public, Congress, and other federal agencies before "final approval" or "final consideration" of this loan.

10.     Third, EXIM ignored the Bank Act's requirement that it consider the Project's environmental and social risks, including that the Project will exacerbate the conflict, and that both insurgents and security forces providing security for the Project threaten local people.

11.     Fourth, EXIM failed to consider the substantial economic harms the Project will inflict on U.S. companies and workers when the "commodity will first be sold," as the Bank Act requires.

12.     Fifth, the loan exceeds Congress's limits on over-subsidizing foreign projects. EXIM may only provide financing that "neutralizes" foreign export credit agency ("ECA") financing. Here, EXIM has not shown that U.S. bidders face competition from foreign companies receiving ECA support. Moreover, EXIM is providing more support for "local costs" that are not directly related to U.S. exports than the Bank Act allows.

13.     Sixth, despite the scientific consensus on the need to quickly reduce greenhouse gases to avoid catastrophe, and although the Project will create a globally significant new source of climate pollution, EXIM and the "acting" Board failed to consider the Project's impacts on the global climate, including in the U.S., as required by the National Environmental Policy Act (NEPA) and EXIM's policies and procedures.

14.     EXIM purports to justify its failures to follow the Bank Act on grounds that it previously approved a loan for the Project in 2019, and in 2020. But the Project has been frozen since Total declared *force majeure* in 2021. EXIM cannot disburse funds under its previous loan approval; a new approval was required. The "acting" Board's March 13, 2025 approval of a new loan for the Project was plainly EXIM's "final consideration" or "final approval" of this loan.

15.     EXIM's new loan is for a Project that is being developed with a far different production timeline, in a fundamentally changed economic and social context from that in 2019 and 2020, and in the face of serious new security and human rights risks. These changed circumstances are directly material to EXIM and the "acting" Board's 2025 approval, but EXIM arbitrarily ignored them, swiftly rubber-stamping billions of taxpayer dollars for a reckless

3

overseas project with significant, unacknowledged environmental, social, and domestic economic costs.

16.     The "acting" Board's final approval violates the substantive and procedural requirements of the Bank Act, the Federal Vacancies Reform Act ("Vacancies Act"), NEPA, EXIM's internal policies and procedures, and the Administrative Procedure Act ("APA"). It was arbitrary and capricious, an abuse of discretion and indeed, patently reckless. It therefore cannot stand.

17.     Plaintiffs ask this Court to preliminarily and permanently enjoin the disbursement of any funds pursuant to EXIM and the "acting" Board's improper March 2025 final approval and declare that approval unlawful and null and void.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701-706. This Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) because this is a civil action against the United States founded upon Acts of Congress.

19.     EXIM and the Board's failure to comply with the Bank Act, the Vacancies Act, and NEPA is arbitrary and capricious, not in accordance with law or procedure required by law, exceeds their statutory authority and limitations, and is subject to judicial review under the APA. 5 U.S.C. §§ 701-706.

20.     In addition to its other remedial authorities, this Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

21.     Venue properly lies with this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are an agency of the United States and its Board members, EXIM's headquarters are located in this District, and Plaintiff Friend of the Earth resides in this District.

## PARTIES

22.     Plaintiff Justiça Ambiental (JA) is a private nonprofit environmental organization founded in 2004 in Mozambique, operating across the national territory. JA is also part of several networks and coalitions, and is a member of Friends of the Earth International, a global network of grassroots environmental groups working in 70 countries to promote environmental sustainability, social justice, and respect for human rights. Based on this affiliation, JA is sometimes known (especially internationally) as Friends of the Earth Mozambique.

23.     JA's mission is to generate a culture of civil engagement in Mozambique through environmental protection actions and the active involvement of citizens in development decisions relevant to environmental justice issues, in Mozambique and throughout the world. As a core part of its mission, JA helps local residents and communities address the environmental, economic, and social threats they face, particularly from large-scale resource extraction projects.

24.     JA does so by helping them vindicate their rights and interests, including through the mechanisms provided by Mozambique law and the policies of project owners and their funders. Thus, JA helps residents and communities in several ways, including by: (1) researching and investigating projects' environmental and social impacts; (2) accessing the public consultation and notice and comment opportunities afforded by due diligence procedures; (3) bringing claims to redress and dispute resolution mechanisms, such as EXIM's; and (4) filing lawsuits and initiating public investigations and inquiries.

25.    Often, key decisions that will impact the remote communities JA serves are made in Maputo or by foreign project owners or funders. In those cases, JA provides critical services that rural Mozambicans could never do for themselves. Working with and through partners in the Friends of the Earth International network and other international coalitions, JA provides a conduit of information in both directions between residents and communities and far-away decision-makers. JA also helps local people access procedures and redress mechanisms that enable them to raise their concerns with foreign decision-makers. JA brings its detailed understanding of local concerns and the facts on the ground, while JA's international partners contribute expertise on using foreign institutions' processes to protect those who have been or will be harmed.

26.    JA has been working on behalf of local residents on the proposed Mozambique LNG Project since 2006, when prospecting and research began. JA has, among other things, helped residents raise concerns about the Project to EXIM to encourage it to avoid or ameliorate the Project's environmental, economic and social impacts, and ensure meaningful participation and proper compensation for those whose homes, lands and fishing rights the Project has taken. JA also works with local residents to ensure they are protected from human rights abuses and with victims of violence from the conflict to help them secure redress.

27.    Plaintiff Friends of the Earth U.S. ("FOE") is a 501(c)(3) non-profit environmental organization founded in 1969 and headquartered in Washington, D.C. FOE is a membership-based organization with over 226,000 members located across all 50 states and the District of Columbia. FOE is the U.S. chapter of Friends of the Earth International.

28.     FOE's mission is to defend the environment and champion a healthier and just world by reducing greenhouse gas emissions and reliance on fossil fuels and ensuring environmental and social justice, human dignity, and respect for human rights.

29.     A central part of FOE's mission is to assist local residents and communities harmed by dirty fossil fuel and other projects to safeguard their environment, health, and human rights, especially where the project involves a U.S. government decision-maker. FOE supports overseas communities through partnerships with in-country organizations. FOE prioritizes providing support through Friends of the Earth affiliates. In Mozambique, FOE works with JA.

30.     Together with in-country partners, FOE provides project-affected people with expert advice and assistance on raising their concerns and protecting their rights through the mechanisms afforded by U.S. law and the relevant U.S. agencies—including public consultation, notice and comment, and redress and dispute resolution mechanisms. FOE also helps adversely affected people and communities uncover critical information through information disclosure and Freedom of Information Act (FOIA) requests.

31.     FOE has supported Project-impacted people in Mozambique since 2015.

32.     Defendant EXIM is an independent federal agency and wholly owned U.S. governmental corporation. It is the official export credit agency of the United States.

33.     Congress established EXIM to help level the playing field for U.S. exporters that compete with foreign companies receiving export financing from their own governments. EXIM's stated purposes are "to aid in financing and to facilitate exports of goods and services, imports, and the exchange of commodities and services between the United States . . . and any foreign country . . . and in so doing to contribute to the employment of United States workers." 12 U.S.C. § 635(a)(1).

34.    Defendant James C. Cruse is EXIM's acting President and acting Chairman of the Board.

35.    Defendant James Burrows is EXIM's acting First Vice President and acting Vice Chairman of the Board.

36.    Defendant Spencer Bachus III is an EXIM director, the only board member duly confirmed by the Senate.

## STATUTORY FRAMEWORK

I.    **The Export-Import Bank Act of 1945.**

37.    Because EXIM's overseas financing can raise sensitive foreign policy, economic, human rights, environmental, or social concerns, Congress placed strict substantive and procedural limits on EXIM's authority.

### A.   EXIM's Board must be appointed by the President of the United States with the advice and consent of the Senate.

38.    EXIM is governed by a Senate-confirmed Board of Directors that Congress has directed to make important decisions, including the approval of major long-term transactions. 12 U.S.C. §§ 635a(c)(1), 635a(c)(10).

39.    The Bank Act provides that the Board is comprised of five voting members: the Bank's President and First Vice President and three additional members who all must be appointed by the President of the United States with the advice and consent of the Senate. *Id*. §§ 635a(b), 635a(c)(1).

40.    The Board may only approve transactions when a quorum of three of the five voting members is present. *See* 12 U.S.C. §§ 635a(c)(6)(A). The statute provides one exception: when a quorum is unavailable for 120 days, a "temporary Board" consisting of the U.S. Trade Representative, the Secretary of the Treasury, the Secretary of Commerce, and any members of

the EXIM Board – all positions requiring Senate confirmation – "shall act in the stead of the Board of Directors" until a normal quorum is restored through Senate confirmation. *Id*. § 635a(c)(6)(B)(i).

41.     The Vacancies Act specifies the requirements for temporarily filling certain vacant positions in Executive Branch agencies that require presidential appointment and Senate confirmation. The Vacancies Act, however, cannot be used to fill seats on a board with "multiple members" that "governs an independent establishment or Government corporation." 5 U.S.C. § 3349c(1)(B). Any action taken by an acting official serving in violation of the Vacancies Act "shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d).

**B.  The Bank Act requires notice and comment before final approval of large loans.**

42.     The Bank Act imposes particularly stringent procedural requirements on the consideration of transactions that exceed $100,000,000. Before the Board may meet for "final consideration" of or take any "final action" on such transactions, EXIM must notify the public, Congress, the Department of Commerce, and the Office of Management and Budget and afford them all the opportunity to comment. *See* 12 U.S.C. § 635a(c)(10)(A), (c)(10)(C)(i)(III) & (c)(10)(E).

43.     The Board may not "finally approve" such transactions unless EXIM has submitted to Congress "a detailed statement describing and explaining the transaction, at least 25 days of continuous session of the Congress prior to the date of final approval." 12 U.S.C. § 635(b)(3).

44.     EXIM must also give the public time to weigh in. "Before any meeting of the Board for final consideration" of a transaction exceeding $100 million, EXIM "shall provide a notice and comment period." 12 U.S.C. § 635a(c)(10)(A). Specifically, it must publish notice in

the Federal Register and "provide a period of not less than 25 days for the submission to the Bank of comments on the application." *Id*. § 635a(c)(10)(C)(i)(II). This period must be "concurrent" with EXIM's submission of the required statement to Congress. *Id*. § 635a(c)(10)(A).

45.    The notice must include information about "the purposes of the transaction and the anticipated use of any item being exported, including … whether the item may be used to produce exports" that compete with exports by a U.S. industry. *Id.* § 635a(c)(10)(C)(i)(I), (c)(10)(C)(ii).

46.    EXIM must "address views of commenters," and before the Board can take "final action," EXIM staff must provide the Board "in writing . . . the views of any person who submitted comments on the application." *Id*. § 635a(c)(10)(E).

47.    Congress ensured the integrity of this notice and comment procedure by mandating that if a material change is made to an application after notice is published, EXIM must publish a new notice in the Federal Register and start the comment period anew. *See id*. § 635a(c)(10)(D)(i).

**C. The Bank Act limits EXIM's ability to finance projects that have adverse economic impacts in the United States.**

48.    The Bank Act requires EXIM's Board to "take into account any serious adverse effect of such loan or guarantee on the competitive position of United States industry . . . and employment in the United States. . . ." 12 U.S.C. § 635(b)(1)(B). Separately, the Bank Act prohibits EXIM from subsidizing foreign production of a commodity if doing so would cause "substantial injury" to U.S. producers of "the same, similar, or competing commodity." *Id*. § 635(e)(1)(B).

49.     The Bank Act prohibits EXIM from funding production of any commodity for export by a foreign country if EXIM determines that "(i) the commodity is likely to be in surplus on world markets at the time the resulting commodity *will first be sold*; or (ii) the resulting production capacity is expected to compete with United States production of the same, similar, or competing commodity; and … the extension of such credit or guarantee will cause substantial injury to United States producers of the same, similar, or competing commodity." *Id*. § 635(e)(1)(A)-(B) (emphasis added). Financing is conclusively presumed to cause "substantial injury" if it supports new or expanded foreign production that "equals or exceeds 1 percent of United States production." *Id*. § 635(e)(4).

50.     The Bank Act has one "exception" to this prohibition: if the Board finds that "the short- and long-term benefits to industry and employment in the United States are likely to outweigh the short- and long-term injury to United States producers and employment of the same, similar, or competing commodity." *Id*. § 635(e)(3).

51.     When EXIM conducts a "detailed economic impact analysis" of a loan, it must "include consideration of the views of the public and interested parties." *Id*. § 635(e)(7)(A). It must publish notice in the Federal Register of its intent to conduct this analysis, and provide at least 14 days for the public to comment on the loan's economic impacts. *Id*. § 635(e)(7)(B)(i). EXIM must also seek comments from the Department of Commerce, the Office of Management and Budget, the Committee on Banking, Housing, and Urban Affairs of the Senate, and the Committee on Financial Services of the House of Representatives. *Id*. This notice and comment period is in addition to the general notice and comment period Section 635a(c)(10) requires.

52.     As with the comment period in advance of Board consideration, Congress wanted this comment period to inform decision-making. Thus, if a "material change" is made to an

application after a notice is published, EXIM must publish a revised notice in the Federal
Register and provide a new comment period. *Id*. § 635(e)(7)(B)(iii)(I). And EXIM staff must
provide the Board with "the views of any person who submitted comments" "[b]efore" the Board
"tak[es] final action on an application for a loan or guarantee." *Id*. § 635(e)(7)(C).

53.    Congress directed EXIM to adopt "regulations and procedures" for conducting
this analysis and the corresponding notice and comment period. EXIM has done so in its
*Economic Impact Procedures and Methodological Guideline*s, which specify that a detailed
economic impact analysis and notice and comment are required whenever "a transaction poses a
risk of substantial injury (*i.e.*, the resulting production is equal to or exceeds 1% of U.S.
production)." *See* Export-Import Bank of the U.S., Export-Import Bank of the United States
Economic Impact Procedures and Methodological Guidelines (2025), https://img.exim.gov/s3fs-
public/documents/2025--economic-impact-
procedures.pdf?VersionId=GZmfh71z6yfxrhrJq5Zg5lUhv_j7uYki. The Guidelines also require
EXIM to circulate its economic analysis, including the public comments, to the Departments of
Commerce, State and Treasury, the U.S. Trade Representative, and the Office of Management
and Budget for their comments. *Id.*

**D.  Under the Bank Act, EXIM may only provide support on rates, terms and
conditions that approximate those being offered by foreign export credit agencies.**

54.    Congress requires EXIM to walk a narrow path. While its mission is to help U.S.
exporters stay competitive in global markets, the Bank Act prohibits it from over-subsidizing
exports relative to foreign ECAs. Thus, EXIM may subsidize exports only to the extent needed
to compete with other ECAs; it cannot do more. EXIM is authorized to "support United States
exports at rates and on terms and conditions which are fully competitive with exports of other
countries." 12 U.S.C. § 635(b)(1)(B). While EXIM's rates, terms and conditions "need not be

identical" to those of other countries' ECAs, they can only "neutralize the effect of such foreign credit on international sales competition," and must be "consistent with international agreements." 12 U.S.C. §§ 635a-1(b), 635(b)(1)(B). Accordingly, the rates, terms and conditions offered by a competitor or established in international agreements impose a hard ceiling on the subsidies that EXIM can provide under the Bank Act.

55.    The Bank Act's requirement that EXIM's rates, terms and conditions be "consistent with international agreements" means that EXIM must comply with the Organization for Economic Co-operation and Development Arrangement on Officially Supported Export Credits ("OECD Arrangement"), the primary multilateral agreement governing ECA rates, terms, and conditions. It specifies that ECAs "shall not provide official support in excess of 85% of the export contract value." OECD Arrangement art. 10(c), OECD/Legal/5005. It limits how much ECAs can finance "local costs" to "30% of the export contract value." *Id.* art. 10(d)(1).[1]

### E.  EXIM and its Board must consider a transaction's adverse environmental and social effects and provide an opportunity for public comment.

56.    The Bank Act requires EXIM to "establish procedures to take into account" the potential adverse environmental impacts of projects it considers for support, and authorizes the Board to "approve financing after considering the potential environmental effects of a project" or withhold financing where those impacts will be unacceptable. 12 U.S.C. §§ 635i-5(a)(1)-(2). These procedures must provide for the public disclosure of "environmental assessments" and "supplemental environmental reports . . . including remediation or mitigation plans and procedures, and related monitoring reports." *Id.* §§ 635i-5(a)(1).

---

[1] Where official support for local costs exceeds 15% of the export contract value, the ECA must notify other Participants in advance, pursuant to Article 44 of the Arrangement, and must specify the nature of the local costs being supported. OECD Arrangement, art. 10 (d)(3).

57.    The Bank Act mandates that these procedures shall apply to, among others, any transaction involving a project for which: long-term support of $25,000,000 or more is requested; "the Bank's support would be critical to its implementation"; and "which may have significant environmental effects upon the global commons or any country not participating in the project, or may produce an emission, an effluent, or a principal product that is prohibited or strictly regulated pursuant to Federal environmental law." *Id.* §§ 635i-5(a)(1)(A)-(C).

58.    EXIM has implemented this statutory mandate by adopting its *Environmental and Social Due Diligence Procedures and Guidelines* ("*Environmental and Social Procedures*" or "E&S Procedures"), which govern its approach to assessing and managing project impacts on the environment, "local communities directly affected by the project," and "the people involved in the [project's] construction and operation." EXIM, *Environmental and Social Due Diligence Procedures and Guidelines*, s. I, ¶ 3, https://www.exim.gov/policies/exim-bank-and-environment/procedures-and-guidelines, The *Environmental and Social Procedures* specify the standards that EXIM uses to evaluate proposed projects and EXIM's role in ensuring projects comply with those standards.

59.    EXIM's *Environmental and Social Procedures* align with the due diligence and risk management standards and practices applied by the World Bank Group, peer export credit agencies, and major private sector project financiers. *See id.* s.I, ¶¶ 11, 20 (adopting the World Bank Group Guidelines set forth in the International Finance Corporation Performance Standards on Social & Environmental Sustainability (IFC Performance Standards) and the World Bank's Environmental Health and Safety Guidelines).[2]

---

[2] EXIM procedures are "intended to be consistent" with OECD Recommendation of the Council on Common Approaches for Officially Supported Export Credits and Environmental and Social

60.    The *Environmental and Social Procedures* require EXIM to evaluate private-sector projects against the host-country environmental guidelines and the IFC Performance Standards.[3] The IFC Performance Standards are widely used industry standards for assessing and managing a project's risks, including environmental and social impacts, the safety and security of workers and local communities, human rights, biodiversity, and climate change. EXIM cannot authorize a "Final Commitment" unless it has assessed the project's risks and impacts. *Id.* s.IV, B, Final Commitments, ¶ 6. EXIM must be assured the project can comply with the applicable guidelines throughout the life of its loan. *Id.* s.I, ¶ 11, 20-21; s.IV, B, Final Commitments, ¶ 6.

61.    The *Environmental and Social Procedures* require a more exacting review of "Category A" projects, which include large projects such as oil and gas development impacting a sensitive site, and that "have the potential to cause significant adverse effects." *Id.* s.II, Category A, ¶ 1. Among other things, an independent environmental and social consultant is required to advise EXIM as part of its due diligence process for limited-recourse project financing for Category A projects. The consultant must prepare reports on the project's risks, impacts, and compliance with applicable standards, and propose or opine on suitable action plans capable of bringing a project into compliance. *Id.* s.IV, B, Final Commitments, ¶ 3.

62.    Where a project "does not meet the applicable environmental guidelines," the Board can withhold financing, or if EXIM and the Board find that the project is capable of coming into compliance, EXIM may impose conditions on project performance. *Id.* s.I, ¶ 22; s.IV, B, Final Commitments, ¶ 6. This is typically done by requiring compliance with an

---

Due Diligence, which EXIM is subject to. EXIM has also adopted the Equator Principles, a social and environmental framework for financial institutions.

[3] For projects co-financed with multilateral development banks, EXIM may apply the respective bank's guidelines. If there is a conflict or gap between such guidelines and the applicable IFC Performance Standards and World Bank Guidelines, the more stringent guidelines apply.

enforceable Environmental and Social Action Plan incorporated into the financial documents. *Id.* s.I, ¶ 22; s.IV, B, Final Commitments, ¶ 6.

63.     Under the *Environmental and Social Procedures*, as part of its due diligence, EXIM "will review and take into account relevant information related to the potential risks and impacts of a project that is provided by stakeholders of the project, non-governmental organizations (NGOs) and interested parties." *Id.* s.III, C. EXIM must "make available" and post project information and link to the project's Environmental and Social Impact Assessment (ESIA or Environmental Impact Assessment) on its "Pending and Approved Transactions List" webpage no fewer than 30 days prior to "any Bank action with respect to financing," *id.* s.I, ¶ 9, 9(2), and "at least 30 calendar days prior to any decision by EXIM Bank to authorize a Final Commitment." *Id.* s.IV B, Final Commitments, ¶ 2. This is so "interested parties have sufficient time to review and provide information and comments." *Id.* EXIM must also make project Environmental and Social Management Plans, supplemental environmental reports, including remediation or mitigation plans, and related monitoring reports available for public consideration. *Id.* s.I, ¶ 9, 9(3); *accord id.* s.V.

64.     The *Environmental and Social Procedures* also require EXIM to engage in ongoing monitoring of project performance and compliance.

## II.    The National Environmental Policy Act.

65.     Congress enacted NEPA in 1969 to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

66.     To this end, NEPA requires federal agencies, including EXIM, to prepare an environmental impact statement for any "major Federal action[]" that "significantly affect[s] the

quality of the human environment," 42 U.S.C. § 4332(2)(C), and has effects in the United States. 42 U.S.C. § 4336e(10)(B)(vi). An environmental impact statement must describe (1) "the environmental impact of the proposed action," (2) "the adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)-(iii).

67.    EXIM must take a "hard look," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989), at "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii).

68.    NEPA guarantees that the relevant information will be made available to the public and provides a springboard for public comment. *Robertson*, 490 U.S. at 349. Accordingly, NEPA requires agencies to provide public comment periods that allow the public to see and weigh in on the agency's environmental analysis. *See* 42 U.S.C. § 4332(2)(C).

69.    The *Environmental and Social Procedures* recognize that EXIM must adhere to the NEPA review procedures for projects "that may significantly affect the quality of the human environment of the U.S." E&S Procedures, s.I ¶ 18. "For certain $CO_2$ emitting Projects, EXIM Bank's determination of whether further NEPA analysis is required will be posted on the Pending Transactions website. For 'fossil fuel projects', this determination will be posted for at least 30 days before Board consideration to ensure that interested parties are provided the opportunity to comment on EXIM Bank's NEPA determination associated with the pending transaction." *Id.*

## III.    The Administrative Procedure Act.

70.    The APA governs the public access and transparency of actions of all federal agencies. 5 U.S.C. § 552 et seq.

71.    Under the APA, a reviewing court "shall" set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; that are adopted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or that are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

72.    When an agency fails to satisfy a statutory requirement, as EXIM has, the action is "not in accordance with law and without observance of procedure required by law, in violation of Section 706 of the APA." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 93-94 (D.D.C. 2015) (cleaned up). Moreover, action is arbitrary and capricious when it is not the product of "reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quotation marks omitted). And agencies must "follow their own regulations, procedures, and precedents." *Nat'l Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980) (citations omitted).

73.    An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTS

### I.    Background of the Mozambique LNG project.

74.    The Mozambique LNG Project is a proposed $20 billion project that includes a network of 18 deep-water wells and a pipe system to collect the gas and bring it onshore, a facility to process, liquefy, and store the gas for shipping, and a dock to load the liquefied gas onto ships for export. In the initial phase, two liquefaction "trains" will produce 13 million tons

per year ("MTPA") with the capacity to expand to produce up to 43 MTPA. Some of the Projects' critical infrastructure will also be used by the neighboring Rovuma LNG facility, enabling an additional 18 million MTPA of production.

75.    The Project footprint is massive, covering approximately 7,000 hectares (27 sq. miles) of land, which has caused significant physical and economic displacement of local communities, with additional displacement to occur if the Project resumes operations. Offshore, it is located in the Mozambique Channel, a global hotspot of marine biodiversity that serves as a biological reservoir for the coastal East African region.

76.    The Project will substantially contribute to the climate crisis. The effect of its annual direct emissions are expected to exceed that of all of Mozambique's $CO_2$ emissions from 2023. A 2021 estimate indicates that the greenhouse gas pollution from using the LNG produced will be equivalent to the emissions from the aviation sector for all European Union member states combined.

**II.    EXIM's prior approvals of funding for the Mozambique LNG Project.**

77.    In April 2015, a consortium led by Anadarko Petroleum, a U.S. company, asked EXIM for a direct loan of up to $5 billion USD to support the Project.

78.    In January 2016, EXIM posted a link on its pending transactions webpage to the Project's 2014 Environmental Impact Assessment ("2014 EIA") for public comment to inform its environmental and social due diligence.

79.    EXIM's compliance checklist for this loan stated that EXIM sought review from the State Department for human rights concerns and use of security forces, receiving clearance on June 15, 2015, that a NEPA memo was required, and that its availability was posted on

August 30, 2016. EXIM's website asserted that EXIM did not need to do a NEPA analysis because its multi-billion-dollar loan was not a "major Federal action."

80.     EXIM categorized the proposed Project as a "Category A" project. EXIM's loan for this Project is limited-recourse project financing.

81.     In assessing the application as part of its required due diligence, EXIM and other prospective lenders worked with an independent environmental and social consultant to consider the proposed Project's compliance with its policies and requirements. EXIM also carried out a site visit. EXIM concluded that the proposed Project was not in full compliance with the applicable environmental and social standards. Nonetheless, it asserted that non-compliance could be addressed through an enforceable Environmental and Social Action Plan incorporated into finance documents.

82.     In assessing the original application, EXIM concluded that the proposed Project's new LNG capacity would exceed 1% of U.S. LNG production—thus causing "substantial injury" to the U.S., as defined in the Bank Act. EXIM determined a Detailed Economic Impact Analysis was required and posted an Economic Impact Notice in November 2018. Its August 2019 analysis found that under the market conditions then expected to exist when the Project's output would first be sold, the loan "will likely have a net positive impact on the U.S. economy." This determination was based in part on the assumption that LNG was "not currently, and not likely to become, in structural oversupply during the [loan's] repayment."

83.     In August 2019, prior to a Board meeting on August 22, 2019 to consider this loan, EXIM staff sent a memorandum to the Board detailing the transaction's provisions and risks, including an Environmental and Social Evaluation, a summary security analysis, and the Economic Impact Analysis.

84.    EXIM provided notice to and sought comment from Congress and the public. EXIM staff sent the comments it received through the notice and comment period to the Board.

85.    The Board approved a $5 billion loan for the Project on September 26, 2019. By then, the Project was owned by a group led by Occidental Petroleum Corporation, a U.S. company that had recently acquired Anadarko.

86.    Shortly thereafter, French oil giant Total acquired Occidental's interest in the Project and became the lead sponsor and operator. On May 14, 2020, EXIM's Board approved a new loan, with Total as the lead sponsor, that reduced the amount to $4.7 billion and expanded the scope of EXIM's financing to include the offshore portion of the facility.

## III.    The Project area has been engulfed in an armed conflict with alleged abuses.

87.    Since 2017, Cabo Delgado province, where the Project is located, has been—and continues to be—riven by conflict between the Mozambican government and insurgents known as Al-Shabab (separate from a Somali group of the same name) or Ahl al-Sunna wa al-Jamma. The insurgents have connections with the Islamic State, which has claimed responsibility for some of the attacks in Cabo Delgado, and are also referred to as ISIS Mozambique. The first major attack was in October 2017. After EXIM's initial approval in 2019, the conflict has substantially escalated.

88.    The insurgents are known for their gruesome attacks on civilians, which include raiding villages, beheading civilians, "burn[ing] homes and hack[ing] people to death," and, in recent years, the use of improvised explosive devices.

89.    Numerous groups have documented human rights violations against civilians by the Mozambican security forces responding to the insurgency.

90.     The conflict, ongoing violence, and resulting humanitarian crisis have been and continue to be covered by local Mozambican and international media as well as by civil society groups and conflict analysts.[4]

**A. The Project repeatedly suspended operations and ultimately declared *force majeure*.**

91.     In June 2018, media reported that Anadarko, the Project operator at the time, suspended some activities following a U.S. embassy warning of an imminent attack on Palma, a town near the Project where contractors lived. According to the media, Anadarko said it was "monitoring the situation after a spate of beheadings and kidnappings."

92.     In February 2019, insurgents attacked two Project convoys on the main road to the Project area (Afungi), killing one contractor and leaving at least six workers injured. Anadarko suspended its activities until May 8, 2019.

93.     Two days after Anadarko resumed activities, insurgents reportedly attacked a bus near Palma, shot an Anadarko contractor, killed another passenger, and kidnapped a woman.

94.     In 2019, Anadarko signed a Security Memorandum of Understanding with the Mozambican government for the deployment of military and police (the "Joint Task Force") and logistical support.

95.     In the fall of 2019, around the same time as EXIM's 2019 loan approval, media reported that the Mozambican government brought in Russian mercenaries from the infamous Wagner Group to support their fight against the insurgents. However, the group reportedly sustained significant losses and left shortly after.

---

[4] This is despite government restrictions on access by independent monitors, civil society, and media to areas most affected by the conflict.

96.    Violence escalated throughout 2020. In June 2020, eight people were killed in an attack on a Project sub-contractor's vehicle; three more were reported missing.

97.    As the security situation deteriorated, in August 2020, Total signed a new agreement with the government. Under that agreement, the government would assign more personnel to the Joint Task Force and the Force would "ensure the security of Mozambique LNG project activities in Afungi site and across the [Project's] broader area of operations."

98.    In December 2020 to early January 2021, insurgents launched attacks near the Project, including a village in the Project's concession built to resettle people the Project displaced. In response, Total suspended its onshore construction work.

99.    In March 2021, the U.S. State Department designated ISIS Mozambique "also known as Al-Shabab"—a Foreign Terrorist Organization.

100.    On March 23, 2021, Total announced it would resume Project activities with increased security measures. As the New York Times described, the Project "not the town [Palma], is the most secure place."

101.    The next day, insurgents attacked Palma, the base of operations for many Total construction workers. The New York Times reported that the insurgents' "target was the base for [the Project]" and that "government forces weren't able to defend Palma, leaving its citizens to mostly fend for themselves."

102.    Reports indicate that Al-Shabab killed hundreds of residents and at least 55 Project contractors, beheading many of the victims. Tens of thousands fled, both within and out of the Palma district, including to Quitunda, the village where locals who the Project displaced were resettled.

103.    According to news coverage, during the Palma massacre, approximately 200 foreign contractors and local people sheltered in the Amarula Hotel—"the center of contractor life in Palma." According to the coverage, and allegations in a subsequent lawsuit, no plan for their evacuation was in place, and Total refused to provide fuel for rescue flights by a private military contractor. According to the coverage, while some people were evacuated by helicopter, many fled in a 17-vehicle convoy, which was ambushed, and a number of people were killed.

104.    According to Total, "in the aftermaths of these attacks, security conditions in Palma district and around the Project site worsened," with "regular attacks every couple of weeks in and around Palma."

105.    By early April, Project activities fully stopped, and Total withdrew all field staff. On April 26, Total declared *force majeure*, stating that "[c]onsidering the evolution of the security situation in the north of the Cabo Delgado province in Mozambique, Total confirms the withdrawal of all Mozambique LNG project personnel from the Afungi site."

106.    In the wake of the *force majeure* declaration, Total notified Mozambican regulators of the "stoppage of all onsite activities . . . and of the impossibility of fulfilling the obligations that require presence onsite." Total stopped onsite environmental performance monitoring and implementation of the Environmental and Social Management Plan and associated plans, and cancelled all contracts for such monitoring, noting that these activities "can only be resumed when Project activities on site resume." All resettlement related field activities were likewise suspended, leaving many families who were already displaced by the Project without land or compensation.

**B.  There are reports of egregious abuses committed by the Mozambican security forces.**

107.    The U.S. State Department Country Reports on Human Rights and reports by Human Rights Watch and Amnesty International have documented grave human rights abuses by the Mozambican security forces (including military and police) dating back at least to 2015, when EXIM first started considering funding this Project.

108.    Prior to the Board's approval of the 2019 loan, the U.S. State Department 2018 Country Report on Human Rights Practices for Mozambique noted that "[t]he government's security force responses to [insurgent] attacks were at times heavy-handed and included arbitrary arrest and detention [and] harassment of civilians." These forces "detain[ed] suspects without judicial authorization" and there were "reliable reports of harsh interrogation measures" including torture or similar practices.

109.    A few months after the Palma attack, a Mozambican military unit operating out of the Project's gatehouse reportedly committed a massacre and other egregious human rights abuses at the Project site. According to reporting, in June 2021, the army told local civilians that it was planning a counterattack against Al-Shabab and advised them to seek sanctuary at a military base close to the Project. Hundreds of men, women and children walked to the base and sought refuge, but the soldiers accused them of being insurgents. Soldiers sexually assaulted women and locked hundreds of men in shipping containers at the entrance to Total's facilities for months. The soldiers beat, suffocated, starved, tortured, and eventually killed most of the civilian detainees. According to one survivor, only 26 made it out alive.

110.    Reports from Total from 2021 and 2022 to EXIM and other lenders include accounts of additional abuses by Mozambican security forces against local civilians. Total noted "regular community allegations of [Joint Task Force] human rights violations (limitation of

25

freedom of movements, petty extortion, physical violence and arrests/disappearances)" and that "community leadership's biggest concerns were intimidation, extortion and violence" by these forces.

111.    The reports also show that the relationship between the military and local communities is "particularly sensitive" as communities "blame the Project for bringing the [Joint Task Force] to Palma district." "The community thinks that the Project is also responsible for the military actions as the military are in the region to guarantee the security of the Project assets."

112.    On July 14, 2022, the U.S. House of Representatives passed a Resolution acknowledging the "armed insurgency" in Cabo Delgado and condemning the "violence, targeting of civilians, and terrorist attacks carried out by ISIS-Mozambique" and "reported human rights violations perpetrated by Mozambican security forces." The Resolution recognized that the conflict "has had dire consequences for human rights, security, and socioeconomic welfare."

113.    Reported abuses by the Mozambican security forces throughout the conflict include war crimes, sexual violence, extrajudicial killing, arbitrary detention, torture, harassment and extortion, and harassment and intimidation of journalists; there are also allegations of failure to protect civilians from Al-Shabab attacks.

**C.  There are official investigations underway into Total's actions during the Palma massacre and into the massacre at the Project site.**

114.    Relatives of victims and survivors of the Palma massacre filed criminal charges in France in 2023 against Total alleging it failed to protect its subcontractors. French prosecutors opened a preliminary investigation in May 2024. In March 2025, just days after EXIM approved the loan, the prosecutor opened a judicial investigation against Total for involuntary manslaughter and failure to assist a person in danger.

115.    In the United Kingdom, a coroner's inquest has been initiated to investigate the death of a British subcontractor for the Project who was killed during the Palma massacre.

116.    The allegations of atrocities committed at Total's gatehouse, by soldiers based there, are currently under investigation by the Mozambique Attorney-General's Office, the Mozambique National Commission for Human Rights, the Dutch Government, and U.K. Export Finance.

**D.  The conflict is ongoing.**

117.    While insurgent violence has ebbed and flowed, insurgents continue to terrorize the province to the present day.

118.    The Mozambique government brought in external support to respond to the insurgency. In July 2021, Rwanda deployed forces to the province. In August 2021, the South African Development Community deployed forces to combat "terrorism and violent extremism in Cabo Delgado." After the South African Development Community forces withdrew in 2024, thousands more Rwandan troops were deployed to and remain in Cabo Delgado. Analysts have recently expressed concern about the Rwandan forces' willingness and ability to protect civilians. There are also questions about whether the Rwandan forces will stay long-term.

119.    In 2023, according to Total, it terminated its MOU with Mozambican security forces, after a company commissioned report on the humanitarian situation in the area critiqued the Project's relationship with Mozambican security forces. According to Zitamar news, the company signed a revised agreement with the Ministry of Finance and the Ministry of Mineral Resources and Energies, and the joint force of Mozambican armed forces and police continue to provide security for the Project. State security forces are reinforced by Rwandan forces.

120.     There continue to be reports of human rights abuses by Mozambican security forces. In February 2024, media reported that the "Mozambican navy ha[d] been accused of indiscriminately killing or capturing anyone found fishing off the coast of northern Cabo Delgado."

121.     Insurgent attacks continue. In March 2024, Human Rights Watch reported "a new wave of deadly attacks" forcing thousands to flee. It found that while the "government [] downplay[s] the insurgents' threat, insisting that the security forces . . . have the situation under control [] recent events show that people in Cabo Delgado are far from being safe even in places previously considered secure and able to accommodate those displaced by the conflict."

122.     In December 2024, the United Nations found the insurgency was "gaining strength" and intensified Rwandan Defense Forces operations in insurgent-controlled areas "are further impacting civilians, compounding the crisis." In sum, "security is expected to remain volatile."

123.     In 2025, there have been weekly reports of violent incidents, including attacks on the main highway (N380).

124.     A United Nations report from March 7, 2025—before EXIM's approval of the new loan—states that in January 2025 "violence against civilians and armed clashes intensified."

125.     A May 2025 United Nations report states that the humanitarian situation in northern Mozambique, including Cabo Delgado, worsened significantly in April 2025 due to "escalating violence by non-State armed groups, resulting in widespread displacement."

126.     In May 2025, the U.S. Peace Corps announced that it "will close its country program in Mozambique" due to "ongoing security concerns and persistent operational challenges."

127.    At the end of May 2025, Total reportedly announced that it is revising its security plans. It now plans to make "the LNG Park area on the Afungi peninsula … totally inaccessible by land … Provisions, construction materials and site workers will all arrive by sea or air."

128.    As of the filing of this Complaint, Total has not lifted *force majeure*. But Total has resumed preparatory work, and after EXIM approved the new loan, it announced it will seek Mozambique's approval to lift *force majeure* so it can resume construction as early as summer 2025.

**E. The ongoing conflict has taken a devastating toll on the people of Cabo Delgado.**

129.    The conflict has claimed thousands of civilian lives, displaced over a million people at one point, and created a dire humanitarian crisis. Today, hundreds of thousands are displaced, and displacement is ongoing with the continuing violence.

130.    In March 2024, an officer with the Office of the United Nations High Commissioner for Refugees officer wrote about the situation in Cabo Delgado: "[E]very day is a fight for survival. . . . [P]eople have endured violent attacks and witnessed their loved ones being killed, mutilated, and raped, and their homes and businesses burned to the ground. Men and boys have been forcibly recruited into non-state armed groups []. Girls and women have been kidnapped and used as sex slaves. Livelihoods have been destroyed, and access has been cut off to basic necessities such as food, healthcare and education."

131.    Critical health facilities and water infrastructure have been damaged or destroyed. Humanitarian organizations, including the United Nations, have had difficulty reaching and delivering aid to affected regions, and have had to suspend operations at times.

132.    Moreover, throughout the conflict—including to the present day—the insurgents have targeted the main highway that runs through the province, making travel by road unsafe.

29

**F. The Project and the conflict are interconnected.**

133.    The Project fuels the insurgents' grievances, which include socio-economic marginalization and inequalities exacerbated by the discovery of natural gas.

134.    The Congressional Research Service has noted that "a key grievance is the state's historical marginalization of Cabo Delgado, one of Mozambique's poorest regions, and resulting high rates of poverty, socioeconomic inequality, and youth unemployment. The state's displacement of some villagers and transfer of their traditional lands to the Total gas project, the perceived low share of gas sector jobs given to locals, disruptions of livelihoods, and the influence of foreign extractive industry actors also have driven tensions. Human rights abuses and corruption in the context of counterterrorism operations also have spurred discontent."

135.    According to the International Crisis Group, "most" of the insurgents "are motivated by their perceived socio-economic exclusion amid major mineral and hydrocarbon discoveries in the region."

136.    Civil society groups and analysts explain that a militarized solution will not end the conflict; a sustainable solution requires addressing the conflict's roots.

**IV.    EXIM's "acting" Board unlawfully provided final approval for the 2025 loan.**

**A. EXIM's "acting" Board approved the 2025 loan without a quorum.**

137.    Total launched a major lobbying campaign in the United States to seek a new financing approval from EXIM before the 2025 Presidential transition, even though it had not lifted its declaration of *force majeure* due to the insurgency.

138.    When President Trump took office in January 2025, EXIM's Board had only one Senate-confirmed Board member and thus lacked a quorum of Senate-confirmed members.

139.    Since EXIM's Board is a multimember board governing an independent agency and a government corporation, the Vacancies Act cannot be used to make "acting" appointments to vacant Board positions.

140.    Rather than nominating candidates for Senate confirmation to fill the vacancies or waiting 120 days for a "temporary board" of Senate-confirmed members to take over—the only two alternatives Congress provided in the Bank Act—President Trump instead purported to install two unconfirmed "acting" Board members. On February 28, 2025, President Trump appointed James Cruse to be "acting" President and Board Chair and James Burrows to be "acting" Vice Chairman of the Board of Directors, without the Senate's advice and consent.

141.    On March 11, 2025, EXIM posted on its website the agenda for its first "acting" board meeting, to be held on March 13, 2025. The Project was listed on the agenda for approval with the statement: "review required: none."

142.    Two days later, on March 13, 2025, EXIM's "acting" Board approved the $4.7 billion direct loan for the Project.

143.    At the time of the vote, there was still only a single Senate-confirmed member of the Board and no quorum of Senate-confirmed members.

**B. EXIM approved the 2025 loan without providing any of the statutorily required notifications and comment periods.**

144.    The Bank Act requires EXIM to provide notice and permit comment every time the Board considers a loan as well as after a material change to an application. 12 U.S.C. § 635a(c)(10)(A), (D). The March 13 Board meeting was the last time the Board will consider the terms and conditions of this loan before disbursement; it is the Board's "final consideration" of this transaction.

145.    There were also a number of material changes to the application and conditions surrounding the Project since a prior Board approved the earlier loans in 2019 and 2020. As set forth below, the Bank Act itself makes the date when the commodity will "first be sold"—and thus the changes to the Project's construction and production start date resulting from the conflict—material to EXIM approval, and the economic, security, and human rights context is significantly different than what was considered before the prior approval.

146.    EXIM and the "acting" Board approved the 2025 loan without providing the statutorily required notices and opportunities to comment to the public, Congress, the Department of Commerce, or the Office of Management and Budget. The only public indication that the "acting" Board was going to consider final approval of the loan on March 13 was on the Board's calendar on its website, not the Federal Register, posted on March 11, just two days before the Board's vote.

147.    As noted above, the Bank Act also has a notice and comment period for input into the economic analysis. EXIM's policies and procedures, and NEPA, have further notice and comment requirements. EXIM did not provide any such notice and opportunities to comment on the 2025 loan prior to approval.

148.    As a result, EXIM did not consider the views, among others, of: (1) Members of Congress with regard to the substantial economic, trade, security, environmental, and human rights impacts of this project; (2) those who oppose foreign subsidies or believe the Project will compete with and threaten U.S. LNG projects and export terminals and/or the U.S. renewable energy industry; (3) Administration officials who may be concerned that the funding contradicts President Trump's policy goal to promote U.S. energy dominance; and (4) those like Plaintiffs who are concerned that the Project provides unlawful subsidies to the Project sponsor, will harm

the environment, and will subject local people to further human rights abuses, and who would have provided relevant information about the Project's impact on the ongoing armed conflict and the humanitarian crisis.

**C. EXIM approved the 2025 loan without conducting the required economic analysis to ensure that the Project does not harm domestic producers and the U.S. economy.**

149.    Despite the substantially changed production timeline and fundamental changes to the forecasted global LNG market, EXIM did not analyze the adverse impacts on the U.S. economy prior to final approval on March 13, 2025.

150.    EXIM must assess the competitive impacts of expanded foreign production on U.S. producers at the time the Project's production "will first be sold," and specifically whether, at that time, either LNG will likely be in global surplus or the financed production will compete with U.S. production. 12 U.S.C. § 635(e)(1)(A). Both circumstances exist for the 2025 loan, requiring EXIM to scrutinize whether the Project will substantially injure U.S. producers.

151.    When EXIM conducted its economic impact analysis in August 2019, it did so based on the expectation that production would begin in 2024. But *force majeure* has halted the Project for over four years, and now the Project's output is not expected to "first be sold" until 2029 at the earliest. EXIM approved the 2025 loan without considering current data as to the economic impacts in 2029. Thus, the "acting" Board approved this loan with no understanding— let alone a coherent analysis—of the costs and benefits to U.S. economic interests.

152.    In fact, current analyses show that: 1) LNG markets will be in oversupply at the time the LNG would "first be sold"; 2) production capacity is expected to compete with U.S. producers; and 3) this new production will cause substantial injury to U.S. producers of similar or competing commodities.

1.    Global Oversupply

153.    In 2019, analysts forecasted a relatively tight global LNG market in 2024; EXIM's review of expert forecasts found "little doubt" LNG supply "will fall short by 5-10% of satisfying demand sometime in the next five years" when production from the Project was supposed to begin.

154.    In the almost six years since EXIM conducted an economic analysis for the original 2019 loan, the production timeline for this Project and market dynamics have changed dramatically. Today, the expert consensus is that by 2029, the earliest point that production could now commence, global LNG markets will be in a protracted period of oversupply due to the near certainty of rapid supply growth and the very real possibility of weak demand growth.

155.    For example, the International Energy Agency—the world's most authoritative source of global energy projections—foresees a substantial LNG glut in the coming years. In 2023, it warned of "an unprecedented surge in new LNG projects" starting in 2025 that would push markets into surplus "at an uncertain moment" for demand. In 2024, it stated that "[e]xisting LNG export capacity and new capacity under construction is sufficient to meet projected demand in [the agency's baseline planning scenario] until 2040. This suggests that no further projects are required in the near term to satisfy demand." It further warned that advancement of alternative energy systems, or a market "wild card" such as a Russia-China gas supply deal, would "exacerbate the LNG glut."

156.    Private sector LNG analysts also predict oversupply. In January 2024, Bernstein Research forecasted that the upcoming wave of planned LNG export capacity would cause an LNG glut that would drive down global prices. In February 2024, Energy Intelligence warned of global LNG oversupply. In April 2024, Morgan Stanley noted that a "record wave of expansion" would cause "gas market oversupply to reach multi-decade highs over the coming years," and

S&P Global Commodity Insights remarked that global LNG prices would likely drop due to oversupply and over-investment. In July 2024, Bloomberg New Energy Finance forecasted that a "massive wave" of new projects coming online before 2030 will create a "new order" in which demand growth "will lag the expansion in supply, leading to a glut" and putting "increasing downward pressure on prices." It expects global oversupply starting in 2027, and supply outpacing demand by 11 percent in 2030. In October 2024, RBC Capital Markets warned of "an extended period of oversupply" likely persisting through 2030. In April 2025, the Independent Commodity Intelligence Services forecasted global oversupply from late 2026 through 2036, with annual oversupply peaking at 69 million tons between 2028 and 2032. Likewise, the Dutch bank ING anticipates a surplus from 2026 and 2027, depressing prices.

157.    Independent think tanks agree. In January 2024, the Oxford Institute for Energy Studies "project[ed] a glut of LNG in the late 2020s. . . LNG demand is likely to peak around 2030 or shortly thereafter, so all the capacity being built or expected to be built may be underutilised in the 2030s."

158.    Similarly, the Institute for Energy Economics and Financial Analysis (IEEFA) has measured the enormous new LNG supply capacity coming online, while detailing the market barriers that have slowed demand growth, particularly in the Asian markets seen as the main long-term drivers of global demand. IEEFA highlighted that LNG has not displaced coal in the power generation mix in China or India, undermining many of the industry's best targets for rapid demand growth. Thus, IEEFA expects a 40 percent increase in global LNG capacity from 2024 to 2028, and that this, combined with "lackluster demand growth," will "send global LNG markets into oversupply within two years."

159.    EXIM has considered none of this.

### 2.  Competition with U.S. Producers.

160.    Likewise, the risk that gas from the Project would directly compete with U.S. producers has significantly intensified. Even prior to the 2019 approval, industry experts cautioned that Project gas would compete directly with U.S. producers. But in approving the 2025 loan, EXIM did not consider that the risk that the financed production would compete with U.S. producers is now far greater.

161.    The coming oversupply conditions will likely mean curtailment of output from LNG plants and create significant financial challenges to large portions of the global LNG industry, including U.S. LNG producers and their workers, suppliers and their investors. In this environment, production from the Project will directly compete with U.S. production.

162.    For example, former U.S. Energy Secretary Rick Perry recently warned that the Project will compete with existing and proposed U.S. LNG export plants. Secretary Perry concluded that funding the Project would make a proposed $38 billion LNG export facility in Alaska nearly impossible to build.

163.    EXIM did not evaluate, nor did the Board consider, these market dynamics.

### 3.  Substantial Injury

164.    By definition, EXIM support for Mozambique LNG will cause "substantial injury" to U.S. LNG producers under Section 635(e)(1)(B). New overseas production that "exceeds 1 percent of United States production" is conclusively presumed to substantially injure U.S. producers. 12 U.S.C. § 635(e)(4). With new liquefaction plants currently under construction, U.S. LNG capacity will grow from 113 MTPA today to 180 MTPA in 2030. Thus, any project EXIM might support that would exceed 1.8 MTPA (the anticipated 1 percent threshold in 2030) would be subject to the heightened economic impact analysis requirement.

165.    The Mozambique Project is now targeting production to start in 2029 at the earliest with an initial capacity of 13 MTPA that may be expanded to 43 MTPA. Thus, the project would add 7 to 24 percent of U.S. 2030 LNG production capacity to global markets. What's more, the Project sponsors will build critical infrastructure that will also be used by the neighboring Rovuma LNG facility, facilitating an additional 18 million MTPA of production. That will be 10 percent of U.S. 2030 LNG production capacity. In total, the Project may unleash 34 *times* the production that Congress has determined will cause substantial injury in the United States.

166.    Because LNG will be in global oversupply when the Project's output "will first be sold" in 2029, the Project would directly compete with U.S. producers, and production would exceed the 1 percent statutory threshold for "substantial injury," the Bank Act prohibits EXIM from funding it, unless the Board determines that the Project's overall economic benefit to industry and employment in the U.S. outweigh the injury to U.S. producers and employment of the same, similar or competing commodity. 12 U.S.C. § 635(e)(3). But EXIM staff did not analyze or solicit comments on, and the "acting" Board did not consider, the actual costs and benefits to U.S. producers and workers in 2029—when the Project's output "will first be sold"— based on current data, and in light of the coming glut. Accordingly, the "acting" Board finally approved EXIM financing in 2025 without making the specific determination that the statute requires.

   D.  **EXIM approved a loan that was not necessary to "neutralize" foreign ECA support, and over subsidized local costs.**

167.    Because the Bank Act requires that EXIM's support can only "neutralize the effect of . . .foreign credit on international sales competition," §§ 635(b)(1)(B); 635a-1(b), EXIM may only provide support where a foreign ECA is actually supporting a competitor's bid, and

may not provide larger subsidies to U.S. exporters than the foreign ECA would provide to its exporters. Here, EXIM has violated both restrictions.

168.    EXIM may not support the bid of a U.S. exporter unless that company faces direct competition for the same goods or services from a foreign company that is being subsidized by a foreign ECA.

169.    On information and belief, EXIM has never adequately evaluated whether U.S. companies face *bona fide* competition for specific work on this Project from foreign companies that are receiving equivalent foreign ECA support.

170.    When the 2019 loan was approved, EXIM claimed (citing no evidence) that it had "been told" that without its support, Russia and China might have funded the Project. This is not the evidence needed to meet Congress's stringent "neutralize" requirement. In response to this kind of laxity in determining whether EXIM's funding was actually needed, Congress pushed EXIM to adopt a more rigorous approach, which EXIM adopted in an "Additionality Policy" in May 2020, after the 2019 loan was approved.

171.    Even if the Project might have received funding from a Russian or Chinese export credit agency, that does not justify EXIM's involvement. The supposed financing must subsidize direct competition with U.S. contractors. EXIM made no claim that it would do so.

172.    Rumors of Chinese or Russian financing were highly unlikely to have been credible then, and are even less likely to be so today. China's banks do not fund this kind of project. Neither the Export Import Bank of China nor the China Development Bank have funded any deepwater natural gas drilling projects this century. They have funded just one LNG facility in the last 25 years and have funded no natural gas projects or fossil fuel extraction projects of

any kind since 2019. Russia's export credit agencies cannot participate because they are under sanction by Western governments, including France, Total's corporate domicile.

173.    Moreover, the prospect that other foreign ECAs would step in and fund a U.S. competitor if EXIM did not support this Project has diminished substantially since the Project was halted. Many leading exporting countries, including the largest European Union exporters,[5] as well as the United Kingdom, Canada, Norway, Australia, and Switzerland, have adopted tight restrictions on export credit support for fossil fuel projects. As a result of these policies and the reports of human rights abuses associated with this Project, both the United Kingdom and Netherlands ECAs, which previously planned to fund the Project, are reconsidering their support.

174.    Despite these dramatic changes in the export credit markets and Project context, in approving the 2025 loan, EXIM did not assess, and the "acting" Board did not consider, whether EXIM support is actually needed to level the playing field for U.S. exporters by "neutraliz[ing] the effect of such foreign credit on international sales competition." EXIM has provided no evidence that any foreign ECA was subsidizing a bidder competing for the same work as each of the U.S. exporters EXIM seeks to support on this Project.

175.    EXIM also appears to be subsidizing this Project more lavishly than the Bank Act permits, by funding more "local costs" than the OECD Arrangement allows. In 2020, such costs were capped at 30 percent; today they are capped at 50 percent of the export contract value.

176.    When EXIM approved a $5 billion loan to the project in 2019, it asserted that its subsidies would support about $3 billion worth of U.S. exports. EXIM has not publicly estimated the value of the subsidized exports since the loan value was reduced to $4.7 billion in 2020. But

---

[5] For example, Germany, France, Italy, Spain, Belgium, Finland, Sweden, Denmark, have all adopted restrictions.

even assuming the $4.7 billion dollar loan still supported the same $3 billion of exports, EXIM's loan should have been limited to $3.45 billion under the OECD's "85 percent" and "local cost" rules in place in 2020, and to $4.05 billion under the rules in place now. It has oversubsidized the Project by $650 million to $1.25 billion.[6]

177.    Moreover, on information and belief, EXIM funds considerably more local costs than its competitor ECAs are willing to support. While peer ECAs will only fund local costs contained within an export contract (such as for the installation of an exported piece of equipment), EXIM finances local costs outside the contract as well. This allows EXIM to subsidize overseas projects in ways that its competitors will not and that have no direct relationship to U.S. exports. On information and belief, EXIM is funding such local costs here, in violation of the Bank Act's restriction that it only provide funding that approximates and "neutralizes" the rates, terms, and conditions provided by foreign ECAs.

**E.    EXIM's "acting" Board failed to consider the risks from the ongoing conflict and humanitarian crisis, staff failed to consider most of these issues, and EXIM provided no public notice or comment opportunity.**

178.    Prior to its initial approval in 2019, EXIM knew that the "the insurgency [was] highly likely to target the Project throughout its lifecycle," there was an "escalating threat to communities and the Project from the insurgent groups," and that the Mozambican security forces were "incompetent." EXIM overlooked this risk with catastrophic consequences.

179.    Since the 2019 approval, Al-Shabab escalated its insurgency in the area, causing a multi-year conflict and humanitarian crisis. The insurgency targeted the Project, attacking Palma,

---

[6] The cap in 2020 would be calculated as ($3 billion x 85 percent) + ($3 billion x 30 percent) = $3.45 billion. If the current cap is applied, the cap would be $4.05 billion. ($3 billion x 85 percent) + ($3 billion x 50 percent) = $4.05 billion. Under that cap, EXIM has oversubsidized the project by $650 million.

and Total declared *force majeure*. Mozambican security forces guarding the Project allegedly committed grave human rights abuses against local civilians, including the "containers massacre" at the Project site. Thousands of foreign troops have been brought in, but there is no way to know if they will remain for the duration of the insurgency. *Force majeure* was still in effect when EXIM approved the 2025 loan and still is. The violence and insecurity in the region continues and is exacerbated by the Project.

180.    EXIM and the Board were required to consider and evaluate the risks from this ongoing conflict and whether the Project can operate in a manner that complies with its *Environmental and Social Procedures*. The "acting" Board appears not to have considered any of these risks. And, while EXIM states that it considered "the physical security risks to the Project," that is—on its face—inadequate to comply with its obligations and plainly insufficient given the gravity of the situation.

1. <u>EXIM's Board rushed the Project through final approval without considering the Project's security, humanitarian, and human rights risks.</u>

181.    EXIM's "acting" Board granted final approval of the 2025 loan without considering the Project's profound conflict, security, humanitarian, and human rights risks.

182.    EXIM's March 19, 2025 press release announcing the final approval asserted that the Board approved only an "amendment" containing "no material change from the original approval" of the 2019 loan. It described the "amendment" as only "extend[ing] certain dates" and making other unspecified "related changes in connection with the restart of project construction operations" following the April 2021 *force majeure* declaration. Thus, the "acting" Board considered only technical changes to the dates in the Project documents and "related changes" necessary to reflect the restart of construction.

183.    The "acting" Board apparently did not consider the escalated conflict and humanitarian catastrophe, the Project contractors who had been killed, the Mozambican security forces' alleged rapes and murders at the Project's gate and their years of documented human rights abuses, or the deployment of thousands of foreign soldiers and police officers, to be "material." But these changes to the Project's security and humanitarian context have dramatically altered the risks of the Project and of EXIM financing.

184.    Evidently, EXIM did not even consider the "security related *force majeure*" itself—still in force at time of approval—to be a "material change from the original approval" that would require Board review.

185.    These material changes render obsolete EXIM's 2019 analysis of the risks and impacts to the Project and local communities, and of avoidance and mitigation options. But the "acting" Board did not consider the current security risks to the Project and whether Total has appropriate management plans and mitigation measures to operate safely in an active conflict zone. The "acting" Board did not consider whether the Project complies with EXIM's *Environmental and Social Procedures* and the applicable environmental guidelines they reference.

186.    Specifically, the Board did not consider (1) material changes in the security environment after the insurgent attacks; (2) the fact that the Project's original security plan to outsource security to a Mozambican military that EXIM understood at the time to be "incompetent" proved catastrophically misguided; (3) the current security situation, including the risks that resumed operations will provoke further attacks on workers and neighboring communities by Al-Shabab and/or security forces; (4) whether the Project's revised security plan, which appears to rely on foreign troops, can be sustained throughout the life of the Project;

(5) allegations of human rights violations and unlawful killings at the Project site, allegations of Total's responsibility for the death of subcontractors during the Palma massacre, and the implications of the ongoing civil and criminal investigations; and (6) the risk that, once the Project resumes operations and lifts *force majeure*, it will be forced to declare *force majeure* and stop again, potentially delaying or jeopardizing repayments to EXIM.

187.    These changes to the Project context pose significant new material risks not only to workers and neighboring communities, but also to EXIM itself. An ongoing insurgency, a volatile security situation, an alleged massacre at the Project site, a still-operative declaration of *force majeure*, pending investigations, and the extreme risks that restarting the Project will put workers and surrounding communities in further jeopardy all entail substantial legal, financial, reputational, and moral risks.

188.    Any reasonable Board of any responsible lender would consider these issues to be integral to its decision-making. But the "acting" Board of EXIM, one of the Project's largest sources of financing, did not consider them at all. While Board approval without considering material circumstances would be unlawful and reckless for the final approval of any large-scale infrastructure project, it was unconscionable here given the gravity and potential consequences of the changes to the Project's security context, the ongoing armed conflict, and the humanitarian crisis to Project workers and local people.

2.    EXIM's staff did not adequately assess the risks and impacts from the Project's security situation and the conflict.

189.    Although EXIM's "acting" Board did not assess *any* of the Project's current risks, it likely could not have meaningfully done so even if it had tried, because EXIM's staff's analysis was wholly inadequate.

190.    EXIM's March 2025 press release claimed that staff had found that "security risks to the Project had been properly addressed." That assertion was proven wrong weeks later when in May, Total announced it was overhauling its security plans. Thus, Total has now determined that the plans EXIM staff thought were adequate are in fact inadequate. And EXIM approved the loan without assessing what is now the operative security plan.

191.    Regardless, it appears that EXIM staff largely failed to conduct its required due diligence. EXIM's *Environmental and Social Procedures* require EXIM to thoroughly evaluate "the nature and extent" of the risks associated with the Project and "the effectiveness of proposed mitigation measures" based on current conditions. But on information and belief, EXIM staff did not fully evaluate the current risks the ongoing conflict and the Project's security arrangement pose to local communities, or the adequacy of the mitigation measures Total has proposed to implement, prior to the Board's final 2025 approval. Continued reliance on a previous assessment from 2019 would be unreasonable given the profound security, demographic, social, and humanitarian changes in the intervening years.

*a.   Reviewing the Project's physical security is not sufficient.*

192.    EXIM's March 2025 press release claimed that staff "reviewed the physical security situation of the project," *i.e.* only the "security risks *to the Project.*" EXIM has given no indication of the scope of that review. And aside from that, EXIM only refers to the due diligence conducted prior to the Board's approval in 2019 when the circumstances were completely different.

193.    On information and belief, EXIM's assessment of "physical security" focused narrowly on, as it said, the "security risks *to the Project,*" and did not consider other key conflict and security risks, including risks to affected communities. On information and belief, contrary

to what its policies require, EXIM did not "evaluate," "thoroughly review," and/or ensure that the Project has properly assessed: risks to communities from the Project's security arrangements; the risk that restarting the Project will exacerbate or expand the conflict; and the risks to communities and workers posed by the insurgency.

194.    EXIM must also evaluate and ensure the Project has properly assessed the risks created by the forces securing the Project, including their human rights records, to ensure that they will respond lawfully to security issues and are not implicated in past abuses. EXIM's clients "should not . . . use any individuals or companies that have abused or violated human rights in the past." On information and belief, before the Board approved the 2025 loan, EXIM staff did not consider the risk that security forces pose to local people or evaluate whether the Project can ensure security "is carried out in accordance with relevant human rights principles and in a manner that avoids or minimizes risks to the [a]ffected communities." This evaluation is critical: the Project is in a conflict zone, with security forces that have allegedly committed grave human rights abuses, including at the Project's gate.

195.    Independent investigations into the alleged June 2021 abuses at Total's facility, as well as into Total's conduct during the Palma attack in April 2021, are still ongoing. On information and belief, EXIM did not conduct its own investigation. EXIM concedes that its staff have not visited the Project to verify the security situation since *force majeure* was declared.

196.    Moreover, EXIM received a review and "clearance" from the State Department in June 2015 regarding human rights concerns and use of security forces. The clearance was already outdated by the time of approval in 2019. A Congressional Research Service report from September 12, 2019, a week and a half before EXIM's initial approval, noted that "according to the State Department, Mozambique's government lacks adequate capacity to deal with the

'complexity of violent extremism,'" and noted reports of human rights abuses by state security forces in their response to the insurgents. The State Department review is now 10 years old. It did not consider the intervening events, including abuses by security forces guarding the Project. On information and belief, EXIM did not seek or receive State Department clearance in 2025.

197.    In contrast to EXIM, the Netherlands Government as part of its reassessment of the Project commissioned an independent analysis of the Mozambican security services' alleged human rights violations associated with the Project, including the "roles of various security actors in the region and their relationship with project owner Total."

198.    The U.K. Export Finance also commissioned an independent investigation of the alleged human rights violations by Mozambican security forces linked to the Project and the measures put in place to prevent potential abuses from recurring. The U.K. Export Finance is also "conducting relevant due diligence," which is not limited to the security situation; the agency has stated it will "take proper account of relevant factors, including its Environmental, Social and Human Rights Policy, in its approach to the transaction."

199.    EXIM must evaluate whether, and ensure that, the Project operator meaningfully consulted with affected communities regarding security arrangements and disclosed its updated security plans to those communities. On information and belief, EXIM did not do this, and communities have not been properly consulted on security issues.

200.    EXIM's 2019 Evaluation for the Project stated that neither EXIM nor the independent environmental and social consultant undertook a field review of the Project's emergency response capabilities, noting "there is no obvious risk." While that conclusion was suspect in 2019, it is absurd today, given that an emergency response has since been necessary and proved incapable. Despite that, no such field review was done prior to the 2025 approval,

and on information and belief, the independent consultant did not conduct the required assessment.

                  *b.   The new operating environment renders prior assessments obsolete.*

201.    The new reality of operating amidst an armed conflict and humanitarian crisis affects the Project's and communities' security as well as health and safety, resettlement, engagement with affected communities and other stakeholders, and other critical issues EXIM must evaluate. Hundreds of thousands of people continue to be displaced today. Thus, the composition of the affected communities has changed, rendering the prior assessment of risks, impacts, mitigation measures, and management plans obsolete.

202.    Yet, EXIM stated only that it "review[ed]" the "physical security" risks to the Project itself, and otherwise references its due diligence done prior to 2019. That plainly was not based on current circumstances, and does not account for the current risks and impacts.

203.    For example, since 2019, Plaintiffs have raised publicly—and to EXIM—numerous issues with the resettlement process, including that resettlement must be reassessed given that families and communities are dynamic and local populations changed due to the conflict. They have also informed EXIM that regional insecurity limits safe access to fields and the coast, impacting displaced families' livelihoods and subsistence. A September 2023 report Total commissioned highlighted a number of issues with the resettlement process. EXIM needed to ensure that the Project has an updated census and resettlement plan that respects peoples' rights and is adequate to address the current situation, but did not.

204.    EXIM's procedures and applicable standards recognize that identification of risks and impacts should be based on current information, and changing situations can "affect the efficacy of mitigation measures," and require revised plans. For example, emergency

management plans need to be "revised … to reflect changing conditions," and a new census may be required when time passes between the completion of the census and implementation of the resettlement plan, with intervening population movements.

205.    Prior to approval in 2019, EXIM's memo to the Board noted that the 2014 EIA had "deficiencies" in "identif[ying] [] risks and impacts," and needed to be redone given the "changing conditions." The Project provided updated assessments and plans to the independent environmental and social monitoring consultant and the lenders. Yet, despite far more significant changes in circumstances since then, possibly aside from plans regarding the Project site's physical security which are now outdated, EXIM appears not to have required or evaluated updated assessment and management plans prior to its March 2025 approval.

206.    Following EXIM's 2019 approval, Plaintiffs raised concerns regarding the security situation, the alleged human rights abuses, and the evolving conflict, including the adverse impacts on people waiting for resettlement and/or compensation, and called on EXIM to do comprehensive due diligence prior to any new approval of funding.

207.    Plaintiffs also provided EXIM an independent assessment they commissioned from the non-profit Uprights of Total's human rights due diligence process in relation to the Project, in light of indications that Total was considering restarting the Project. The report found that the due diligence "disregard[ed] . . . the armed conflict," and thus "almost entirely disregard[ed] the potential and actual human rights impacts of the Project in relation to the armed conflict." It also highlights adverse impacts of the conflict on the resettlement process. EXIM should have reviewed and assessed the concerns raised through the materials shared.

*c. Failure to provide notice or a comment opportunity for its due diligence.*

208.    EXIM did not provide the required notice or make any recent assessments of any environmental and social issues publicly available for comment prior to its March 2025 approval.

209.    On at least three occasions since August 2024, FOE asked EXIM for the Project's updated environmental and social monitoring reports. EXIM never responded and has not provided the reports. FOE also asked EXIM when the Project would be posted on the "Pending Approvals" webpage, signaling that EXIM is doing its due diligence and triggering the opportunity for interested parties, like Plaintiffs, to comment. While EXIM posted the Project on its "Pending Approvals" page prior to its 2019 approval, it removed the Project from that page following that approval. EXIM did not post the Project on the "Pending Approvals" page while it was considering the 2025 approval. It did not post any updated project information or ESIA, nor did it disclose any updated Environmental and Social Management Plans, remediation and mitigation plans, or monitoring reports. And EXIM approved the loan with two days' notice.

210.    As a result, prior to the 2025 approval, EXIM never permitted interested parties like Plaintiffs to comment on recent security, humanitarian, human rights and social developments; the Project's current risks and impacts; or whether there are effective management plans in place that address each of these risks and impacts.

211.    Without such comments, EXIM staff could not have properly considered (and did not properly consider) any of these issues or ensured that the Project complies with EXIM's *Environmental and Social Procedures* and the applicable environmental guidelines.

**F.   EXIM and its "acting" Board failed to consider additional environmental and social effects.**

1.   <u>EXIM was informed of substantial environmental and social issues connected with the Project that it should have evaluated.</u>

212.    Before and since initial approval in 2019, Plaintiffs and others have raised with EXIM ongoing environmental and social concerns regarding the Project and Total's implementation of the social management plan, including about the Project's: (1) displacement of local residents from their homes and farms, without adequate consultation or compensation; (2) economic impact on farmers, fisherpeople, and intertidal collectors; (3) severe environmental damage, including destruction of critical local ecosystems; (4) significant contribution to climate change; and (5) ongoing insecurity.

213.    Plaintiffs have shared testimony from project-affected people with EXIM, as well as the Uprights report highlighting concerns with Total's human rights due diligence. All of this raised significant risks and impacts that EXIM needed to evaluate to ensure the Project can comply with its *Environmental and Social Procedures*, including the applicable environmental guidelines. The information provided highlights areas of noncompliance, yet EXIM did not evaluate or adequately evaluate this information. EXIM thus ignored dire risks and impacts to Project-affected people.

214.    In November 2022, in response to a grievance complaint Plaintiffs filed, EXIM stated it could not address several of the issues raised because of the ongoing *force majeure*, but that it would "review the status of the project and its compliance with requirements to mitigate the potential for adverse environmental and social impacts," when Total "decides to resume development of the Project." Yet, EXIM does not appear to have done such an assessment.

2.    EXIM failed to evaluate the Project's climate risks and impacts.

215.    EXIM's standards require an evaluation of the Project's climate-related risks, impacts (including cumulative impacts and impacts on communities), alternatives, and mitigation and adaptation measures based on the "most current climatologic data."

216.    NEPA also requires EXIM to take a "hard look" at actions that "significantly affect[s] the quality of the human environment" and have effects in the United States, and to permit comment on its analysis. It is "reasonably foreseeable" that the Project's direct emissions will have a "significant effect" on the environment in the United States. 42 U.S.C. § 4332(2)(C). As described below, the Project's direct emissions will have a "significant effect" on the atmosphere, and thus the global climate, and therefore will have effects in the United States. EXIM failed to consider the Project's effects in the U.S. and permit comment on its analysis. Instead, EXIM erroneously asserted that it did not need to do a NEPA analysis because its multi-billion-dollar subsidy is not a "major Federal action."

217.    The Project will significantly contribute to climate change with impacts globally, including in the U.S. and Mozambique, from its direct (Scope 1) greenhouse gas emissions alone and when combined with its indirect (Scope 3) emissions. EXIM did not consider these effects.

218.    The Project's 2014 EIA estimates annual direct emissions from the Project's operation to be "approximately 13 MtCO₂e" (million metric tons of $CO_2$ equivalent) when in full production with six trains. The EIA and 2020 update concluded that the impact from these emissions will be "major." Indeed, they exceed all of Mozambique's $CO_2$ emissions from 2023.[7] The EIA does not assess the Project's annual or lifetime indirect greenhouse gas emissions, which are primarily comprised of the carbon pollution that will be released from the intended burning of the LNG the Project will produce. These emissions have been estimated to be 116 MtCO₂e annually, at full capacity. EXIM never considered this greenhouse gas pollution.

219.    EXIM did not evaluate climate change contributions, risks, or impacts in its 2019 Environmental and Social Evaluation of the Project. For instance, the Evaluation does not

---

[7] According to World in Data, Mozambique's annual $CO_2$ emissions from 2023 were 8.02MtC0₂.

consider whether Total properly assessed the Project's direct and indirect contribution to climate change, or the risks and impacts associated with climate change, including on the Project, globally, in the United States, and on local residents, communities and ecosystems. Nor did EXIM consider existing climate impacts that the Project will exacerbate, the Project's climate-related alternatives, or climate-related mitigation or adaptation opportunities.

220.    If EXIM had evaluated such climate change concerns, they should have recognized that the EIA was inadequate. For example, the EIA merely focused on direct greenhouse gas emissions, their impact on Mozambique's national emissions, and resource efficiency measures. The EIA does not include a breakdown of its calculations or detailed assumptions, inhibiting an assessment of the accuracy and completeness of its estimates. Further, assessing the Project's direct emissions impact on Mozambique's national emissions is not equivalent to assessing the Project's direct, indirect and cumulative contribution to climate change, its climate risks and impacts, and alternatives and adaptation measures. The EIA did not do that assessment.

221.    EXIM did not conduct any updated climate due diligence or provide notice and an opportunity to comment prior to its approval in 2025.

222.    Moreover, the climate-related assessments conducted in, or before, 2019 are outdated now; the world's climate has been further destabilized, and current science reveals greater risks and impacts and more challenging mitigation pathways. EXIM's procedures require it to ensure that a climate assessment is based on "the most current climatologic data."

223.    Indeed, the 2014 EIA that the Project operator submitted to EXIM prior to its 2019 approval contains climate data from 2007-2012. Since then, climate forecasting models and direct observations have improved and there has been advancement in, and new

methodologies for, determining a Project's climate impact, including the social cost of greenhouse gases and the mortality cost of carbon.

224.   Current science has better identified local and regional risks associated with climate change that were not accounted for in the materials before EXIM in 2019. Mozambique is one of the countries most vulnerable to climate change, and its vulnerability has increased since EXIM's approval in 2019, more than the baseline data used in the 2014 EIA predicted.

225.   For example, the 2014 EIA states that Cabo Delgado Province is not cyclone-prone. However, updated climate science shows that northern Mozambique is now prone to more frequent landfall of tropical cyclones and to higher intensity cyclones. The entire coast of Cabo Delgado, including Palma, is now classified as a "Very High Cyclone Susceptible Region." Cyclones have hit Cabo Delgado multiple times since EXIM's 2019 approval, causing extensive damage to infrastructure and resulting in fatalities and significant displacement. In 2019, EXIM knew that cyclones demonstrated the "considerable climate risk of operating in Mozambique," but failed to require consideration of the most current science and to require corresponding risk and impact assessments as well as consideration of alternatives and mitigation/adaptation measures.

226.   Recent reports from the Intergovernmental Panel on Climate Change (IPCC), the leading international body for assessing climate change, and other scientific reports have new information about the climate-related risks for Mozambique and the region. These reports project increases in the frequency and/or intensity of extreme heat, marine heatwaves, ocean

acidification, coral bleaching, and the acceleration of sea level rise, with increased levels of warming.

227.    Since initial approval in 2019, global impacts and risks are also projected to be far more dire. Recent climate science, described in the IPCC's most recent Assessment Report (AR6) has documented the severe harms to people and the environment that are already occurring at current levels of warming. It warns about the impacts of continued temperature rise, cautioning that any increase above 1.5°C above pre-industrial levels, even if temporary, will cause further irreversible harm and catastrophic consequences for people and ecosystems worldwide. These realities are particularly important for a country like Mozambique given its large climate change vulnerable populations along the country's extensive flood-and -cyclone-prone coastline, dependency on agriculture and fisheries, and extreme poverty.

228.    Climate science since 2012 is clear that there is no room for new fossil fuel projects if the world is to meet the internationally agreed goal of limiting warming to 1.5°C. According to the IPCC AR6, "emissions from existing fossil fuel infrastructure without additional abatement would exceed the remaining carbon budget for 1.5°C." In 2021, the International Energy Agency reached a similar conclusion. The world *already passed* an average increase of 1.5°C in 2024 for the first time. The Project will contribute to increasing climate harms across the globe and in Mozambique.

229.    The EIA evaluated the Project assuming it would come online in 2018. Current predictions are 2029 at the earliest. Now, the Project will operate during an LNG glut, in years with more severe climate impacts and into years where the scientific consensus is that the world should have net zero emissions. An assessment of climate impacts based on the current timeline, in light of the current science is critical to evaluating the Project's climate risks and impacts and

its compliance with EXIM's *Environmental and Social Procedures*. But EXIM did not do such an assessment. It did not consider the risks and impacts based on current baseline information and science—or whether the Project properly assessed these risks, impacts, and any mitigation or adaptation measures—as part of its approval in 2025.

3. Neither EXIM nor the "acting" Board considered the Project's impacts on the critical habitats of the endangered species, including the whale shark, as required by EXIM policy.

230.    The *Environmental and Social Procedures* require EXIM to ensure the conservation of biodiversity and the proper management of living natural resources and habitats. The *Procedures* adopt particularly stringent protections for "critical habitats" with high biodiversity values. These include habitats of significant importance to "endangered" or "critically endangered" species (as listed on the International Union for the Conservation of Nature Red List of Threatened Species); habitats supporting globally significant concentrations of migratory species and/or congregatory species; and highly threatened and/or unique ecosystems.

231.    In such areas, EXIM clients "will not implement any project activities unless all of the following are demonstrated:"

No other viable alternatives within the region exist for development of the project on modified or natural habitats that are not critical;

The project does not lead to measurable adverse impacts on those biodiversity values for which the critical habitat was designated, and on the ecological processes supporting those biodiversity values;

The project does not lead to a net reduction in the global and/or national/regional population of any Critically Endangered or Endangered species over a reasonable period; and

A robust, appropriately designed, and long-term biodiversity monitoring and evaluation program is integrated into the client's management program.

232.    The adverse impacts of the Project must be assessed and managed in light of the cumulative effect of "other existing, planned or reasonably defined developments" including, here, several other large-scale offshore LNG extraction and development projects in the Northern Mozambique Channel.

233.    The Project will be drilling, dredging, laying pipelines, and shipping its LNG in globally important ocean habitats for endangered and critically endangered species. One example is the whale shark (*Rhincodon typus*), a gentle filter-feeder that is the largest fish on Earth. The International Union for the Conservation of Nature recognizes the whale shark as "endangered" because its global population is "largely depleted" and decreasing. Following the global trend, whale shark populations in the Mozambique Channel are declining, with sightings dropping by about 80 percent between 2005-2016.

234.    Whale sharks both migrate through and may congregate in the affected waters. Accordingly, the impacts of Project operations on whale shark habitat and populations should have been carefully assessed, and EXIM should not have authorized funding unless the four preclusive criteria were evaluated and found not to apply.

235.    The construction of drilling platforms and sea floor dredging necessary to implement the Project will adversely affect whale shark habitat. In addition, whale sharks are vulnerable to ship strikes from the dramatically increased shipping traffic that will be necessary to facilitate construction, ferry workers, and ship the Project's outputs to overseas markets.

236.    Although the Project's environmental impact assessment recognizes that whale sharks may be present in the affected area, neither EXIM nor the Project operator analyzed the

Project's impacts on the whale shark populations, or of the cumulative harms whale sharks will suffer because of the constellation of LNG projects in the region. Indeed, neither the Project's original EIA nor its Environmental Social Health Impact Assessment Executive Summary and Update even recognize that whale sharks will be impacted by the Project in any way.

237.    Another example is the coelacanth (*Latimeria chalumnae*). Coelacanths, colloquially called "living fossils," are among the oldest fish species on Earth, having swum the oceans for 400 million years. Once thought to be extinct, they are now considered "critically endangered."

238.    The coelacanth inhabits the East African coastline, to the north and south of the Project area and in Madagascar and Comoros across the Mozambique Channel. Potential coelacanth habitat has been identified within the Project affected area, including undersea canyons and caves near the mouth of Palma Bay and the nearby Tecomaji and Rongui islands.

239.    Potential coelacanth habitat will be impacted by the two planned undersea pipelines that will connect the Project's offshore drilling sites to its LNG processing plants on the Afungi Peninsula. Both will cut across undersea canyons and shoreline coral reefs. In addition, toxic dredging waste (which smothers bottom dwelling creatures and reduces water quality) will be dumped in an undersea canyon at the east end of Palma Bay that also has been identified as potential coelacanth habitat.

240.    Despite evidence that coelacanths exist near and may be present in the Project area, the EIA did not adequately assess whether coelacanths are present or the potential impacts of Project activities on coelacanth populations.

4.    <u>EXIM failed to properly consider other critical impacts on biodiversity and the health of local ecosystems because the Environmental Impact Assessment produced by the Project Sponsors was flawed and inadequate.</u>

241. The 2014 assessment of the Project's environmental impacts released by its sponsors downplays or underestimates key environmental risks that EXIM and its Board should have fully considered. For example, the EIA failed to: fully account for cumulative impacts; conduct thorough, scientifically sound baseline surveys on ecosystems and biodiversity in the terrestrial, near-shore, or deep ocean affected areas; comprehensively address the impacts of gas exploitation activities on marine life in the affected region; assess the impacts from the extensive marine traffic that would accompany the gas projects, particularly the arrival and departure of LNG carriers; and include thorough, scientifically sound assessments of the potential chemical pollution impacts. For example, the impacts of gas and gas condensate leaks from wells and pipes are not considered. The EIA also significantly underestimated the impacts of alien invasive species and the undersea acoustic impacts of the gas development. In light of these shortcomings, the EIA did not provide a sound basis for EXIM to conclude that the Project was in compliance with its environmental policies.

## G. EXIM and its Board failed to share statutorily mandated information with the public.

242. EXIM failed to make a host of information available to Plaintiffs and the public, as mandated by the Bank Act. It did not: (1) list the Project on its Pending Transactions website prior to the 2025 loan; (2) publish a notice in the Federal Register regarding the 2025 loan; (3) post any recent environmental assessments on its website, or otherwise make an updated EIA available to interested parties (let alone 30 days prior to Bank action); (4) make available any updated Environmental and Social Management Plan, supplemental environmental reports, remediation or mitigation plans, or related monitoring reports; (5) post a determination of whether further NEPA analysis is required on the Pending Transactions website (let alone 30 days before Board consideration).

243.    FOE requested from EXIM the monitoring reports for the Project, which were required to be made available upon request, on August 1, 2024; February 10, 2025; and March 31, 2025. EXIM did not provide them.

**V.    EXIM's final approval has caused, and will continue to cause, actual, imminent and irreparable harm to Plaintiffs, their members, and the local residents and communities they serve**

244.    EXIM's actions to finally approve and eventually disburse the loan to the Project has harmed, and will continue to harm Plaintiffs, their members, the local communities they serve, and others, including but not limited to those harms set forth below.

245.    The relief sought will redress injuries to Plaintiffs FOE and JA by rescinding EXIM's unlawful March 2025 approval of financing for the Mozambique LNG project, without which the Project will not proceed.

**A.  Plaintiff Organizations.**

246.    As part of their missions to safeguard the environment and the health and human rights of people living near harmful projects, Plaintiffs help Project-impacted people understand the Project, present their interests and concerns, and defend their rights. Plaintiffs' core functions include counseling and representing individuals and communities that have suffered concrete harms due to the Project, and providing them with timely information about the Project. Each Plaintiff has been and will be imminently impeded from conducting those core functions by the Board's final approval of the Project.

247.    As part of their core activities, Plaintiffs have dedicated extensive time and resources to investigating the Project and its impacts on local communities. Plaintiffs have also helped Project-affected people participate in procedures that enable them to raise their rights, interests and concerns with Total and entities considering supporting or participating in the

Project, including EXIM. These procedures include public consultations, notice and comment periods, grievance mechanisms, remedy processes, and a court case. This enables the people Plaintiffs serve to more effectively claim their rights and seek better outcomes, including through improved mitigation measures to prevent the Project from causing harms and appropriate compensation when harms occur.

248.    EXIM's approval without following its notice and comment and environmental and social assessment obligations prevented Plaintiffs from conducting these core activities. EXIM denied Plaintiffs the opportunity to submit comments prior to the final approval. EXIM also denied Plaintiffs access to and the ability to comment on the assessments upon which approval should have been based. They were thereby prevented from exercising rights guaranteed by law on behalf of the communities they serve.

249.    As a result of EXIM's approval, each Plaintiff has and/or will expend substantial time and resources to provide services to the residents and communities they counsel and represent. Each Plaintiff has been forced to divert resources that would otherwise be devoted to their core mission.

1. Friends of the Earth

250.    As part of FOE's mission, it has partnered with JA to help people harmed by the Project vindicate their rights and protect their interests through the laws, policies and procedures that govern public- and private-sector decision-makers, including those funding the Project.

a. *Facilitating community participation in feedback and redress mechanisms.*

251.    FOE has dedicated extensive time and resources to providing Project-impacted people and communities with counseling, technical advice, information and research, and representation. FOE assists community members in ensuring that decision-makers understand

and account for the Project's impacts and ameliorate its environmental, economic and social harms, and provide meaningful participation and proper compensation for those whose homes, lands, and fishing rights the Project has taken.

252.    More specifically, FOE uses its expertise on the governing law and U.S.-based institutions' due diligence, grievance, and remedy processes to facilitate Project-affected people's participation in those processes. FOE, through JA, counsels communities on the rules and processes of these foreign institutions, and how to use them to ensure these institutions do not support a Project that is environmentally destructive and violates human rights. FOE also makes submissions through these rules and processes on communities' behalf, as set forth below.

253.    FOE thus strengthens local residents' and communities' ability to raise their concerns with decision-makers and ensure they are properly considered, and to seek remedy when they are harmed by the Project.

254.    FOE has dedicated extensive resources to supporting community members' engagements with EXIM regarding this Project. If not for EXIM's focus on supporting the Project, FOE would have expended these finite resources on other aspects of FOE's mission.

255.    In 2016, a FOE staff member traveled to Cabo Delgado to meet with impacted communities and investigate their interactions with and views on the Project, and how it impacts their lives, so that FOE could better represent their concerns before U.S. decision-makers.

256.    FOE works with economists to gather and analyze data on LNG trends and the Project's economic implications; scientists to highlight its impacts on the local environment and endangered species; and researchers to calculate its greenhouse gas emissions.

257.    FOE uses its expertise in the Bank Act and EXIM's *Environmental and Social Procedures* to help Project-affected people navigate those procedures and ensure EXIM follows its legal obligations.

258.    In May 2016, FOE along with JA and other partners, raised affected communities' rights and concerns through EXIM's notice and comment processes. These processes inform EXIM's environmental and social due diligence, and thus EXIM's Board's consideration. FOE submitted the comments in response to EXIM listing the Project on its Pending Transactions webpage. The comments raised community members' concerns, which JA collected on the ground and FOE and JA had analyzed together. The comments highlighted that the Project would: (1) force people to leave their homes and livelihoods without proper compensation; (2) impose economic harms on local residents and communities; (3) not fairly share project benefits, including that the Project would not improve local energy access; (4) cause more severe environmental damage than was claimed in the Project's EIA, including harms to vulnerable species and sensitive ecosystems; and (5) contribute to devastating climate impacts. The comments also highlighted EXIM's obligations to engage in consultation under the Endangered Species Act and evaluate the Project's impacts under NEPA.

259.    FOE, JA, and others directly assisted community members in drafting and submitting a letter to EXIM outlining their concerns regarding the Project in March 2018.

260.    FOE, JA, and others directly assisted community members in drafting a letter outlining their concerns regarding the Project and COVD-19 in September 2020. FOE sent the letter to the Board and the Inspector General's office.

261.    After EXIM's Board ignored concerns about the Project, JA and FOE sent EXIM a letter detailing community members' concerns in 2021.

262.    FOE along with JA submitted a complaint in November 2021 to EXIM's grievance mechanism, raising communities' concerns regarding compensation, resettlement, the Project's social management plan, and social investment activities.

263.    As the conflict escalated, FOE and JA informed EXIM about critical emerging issues regarding the safety of local communities, problems with the resettlement process, and engagement of local communities. In March 2021, September 2022, November 2023, and December 2024, FOE, JA, and other local and international organizations sent letters to EXIM and other financiers sharing concerns from Project impacted people. These letters highlighted the dangerous situation created by the ongoing conflict and human rights violations, the harms associated with the displacement process, and the irreversible environmental and climate impacts. They urged EXIM and other financers to comprehensively assess the risks based on evolving conditions.

264.    In a January 2025 letter, FOE and JA highlighted the allegations of human rights abuses in June 2021 at the Project site, calling for an independent international investigation.

265.    FOE, on occasion with JA, has also met with EXIM to raise Project-affected people's concerns, including shortcomings in the Project's EIA and application of its environmental and social policies, the security situation, the Project's failure to properly compensate community members it has displaced, and the violence committed against community members by both insurgents and the military. FOE met with EXIM in March 2016, April 2016, and April 2017 to raise concerns about the EIA and highlight key considerations for EXIM's due diligence process. FOE also met with EXIM in February or March 2021, December 2022, and July 2024, and raised the importance of EXIM doing new due diligence prior to approving financing following *force majeure.*

266.    FOE has shared community members' concerns about the Project with EXIM's Office of Inspector General. FOE submitted community members' requests that the office investigate the Project in February 2019, September 2020, February 2024, and October 2024.

*b.   Sharing information with local organizations and communities.*

267.    FOE gathers and uncovers information about the Project and works with JA to share that information with community members.

268.    Total, EXIM, or other foreign actors' information, including environmental impact statements, harm mitigation plans, and other Project risk assessments, are often unavailable to Project-affected communities due to language barriers and lack of access to the internet and literacy. Moreover, accessing these documents often requires specialized knowledge about these organizations. These technical documents are often difficult to understand. FOE accesses this information from EXIM, Total or others, and through FOIA requests, and shares it with JA and other local partners, who disburse it to local people. FOE, together with JA, summarize, translate, and explain the information so that it is accessible to local residents.

269.    FOE has used its expertise in EXIM's information disclosure policies and FOIA to help obtain critical Project information to support Project-affected people. In 2017, 2018, and 2019, FOE submitted FOIA requests to EXIM to help JA and local communities better understand the Project's due diligence and decision-making processes. The documents received through these requests showed that EXIM's Board had ignored local concerns about the Project. Based on the shortcomings the FOIA documents revealed, JA and FOE sent a letter detailing community members' concerns to EXIM in 2021.

270.    Alongside JA, FOE has dedicated extensive time and resources to investigating the Project and its impacts on communities, including problems and violations associated with the resettlement process.

271.    FOE's work collecting and analyzing data has enabled community members to better understand Project activities, effects, plans, and expected revenues where explanations from Total have not been forthcoming. It also enables them to better understand their rights and more effectively assert their interests through submissions to EXIM, Total, and other decision-makers, and to better negotiate opaque and complicated grievance procedures.

2.    Justiça Ambiental.

272.    As part of its mission, JA helps communities address the environmental, economic, and social threats they face or likely face from the Project. JA dedicates extensive time and resources to providing counseling, technical advice, strategic assistance, training, information and research, and representation to individuals and community groups that have suffered concrete harms due to the Project or likely will be harmed by the Project.

*a.  Gathering and disbursing information.*

273.    As noted above, JA shares Project documents and information with community members and their representatives.

274.    JA has dedicated extensive time and resources to investigate the Project and its effects, including issues and violations associated with the resettlement process and information on the evolving facts on the ground. JA has investigated the adverse impacts on residents' homes and livelihoods, and is analyzing the environmental impacts of the Project, including on climate and biodiversity impacts. JA has worked with scientists and energy analysts to review the

Project's EIA, along with the EIAs of neighboring gas projects, and has published an assessment and critique.

275. JA often meets with local community members to interview them and document the impacts of the Project on them.

276. In particular, JA has focused on the Project's resettlement process. Among other things, JA handles complaints. It has also assisted communities with asset mapping prior to displacement in 2014 and 2015, mapping of new assets for compensation, and is assisting them with monitoring affected assets.

277. JA's data collection and analysis enables communities to better understand the Project's effects and to make more comprehensive and persuasive submissions to EXIM, Total, and other decision-makers.

278. JA prioritizes scientific research as a tool to challenge the Project's claims and effects. JA has released several reports on the Project.

> b. *Accessing due diligence, grievance, and redress mechanisms.*

279. JA has helped Project-affected people to understand, access, and participate in a range of mechanisms and procedures governing decision making about the Project. This includes due diligence processes, public consultations and notice and comment periods, as well as grievance mechanisms and remedy processes.

280. JA uses its expertise to advise local people on the law and mechanisms provided under Mozambique law, and on relevant policies and procedures governing government and private-sector decision-makers, including public and private financial institutions. JA advises communities in using such mechanisms and procedures to provide information to decision-makers, including the Mozambique government, Total, prospective funders like private banks

and ECAs, including EXIM, and the public, to raise their concerns, and to seek remedy for harms.

281.    JA helps community members present their interests, questions, and concerns, drafts materials for community members, and represents them when they cannot be present.

282.    JA has helped communities engage in the public consultations around this Project and brings their concerns to these consultations.

283.    For example, JA submitted comments reflecting affected community members' concerns in the 2012 EIA process, public consultations around the government-issued licenses for the construction of the gas liquefaction plants, resettlement villages, and social infrastructure, and public consultations around resettlement.

284.    JA has helped communities request meaningful community participation in, and adequate compensation for, the resettlement of people the Project displaced.

285.    JA helps local residents and communities negotiate with industry actors and gain access to government decision makers and officials. JA has provided technical assistance to affected families to support the discussions and execution of compensation agreements. It shares legal and technical information and develops capacity-building sessions about land and resettlement laws so community members know and can claim their rights in the resettlement process.

286.    JA has helped community members access notice and comment opportunities afforded by EXIM's due diligence procedures.

287.    JA has helped communities bring claims to redress and dispute resolution mechanisms, file lawsuits, initiate public investigations and bring community members' concerns and evidence to relevant proceedings initiated by other parties.

288.    JA provides legal advice for community members in complaints filed in the resettlement process. JA has received over 1,300 complaints around the Project resettlement and compensation process. JA verified the complaints in the field and connected community members with legal representation. JA continues to advise and support community members in these complaints.

289.    JA assists individuals in cases arising out of rape and kidnapping at military checkpoints in 2019-2021.

290.    JA has also connected kidnapping victims with legal representation. JA assisted the victims in pursuing their case to the National Human Rights Commission.

291.    JA is in the early stages of preparing a formal complaint against the African Development Bank.

292.    JA, together with FOE, has engaged with EXIM regarding this Project, as described above.

3.    Impact of EXIM's decision to fund the Project on FOE and JA's activities.

293.    FOE and JA have dedicated extensive time and resources to provide information and services to local people who have been or likely will be harmed by the Project, and to investigate the Project and its effects in order to provide such information and services. EXIM's approval of this Project by an improperly constituted Board, without notice and comment or the necessary due diligence, nullifies their efforts supporting local community members, and has prevented them from providing services to local communities that are critical to their missions.

294.    As a result of EXIM's final approval, FOE has expended substantial time and resources to provide more burdensome services, with and through JA, to local communities, and will continue to do so. The increased burden caused by EXIM's decision will force FOE to shift

more time, resources and attention away from core activities of defending other communities and addressing other issues.

295.    Since EXIM's approval of the Project in March, FOE has spent considerable time updating Congress, to allow it to ensure EXIM follows the law, and enable it to voice any opposition to the Project or add conditions to EXIM's reauthorization that could stop support from EXIM. FOE has also spent time reaching out to the press to try to increase attention on the Project and EXIM's financing.

296.    Given FOE's additional work on the Project, it has not had enough time to focus on other projects that EXIM and the U.S. government are considering supporting, such as Papua LNG in Papua New Guinea and Numay LNG in Peru. FOE also would have put more time into supporting its partners and local communities fighting other harmful fossil fuel projects, including gas projects in Guyana, an oil refinery in Indonesia, and a petrochemical project in Malaysia.

297.    JA's additional work on the Project has and will limit the time JA would otherwise spend to investigate and verify other issues associated with this Project and other Projects such as claims of intimidation and threats, and contributes to the dispersion of attention from legal cases related to human rights abuses that are already underway. JA will have less time to pursue the negotiations for the families that have already been displaced. JA will have to both continue to assist communities regarding the currently outstanding displacement issues and simultaneously respond to additional displacement and other foreseeable harms caused by the Project restart, overstretching JA's resources.

298.    FOE and JA's injuries will be redressed if the Court finds that EXIM's approval violated the law and requires EXIM to reassess the full range of environmental and socio-

economic impacts of this decision, in compliance with pertinent federal laws and procedures put in place to protect local ecosystems and communities and to ensure reasoned decision-making.

*a. Preventing FOE and JA from sharing information with communities.*

299.    In 2024, FOE asked EXIM when the Project would be posted on the "Pending Approvals" webpage, signaling that EXIM is doing its due diligence and triggering the opportunity for interested parties to provide comments. FOE advised EXIM that EXIM needed to conduct additional due diligence prior to any new approval. EXIM did not post the Project. FOE only learned that the "acting" Board would consider the proposed 2025 financing when it was posted on EXIM's website, two days before the "acting" Board approved it.

300.    EXIM denied FOE and JA advance notice that it was considering funding the Project, and that the Project would be restarting, despite repeated requests for this information. By not providing notice of their plans to fund the Project, EXIM has prevented FOE and JA from sharing this information with community members, an important service they typically provide. Had FOE and JA had advance notice, they would have worked with community members to gather their concerns and share them with EXIM through formal and informal channels.

301.    As set forth above, EXIM failed to make public reports, assessments, plans, and other information upon which the 2025 approval should have been based. This information ought to include (among other things) Total's security plans, critical information for Project-affected communities. FOE and JA would have worked together to share this information with local community members, and would have reviewed the documents to clarify issues or identify errors and ensure the information accorded with policy requirements and the situation on the ground. They would have provided EXIM with comments from community members on any deficiencies, and shared such deficiencies with Congress, and EXIM's Inspector General.

302.     FOE has had to spend time working with partners in other countries to try to get this information from other public finance institutions instead, including in the Netherlands and Italy. EXIM is actively trying to block the release of this information in those jurisdictions.

303.     FOE and JA must now expend substantial additional time and resources investigating the Project to provide local people with information and services to protect their rights and combat harms from the Project, including environmental harms and human rights abuses.

      *b. Denying communities a means of redress.*

304.     Had EXIM provided notice and permitted comments prior to its March 2025, final approval, FOE and JA would have worked with Project-impacted people to develop and submit comments detailing, among other things, (1) the risk of human rights abuses against local people, (2) the Project's effects on the climate, including the estimated lifetime emissions of the project, (3) the inadequacy of EXIM's consideration of those risks and effects, (4) how EXIM's subsidization of the Project exceeds limits set by Congress, (5) the fact that the Project is unnecessary in light of a coming LNG glut and how the Project will harm the U.S. renewable energy industry, and (5) issues with resettlement, including the failure to provide proper compensation and the loss of livelihoods. FOE also would have provided comments focused on measures to mitigate harms to local communities.

305.     Although Plaintiffs have provided EXIM with information over the years, they expected EXIM to afford them the legally required opportunity to provide more comprehensive and formal comments based on updated information in order to inform EXIM's due diligence and decision of whether to approve the 2025 loan. This is particularly so because the previous

Board consideration was more than five years ago and there have been substantial changes in the Project's impact on the communities they work with.

306.    Helping local community members raise their concerns through the mechanisms that EXIM has set up to receive such input is a core activity central to FOE and JA's missions. The comment procedures EXIM abandoned are a critical means of redress for communities harmed by EXIM-funded projects. By precluding FOE from presenting the concerns of Project impacted people and FOE's members through notice and comment, EXIM removed an avenue of redress from the potential services FOE and JA can provide their clients.

307.    With this important avenue of redress foreclosed, FOE and JA will now have to seek alternative, likely less effective and more time-consuming means to protect affected community members' rights and interests. This work will include using grievance mechanisms at EXIM and other public finance institutions, meeting with Congress to keep them up-to-date on the Project and trying to get them to include measures in EXIM's reauthorization that could stop EXIM's financing, engaging with the Inspector General's office on their reports on the Project, and press outreach to highlight the impacts on the ground and keep the attention on EXIM's support for the Project.

308.    FOE will also submit complaints to other funders to encourage them to implement community-protective measures, including to the African Development Bank and the Japanese export credit agencies. If EXIM had declined to fund the Project and it therefore was not proceeding, much of this burdensome work would be unnecessary.

c. *Implementing a more harmful Project.*

309.    Following the declaration of *force majeure,* as outlined above, FOE and JA have consistently raised the devastating impacts of the Project and the insecurity in the region. FOE

has told EXIM and other financiers they needed to do new due diligence prior to any re-approval. EXIM did not do so, ignoring these risks and impacts to Project-affected people.

310.    By approving the loan without Board review of critical issues, or input from community members and interested parties like JA and FOE, EXIM has approved a Project that is more harmful to community members.

311.    Because EXIM's financing is critical to the Project, EXIM has substantial leverage to ensure that Total meets EXIM's environmental and social standards, by, for example, conditioning financing on meeting those criteria, if they proceed with financing. EXIM's leverage can be a critical tool to prevent violations that harm Project-affected people. EXIM could have used its leverage to ensure the Project had adequate mitigation plans to prevent future injuries and worked with Project-impacted people to effectively resolve outstanding issues, such as those around inadequate compensation for those who have forcibly resettled from their lands to make way for the Project. Instead, EXIM has ignored these rights violations and in providing financing is essentially sanctioning and enabling them. For instance, EXIM's loan will cause more displacement without ensuring the necessary mitigation and compensation plans are in place.

312.    Prior to the 2025 approval, FOE and JA spent time and resources supporting Project-impacted people in seeking redress for existing harms, but they also focused on preventing future injuries. Because EXIM eschewed the procedures in which it receives feedback from the public and approved the Project loan without adequate mitigation measures in place, if EXIM's loan approval stands and the Project goes forward, FOE and JA will have to dedicate even more time and resources to helping local people ameliorate and seek redress for Project harms, rather than or in addition to preventing harms.

313.    For example, FOE anticipates that it will need to submit more grievance complaints to EXIM and other public finance institutions on behalf of JA and local communities.

314.    JA will have to expend significant time and resources on the resettlement process. JA has already received over 1,300 complaints around the Project resettlement process and compensation and is in the process of confirming the facts and preparing for conflict resolution.

315.    If the Project proceeds, it will displace additional families from their land. Project subcontractors have returned to the area to advance the Project. The Project will displace community members from their farms to build roads, source materials, and conduct operations. Community members will not have the necessary protections they would have proposed through notice and comment. JA will face time pressures to solve an intractable problem – the Project will continue to displace people although there is no more land for them to be resettled on. JA will need to spend time and resources to help communities address these injuries. JA will have to both continue to assist communities regarding the currently outstanding displacement issues and simultaneously respond to additional displacement and other foreseeable harms caused by the Project restart, overstretching JA's resources.

### d.  Exacerbating risks from the conflict.

316.    Due to EXIM's approval, which enables the Project to proceed, JA will have to make more frequent trips to the area to respond to new displacement.

317.    JA's work has been directly affected by the conflict.

318.    The conflict creates risk for JA when they visit Cabo Delgado.

319.    The conflict makes travel within Cabo Delgado dangerous. Those visiting risk attack from the insurgents or government-affiliated forces. Although Palma itself may be

accessible, the surrounding districts and villages remain high-risk zones due to insurgent activities.

320.    While in Cabo Delgado and in the Project affected areas, the military prevents JA from visiting certain areas or requires military authorization to visit. Even authorization might not guarantee that JA can do their work. For instance, during JA's first visit to Palma following the 2021 attack, they obtained authorization from the Ministry of Defense. But JA staff was denied access to the village of Quitupo upon arrival, despite presenting the official authorization. During another visit to Cabo Delgado by the JA team, they were asked to present authorization to enter an area, despite it being a civilian fishing zone.

321.    The military has instituted restrictions around group gatherings, which has prevented JA from work around community capacity building. The prohibition against people, especially young men, gathering in villages reflects a strategy to minimize perceived threats, as such gatherings could be misconstrued as planning or conspiring against the authorities.

322.    JA has had to cancel programs due to an inability to travel to parts of the region due to a significant escalation of violence.

323.    The conflict has made travel on the road to Cabo Delgado particularly dangerous. JA staff have not traveled by road in at least one year.

324.    Presently, the only way JA staff can travel to the region is on a chartered United Nations flight. This flight is only scheduled twice or three times a week. It is expensive. There is a wait list for travel and thus this is not a reliable option.

325.    The difficulty and expense in traveling to the region has decreased JA's ability to regularly visit. It also decreases JA's ability to react to emergencies. It is more difficult to bring

experts to the region, both because of the lack of logistical flexibility and experts' hesitancy to work in dangerous areas.

326.    JA's legal support for affected communities has been impacted by the conflict. The courts are in Pemba, which requires JA to travel with the plaintiffs, family members, and witnesses. However, the United Nations flights are too limited and expensive to be used as regular travel. Lawyers are also more hesitant to work in the north of Mozambique due to safety. While JA occasionally brings community members to lawyers, that is expensive.

327.    JA's research has also been delayed due to increased costs and logistical restrictions due to safety and militarization.

328.    If the Project was not restarting, the need to provide services to community members would be less urgent, as there would be no new threats to community members' land and homes. If the Project proceeds and continues to appropriate land and resources from community members, even more community members will urgently need services.

329.    If the Project were to restart, JA's core activities of providing services to Project-affected individuals will be significantly more difficult due to the conflict. JA staff will have to try to make more frequent trips to the area to respond to new displacement. If JA is unable to secure a flight, they may not be able to go. When JA arrives, JA will be at risk of attacks by the insurgents.

330.    Alternatively, JA will have to conduct its work over the phone or virtually, which is less effective and more difficult than in person counselling. While phone communication is a vital tool for gathering information on conditions in the affected communities, many community members cannot access phones. It is difficult to conduct sensitive interviews virtually.

331.    JA will have to choose between dangerous travel and providing communities less effective services.

332.    JA fears that the Project resuming will cause increased violence, which will further impede JA's work.

4.    Informational injury.

333.    As described above, EXIM violated the Bank Act by failing to release statutorily mandated information.

334.    Plaintiffs rely on this information in their work; accordingly, they repeatedly requested the monitoring reports and requested that EXIM inform them when they would post the Project information on the Pending Approvals website.

335.    EXIM did not post any updated project information or environmental and social impact assessment, or disclose any updated Environmental and Social Management Plans, remediation and mitigation plans, or monitoring reports. EXIM's failure to provide any updated impact assessments, monitoring reports, or plans denied FOE access to the environmental and social information upon which the 2025 approval should have been based.

336.    This information is critical to the counseling services Plaintiffs provide community members through JA. EXIM's failure to provide this information has impeded Plaintiffs' ability to share information to local communities and protect their rights, and forced Plaintiffs to expend time and resources seeking information necessary to help local people combat harms from the Project.

**B.  Plaintiff FOE's Members.**

337.    Multiple FOE members travel to, recreate in, and enjoy the abundant and healthy ecosystem in Mozambique. These members' future plans to visit Mozambique, and their

enjoyment of the area, depend on a healthy environment and abundant marine wildlife protected from industrial development and extraction activities.

338.    For example, in January 2025, one FOE member, Nina Pusic, travelled with a friend to Tofo Beach in Mozambique in hopes of going scuba diving to see the famous whale sharks, during peak whale shark season. She chose Tofo Beach in part because it was not directly affected by conflict in the North. Unfortunately, due to unseasonably rough weather conditions, she was unable to dive during the duration of her stay (January 5-8, 2025). Ms. Pusic plans to return to Mozambique in January 2027, in order to dive in these world-renowned diving sites, featuring unique biodiversity including whale sharks. Ms. Pusic's interests in enjoying the biodiversity will be harmed due to the environmental impacts of EXIM's unlawful decision here.

339.    The Project will harm Ms. Pusic and other FOE members' aesthetic and recreational interests. As set forth above, the Project and its attendant increase in ship traffic will harm the regional marine ecology and biodiversity, and marine creatures, including whale sharks.

340.    FOE brings this action for itself and as representative of its members.

**C. Community Members.**

341.    The Project has harmed and will harm residents of the Project area by among other things, taking their land and homes, depriving them of access to their livelihoods, destroying the natural environment that their livelihoods depend on, and increasing the risks of abuses due to the conflict, as set forth in more detail herein.

342.    JA and FOE provide services to these local residents to help them prevent these injuries and to seek redress for them once they occur.

343.    They could not bring this suit themselves, given the risk of government reprisal.

**I.      The Project would not go forward without EXIM's approval of a new loan.**

344.    The Project would likely not be able to proceed without this funding from EXIM. Total has described EXIM's funding as critical to its ability to proceed, saying without the loan, "work on the Mozambique LNG project may not be resumed or completed."

345.    In a September 26, 2019, press release announcing the original final approval, then EXIM President and Chairman Kimberley Reed stated: "Private financing was not available for this project given its size, complexity, and risk-necessitating support from EXIM."

346.    EXIM's 2019 Memorandum to the Board stated that the "financing for the Project is highly dependent on support from ECAs and/or development finance institutions. Approximately 98% of the debt financing is being provided by ECA and/or development financial institutions. Without the ECAs there would be no material financing support from commercial banks."

347.    EXIM's statement announcing its 2025 final approval recognized that EXIM's subsidy is critical to enabling this Project to proceed. It endorsed the view that "EXIM is considered a bellwether export credit agency" whose approval "is essential so that construction may be resumed as early as possible in 2025" and that "without EXIM's approval…the project as currently defined will be jeopardized."

348.    The declaratory and injunctive relief sought will redress Plaintiffs' injuries by nullifying EXIM's March 2025 improper approval of financing for the Mozambique LNG project, requiring notification and public comment as required by law before any final approval, and/or preventing EXIM from disbursing funds that have not been lawfully authorized.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of APA Section 706(2)(A) and (C) – EXIM's "acting" Board approval exceeded its statutory authority.

349.    Plaintiffs reallege and incorporate all preceding paragraphs.

350.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), that is "without observance of procedure required by law," *Id.* § 706(2)(D) or that is taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C). Plaintiffs also have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

351.    EXIM's March 13, 2025, final approval of the direct loan for the Project constitutes "final agency action."

352.    The loan at issue can only be approved by a quorum of the Board. All five voting members of the Board must be confirmed with advice and consent of the Senate, and three of the five voting members must be present to form a quorum.

353.    At the time of the Board's March 13, 2025 final approval, EXIM's Board was unlawfully constituted and did not have a statutorily required quorum. On March 13, the "acting" Board approved the loan with only one Senate-confirmed board member.

354.    The President's appointment of James Cruse to be "acting" Board Chair and James Burrows to be "acting" Vice Chairman of the Board of Directors without Senate confirmation is contrary to the Bank Act and the Vacancies Act.

355.    Because its "acting" Board members were installed in violation of the Bank Act and the Vacancies Act, and the "acting" Board lacked the statutorily required quorum, it had no

authority to approve the financing for this Project. Under the Vacancies Act, the acting Board's purported approval of the loan to Mozambique LNG on March 13, 2025 is null and void.

356.    EXIM's final agency action exceeds its statutory authority under the Bank Act, the Vacancies Act and the APA. It was *ultra vires*, "not in accordance with law" or procedure required by law, and taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C), (D).

### COUNT II
### Violation of APA Section 706(2)(A) and (C) – EXIM's approval of the loan violates the Bank Act's limits on over-subsidization.

357.    Plaintiffs reallege and incorporate all preceding paragraphs.

358.    The Bank Act imposes strict limits on the subsidies that EXIM may provide to support U.S. exports. EXIM's rates, terms and conditions can only "neutralize the effect of [] foreign credit on international sales competition." 12 U.S.C. § 635(b)(1)(B); 12 U.S.C. § 635a-1(b).

359.    EXIM may only provide funding where a foreign ECA is supporting a direct competitor's bid. It may not subsidize U.S. exporters more generously than a foreign ECA would subsidize foreign exporters. And its support must be consistent with international agreements.

360.    Here, on information and belief, EXIM simply assumed that the exports it is subsidizing would be provided by foreign suppliers and supported by their ECAs absent EXIM's involvement. EXIM did not properly consider whether *bona fide* competitors were actually contending for the same work as the U.S. exporters, nor whether the foreign companies that were seeking contracts had committed support from their ECAs. A foreign ECA was not subsidizing each bidder competing for the same work as every one of the U.S. exporters that EXIM seeks to subsidize.

361.    If *bona fide* competitors with committed ECA support did exist, EXIM did not ensure that the rates, terms, and conditions of its support were equivalent to the foreign ECA support, so that EXIM would not oversubsidize U.S. exports. EXIM impermissibly provided more expansive subsidies than foreign ECAs.

362.    Contrary to the Bank Act, EXIM has provided more "local cost" subsidies than the OECD Arrangement allows, oversubsidizing the Project by $650 million to $1.25 billion. Also contrary to the Bank Act, it is providing more "local cost" subsidies than its competitor ECAs provide.

363.    Because EXIM's loan would subsidize the Project in violation of the Bank Act, this final agency action was arbitrary and capricious, "not in accordance with law," and/or taken "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

## COUNT III
### Violation of APA Section 706(2)(A) and (D) – EXIM failed to provide notice and an opportunity to comment.

364.    Plaintiffs reallege and incorporate all preceding paragraphs.

365.    Because the Project loan exceeds $100,000,000, the Bank Act required EXIM to notify the public, Congress, the Department of Commerce, and the Office of Management and Budget and afford them all the opportunity to comment prior to approval.

366.    EXIM approved the loan to support the Project without providing the required notice and opportunity to comment to the public, Congress, the Department of Commerce or the Office of Management and Budget.

367.    EXIM's failure to provide notice and permit comment means it did not consider critical inputs and evidence, including for example, the views of (1) Congress members with regard to the substantial economic, trade, security, environmental and human rights impacts of

this project; (2) those who believe the Project will compete with and threaten U.S. LNG projects and export terminals; (3) administration officials that may be concerned that the funding contradicts President Trump's policy of promoting U.S. domestic energy dominance; and (4) those like Plaintiffs who have evidence that the Project unlawfully oversubsidizes the Project, will harm the climate and the local environment, and risks local peoples' lives by exacerbating the ongoing conflict and humanitarian crisis.

368.    EXIM's approval of the loan without complying with the Bank Act's and its own procedures' notice and comment requirements was "not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2). And by precluding input from those Congress required EXIM to afford the opportunity to be heard, EXIM necessarily failed to fully consider key aspects of the Project. Thus, EXIM's final approval was not a product of reasoned decision-making, and was arbitrary, capricious, or an abuse of discretion. *Id.*

**COUNT IV**
**Violation of APA Section 706(2)(A) and (D) – EXIM failed to analyze the adverse economic impacts in the United States for the time period during which the Project's production will be sold.**

369.    Plaintiffs reallege and incorporate all preceding paragraphs.

370.    Before reaching its final decision to subsidize the Project, EXIM was required to consider the new production from the Project's adverse economic impacts in the United States at the time the commodity will "will first be sold." 12 U.S.C. § 635(e)(1)(A).

371.    EXIM was required to conduct a detailed economic impact analysis, which must incorporate the views of the public and interested parties.

372.    EXIM could only support the Project if the Board conducted that analysis and concluded that "the short- and long-term benefits to industry and employment in the United

States are likely to outweigh the short- and long-term injury to United States producers and employment of the same, similar, or competing commodity." 12 U.S.C. § 635(e)(3). The insurrection and declaration of *force majeure* delayed when the Project would come online from 2024 to at least 2029. In 2019, EXIM considered adverse economic impacts in the United States, based on the market outlook for 2024. But since 2019, the LNG market outlook has fundamentally changed; whereas in 2019, global LNG markets were projected to be in relative balance in 2024, it is now clear there will be a substantial supply glut in 2029.

373.    EXIM has not conducted the required detailed economic impact analysis of the adverse economic impacts in the United States in 2029 based on current data or weighed the costs to U.S. producers of supporting the competition during a world-wide glut. Nor has EXIM solicited or considered the public's and interested parties' views on the adverse economic impacts in 2029. EXIM's decision to subsidize the Project without analyzing these effects and accepting and considering comments was "arbitrary, capricious, [or] an abuse of discretion," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

374.    By not considering current information and public input about the market when the Project will come on line, EXIM failed to consider key economic risks and harms associated with the Project and its final approval was not a product of reasoned decision-making.

**COUNT V**
**Violation of APA Section 706(2)(A): EXIM's action was arbitrary, capricious or an abuse of discretion in causing substantial injury in the United States.**

375.    Plaintiffs reallege and incorporate all preceding paragraphs.

376.    Even if EXIM had properly conducted a detailed Economic Analysis, permitted comment on that analysis, and properly considered all of the comments and the adverse economic impacts in the United States when the Project would come online, any conclusion that

the benefits outweigh the costs, and thus the final decision to subsidize the Project, would have been arbitrary, capricious or an abuse of discretion.

377.    The Bank Act established a conclusive presumption that funding more than 1 percent of U.S. capacity causes a "substantial injury" to the U.S. The Project's first phase will produce 7 percent of U.S. capacity; with the next phases it would climb to 24 percent. The Project will also supply key infrastructure for the neighboring Rovuma LNG facility, enabling an additional 10 percent of U.S. production to come to market, bringing the total to 34 percent.

378.    Given that the Project will exceed Congress's "substantial injury" threshold by 700-3400 percent, *any* finding that benefits exceed the costs would be arbitrary, capricious or an abuse of discretion.

### COUNT VI
### Violation of APA Section 706(2)(A) and (D) – EXIM failed to consider the Project's environmental, humanitarian, human rights and social risks and to provide an opportunity to comment.

379.    Plaintiffs reallege and incorporate all preceding paragraphs.

380.    Both EXIM staff and the Board were required to consider the Project's potential environmental and social harms prior to reaching its final decision to subsidize the Project.

381.    The Bank Act requires EXIM to create procedures for conducting this analysis. 12 U.S.C. § 635i-5(1). EXIM's *Environmental and Social Procedures* set out a comprehensive screening and evaluation process. They also provide that EXIM must "make available" and post the Project information and links to the ESIA on their pending and approved transactions page, no fewer than 30 days prior to any Bank action regarding financing, and separately, at least 30 days before *any decision* to authorize a Final Commitment, to allow interested parties to review and provide comments. *Environmental and Social Procedures*, s.I ¶9(2); s.IV.B, Final

Commitments, ¶2. In addition, EXIM must "make available" other related reports, including monitoring reports that it requires the borrower to submit.

382.    FOE has sought monitoring reports from EXIM on multiple occasions, but EXIM has never provided the requested reports.

383.    EXIM removed the Project from its pending transactions website following its initial approval in 2019. Prior to its approval in March 2025, EXIM did not re-list the transaction among its pending environmental Category A projects, inviting interested parties to comment.

384.    EXIM failed to do so even though the insurgency had erupted, the insurgents had attacked Palma (and Project contractors in the town), and the Mozambican military securing the Project site had allegedly committed egregious human rights abuses against local villagers after EXIM's comment period. Since its approval in 2019, the conflict significantly escalated and is still ongoing. There is a dire humanitarian crisis in Cabo Delgado and hundreds of thousands remains displaced. The conflict and passage of time have fundamentally changed the Project's operating environment.

385.    Despite these critical issues and changes in circumstances since the Board considered the 2019 loan, the Board approved the 2025 loan without considering the Project's environmental and social effects and whether the Project complies with EXIM's *Environmental and Social Procedures*.

386.    Prior to approval in 2025, EXIM staff did not complete the necessary due diligence as required by the Bank Act and set out in its *Environmental and Social Procedures*. It did not fully evaluate the risks and significant material changes to the environmental and social context in Mozambique and the Project's area of influence.

387.    EXIM did not adequately evaluate the Project's security plans, the risks associated with the plans and ongoing conflict, nor the changed situation due to the conflict.

388.    EXIM did not evaluate the Project's climate risks, impacts, and mitigation or adaptation measures. EXIM did not evaluate the Project's other social and environmental risks, including displacement.

389.    The acting Board's 2025 final decision to approve the loan without even considering the current environmental, security, and humanitarian situation, without staff conducting the required environmental and social impacts analysis based on current information, and without providing the required notice and opportunity to comment was arbitrary or capricious, 5 U.S.C. § 706(2)(A), and "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Given the Board's failure to consider critical issues, risks, and evidence, and in the absence of a full staff evaluation of these issues and current input from knowledgeable and interested parties, the final approval was not a product of reasoned decision-making.

390.    EXIM's decision to approve the Project was also arbitrary and capricious because Total had not lifted its declaration of *force majeure*, and thus was still taking the legal position that the Project could not proceed due to the insurgency.

**COUNT VII**
**Violation of APA Section 706(2)(A): EXIM's actions were arbitrary, capricious, or an abuse of discretion.**

391.    Plaintiffs reallege and incorporate all preceding paragraphs.

392.    Even if EXIM had conducted the required environmental and social due diligence, the final decision to subsidize the Project would have been arbitrary, capricious, or an abuse of discretion. Any conclusion that the Project is secure and that restarting it does not threaten local people cannot be justified, given that the insurgents have targeted local people, the risk that the

Project will exacerbate the conflict, the instability of the security situation, the reprehensible

human rights record of the security forces guarding the Project, and the fact that Total's security

arrangements are fluid and do not provide for the security of the local communities.

## COUNT VIII
### Violation of NEPA and the APA: EXIM failed to adequately consider harms to the global climate, including in the United States.

393.    Plaintiffs reallege and incorporate all preceding paragraphs.

394.    NEPA required EXIM to evaluate the Project's environmental impacts before

approval. EXIM's multi-billion-dollar subsidy is a "major Federal action," and it is "reasonably

foreseeable" that the Project's direct emissions will have a "significant effect" on the

environment. 42 U.S.C. § 4332(2)(C). In particular, the Project's direct emissions will have a

"significant effect" on the atmosphere, and thus the global climate, and therefore will have

effects in the U.S. EXIM failed to consider the Project's effects in the U.S.

395.    EXIM failed to seek public comment and prepare an environmental impact

statement considering the Project's direct greenhouse gas pollution prior to the 2025 approval.

396.    EXIM's failure to adequately analyze or consider the significant and adverse

environmental impacts of its loan approval in the United States, identify and analyze reasonable

and viable alternatives, and provide the public with an opportunity to weigh in on the Project's

effects on the climate violated NEPA, 42 U.S.C. § 4332(2)(C), and was arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with procedures required by law, in violation

of the APA. 5 U.S.C. § 706. In addition, since EXIM had a legal obligation to conduct a NEPA

review but did not, it unlawfully withheld action required by law. *Id.*

## COUNT IX
### Violation of APA Section 706(1) – EXIM failed to provide statutorily mandated information

397.    Plaintiffs reallege and incorporate all preceding paragraphs.

398.    EXIM violated the Bank Act and the *Environmental and Social Procedures* by failing to (1) list the Project on its pending transactions website prior to its 2025 loan; (2) publish a notice in the federal register regarding the 2025 loan; (3) post any updated ESIA on its website, or otherwise make an updated ESIA available to interested parties (let alone 30 days prior to Bank action); (4) make available an updated Environmental and Social Management Plan, supplemental environmental reports, remediation or mitigation plans, or related monitoring reports; (5) post a determination of whether further NEPA analysis is required on the Pending Transactions website (let alone 30 days before Board consideration).

399.    EXIM was legally required to provide this information.

400.    EXIM's failure to provide this information deprives Plaintiffs and other interested parties of information that EXIM has a legal obligation to disclose. Because EXIM has failed to provide information required by the Bank Act and its own internal procedures and policies, this final agency action was "unlawfully withheld" in violation of the APA. 5 U.S.C. § 706(1).

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor against Defendants, and that this Court:

(1)    Declare that March 13, 2025 final approval was arbitrary, capricious, an abuse of discretion or otherwise contrary to law; in excess of statutory authority or limitations; and/or without observance of procedure required by law;

(2)    Preliminarily enjoin Defendants from disbursing any funds pursuant to the March 13, 2025 final approval until this suit can be fully litigated;

(3)     Permanently enjoin Defendants from disbursing any funds pursuant to the March
        13, 2025 final approval;

(4)     Vacate the March 13, 2025 final approval and any actions taken by Defendants
        pursuant to or to implement the March 13, 2025 final approval;

(5)     Instruct Defendants to comply with all substantive and procedural requirements in
        federal law and EXIM's own policies in considering whether to issue and before
        issuing any new loan for the Project;

(6)     Award Plaintiffs their attorneys' fees and costs; and

(7)     Grant all such other relief as the Court may deem just and proper.

DATED:                          Respectfully submitted,

July 14, 2025                   /s/ Michelle C. Harrison
                                Michelle C. Harrison (D.C. Bar No. 1026592)
                                Richard L. Herz (pro hac vice motion forthcoming)*
                                Tamara Morgenthau (pro hac vice motion
                                forthcoming)
                                Lindsay A. Bailey (pro hac vice motion
                                forthcoming)
                                EarthRights International
                                1400 K ST NW Suite 750,
                                Washington, DC 20005
                                (202) 466 5188
                                michelle@earthrights.org

                                Counsel for Plaintiffs

---

* Based in CT; admitted in NY; does not practice in DC's courts.