**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **FRIENDS OF THE EARTH U.S.,** et. al, |
| *Plaintiffs*, |
| v. |
| **EXPORT-IMPORT BANK OF THE UNITED STATES,** et. al., |
| *Defendants*. |

Civil Action No. 1:25-cv-02235-CJN

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND PARTIAL SUMMARY JUDGMENT**

Michelle C. Harrison (D.C. Bar No. 1026592)
Richard L. Herz
Tamara A. Morgenthau (D.C. Bar No. 90032827)
Lindsay A. Bailey (D.C. Bar No. 1723447)
EarthRights International
1400 K St. NW Suite 750
Washington, DC 20005
(202) 466 5188
michelle@earthrights.org

*Counsel for Plaintiffs*

July 21, 2025

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 4

I.    Statutory framework. ......................................................................................... 4

II.   The Mozambique LNG Project............................................................................ 5

III.  Conflict forced the Project to declare *force majeure*, which continues to this day. .......... 5

IV.   EXIM's "acting" Board purports to approve the 2025 loan. ............................... 7

V.    Plaintiffs have spent over a decade providing counseling and other services to communities directly impacted by the Project. ........................................................ 9

VI.   Impact of the Project restarting........................................................................... 11

A PRELIMINARY INJUNCTION IS WARRANTED. ............................................. 13

I.    Plaintiffs are likely to succeed on the merits. .................................................... 14

  A.   The "acting" Board's final approval violated the Bank and Vacancies Acts. .............. 15

  B.   EXIM's failure to provide notice and comment violated the Bank Act. ..................... 17

  C.   EXIM's failure to consider the substantial economic harms the Project will inflict on U.S. companies and workers at the time production "will first be sold" violated the Bank Act. ........................................................................................................... 21

  D.   EXIM's acting Board acted arbitrarily by failing to consider the risks that the conflict poses to the Project, its workers, and local people. ........................................ 23

  E.   EXIM failed to comply with NEPA's requirement that it produce an environmental impact statement and provide for public comment............................................ 25

  F.   EXIM failed to produce statutorily mandated information............................................. 27

  G.   Plaintiffs have standing............................................................................................... 28

    1.   Plaintiffs and the communities they serve are injured by EXIM'S approval. .......... 29

      a)   JA and FOE will suffer concrete organizational harm if this financing moves forward. ......................................................................................................... 29

      b)   JA and FOE have third-party standing................................................................ 36

      c)   JA and FOE have informational standing. ........................................................ 38

    2.   Plaintiffs satisfy any causality and redressability requirements. .............................. 39

II.   Absent a preliminary injunction, Plaintiffs face irreparable harm.................... 41

  A.   Defendants' procedural violations and approval of the Project will cause Plaintiffs and the communities they serve irreparable harm. ...................................................... 41

B.    These harms are imminent. .......................................................................... 42

III.    The balance of equities and public interest favor a preliminary injunction................. 42

SUMMARY JUDGMENT IS WARRANTED. ........................................................................ 44

CONCLUSION.................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. DOL*,
  No. 25-339 (JDB), 2025 U.S. Dist. LEXIS 72516 (D.D.C. Apr. 16, 2025) ............................ 31

*Aid Ass'n for Lutherans v. United States Postal Serv.*,
  321 F. 3d 1166 (D.C. Cir. 2003) ................................................................................................ 15

*Air Transp. Ass'n of Am. v. Exp.-Import Bank of the United States*,
  840 F. Supp. 2d 327 (D.D.C. 2012) .......................................................................................... 37

*Al-Aulaqi v. Obama*,
  727 F. Supp. 2d 1 (D.D.C. 2010) .............................................................................................. 38

*Am. Anti-Vivisection Soc'y v. USDA*,
  946 F.3d 615 (2020) .................................................................................................................. 34

*Aviel v. Gor*,
  No. 25-778, 2025 U.S. Dist. LEXIS 65269 (D.D.C. Apr. 4, 2025) .................................... 16, 44

*Capital Area Immigrants' Rights Coal. v. Trump*,
  471 F. Supp. 3d 25 (D.D.C. 2020) ............................................................................................ 32

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .................................................................................................. 42

*Citizens Alert Regarding the Environment v. EPA*,
  259 F. Supp. 2d. 9 (D.D.C. 2003) ............................................................................................. 27

*Citizens for Const. Integrity v. Census Bureau*,
  669 F. Supp. 3d 28 (D.D.C. 2023) ............................................................................................ 39

*Ctr. for Biological Diversity v. United States Int'l Dev. Fin. Corp.*,
  77 F.4th 679 (D.C. Cir. 2023) ................................................................................................... 38

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ...................................................................................................................... 14

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) .................................................................................................. 28

*Equal Rights Ctr. V. Post Properties Inc*,
    633 F.3d 1136 (D.C. Cir. 2011) ............................................................................ 32

*Exodus Refugee Immigration, Inc. v. Pence*,
    165 F. Supp. 3d 718 (S.D. Ind. 2016) ............................................................. 37, 38

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................................................ 29

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ............................................................................ 29

*Fund for Animals v. Norton*,
    281 F. Supp. 2d 209 (D.D.C. 2003) ............................................................. 41, 42

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    920 F.3d 1 (D.C. Cir. 2019) ............................................................................... 42

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009) ..................................................................... 17, 21

*Hedgeye Risk Mgmt., LLC v. Heldman*,
    196 F. Supp. 3d 40 (D.D.C. 2016) ..................................................................... 45

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ............................................................................ 42

*Indian River Cnty. v. Rogoff*,
    201 F. Supp. 3d 1 (D.D.C. 2016) ....................................................................... 27

*Iyengar v. Barnhart*,
    233 F. Supp. 2d 5 (D.D.C. 2002) ....................................................................... 28

*Jibril v. Mayorkas*,
    20 F.4th 804 (D.C. Cir. 2021) ............................................................................ 28

*L.M.M. v. Cuccinelli*,
    442 F. Supp. 3d 1 (D.D.C. 2020) ................................................................. 39, 40

*Las Ams. Immigrant Advoc. Ctr. v. United States Dep't of Homeland Sec.*,
    No. 24-1702 (RC), 2025 U.S. Dist. LEXIS 94453 (D.D.C. May 9, 2025) ......................... 31, 32

*\*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................ 13, 41, 42, 43

*Lepelletier v. FDIC,*
    164 F.3d 37 (D.C. Cir. 1999) ............................................................................... 37

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................ 40

*LULAC v. Exec. Office of the President,*
    No. 25-0946, 2025 U.S. Dist. LEXIS 78304 (D.D.C. Apr. 24, 2025) .............................. 29, 44

*Med. Imaging & Tech. All. v. Libr. of Cong.,*
    103 F.4th 830 (D.C. Cir. 2024) ........................................................................... 14

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) ........................................................................... 39

*N. Mariana Islands v. United States,*
    686 F. Supp. 2d 7 (D.D.C. 2009) ........................................................................ 41

*N.D. v. Reykdal,*
    102 F.4th 982 (9th Cir. 2024) ........................................................................... 43

*N.W. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.,*
    496 F. Supp. 3d 31 (D.D.C. 2020) ....................................................................... 32

*NAACP v. United States Postal Serv.,*
    496 F. Supp. 3d 1 (D.D.C. 2020) ......................................................................... 35

*Nat'l Ass'n for Fixed Annuities v. Perez,*
    217 F. Supp. 3d 1 (D.D.C. 2016) ......................................................................... 45

*Nat'l Conservative Political Action Comm. v. FEC,*
    626 F.2d 953 (D.C. Cir. 1980) ........................................................................... 14

*Nat'l Fed'n of the Blind v. United States Dep't of Educ.,*
    407 F. Supp. 3d 524 (D.Md. 2019) ....................................................................... 31

*Natural Res. Def. Council v. Morton,*
    337 F. Supp. 167 (D.D.C. 1971) ......................................................................... 44

*Open Cmtys. All. v. Carson,*
    286 F. Supp. 3d 148 (D.D.C. 2017) ................................................................. 33, 35

*\*People for the Ethical Treatment of Animals v. USDA,*
    797 F.3d 1087 (D.C. Cir. 2015) ................................................... 29, 30, 31, 34

*Powers v. Ohio*,
    499 U.S. 400 (1991) ........................................................................................... 37

*Rigdon v. Perry*,
    962 F. Supp. 150 (D.D.C. 1997) ........................................................................ 45

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ..................................................................................... 25, 26

*Sierra Club v. U.S. Dep't. of Agriculture*,
    777 F. Supp. 2d 44 (D.D.C. 2011) ..................................................................... 26

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ........................................................................................... 20

*Turner v. U.S. Agency for Glob. Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) .............................................................. 37, 38

*United States Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ........................................................................................... 14

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Fed. Highway Admin.*,
    151 F. Supp. 3d 76 (D.D.C. 2015) ..................................................................... 14

*Vote Forward v. DeJoy*,
    490 F. Supp. 3d 110 (D.D.C. 2020) .................................................................... 43

*Whitman-Walker Clinic, Inc. v. United States HHS*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................... 33

*Wis. Gas Co. v. Fed. Energy Regulatory Com.*,
    758 F.2d 669 (1985) ........................................................................................... 41

**Statutes**

*12 U.S.C. § 635 ................................................................... 4, 17, 19, 21, 22, 23, 28

*12 U.S.C. § 635a ........................................................................ 4, 15, 16, 17, 19, 20

*12 U.S.C. § 635i-5 .............................................................................. 4, 23, 24, 27, 28

42 U.S.C. § 4332 ........................................................................................... 25, 26

42 U.S.C. § 4336 ................................................................................................. 25

42 U.S.C. § 4336e ............................................................................................... 26

5 U.S.C. § 3348 ................................................................................................................... 16

5 U.S.C. § 3349c ................................................................................................................. 16

*5 U.S.C. § 706 ............................................................................ 14, 15, 23, 24, 27, 28

Fed. R. Civ. P. 56(a) .......................................................................................................... 44

Fed. R. Civ. P. 65 ............................................................................................................... 45

**EXIM Documents**

EXIM *Economic Impact Procedures and Methodological Guideline*s, Stage V, Category C, para.
4 (August 2020), https://www.exim.gov/policies/economic-impact/economic-impact-
procedures ..................................................................................................................... 21

*EXIM, *Environmental and Social Due Diligence Procedures and Guidelines*,
https://www.exim.gov/policies/exim-bank-and-environment/
procedures-and-guidelines ................................................................... 18, 24, 26, 27, 28

Management Advisory: EXIM's Process for Advancing Oil and Gas Transactions for Board
Approval Needs Improved Transparency, Office of the Inspector General (Mar. 31, 2025),
https://www.oversight.gov/sites/default/files/documents/reports/2025-
03/Final%20Management%20Advisory_Oil%20
and%20Gas%20%28OIG-O-25-05%29.pdf .......................................................... 40

Press Release, EXIM, EXIM Board of Directors Votes to Proceed with $4.7 Billion LNG
Equipment and Services Transaction After Four-Year Delay (March 19, 2025). .................. 19

**United States Government Reports**

Complex Emergency Fact Sheet #4 Fiscal Year (FY) 2024, U.S. Agency for Int'l Development
(Sept. 30, 2024), https://reliefweb.int/report/mozambique/mozambique-complex-emergency-
fact-sheet-4-fiscal-year-fy-2024 ...................................................................................... 12

Nicolas Cook, *Insurgency in Northern Mozambique: Nature and Responses*, Cong. Rsch. Serv.
(2022), congress.gov/crs-product/IF11864 .................................................................. 11, 12

Nicolas Cook, *Mozambique: Politics, Economy, and U.S. Relations*, Cong. Rsch. Serv. (2019),
congress.gov/crs-product/R45817 ............................................................................... 11, 12

**United Nations Documents**

*Mozambique: Access Snapshot - Cabo Delgado Province, as of 30 April 2025*, U.N. Office for
the Coordination of Humanitarian Affairs (May 20, 2025),
unocha.org/publications/report/mozambique/mozambique-access-snapshot-cabo-delgado-
province-30-april-2025-enpt ........................................................................................... 7

*Mozambique: Access Snapshot - Cabo Delgado Province, as of 31 January 2025*, U.N. Office for the Coordination of Humanitarian Affairs (Mar. 7, 2025), unocha.org/publications/report/mozambique/mozambique-access-snapshot-cabo-delgado-province-31-january-2025 ................................................................................................ 7

*Mozambique: Access Snapshot - Cabo Delgado Province, as of 31 May 2025*, U.N. Office for the Coordination of Humanitarian Affairs (June 12, 2025), unocha.org/publications/report/mozambique/ mozambique-access-snapshot-cabo-delgado-province-31-may-2025 ................................. 7, 34

*Mozambique: Access Snapshot - Cabo Delgado Province, as of June 2025*, U.N. Office for the Coordination of Humanitarian Affairs (July 4, 2025), unocha.org/publications/report/mozambique/mozambique-cabo-delgado-nampula-niassa-humanitarian-snapshot-june-2025 ................................................................................................ 7

**Newspaper articles**

*"All Conditions Being Created" for the Resumption of TotalEnergies Mozambique LNG Megaproject – Government – Lusa*, Club of Mozambique (July 14, 2025), https://clubofmozambique.com/news/all-conditions-being-created-for-the-resumption-of-totalenergies-mozambique-lng-megaproject-government-lusa-286935/ ................................. 42

*Cabo Delgado: Prosecutor Opens Case on Abductions and Killings Attributed to Defence and Security Forces*, 360 Mozambique (Apr. 3, 2025), 360mozambique.com/development/cabo-delgado-prosecutor-opens-criminal-proceedings-for-human-rights-violations .......................... 6

*CEO: TotalEnergies hopes to resume Mozambique LNG construction by mid-2024*, LNG Prime (Feb. 8, 2024), lngprime.com/lng-terminals/ceo-totalenergies-hopes-to-resume-mozambique-lng-construction-by-mid-2024/104366 .................................................................................... 7

Csongor Körömi, *Netherlands Starts Inquiry Into Mozambique Gas Plant Massacre*, Politico (Mar. 5, 2025), politico.eu/article/netherlands-inquiry-mozambique-military-gas-plant-massacre-totalenergies ............................................................................................................. 6, 7

Tom Gould, Tomás Queface & Fernando Lima*, The Islamic State in Mozambique: The Cabo Delgado Conflict since 2021*, The Hudson Institute (Feb. 20, 2024), https://www.hudson.org/islamic-state-mozambique-cabo-delgado-conflict-2021-tom-gould-tomas-queface-fernando-lima ............................................................................................... 12

**Other Authorities**

*2014 EIA Chapter 12: Onshore Environmental Impact Assessment and Mitigation*, Mozambique
    LNG (2014), mozambiquelng.co.mz/sustainability/environment/environmental-impact-
    assessment/................................................................................................................................... 13

Hannah Ritchie, Max Roser, and Pablo Rosado, *Mozambique: CO2 Country Profile*, Our World
    in Data (2020), https://ourworldindata.org/co2/country/mozambique#citation ....................... 13

Letter from Patrick Pouyanne, CEO of TotalEnergies to Gina Raimondo, US Sec. of Commerce
    (Dec. 3, 2024), https://efile.fara.gov/docs/7504-Informational-Materials-20241216-1.pdf...... 20

Will Rundle, *Briefing: UK Export Finance – climate litigation*, Friends of the Earth (2021),
    cdn.friendsoftheearth.uk/sites/default/files/downloads/UKEF_Briefing_updated_June_2021.pd
    f ................................................................................................................................................ 13

## INDEX OF EXHIBITS

Ex. A: Declaration of Kate DeAngelis ("FOE Decl.")
> Ex. 1 EXIM, Memorandum from The Mozambique LNG Deal team, Subject: AP087889XX-MOZ LNG, Mozambique (Sept. 16, 2019)
> Ex. 2 EXIM, Memorandum to the Board of Directors (August 22, 2019)

Ex. B: Doe Declaration from Justiça Ambiental (attached to sealed Motion for Leave to Seal Declarations and for Declarants to use a Pseudonym) ("JA Decl.")

Ex. C: Doe Declaration on Conflict (attached to sealed Motion for Leave to Seal Declarations and for Declarants to use a Pseudonym) ("Conflict Decl.")

Ex. D: Declaration of Richard Herz ("Herz Decl.")
> Ex. 1 Ian Johnston and Malcom Moore, *TotalEnergies gas project in Mozambique faces UK human rights probe*, Financial Times (June 16, 2025), www.ft.com/content/28defb12-a248-493d-8563-5492aeb8b425
> Ex. 2 *TotalEnergies Says it Can Get Mozambique LNG Running by 2029*, Bloomberg (June 26, 2025).
> Ex. 3 Malcolm Moore, *UK takes legal advice over pulling out of $20bn Total LNG project in Mozambique*, Financial Times (Feb. 4, 2025), www.ft.com/content/cacd29fb-1535-4462-bd5f-3f2bcb546a8d
> Ex. 4 United Nations OCHA, *Mozambique: Humanitarian Needs and Response Plan 2025* (December 2024)
> Ex. 5 *TotalEnergies introduces drastic security measures on Mozambique LNG*, Africa Intelligence (June 9, 2025), www.africaintelligence.com/southern-africa-and-islands/2025/06/09/totalenergies-introduces-drastic-security-measures-on-mozambique-lng,110462908-art
> Ex. 6 *Total Edges Closer to Restart Work on $20 Billion Mozambique LNG*, Bloomberg (July 4, 2024)
> Ex. 7 EXIM, Agenda of the Closed Meeting of EXIM's Board of Directors for March 11, 2025
> Ex. 8 EXIM's "Pending and Approved Transactions" webpage, as it was visible to the public on October 13, 2017
> Ex. 9 Letter from U.S. Senator Dan Sullivan to Secretary of the Treasury Scott Bessent and Secretary of the Interior Doug Burgum, dated March 21, 2025, accessed from Sen. Sullivan's Twitter, from a tweet dated March 25, 2025, https://x.com/SenDanSullivan/status/1904670005725138975.

Ex. E: Declaration of Clark Williams-Derry ("Williams-Derry Decl.")

## INTRODUCTION

On March 13, 2025, the "acting" Board of Directors of Defendant Export-Import Bank of the United States ("EXIM") unlawfully approved a $4.7 billion loan—one of the largest direct loans in its history—to subsidize a foreign corporation's construction of a massive, highly controversial liquefied natural gas ("LNG") project ("the Project") in Mozambique.

The Project is in a conflict zone. Its operator, the French oil giant TotalEnergies SE ("Total"), halted construction and declared *force majeure* in 2021, after Al-Shabab, a brutal insurgency, seized the town where many Total contractors were based, reportedly killing hundreds of people (including contractors). Victims were beheaded. Thousands were forced to flee. Soon after, Mozambican forces securing the Project reportedly gathered civilians at the Project, accused them of being insurgents, then raped women, imprisoned and tortured hundreds of men in shipping containers at Total's gate, and eventually killed most of their captives.

The conflict remains active, complex, and highly dangerous. The insurgents have killed thousands and displaced hundreds of thousands of people. The area has been heavily militarized, with thousands of foreign troops, as well as Mozambican forces who reportedly still commit abuses against local people. *Force majeure* remains in effect. And multiple countries have launched investigations into alleged abuses and paused consideration of supporting the Project.

For most, this would counsel caution. Not for EXIM. Just days after President Trump hurriedly installed an "acting" Board that lacked the required quorum of Senate-confirmed members, that Board rushed this loan through final approval. It dispensed with four separate notice-and-comment requirements that would have gathered critical input from the public and Congress. It failed to even consider the deadly risks that Al-Shabab and the Mozambican forces securing the Project pose to local people and how the violence would increase as a result of the

loan. It ignored the environmental and climate harms. Nor did it determine whether the supposed benefits to U.S. exporters outweigh the substantial economic harms subsidizing this foreign project will inflict on U.S. companies and workers. Each of these acts and omissions violates clear provisions of the Export Import Bank Act of 1945 ("the Bank Act"), 12 U.S.C. §§ 635-635t, and EXIM's own procedures.

A wide array of interested parties from across the political spectrum have opposed EXIM's financing, including: local Mozambicans; human rights and humanitarian organizations; environmentalists; Congressmembers from both parties; The Wall Street Journal editorial board; President Trump's first Energy Secretary; and those who oppose U.S. government subsidies for oil companies or foreign corporations. This motion seeks to force Defendants to take a deep breath, gather public input, and actually consider the loan's consequences, as the law demands.

EXIM believes it can ignore Congress's mandates by calling the 2025 loan an "amendment," since it approved Project funding in 2019 and 2020, which was never disbursed. But the Bank Act requires notice and comment for *any* "final consideration" or "final approval" of a major loan. And EXIM must assess the economic consequences of its loan as of the time commodity production will *begin*, which will be many years later than had been planned in 2019.

Circumstances have changed so dramatically since 2019 that the Board's failure to consider those changes is patently arbitrary. The smoldering conflict has since ignited. Security forces guarding the Project have reportedly committed war crimes. The global LNG market is radically different too. On the Project's new timeline, production will begin at a time when there will be an LNG glut. EXIM will be subsidizing foreign production that will cause "substantial injury," as defined in the Bank Act, to the U.S. economy. These are precisely the kinds of harms Congress sought to ensure EXIM would *not* facilitate when financing foreign projects.

A preliminary injunction is warranted. Plaintiffs Friends of the Earth U.S. ("FOE") and Justiça Ambiental ("JA") are non-profit organizations that provide services to people the Project harms and defend their rights, including in EXIM's formal decision-making processes. They are likely to succeed on the merits of their Administrative Procedure Act ("APA") claims. The statutory requirements that EXIM act through a Senate-confirmed Board, provide Congress and the public notice and opportunity to comment, and consider the Project's impacts on local people and environmental and economic harms in the United States are all crystal clear.[1]

Plaintiffs have standing, and they will be irreparably harmed absent a preliminary injunction. By failing to disclose statutorily required information that Plaintiffs would have provided local people, and precluding comment raising their concerns, EXIM prevented Plaintiffs from providing services that are central to Plaintiffs' missions. Moreover, absent EXIM financing, the Project cannot proceed. But if the loan goes forward, the Project will exacerbate the conflict, harm the environment, and displace even more people from their land and fishing grounds. More people will need Plaintiffs' services. But Plaintiffs will be forced to seek less effective, more difficult to secure after-the-fact remedies rather than preventing harm.

The balance of equities and public interest favor maintaining the *status quo* by temporarily enjoining EXIM from disbursing billions of dollars in taxpayer funds while the Court considers whether the loan is even lawful. The harms to Plaintiffs and local people are severe. Conversely, EXIM and Total will bear only a minimal burden, if any; the Project has been paused for over four years and remains so. The Court should therefore preliminarily enjoin Defendants from disbursing any funds pursuant to the March 13, 2025 final approval.

---

[1] Plaintiffs are also likely to succeed on their other claims. However, because EXIM has not yet produced the administrative record, Plaintiffs do not raise those claims here.

Regardless, because the facts material to this motion are undisputed and Defendants' acts are contrary to law, this Court should grant partial summary judgment to Plaintiffs on these claims without delay, setting aside Defendants' unlawful final approval and any acts taken to implement it, and permanently enjoining them from disbursing funds pursuant to that approval.

**BACKGROUND**

## I.    Statutory framework.

EXIM in its current form was established and is governed by the Bank Act. Congress created EXIM to promote U.S. exports by providing loans and loan guarantees to foreign purchasers. *See* 12 U.S.C. § 635. Because EXIM's overseas financing can raise sensitive foreign policy, economic, environmental, and social concerns, Congress placed strict limits on EXIM's authority. One is that major financing decisions must be made by a Senate-confirmed Board of Directors. 12 U.S.C. § 635a(b), 635a(c)(1), (6)(A), (10). Where there is no quorum for 120 days, a "temporary" Board with specified Senate-confirmed members "shall act in the [Board's] stead" until a normal quorum is restored through Senate confirmation. *Id*. § 635a(c)(6)(B)(i). There are no other exceptions to the Board requirements.

Congress also directed that before approving large loans, EXIM must provide notice and opportunity to comment to, and the Board must consider the views of, the public, other agencies, and Congress. 12 U.S.C. §§ 635(b)(3), 635a(c)(10). EXIM must also consider economic impacts in the United States, 12 U.S.C. § 635(b)(1)(B), and cannot fund foreign production that would be in surplus on world markets when it would "first be sold," or would compete with U.S. production, and injure U.S. producers, unless the benefits outweigh the costs. *Id.* § 635(e)(1)(A)-(B), (3). Congress further directed EXIM to ensure that the environmental and social impacts of projects it supports are assessed and properly managed. 12 U.S.C. § 635i-5(a)(2).

4

II.     **The Mozambique LNG Project.**

Plaintiffs challenge EXIM's final approval of a loan for the Project, which includes deep-water wells, pipelines, liquefaction and storage facilities, and a dock to load ships for export. FOE Decl. Ex. 2 at 7-11. The Project occupies 27 square miles and took hundreds of people's land and homes, often without their consent, preventing them from farming, and blocking fisherpeoples' access to the sea. JA Decl. ¶¶ 70-72. Total has not adequately compensated many families for these losses, leaving them adrift in a war-torn region. *Id*.

In April 2015, a consortium asked EXIM for a $5 billion loan for the Project. FOE Decl. Ex. 1. EXIM reviewed the Project, conducted environmental and social due diligence (albeit flawed), and provided notice to and sought comment from Congress and the public. *Id.* Ex. 1 at 2. EXIM conducted a Detailed Economic Impact Analysis in 2018-2019, based on the market conditions expected in 2024 when production was scheduled to start. Statement of Undisputed Material Facts (SUMF) ¶¶ 29-30. The Board approved the $5 billion loan in September 2019. *Id.* ¶ 1. Soon after, Total became the lead Project sponsor and operator. *Id.* ¶ 2. In May 2020, the Board approved a revised loan, which reduced the amount to $4.7 billion, expanded the scope to include offshore portions of the facility, and made Total the lead sponsor. *Id.* ¶ 3.

III.    **Conflict forced the Project to declare *force majeure*, which continues to this day.**

Even as EXIM initially assessed whether to invest in the Project, an insurgency was gaining force in Cabo Delgado, where the Project is located. FOE Decl. Ex. 2 at 3-5, 12-15. Since EXIM's approvals of the 2019 and 2020 loans, armed conflict between government forces and Al-Shabab escalated and engulfed the area. SUMF ¶ 4.

In January 2021, the Project suspended activities due to nearby insurgent attacks, including at a village in the Project's concession built to resettle people it displaced. Conflict

Decl. ¶ 21. On March 23, 2021, Total announced it would resume activities. *Id.* ¶ 71. The next day, Al-Shabab attacked Palma, many Project contractors' base of operations. SUMF ¶ 5. Al-Shabab reportedly killed hundreds of residents and at least 55 contractors, beheading many victims. *Id*. ¶ 6 Total declared *force majeure*, halting the Project indefinitely. *Id.* ¶ 7.

A few months after the Palma attack, Mozambican forces operating out of the Project's gatehouse reportedly offered hundreds of local men, women, and children refuge at the Project site, then accused them of being insurgents. SUMF ¶ 8. Soldiers allegedly sexually assaulted women, locked men in shipping containers at the entrance to Total's facilities, and beat, suffocated, starved, and tortured the civilian detainees for months, killing most of them. *Id.* ¶ 9.

The conflict has caused a humanitarian crisis, killing thousands and displacing hundreds of thousands of people. SUMF ¶ 13. Throughout the conflict, there have been widespread reports of the insurgents and Mozambican forces committing human rights violations against civilians. Insurgents' tactics reportedly include killings, beheadings, abductions, sexual violence, burning homes, looting, and destroying villages; Mozambican security forces have allegedly killed, harassed, extorted, arbitrarily arrested, raped, and disappeared civilians. *Id.* ¶¶ 10-12.

Multiple jurisdictions have launched investigations. The Mozambique Attorney-General's Office and Dutch Government both announced in March 2025—prior to EXIM's loan approval—that they would investigate the alleged massacre at the Project site by forces protecting Total's facilities.[2] In June 2025, media reported that the United Kingdom had "commissioned a human rights review" into the same allegations. Herz Decl. Ex. 3. In March

---

[2] *Cabo Delgado: Prosecutor Opens Case on Abductions and Killings Attributed to Defence and Security Forces*, 360 Mozambique (Apr. 3, 2025), 360mozambique.com/development/cabo-delgado-prosecutor-opens-criminal-proceedings-for-human-rights-violations; Csongor Körömi, *Netherlands Starts Inquiry Into Mozambique Gas Plant Massacre*, Politico (Mar. 5, 2025), politico.eu/article/netherlands-inquiry-mozambique-military-gas-plant-massacre-totalenergies.

2025, days after EXIM rushed through its loan approval, French prosecutors opened an investigation against Total for involuntary manslaughter, following criminal charges filed by victims and survivors of the Palma massacre.[3] EXIM knew before it approved the loan that French prosecutors were likely to do so. FOE Decl. ¶ 35.

The insurgency remains active. SUMF ¶ 14. A week before EXIM's approval, the United Nations noted that in January 2025, "violence against civilians and armed clashes intensified."[4] The United Nations continued reporting "escalating" violence in April, May, and June 2025.[5]

## IV.    EXIM's "acting" Board purports to approve the 2025 loan.

Since 2021, Total has reportedly launched several ineffective attempts to acquire financing and restart the Project.[6] Potential funders have expressed hesitancy, given the Project's significant environmental impact and the alleged human rights abuses associated with it.[7] Nonetheless, Total lobbied EXIM to authorize funding, recognizing that the Project could not move forward without EXIM approving new financing. SUMF n. 37 (*see* Total CEO's letter).

---

[4] *Mozambique: Access Snapshot - Cabo Delgado Province, as of 31 January 2025*, U.N. Office for the Coordination of Humanitarian Affairs (UNOCHA) (Mar. 7, 2025), unocha.org/publications/report/mozambique/mozambique-access-snapshot-cabo-delgado-province-31-january-2025.

[5] *Mozambique: Access Snapshot - Cabo Delgado Province, as of 30 April 2025*, UNOCHA (May 20, 2025), unocha.org/publications/report/mozambique/mozambique-access-snapshot-cabo-delgado-province-30-april-2025-enpt; *Mozambique: Access Snapshot - Cabo Delgado Province, as of 31 May 2025*, UNOCHA (June 12, 2025), unocha.org/publications/report/mozambique/mozambique-access-snapshot-cabo-delgado-province-31-may-2025; *Mozambique: Access Snapshot - Cabo Delgado Province, as of June 2025*, UNOCHA (July 4, 2025), unocha.org/publications/report/mozambique/mozambique-cabo-delgado-nampula-niassa-humanitarian-snapshot-june-2025; *see also* JA Decl. ¶¶ 102-31 (describing weekly attacks); Conflict Decl. ¶¶ 32-44 (discussing violence in 2025).

[6] *See, e.g.*, *CEO: TotalEnergies hopes to resume Mozambique LNG construction by mid-2024*, LNG Prime (Feb. 8, 2024), lngprime.com/lng-terminals/ceo-totalenergies-hopes-to-resume-mozambique-lng-construction-by-mid-2024/104366/.

[7] Herz Decl. Ex. 1, 3; Körömi, *Netherlands Starts Inquiry*.

When President Trump took office in January 2025, Spencer Bachus III was EXIM's Board's only Senate-confirmed member. SUMF ¶ 18. But President Trump did not try to fill the vacancies by nominating candidates for Senate confirmation. Nor did he wait 120 days for a "temporary board" of Senate-confirmed members to take over. Instead, he installed two "acting" Board members—James Cruse as "acting" President and Board Chair and James Burrows as "acting" Board Vice Chairman—without the Senate's advice and consent. *Id*. ¶ 19.

Less than two weeks later, on March 11, 2025, EXIM posted the agenda for its first "acting" board meeting, set for March 13, 2025. *Id*. ¶ 20. The Project was listed for approval with the statement: "review required: none." *Id*. ¶¶ 21-22. EXIM provided no other notice or any opportunity to comment. *Id*. ¶ 23. Two days later, EXIM's "acting" Board approved the $4.7 billion loan, with only a single Senate-confirmed member. *Id*. ¶¶ 24-25.

EXIM's press release asserted that the Board approved only an "amendment" containing "no material change from the original approval" of the 2019 loan, and admitted that while EXIM staff "reviewed the [Project's] physical security situation," the Board considered only changes to the dates in the Project documents and unspecified "related changes" necessary to reflect the start of Project construction following the "security related *force majeure*."[8]

Thus, the "acting" Board did not consider how the Project restart might exacerbate the conflict and put contractors and local people at greater risk, or whether Total's security measures are adequate to protect them. SUMF ¶ 27. Nor did it consider the militarization of the area, the thousands of people killed and displaced, or the abuses, rapes, and murders allegedly committed at the Project's gate. *Id*. EXIM also did not analyze the Project's harms to the U.S. economy

---

[8] Press Release, EXIM, EXIM Board of Directors Votes to Proceed with $4.7 Billion LNG Equipment and Services Transaction After Four-Year Delay (March 19, 2025), exim.gov/news/ exim-board-directors-votes-proceed-47-billion-lng-equipment-and-services-transaction-after.

based on current information about the production timeline that would now start in 2029 or 2030, not 2024, as was anticipated in 2019. SUMF ¶¶ 28-32.

**V.      Plaintiffs have spent over a decade providing counseling and other services to communities directly impacted by the Project.**

Plaintiffs JA and FOE are nonprofit environmental organizations with similar missions: to work for equitable and safe socio-economic development and a sustainable environment, and to defend people's health and human rights, particularly in poor and marginalized communities harmed by fossil fuel projects. JA Decl. ¶¶ 3, 7; FOE Decl. ¶ 8. They are the Mozambique and U.S. affiliates of Friends of the Earth International. JA Decl. ¶ 6; FOE Decl. ¶ 8.

As part of their missions, Plaintiffs dedicate extensive time and resources to providing services, including counseling, technical advice, information, research, and representation to individuals and communities to help them protect their rights and address the environmental, economic, and social threats they face from projects like this one. FOE Decl. ¶ 14; JA Decl. ¶¶ 8, 12-14.

First, Plaintiffs gather and uncover information about the Project and JA disburses it to local people. Total, EXIM, or other actors' environmental impact statements, harm mitigation plans, and other Project risk assessments are often unavailable to affected communities due to language barriers, and lack of internet, literacy, or knowledge of how to access such documents. JA Decl. ¶ 26; FOE Decl. ¶ 7. For instance, FOE used its expertise in EXIM's information disclosure policies and the Freedom of Information Act to obtain critical Project information. FOE Decl. ¶ 28. This helped JA and community members better understand EXIM's due diligence and decision-making and assisted JA's direct counseling services to local people. *Id*.

Second, Plaintiffs have dedicated extensive time and resources to investigating the Project and its impacts on affected communities and the environment, collecting information

from community members, and assessing whether those impacts align with Total and its financiers' policy and legal obligations. *Id.* ¶¶ 18-19; JA Decl. ¶¶ 15, 21-24. FOE and JA's research and analysis allows communities to better understand the Project's effects and to more effectively raise their concerns with EXIM, Total, and other decision-makers. JA has interviewed hundreds of Project-affected people since 2006. JA Decl. ¶ 17. JA has also collected over 1,300 complaints about the resettlement process from people whose lands were taken by the Project, and is continuing to investigate claims. *Id.* ¶ 22.

Third, Plaintiffs help communities vindicate their rights and protect their interests through Mozambique law, U.S. law, and other laws and policies governing government and private-sector decision-makers. *Id.* ¶¶ 28-29; FOE Decl. ¶¶ 9, 12. Plaintiffs facilitate Project-affected people's participation in procedures that enable them to raise their rights and concerns, and seek remedies from, the Mozambique government and Total and other foreign actors, including EXIM. These procedures include public consultations, notice and comment periods, due diligence procedures, grievance mechanisms, and remedy processes. Plaintiffs draft submissions and complaints that provide information, raise questions and concerns, and assert Project-affected people's rights and interests. FOE Decl. ¶ 14; JA Decl. ¶¶ 28-31, 42-52.

JA has facilitated community engagement or shared community concerns with decision-makers around the Project, including public consultations with the operator on resettlement, Mozambique government-led consultations around the 2012 Environmental Impact Assessment process and construction licenses, and claims in the resettlement process. JA Decl. ¶¶ 32-34.

Plaintiffs have regularly helped community members engage with EXIM, relying in part on FOE's expertise in the Bank Act and EXIM's Environmental and Social Procedures. FOE Decl. ¶¶ 15, 18, 24. In May 2016, JA, FOE and others raised communities' rights and concerns

through EXIM's notice and comment process, for EXIM's consideration as part of its due diligence and funding decision, in response to EXIM listing the Project on its Pending Transactions page. *Id.* ¶ 19. JA collected community concerns and Plaintiffs analyzed them. *Id.* The comments highlighted issues with displacement and economic and environmental harms. *Id.*

In November 2021, Plaintiffs submitted a complaint on behalf of individuals impacted by the Project to EXIM's grievance mechanism. Plaintiffs gathered and submitted testimony from community members explaining their concerns about resettlement, the Project's social management plan, insurgent and military violence, and the environmental impacts.

Plaintiffs have also raised community concerns with EXIM, through letters and meetings, about the conflict, human rights abuses, resettlement, and climate and environmental impacts. FOE Decl. ¶ 23. Plaintiffs urged EXIM to assess the Project's risks based on evolving conditions. *Id.*

## VI.    Impact of the Project restarting.

EXIM's funding is necessary for the Project to proceed, and will allow it to restart. SUMF ¶ 37 (citing 2024 letter from Total CEO to US Sec. of Commerce arguing that without EXIM's loan "work on the Mozambique LNG project may not be resumed or completed"). That will likely exacerbate the conflict, exposing local people to further instability and violence. Conflict Decl. ¶¶ 7-8, 65, 70-72; JA Decl. ¶¶ 132-40. The Congressional Research Service has noted that among the insurgents' grievances are the "displacement" of villagers, "transfer of their traditional lands to the [Project], the perceived low share of gas sector jobs given to locals, disruptions of livelihoods, and the influence of foreign extractive industry actors."[9] Even prior to

---

[9] Nicolas Cook, *Insurgency in Northern Mozambique: Nature and Responses*, Cong. Rsch. Serv. 2 (2022), congress.gov/crs-product/IF11864; *see also* Conflict Decl. ¶¶ 7, 65, 86; Nicolas Cook, *Mozambique: Politics, Economy, and U.S. Relations*, Cong. Rsch. Serv. (2019),

its 2019 approval, EXIM knew that "the insurgency is highly likely to target the Project throughout its lifecycle." FOE Decl. Ex. 2 at 5. The insurgents have increased violence or launched attacks, including the Palma attack, when the Project announces it will resume operations. Conflict Decl. ¶ 71. "A full restart of LNG operations is likely to create a target that insurgents will not be able to resist."[10] And that target is not limited to the Project itself; the insurgents see significant propaganda value in any attack on villages near the Project or its interests. Conflict Decl. ¶ 69, 72; *see also* SUMF ¶17.

To protect the Project, the government militarized the area. Conflict Decl. ¶¶ 26-27, 70, 73-75, 78-80. That may benefit Total, but security forces are implicated in a wide swath of abuses against local people. SUMF ¶¶ 8-9, 12. These "abuses and corruption" "have spurred discontent," further motivating extremists.[11] Moreover, Total announced in May 2025 that it intends to create a "Green Zone" security enclave for the Project, permitting access only by ship and air, not by road. SUMF ¶ 16. This will require more security checkpoints, likely provoking further abuses, and will eliminate economic opportunities for local people. Conflict Decl. ¶¶ 78-79. Worse, this strategy leaves communities that will be targeted because of the Project even more vulnerable to attack. *Id.* ¶¶ 33, 69, 72, 78, 80-85.

---

congress.gov/crs-product/R45817 ("Other notably intense sources of local anger that [ASWJ] may exploit include the loss of local agricultural and fishing livelihoods"); Complex Emergency Fact Sheet #4 Fiscal Year (FY) 2024, U.S. Agency for Int'l Development (Sept. 30, 2024), https://reliefweb.int/report/mozambique/mozambique-complex-emergency-fact-sheet-4-fiscal-year-fy-2024 (noting competition over LNG reserves contributed to the rise of the insurgency).

[10] Tom Gould, Tomás Queface & Fernando Lima*, The Islamic State in Mozambique: The Cabo Delgado Conflict since 2021*, The Hudson Institute (Feb. 20, 2024), https://www.hudson.org/islamic-state-mozambique-cabo-delgado-conflict-2021-tom-gould-tomas-queface-fernando-lima.

[11] Cook, *Insurgency in Northern Mozambique*; *see also* Cook, *Mozambique* ("heavy-handed . . . responses to ASWJ violence also appear to have alienated local populations.").

The Project will also displace more families from their farms and homes and prevent more fishermen from making a living. JA Decl. ¶¶ 70, 84. And the Project will threaten endangered flora and fauna, and cause destruction to pristine mangroves, seagrass beds and coral reefs in the Quirimbas Archipelago, a United Nations Biosphere Reserve. *Id.* ¶ 86.

The Project will also significantly contribute to the climate crisis, disproportionately hurting Mozambique, which is already suffering from, and is one of the countries most vulnerable to, devastating climate impacts. The Project's 2014 Environmental Impact Assessment estimated its annual direct emissions to be approximately 13 million metric tons of $CO_2$ equivalent when in production with six trains.[12] This will cause more harm than all of Mozambique's $CO_2$ emissions from 2023.[13] And the greenhouse gas pollution from using the LNG produced has been estimated to equal the emissions from the aviation sector for all EU states combined.[14] These harms will result if the Project resumes, which would only be possible with EXIM's loan.

## A PRELIMINARY INJUNCTION IS WARRANTED.

A plaintiff seeking a preliminary injunction must show "that four factors, taken together, warrant relief: [1] likely success on the merits, [2] likely irreparable harm in the absence of preliminary relief, [3] a balance of the equities in its favor, [4] and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting

---

[12] *2014 EIA Chapter 12: Onshore Environmental Impact Assessment and Mitigation*, Mozambique LNG 12-4 (2014), mozambiquelng.co.mz/sustainability/environment/environmental-impact-assessment/

[13] Hannah Ritchie, Max Roser, and Pablo Rosado, *Mozambique: CO2 Country Profile*, Our World in Data (2020), https://ourworldindata.org/co2/country/mozambique#citation (Mozambique's annual emissions from 2023 were 8.02 million metric tons of CO2 equivalent).

[14] Will Rundle, *Briefing: UK Export Finance – climate litigation*, Friends of the Earth (2021), cdn.friendsoftheearth.uk/sites/default/files/downloads/UKEF_Briefing_updated_June_2021.pdf.

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). Here, a preliminary

injunction is necessary to prevent irreparable harm while the Court reviews Defendants' actions.

**I.        Plaintiffs are likely to succeed on the merits.**

"Agencies must operate within the legal authority conferred by Congress and when those

limits are transgressed," plaintiffs "may seek recourse in Article III courts." *Med. Imaging &

Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 838 (D.C. Cir. 2024). Under the APA, courts

"shall . . . set aside agency action . . .  found to be [1] arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law [; 2] in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right [; or 3] without observance of procedure

required by law[.]" 5 U.S.C. § 706(2). The APA permits judicial review of "final agency action."

*Id.* § 704. Action is "final" if it "mark[s] the consummation of the agency's decisionmaking

process" and is one "from which legal consequences will flow." *United States Army Corps of

Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016).

When an agency fails to satisfy a statutory requirement, as EXIM has, the action is "not

in accordance with law, and without observance of procedure required by law," in violation of

the APA. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers

Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 93-94 (D.D.C. 2015) (cleaned up).

Moreover, action is arbitrary and capricious when it is not the product of "reasoned

decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quotation marks

omitted). And agencies must follow their own regulations and procedures. *Nat'l Conservative

Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980).

The "acting" Board's final approval of the $4.7 billion loan was "final agency action"

subject to APA review. That action—made by an unlawfully constituted Board, without

satisfying statutory notice-and-comment requirements, and without considering the economic harms the Project would cause in the U.S. or its dire impacts on the environment and local people—was arbitrary, capricious, and violated the Bank Act, the Federal Vacancies Reform Act ("Vacancies Act"), 5 U.S.C. § 3345-3349, and EXIM's own procedures. And Plaintiffs have been injured by these violations and thus have standing to challenge them.

### A.    The "acting" Board's final approval violated the Bank and Vacancies Acts.

Congress determined that only officials that have the Senate's consent can be Board members able to make important decisions. The "acting" Board lacked a quorum of Senate confirmed members and thus had no authority to approve the loan. The "acting" Board's final agency action, taken in violation of the Bank Act and the Vacancies Act, was "not in accordance with law" and exceeded its statutory authority, 5 U.S.C. § 706(2).[15]

EXIM's Board has up to five voting members—EXIM's President and First Vice President and three others—who all must be appointed by the President of the United States with Senate advice and consent. 12 U.S.C. § 635a(b), 635a(c)(1). The Board quorum is three voting members. *Id*. § 635a(c)(6)(A). The Bank Act provides a lone exception: when a quorum is unavailable for 120 days, a "temporary" Board with other specified Senate-confirmed members may act until a quorum is restored through Senate confirmation. *Id*. § 635a(c)(6)(A) & (B)(i).

There is no other mechanism to appoint EXIM Board members. Although the Vacancies Act authorizes temporary acting appointments of certain officials, it does not here; the Bank Act does not contemplate Presidential appointment of an acting official and specifically provides an alternative mechanism. Moreover, the Vacancies Act does not provide authority for acting

---

[15] Plaintiffs also have a non-statutory right to enjoin action that is *ultra vires*. *Aid Ass'n for Lutherans v. United States Postal Serv.*, 321 F. 3d 1166, 1173 (D.C. Cir. 2003).

appointments to EXIM's Board; it "shall not apply" to "any member who is appointed by the President, by and with the advice and consent of the Senate to any board" that "is composed of multiple members" and "governs an independent establishment or Government corporation." 5 U.S.C. § 3349c(1). Indeed, the government recently conceded the President cannot use the Vacancies Act to appoint members to such boards. *Aviel v. Gor*, No. 25-778, 2025 U.S. Dist. LEXIS 65269, at *22-23 (D.D.C. Apr. 4, 2025).[16]

EXIM is an independent federal agency and government corporation, *see, e.g.*, 12 U.S.C. § 635a(a), governed by a board composed of multiple members, appointed by the President, by and with the advice and consent of the Senate. *Id*. §§ 635a(b) & 635a(c)(1). The Vacancies Act cannot be used to appoint acting members to EXIM's Board. And "even if the President purports to appoint an officer to a Board-like entity in an acting capacity—something he cannot do under the [Vacancies Act] in the first place—any actions by that officer are null and void." *Aviel,* 2025 U.S. Dist. LEXIS 65269, at *23. Actions taken by an acting official not properly appointed under the Vacancies Act "have no force or effect." 5 U.S.C. § 3348(d).

Here, the "acting" Board approved the loan with only one Senate-confirmed member. Instead of seeking Senate confirmation of the two new members necessary for a quorum, or waiting for the temporary Board the Bank Act authorizes, the President purported to appoint two unconfirmed "acting" members, just days before the Board voted on this loan. Because those two "acting" members were installed in violation of the Bank Act and the Vacancies Act, and the "acting" Board lacked the required quorum of three Senate-confirmed members, it had no

---

[16] *Aviel* rejected the government's "frightening," argument that the President could appoint temporary board members anyway, finding that would "complete[ly] disregard. . . the [Act's] text," and "eviscerate" the Appointments Clause. 2025 U.S. Dist. LEXIS 65269, at *23, 27.

authority to approve this loan. Accordingly, Plaintiffs will likely succeed on their claim that the acting Board's purported approval of the loan on March 13, 2025 is null and void.

**B.    EXIM's failure to provide notice and comment violated the Bank Act.**

"Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that normally requires vacatur" of agency action. *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (cleaned up). Here EXIM was subject to four separate notice and comment requirements and ignored all of them.

First, under the Bank Act, before the Board may take "final" action on transactions, like this one, that exceed $100 million, EXIM must notify the public, Congress, the Department of Commerce, and the Office of Management and Budget ("OMB") and afford them the opportunity to comment. 12 U.S.C. § 635a(c)(10). "Before any meeting of the Board for final consideration" of a transaction exceeding $100 million, EXIM "shall provide a notice and comment period," by publishing notice in the Federal Register and allowing at least 25 days for comment. *Id*. §§ 635a(c)(10)(A), (C)(i)(II). Moreover, "no loan . . . shall be finally approved by the Board" unless EXIM "has submitted to the Congress" "a detailed statement describing and explaining the transaction," including "the reasons for Bank financing of the transaction," and providing time for Congress to comment. 12 U.S.C. § 635(b)(3). EXIM must also "address views of commenters"; before the Board can take "final action," EXIM staff must provide the Board "in writing . . . the views of any person who submitted comments." 12 U.S.C. § 635a(c)(10)(E).

Second, EXIM's internal policies required an additional comment process regarding the Project's environmental and social impacts. EXIM must post the project information and make available and link to the Environmental and Social Impact Assessment on its Pending Transactions webpage no fewer than 30 days before "any Bank action with respect to financing

17

of the application," and "any decision by EXIM Bank to authorize a Final Commitment," so that "interested parties have sufficient time to review and provide information and comments." EXIM, *Environmental and Social Due Diligence Procedures and Guidelines*, s.I ¶ 9, 9(2) & s.IV, B. ¶ 2, https://www.exim.gov/policies/exim-bank-and-environment/procedures-and-guidelines ("Environmental and Social Procedures" or "E&S Procedures").

Third and fourth, as set forth in more detail below, the Bank Act requires EXIM to consider public input on the loan's economic impacts, and the National Environmental Policy Act (NEPA) requires it to consider input on its environmental impacts. *Infra* § I.C., I.E.

EXIM did none of this. In violation of the Bank Act and its own well-established procedures, it did not provide notice in the Federal Register, notify Congress, OMB and Department of Commerce, or post the transaction on its Pending Transactions page 30 days before the 2025 approval. Instead, it simply posted on its website on March 11, 2025 a meeting "agenda" that indicated that the Board would consider the loan for final approval two days later, thereby denying the public and Congress their statutory right to comment. *Supra* 8.

Thus, the acting Board granted final approval without soliciting (let alone considering) critical information and perspectives from those who Congress gave a statutory right to comment, including: (1) Members of Congress with views on the Project's substantial economic, trade, security, environmental and human rights impacts; (2) U.S. renewable energy and LNG companies and workers that are concerned that the Project will compete with them or undermine their interests; (3) Administration officials that may be concerned that the funding contradicts President Trump's policy of promoting U.S. domestic energy dominance; and (4) members of the public like Plaintiffs who would have raised local communities' serious concerns.

18

Indeed, Plaintiffs would have commented on the ongoing problems with the resettlement process and the fact that if the Project proceeds, it will displace even more people; the devastating impact on the environment and local people's livelihoods; the likelihood that the Project will exacerbate the conflict; communities' security; the humanitarian crisis; the militarization of the region; the risks to local people from conflict; the Project contractors who had been killed, the thousands of local people that had been killed and displaced, and the alleged rapes and murders carried out by forces securing the Project; and the adequacy of any plans to address the Project's risks and impacts.

Presumably to try to explain away violating these notice and comment requirements, EXIM has claimed that the 2025 approval was merely an "amendment, which contains no material change from the original approval" of a loan for the Project six years before.[17] That characterization does not justify shutting out Congress and the public. The relevant question under the Bank Act is not whether the Board approved a non-material amendment, but whether the 2025 approval was "final." The Act states that the Board may not "finally approve[]" support without notifying Congress, 12 U.S.C. § 635 (b)(3), and that EXIM "shall" provide for notice and comment before "any" Board "final consideration." 12 U.S.C. § 635a(c)(10)(A). EXIM may not evade these requirements by calling this final approval an "amendment."

In any event, the Board did not merely vote to amend a term in an existing contract; it "[v]ote[d] to [p]roceed" with the loan. SUMF ¶ 24. EXIM itself determined Board approval was necessary to move forward. Total agreed, stating that the 2025 loan required "*final approval*

---

[17] Press Release, EXIM, EXIM Board of Directors Votes to Proceed with $4.7 Billion LNG Equipment and Services Transaction After Four-Year Delay.

from the Board."[18] Because the March 2025 approval was the "final consideration" or "final approval," the statute required EXIM to afford opportunity to comment before that approval.

Similarly, EXIM's own procedures require it to solicit comments before "any Bank action with respect to financing of the application" and "any decision by EXIM Bank to authorize a Final Commitment." *See supra* § II(B). Here too, it is irrelevant whether the Board approved an amendment, because even that is unquestionably such a "Bank action."

In addition to requiring notice and comment before final approval, Congress also mandated that where there is a material change to an application during a comment period, EXIM must publish a new notice in the Federal Register and restart the comment period. 12 U.S.C. § 635a(c)(10)(D)(i). A fact is material if there is "a substantial likelihood" that it "would have assumed actual significance in [a reasonable investor's] deliberations." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

EXIM's claim that nothing material has changed from the original approval in 2019 is jaw-dropping. In the past six years, Total declared *force majeure* as conflict ravaged the region, causing catastrophic effects on local people and dramatically altering the security and humanitarian risks they face, including alleged abuses by forces protecting the Project.

Even the date changes alone are material. The Project is now expected to first produce LNG at least five years later than originally planned. As described in the next section, EXIM must assess the economic impact of foreign commodity production at the time it *will first be sold.* Because the production date is material, changing it is a material change. And there can be no dispute that the prognosis for the global LNG market has shifted drastically since 2019.

---

[18] Letter from Patrick Pouyanne, CEO of TotalEnergies to Gina Raimondo, US Sec. of Commerce (Dec. 3, 2024), https://efile.fara.gov/docs/7504-Informational-Materials-20241216-1.pdf.

Williams-Derry Decl. ¶¶ 14-22, 24-2. All of these are material facts because they entail

substantial legal, financial, reputational, and moral risk to EXIM and jeopardize people's lives.

EXIM's approval without providing the statutorily required notice and opportunity to

comment was not a product of reasoned decision-making and violated the Bank Act and EXIM's

own procedures. It requires vacatur. *Heartland Reg'l Med. Ctr.*, 566 F.3d at 199.

### C.    EXIM's failure to consider the substantial economic harms the Project will inflict on U.S. companies and workers at the time production "will first be sold" violated the Bank Act.

The Bank Act limits EXIM's authority to finance projects that will cause economic

harms in the United States. Before funding a project, EXIM's Board must consider "any serious

adverse effect" on U.S. industry and employment. 12 U.S.C. § 635(b)(1)(B). Separately, the

Bank Act bars EXIM from funding commodity production abroad if it determines that: (i) the

commodity is likely to be in surplus on world markets when the new production "will first be

sold"; or (ii) "the resulting production capacity is expected to compete with United States

production of the same, similar, or competing commodity"; and the funding "will cause

substantial injury" to U.S. producers. *Id*. §§ 635(e)(1)(A)-(B). There is "substantial injury" if the

production "equals or exceeds 1 percent of United States production." *Id*. § 635(e)(4).

Where these criteria are met, EXIM must conduct a "Detailed Economic Impact

Analysis," which must incorporate the views of the public and interested parties on the

transaction's economic impacts. *Id*. § 635(e)(7)(A).[19] It must publish notice in the Federal

Register of its intent to conduct this analysis, and provide at least 14 days for the public to

comment. 12 U.S.C. § 635(e)(7)(B)(i). EXIM must also seek comments from the Department of

---

[19] *See also* EXIM *Economic Impact Procedures and Methodological Guideline*s, Stage V, Category C, para. 4 (August 2020), https://www.exim.gov/policies/economic-impact/economic-impact-procedures.

Commerce, the OMB, the Senate's Committee on Banking, Housing, and Urban Affairs, and the House of Representative's Committee on Financial Services. *Id*.[20] If there is a "material change" to an application after notice is published, EXIM must publish a revised notice and provide a new comment period. *Id*. § 635(e)(7)(B)(iii)(I). EXIM staff must provide the Board with "the views of any person who submitted comments" "[b]efore" the Board "tak[es] final action on an application for a loan or guarantee." *Id*. § 635(e)(7)(C).

After considering that analysis, the Board may only authorize financing for foreign production if it concludes that "the short- and long-term benefits to industry and employment in the United States are likely to outweigh the short- and long-term injury to United States producers and employment of the same, similar, or competing commodity." *Id*. § 635(e)(3).

LNG is expected to be in surplus on world markets in 2029-2030, when the Project's production "will first be sold." Williams-Derry Decl. ¶¶ 14-22, 24. Likewise, the Project's production is expected to compete with U.S. LNG production. *Id*. ¶ 25. And the Project's production far exceeds one percent of U.S. production, and thus "will cause substantial injury," as defined in the Bank Act, to U.S. producers. *Id*. ¶¶ 9-13, 24.

But EXIM approved the 2025 loan without assessing or considering any of these factors. And, it did not conduct the required detailed economic impact analysis, based on current data, of the adverse economic impacts in the United States in 2029-2030. Nor did it evaluate the competitive costs to U.S. producers of expanding foreign production during a global LNG glut. It did not solicit or consider the views of the public and interested parties on these impacts. Thus, the "acting" Board approved this loan with no understanding of the costs and benefits to U.S. economic interests. And the Board did not find that the benefits to outweigh the injury to U.S.

---

[20] This is in addition to Section 635a(c)(10)'s general notice and comment period.

producers and employment, the finding necessary to overcome the statutory presumption of "substantial injury." *See* 12 U.S.C. § 635(e)(3).

EXIM's prior analysis cannot fill the gap. In August 2019, EXIM considered the Project's adverse impacts in the United States based on the market outlook at that time for 2024, when the Project was then expected to begin production. SUMF ¶¶ 29-30. But because *force majeure* has halted the Project since April 2021, it will not begin production until 2029-2030 at the earliest. *Id.* ¶¶ 31-32. Since EXIM conducted its analysis in 2019, the outlook for the LNG market has fundamentally changed. Whereas in 2019, global LNG markets were projected to be in relative balance in 2024, it is now clear there will be a substantial supply glut in 2029-2030. *Id.* ¶ 33. Because the Bank Act requires the assessment of economic impacts when the financed production "will first be sold," 12 U.S.C. § 635(e)(1)(A)(i), EXIM's prior assessment of the state of the market and potential economic harms to the United States in 2024 is irrelevant.

EXIM's decision to fund the Project on a new timeline, without analyzing these effects and accepting and considering comments was not a product of reasoned decision-making, and was contrary to the Bank Act, and thus violates the APA. *See* 5 U.S.C. § 706(2)(A), (D).

**D.    EXIM's acting Board acted arbitrarily by failing to consider the risks that the conflict poses to the Project, its workers, and local people.**

EXIM could not lawfully authorize the loan without considering the Project's environmental and social harms. The Bank Act requires the Board to consider "the potential environmental effects of a project," prior to approving financing, 12 U.S.C. § 635i-5(a)(2), and requires EXIM to "establish procedures" for staff to assess these issues. *Id.* § 635i-5(a)(1). Accordingly, EXIM adopted its Environmental and Social Procedures for assessing and managing project impacts on the environment, "local communities directly affected by the project" and "the people involved in the [project's] construction and operation." E&S

Procedures, s.I ¶ 3. The Act authorizes the Board to withhold financing from a project with unacceptable impacts, 12 U.S.C. § 635i-5(a)(1)-(2); that is, if a project does not comply with the requirements set out in the Procedures. E&S Procedures, s.I ¶ 22.

EXIM admits the "acting" Board finally approved the 2025 loan without considering the current security, humanitarian, and human rights risks. The Board considered only technical changes to dates in Project documents. *Supra* 8. That was arbitrary, "not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2).

The failure to consider the ongoing conflict did not just violate the Bank Act and EXIM's procedures; it was reckless. Prior to its 2019 approval, EXIM knew that the Project's security consultant found that Al-Shabab "is highly likely to target the Project throughout its lifecycle." FOE Decl. Ex. 2 at 5. Since that approval, Al-Shabab escalated its insurgency and Total declared *force majeure*, which it had not been able to lift when EXIM approved the 2025 loan. *Supra* 5-6. The violence continues. *Id.* 7. Yet the Board did not consider the current risks, including whether Total has plans sufficient to operate safely in a conflict zone. Given that Total's plans in 2019 failed catastrophically, the Board's refusal to consider Total's current plans is inexplicable.

Moreover, the Board was required to consider not only the security of the Project site, but also that of "local communities directly affected by the project." E&S Procedures, s.I ¶ 3. Resuming operations will exacerbate the conflict, likely leading to further Al-Shabab attacks on neighboring communities. *Supra* 11-12. And site security depends on government security forces. Since the Board's original consideration, security forces guarding the Project allegedly committed a massacre at the Project's gate, and Mozambican forces have a documented pattern of other abuses. *Supra* 6. Yet the Board did not consider the risk that these forces will commit similar abuses. Given the gravity of the consequences to EXIM, the Project, workers and local

24

people, any reasonable Board of any responsible lender would have considered these issues. EXIM's acting Board did not.

In fact, the Board *could not* have considered Total's present security plan, because it did not exist. In May 2025, Total scrapped whatever plan it had in March 2025, when EXIM approved the loan, SUMF ¶ 16, presumably because the old plan was inadequate. The new plan, to avoid roads and only transport goods and people by air and sea, *id.*, recognizes that the insurgent threat will not end soon, which begs the question of this arrangement's long-term sustainability. Conflict Decl. ¶¶ 77, 85; *see also id.* ¶ 47 (questioning sustainability of relying on foreign forces). And the new plan would further draw security away from protecting communities and instead focus on the Project, leaving local people vulnerable. *Id.* ¶¶ 33, 80-83.

Moreover, EXIM never let Congress, interested government agencies, and the public comment on the Project's current security plans and humanitarian, human rights, and social impacts. *Supra* I.B. Thus, the "acting" Board failed to consider key information from knowledgeable parties, and could not have properly considered any of these issues.

Since the Board failed to consider these critical issues and permit comments about them, Plaintiffs are likely to succeed on their claim that the Board's final approval was not a product of reasoned decision-making and was without observance of procedure required by law.

### E.    EXIM failed to comply with NEPA's requirement that it produce an environmental impact statement and provide for public comment.

NEPA requires federal agencies to take a "hard look at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quotation marks omitted). They must prepare a "detailed" environmental impact statement (EIS) for any "major Federal action[]" that "significantly affect[s]" environmental quality, 42 U.S.C. § 4332(2)(C), *accord* 42 U.S.C. § 4336(b)(1), and has effects in the United States. 42 U.S.C.

§ 4336e(10)(B)(vi); E&S Procedures, s.I ¶ 18. The EIS must assess "reasonably foreseeable adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C). NEPA and EXIM's own procedures also require it to provide comment periods that allow the public to weigh in on its environmental analysis. *Id*.; E&S Procedures, s.I ¶ 18 (requiring EXIM to post determination of whether further NEPA analysis is required 30 days before Board consideration to provide interested parties "opportunity to comment"). NEPA thus ensures that agencies "carefully consider[] detailed information concerning significant environmental impacts," guarantees that the relevant information will be made available to the public and provides a springboard for public comment. *Robertson*, 490 U.S. at 349. EXIM did none of this.

It is "reasonably foreseeable" the Project will "significantly affect" the global climate. 42 U.S.C. § 4332(2)(C). The Project's annual direct emissions will alter the climate more than of all of Mozambique's $CO_2$ emissions from 2023. *Supra* 13. EXIM must post a project's annual emissions if the project requires an environmental review and will produce direct emissions equivalent to 25,000 metric tons of $CO_2$. E&S Procedures, S.I ¶ 9 This Project's 13 million metric tons of $CO_2$ equivalent emissions is 520 times that threshold. Emissions on that scale trigger NEPA.

EXIM, however, never considered the foreseeable environmental effects. Instead, it asserted in 2016 that it did not have to because its multi-billion dollar loan is not a "major Federal action." Herz Decl. Ex. 8. Nonsense. As a threshold matter, that claim receives no deference; the question is one of law. *Sierra Club v. U.S. Dep't. of Agriculture*, 777 F. Supp. 2d 44, 54 (D.D.C. 2011). Regardless, EXIM's financing and the environmental harms are "major" by any reckoning. Moreover, EXIM has sufficient control and responsibility over the use of its funds and the effect of its action. *See* 42 U.S.C. § 4336e(10)(B)(iii). EXIM decides whether to

provide funding or not and sets its financing's terms and conditions. EXIM requires this Project to comply with EXIM's *Environmental and Social Procedures* throughout the life of the loan and EXIM will monitor the Project to ensure it complies.[21] Ultimately, it has the ability to stop the Project, which could not proceed without EXIM funding. This suffices. *See Indian River Cnty. v. Rogoff*, 201 F. Supp. 3d 1, 16, 19 (D.D.C. 2016) (finding major Federal action where government provided significant loan and had discretion to condition its loan on recipient's compliance with environmental conditions); *Citizens Alert Regarding the Environment v. EPA*, 259 F. Supp. 2d. 9, 21 n.10 (D.D.C. 2003) (recognizing that where federal money acts as precondition for project, there may be major federal action). And since the Project will directly affect climate change globally, it will have effects in the United States.

Although NEPA's prerequisites have thus been met, EXIM failed to seek public comment prior to the 2025 approval or prepare an EIS considering the impacts of the Project's greenhouse gas pollution. EXIM thus violated NEPA and the APA. 5 U.S.C. § 706.

### F.    EXIM failed to produce statutorily mandated information.

The Bank Act and EXIM's procedures require EXIM to share vital Project information during the approval and notice and comment periods. 12 U.S.C. § 635i-5(a)(1); E&S Procedures s.I, ¶ 9, 9(2)(3), s.III, C, s.IV, Final Commitment ¶ 2. This includes listing the Project and posting a determination of whether further NEPA analysis is required on its Pending Transactions page, publishing notices in the Federal Register regarding the 2025 loan, and

---

[21] E&S Procedures, s.I ¶¶ 20-21, s.IV(B) Final Commitments ¶ 6, s.V. EXIM can withhold financing for environmental reasons. *See* 12 U.S.C. § 635i-5(a)(2). If a project "does not meet the applicable environmental guidelines," the Board can withhold financing, or EXIM may impose conditions on project performance. E&S  Procedures s.I ¶ 22, s.IV(B) Final Commitments ¶ 6. This is typically done through an enforceable Environmental and Social Action Plan. *Id.* s.I ¶ 22, s.IV(B) Final Commitments ¶ 6. The Board imposed such a plan with the 2019 loan. FOE Decl. Ex. 2 at 4.

making available supplemental environmental reports, remediation or mitigation plans, or related monitoring reports. 12 U.S.C. §§ 635i-5(a)(1), 635a(c)(10)(C)(i)(I) & (ii), 635(e)(7)(B)(i) & (iii)(I); E&S Procedures s.I ¶¶ 9, 18. EXIM did none of this – despite multiple requests from FOE to make this information available. FOE Decl. ¶ 42. EXIM's failure to do so deprives Plaintiffs and others of information the Bank Act and EXIM's own procedures require it to disclose, and was agency action "unlawfully withheld." 5 U.S.C. § 706(1).

### G.    Plaintiffs have standing.

A party has standing where it has or likely will suffer an injury, that likely was or will be caused by defendant, and the injury likely would be redressed by the requested relief. *Jibril v. Mayorkas*, 20 F.4th 804, 813-14 (D.C. Cir. 2021). In a preliminary injunction or summary judgment motion, plaintiffs must provide evidence "that, if taken to be true, demonstrate[s] a substantial likelihood of standing." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (quotation marks omitted). Claims may proceed if one plaintiff has standing. *Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 11 (D.D.C. 2002).

In this motion, Plaintiffs allege three types of injuries. First, Plaintiffs have organizational standing, because EXIM's approval without following its statutory obligations has and will imminently impair Plaintiffs' ability to provide critical services to individuals affected by the Project. Second, Plaintiffs have third-party standing on behalf the people they serve, who will experience environmental devastation, displacement, and human rights violations from the Project but cannot raise their own rights. Third, Plaintiffs have informational standing, because EXIM failed to release information it was legally obligated to produce, causing Plaintiffs to experience the type of harm the Bank Act aims to prevent.

Most if not all of the injuries Plaintiffs have suffered flow from procedural violations, which have diminished causation and redressability requirements. Regardless, EXIM's final approval and imminent disbursal of the loan will harm Plaintiffs, because it will allow the Project to move forward. These harms can be redressed through a Court order vacating the final approval because that would undo the procedural violations and indeed, halt the Project.

       1.      **Plaintiffs and the communities they serve are injured by EXIM'S approval.**

          a)      **JA and FOE will suffer concrete organizational harm if this financing moves forward.**

An organization has Article III injury if the defendant's act or omission "injured the organization's interest" and it "used its resources to counteract that harm." *People for the Ethical Treatment of Animals (PETA) v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (cleaned up).

The organization must show a "concrete and demonstrable injury to [its] activities," such that the challenged action "'perceptibly impaired the organization's ability to provide services.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The challenged actions must have affected the organization's "core" activities, rather than merely compromising its "social interests." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).[22]

FOE and JA are "not only [] issue-advocacy organization[s], but also operate a [] counseling service" to people harmed by large-scale infrastructure projects. *See id*. at 395. In particular, Plaintiffs provide services to people who have been or likely will be harmed by this Project, including information, counseling, and representation. Plaintiffs: (1) gather Project

---

[22] "Prior [D.C.] circuit precedent is consistent with the organizational-standing principles articulated in *Alliance for Hippocratic Medicine*." *LULAC v. Exec. Office of the President*, No. 25-0946, 2025 U.S. Dist. LEXIS 78304, at *69 (D.D.C. Apr. 24, 2025).

information and provide it to community members; (2) investigate and analyze impacts on affected communities and the ecosystems they depend on for their livelihoods; and (3) facilitate community participation in public consultations, due diligence procedures, notice and comment periods, grievance mechanisms, and remedy processes by providing expertise on these processes, working with communities to use them effectively, and raising communities' concerns. *Supra* 9-11. In sum, Plaintiffs enable people in an isolated corner of Mozambique to understand their rights and defend them through the processes offered by the distant decision-makers who will determine their fate.

EXIM's approval without following its statutory obligations has and will imminently impair Plaintiffs' ability to provide these critical services. First, by denying Plaintiffs their right to comment, EXIM precluded them from facilitating local communities' access to a potential means of redress. Second, because EXIM's funding allows the Project to restart, Plaintiffs will now have to provide more, and more burdensome services to their clients—assisting them with remediating harms rather than preventing them. Third, EXIM denied Plaintiffs access to information that they provide local people and use in counseling them.

Plaintiffs have expended substantial time and resources due to the final approval and will continue to do so to serve people the Project harms. FOE Decl. ¶ 37; JA Decl. ¶¶ 53-66.

> ### i. EXIM removed an avenue of redress from the services Plaintiffs can provide.

Plaintiffs have experienced "the same type of injury" as the plaintiffs who had standing in *Havens* and *PETA*: where an organization provides the service of facilitating access to an agency's means of redress, barring that access constitutes organizational harm. *PETA*, 797 F.3d at 1094. Thus, the D.C. Circuit held in *PETA* that USDA injured an organization by depriving it of an important conduit to "seek redress for bird abuse" through USDA's complaint mechanisms

when it refused to apply animal welfare requirements to birds. *Id*. at 1091.[23]

Courts have thus found injury where, as here, an agency denies notice and comment. When the Department of Education failed to allow comment on its complaint processing manual, plaintiff organizations were "harmed by the[ir] diversion of resources . . . to assist their members under the [] Manual's regime"; *i.e.*, they had to provide services to deal with the decision reached without their input. *Nat'l Fed'n of the Blind v. United States Dep't of Educ.*, 407 F. Supp. 3d 524, 533 (D.Md. 2019).

EXIM's refusal to permit comment on the specific aspects of the Project that will harm the people Plaintiffs serve denied Plaintiffs "access to . . . avenues of redress they wish to use" in assisting Project-affected people. *PETA*, 797 F.3d at 1094. The comment procedures are a critical means of preventing and redressing particular harms from EXIM-funded projects. Submitting affected people's concerns and proposals to prevent or redress harms to institutions like EXIM is a core service central to Plaintiffs' missions. *Supra* 10-11. EXIM foreclosed Plaintiffs from providing that service. Had EXIM allowed comment, Plaintiffs would have raised communities' concerns about exacerbating the conflict and the resettlement process, among others. FOE Decl. ¶ 54; JA Decl. ¶¶ 57, 61-64.

EXIM could avoid many of the Project's risks by deciding not to fund it or changing the conditions of its financing. Instead, EXIM wants to enable Total to restart it, without any input from those harmed. Foreclosing this important avenue of redress injured Plaintiffs.

---

[23] Likewise, where consumers could no longer rely on CFPB's complaint system to protect their information, that tool was no longer useful, injuring organizations that facilitated consumers' participation in the system. *AFL-CIO v. DOL*, No. 25-339 (JDB), 2025 U.S. Dist. LEXIS 72516, at *30-31 (D.D.C. Apr. 16, 2025). Similarly, DHS's rule establishing a four-hour window for asylum seekers to consult with an attorney impaired legal organizations' ability to provide services. *Las Ams. Immigrant Advoc. Ctr. v. United States Dep't of Homeland Sec.*, No. 24-1702 (RC), 2025 U.S. Dist. LEXIS 94453, at *34-35 (D.D.C. May 9, 2025).

        **ii.**    **By enabling the Project to restart without mitigation measures in a conflict zone, EXIM's loan will increase the need for Plaintiffs' services and the risk and burden to Plaintiffs to provide them.**

An organization is harmed when a defendant's acts "might increase the number of people in need of the organization's [services]," or decrease services' effectiveness. *Equal Rights Ctr. v. Post Properties Inc*, 633 F.3d 1136, 1139 (D.C. Cir. 2011) (cleaned up). The same is true where a defendant's acts force an organization to provide more burdensome or complicated services.

Thus, a rule requiring asylum-seekers to meet higher standards harmed immigrant support organizations by forcing them to conduct "more resource intensive" interviews that would "severely limit the number of individuals they may serve." *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 39 (D.D.C. 2020); *accord N.W. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46-47 (D.D.C. 2020). And a rule limiting legal organizations' access to asylum seekers harmed them by "forcing [them] to engage in much more work at the end of that process—after noncitizens' claims for protection have been rejected—where [their] ability to provide meaningful assistance and consultation to noncitizens is diminished." *Las Ams. Immigrant Advoc. Ctr.*, 2025 U.S. Dist. LEXIS 94453, at *34-35.

Enabling the Project to restart will increase the number of people needing JA's services. JA Decl. ¶¶ 63-64, 84. The Project will likely exacerbate the conflict, Conflict Decl. Part IV, posing grave risks to the people Plaintiffs serve. And the Project will inflict other new injuries on local people, including further forced displacement and land loss, environmental harm and impacts to livelihoods. JA Decl. ¶¶ 63-64, 84, 94. Those injured will need Plaintiffs' help. *Id*. ¶ 64. And Plaintiffs will spend time and resources helping local people seek redress for the harms they will suffer. *Id*.

Restarting the Project will also force Plaintiffs to provide more burdensome, less effective services. After being prevented from trying to avoid injury by commenting, Plaintiffs will have to engage in remedial work at the end of the process, where their ability to help affected people is diminished. These remedial services are far more difficult to provide than engaging up-front in processes to oppose the Project or shape its mitigation plans. JA Decl. ¶ 63.

For example, JA will have to expend significant resources to help families whose lands will be seized as a result of the restart to seek compensation, family by family. *Id.* ¶ 64. During this displacement, community members will not have the protections they would have proposed through notice and comment. *Id.* Plaintiffs will also have to conduct environmental and other monitoring of the construction, which will proceed without remediation plans informed by Plaintiffs' recommendations. JA Decl. ¶¶ 9, 23-24, 58, 60-61, 91, 94.

Plaintiffs are also forced to provide immediate outreach to communities to explain why the Project is restarting, and what it all means. *Id.* ¶ 56-57, 59. *See Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 177-178 (D.D.C. 2017) (finding injury where organization had to engage in meetings and communications with stakeholders to ensure impact of policy suspension was understood); *Whitman-Walker Clinic, Inc. v. United States HHS*, 485 F. Supp. 3d 1, 56-57 (D.D.C. 2020) (noting health care providers would be injured by expending resources to educate other providers, clients, and organizations). And by funding (and thus restarting) the Project with almost no notice, Defendants forced Plaintiffs to provide services on an accelerated timeline. JA Decl. ¶ 59.

EXIM's decision to greenlight the Project's relaunch during an active conflict not only increases the need for Plaintiffs' services, it makes providing them more difficult and dangerous. SUMF ¶¶ 44, 52-53. Addressing the new displacement and other harms will require JA staff to

33

make more frequent trips to the area. JA Decl. ¶ 169. Staff travelling in the region risk attack from insurgents or abuses by the military. Conflict Decl. ¶¶ 37, 43-44, 52, 56, 72, 78. To get there by road, JA would have to rely on the main highway, which insurgents target and where insurgents, the military and local militias have checkpoints at which people are extorted, abused, or even disappeared.[24] Total's new plan to avoid using roads recognizes that there is no safe way to travel by road to the Project area. There are no economical and reliable alternatives. JA Decl. ¶¶ 165, 167.

The difficulty and expense of traveling to the region has decreased JA's ability to carry out regular visits, attend meetings, respond to emergencies, and bring in experts. *Id.* ¶ 166. JA has been forced to stop working with specific communities that are too dangerous to visit, and reduce support for communities that would require travel to or from Cabo Delgado. *Id.* ¶¶ 155, 166-67. These difficulties are likely to increase as the Project exacerbates the conflict.

EXIM's loan approval has created more, more difficult, less effective work for Plaintiffs.

### iii.    EXIM has removed a source of information that Plaintiffs typically share with their clients, forcing Plaintiffs to conduct independent factfinding.

EXIM injured Plaintiffs by precluding "access to information . . . [Plaintiffs] wish to use in their routine information-dispensing, counseling, and referral activities" or "to educate the public. *PETA*, 797 F.3d at 1094 (quotation marks omitted). This left Plaintiffs "compelled to fill the [informational] void." *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (2020).

EXIM failed to share statutorily mandated information with Plaintiffs, despite their repeated requests. *Supra* I.F. This has impeded Plaintiffs' ability to provide information to local

---

[24] Conflict Decl. ¶¶ 37, 43, 52, 56-57; UNOCHA, *Mozambique: Access Snapshot - Cabo Delgado Province, as of 31 May 2025*; Herz Decl. Ex. 4 at 17.

communities and protect their rights. If EXIM had provided Plaintiffs the required notice that the Board would consider a new loan, they would have gathered community concerns and shared them with EXIM. JA Decl. ¶¶ 56-57, 61. And if they had the monitoring reports, assessments, and plans upon which the 2025 approval should have been based, they would have reviewed and shared them to educate the communities and identify errors. *Id.* ¶ 60. For instance, these assessments should have considered the Project's security plan, information critical to local people in deciding how to protect themselves. FOE Decl. ¶ 44.

Given EXIM's refusal to provide information it was required to make public, Plaintiffs have and will expend time and resources seeking information necessary to help local people protect their rights and combat harms from the Project. *Id.* ¶¶ 25-35, 42-50. Plaintiffs have had to try to fill the gap by seeking information from other sources and conducting independent research. *Id.* For instance, FOE has had to spend time working with organizations in other countries to try to obtain this information from other public finance institutions involved in the Project. *Id.* ¶ 49.

    iv. **EXIM's unlawful approval will force Plaintiffs to divert resources from other work.**

EXIM's financing will force Plaintiffs to "divert[] scarce resources away from previously planned projects." *See Open Cmtys. All.*, 286 F. Supp. 3d at 177-178; *see also NAACP v. United States Postal Serv.*, 496 F. Supp. 3d 1, 11 (D.D.C. 2020). This harms Plaintiff organizations, preventing them from achieving their missions of supporting multiple communities.

As noted above, EXIM's refusal to permit comment denied Plaintiffs access to an avenue of redress for the communities they serve. Now Plaintiffs must expend resources to seek alternative, albeit less effective, means to protect or redress local people's rights. For instance, FOE will submit complaints to other funders to encourage them to implement community-

protective measures. FOE Decl. ¶ 56. Had EXIM declined to fund the Project and it was not proceeding, this burdensome work would be unnecessary.

Similarly, if EXIM's loan approval stands and the Project proceeds, many more people will need Plaintiffs' services. Plaintiffs will have to dedicate even more time and resources to providing assistance, information and other services to help people protect their rights and prevent or ameliorate Project harms. *Id.* ¶ 61; JA Decl. ¶¶ 64-65. This will force Plaintiffs to divert resources from other pre-planned activities. FOE and JA have already shifted and will shift significant time and resources away from core activities of defending other communities and addressing other important issues. FOE Decl. ¶ 38; JA Decl. ¶ 65.

For instance, JA has been helping community members seek redress for land taken by the Project and ongoing failures in the resettlement process. JA Decl. ¶ 22. If the Project proceeds, it will displace more people. While JA assists with the 1,300 complaints it has already received, it will have to also respond to additional displacement and other foreseeable harms that will occur because of the restart. *Id.* ¶ 65. This will limit JA's ability to address other issues, such as ongoing legal cases and investigations related to human rights abuses, intimidation, and threats. *Id*. JA cannot provide all of these services simultaneously. *Id*.

Similarly, responding to EXIM's approval means FOE has not had enough time to focus on other projects EXIM and the U.S. government are considering supporting. FOE Decl. ¶ 40 FOE would have spent more time assisting its partners and local communities affected by EXIM support for other projects, including gas projects in Guyana, an oil refinery in Indonesia, and a petrochemical project in Malaysia. *Id*.

**b)    JA and FOE have third-party standing.**

Resurrecting the Project will injure local people; it will displace more people from their homes and farms and likely exacerbate the conflict, subjecting civilians to abuses from both

sides. *Supra* 11-13. These harms are concrete and based on a pattern of "'harm [that] has occurred in the past and is likely to occur again' in the immediate future." *Air Transp. Ass'n of Am. v. Exp.-Import Bank of the United States*, 840 F. Supp. 2d 327, 337 (D.D.C. 2012) (citing *Wis. Gas Co. v. Fed. Energy Regulatory Com.*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Plaintiffs have third-party standing to raise harms affecting the communities they serve. Such standing is available to plaintiffs who suffered their own injury in fact and have a close relationship with the parties whose rights they assert, and there is "some hindrance" to those parties pursuing their own rights. *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991). Plaintiffs have their own Article III injury, *supra* § I.G.1(a), and the other factors are present here as well.

First, a "close" relationship exists where, as here, there is "an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests." *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999). Courts have found close relationships in a variety of circumstances, including an attorney-client relationship, *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 362-62 (D.D.C. 2020), and where the plaintiff provides the third party with other services. *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 731-732 (S.D. Ind. 2016) (finding refugee services provider had standing to assert rights of those it serves).

Plaintiffs share community members' interest in ensuring EXIM follows the law, and Plaintiffs represent their interests before a variety of institutions, international bodies, and U.S. agencies, including EXIM. *Supra* 10-11. This type of work is the kind often performed by attorneys. There may be no better actor to represent these communities' interests here.

Second, those harmed by the Project face hindrances to bringing their own claims. "[S]ome impediment" to one's "ability to assert his own legal rights" suffices. *Al-Aulaqi v.*

*Obama*, 727 F. Supp. 2d 1, 31 (D.D.C. 2010) (citing *Singleton v. Wulff*, 428 U.S. 106, 118

(1976)). Sufficient hindrance existed where newly-arrived refugees wanted to avoid attention,

*Exodus Refugee Immigration, Inc.*, 165 F. Supp. 3d at 732, or employees feared "employment

retaliation." *Turner*, 502 F. Supp. 3d at 362.

 The hindrances here are far more extreme. Community members cannot publicly

challenge EXIM's approval because they fear retaliation from the Mozambique government. JA

Decl. ¶¶ 170-71; Conflict Decl. ¶¶ 58, 63. Moreover, financial, language, and other barriers

hinder individuals living in these remote, impoverished communities, many of them displaced

from their homes by the conflict or the Project, from bringing their claims. JA Decl. ¶ 172.

### c)    JA and FOE have informational standing.

 EXIM denied Plaintiffs information it was required to make public. *Supra* I.F. This not

only affords Plaintiffs standing because it hampers their ability to provide services, it also affords

them standing because EXIM denied them "information which must be publicly disclosed

pursuant to a statute," and Plaintiffs suffer "the type of harm Congress sought to prevent by

requiring disclosure." *Ctr. for Biological Diversity v. United States Int'l Dev. Fin. Corp*., 77

F.4th 679, 685 (D.C. Cir. 2023) (quotation marks omitted). Failure to post notice in the Federal

Register, when a statute requires it, causes informational injury to interested parties. *Id.* at 686.

 Plaintiffs are harmed by EXIM's failure to make information public. They were left in

the dark about EXIM's intentions and the Project's plans and impacts, forced to seek alternate

information sources, denied the ability to make fully informed submissions, and will be harmed

by the destructive Project. *Supra* 29-36. These are precisely the types of injuries Congress sought

to prevent by ensuring that EXIM conducted its business in the open, with public review.

### 2.    Plaintiffs satisfy any causality and redressability requirements.

Where defendants violate required procedures, the causation and redressability requirements are relaxed. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). A plaintiff "denied a procedure to which he was entitled" need only show "he was harmed by a decision made without that procedure." *Citizens for Const. Integrity v. Census Bureau*, 669 F. Supp. 3d 28, 34 (D.D.C. 2023). Such a plaintiff need not show an agency *would* have acted differently if it followed procedure or that correcting the violation would necessarily alter the agency's effect on plaintiffs. *Mendoza*, 754 F.3d at 1010. Standing exists if "there is 'some possibility' that the proper procedure would lead to a more favorable decision." *Citizens for Const. Integrity*, 669 F. Supp. 3d at 34 (quoting *Massachusetts v. EPA*, 549 U.S. at 518).

Plaintiffs were prevented from exercising procedural rights guaranteed by law. The Bank Act, NEPA and EXIM's policies specifically grant Plaintiffs the right to certain information and the right to comment on the proposed loan and the environmental and social assessments and management plans upon which approval should have been based. *Supra* §§ I.B, C, E, F. "Statutory provisions that give private parties a right to participate in a government process" or "cooperate with an agency in preparing impact statements" are canonical examples of procedures designed to protect a plaintiff's interest. *Citizens for Const. Integrity*, 669 F. Supp. 3d at 34-35.

There is at least "some possibility" that if EXIM had followed the required procedures it would have reached a decision "more favorable" to Plaintiffs. This "undemanding test" is met where plaintiff would have provided information that could lead the agency to a different conclusion. *L.M.M. v. Cuccinelli*, 442 F. Supp. 3d 1, 21 (D.D.C. 2020). Had EXIM permitted comments, Plaintiffs would have explained, among other things: the risks of exacerbating the conflict, the shortcomings of the resettlement regime, and the Project's harms to the

environment. Unless EXIM intends to arbitrarily ignore information before it, there is at least some possibility this information could have led to a different decision.

The same standards apply to the Board's failure to consider issues it was required to address. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 & n.7 (1992) (recognizing procedural injury standard would apply to challenge to agency's failure to prepare an environmental impact statement, and thus to consider environmental impacts). Here, that includes EXIM's failure to assess and balance the economic costs and benefits in the U.S. and to consider the environmental effects and the humanitarian and human rights risks, as required before final approval. And again, had the Board considered these issues, there is some possibility it would not have approved the loan or would have imposed additional conditions.

Similarly, EXIM might have reached a different conclusion if a properly constituted Board were in charge. The provisions requiring a Senate-confirmed Board prevent ill-advised lending. *See L.M.M.*, 442 F. Supp. 3d at 7 (Senate confirmation is a check on the Executive and "promot[es] judicious choices of [officials]") (cleaned up). Indeed, EXIM's Inspector General found that the last Senate-confirmed Chair refused to bring the Project before the Board during the last eleven months of her tenure due in part to concerns over the security situation.[25]

In sum, Plaintiffs easily satisfy the reduced causation and redressability standard governing EXIM's failure to act through a Senate-confirmed Board and to follow due diligence and notice and comment procedures. Regardless, Plaintiffs meet even a stricter standard. Without EXIM funding, the Project will not proceed, and Plaintiffs will not suffer the same injury. *Supra*

---

[25] Management Advisory: EXIM's Process for Advancing Oil and Gas Transactions for Board Approval Needs Improved Transparency, Office of the Inspector General (Mar. 31, 2025), https://www.oversight.gov/sites/default/files/documents/reports/2025-03/Final%20Management%20Advisory_Oil%20and%20Gas%20%28OIG-O-25-05%29.pdf.

11. Thus, "harm will directly result from the action which the movant seeks to enjoin," *Wis. Gas Co. v. Fed. Energy Regulatory Com.*, 758 F.2d 669, 674 (1985), and vacating the improper approval would redress Plaintiffs' injuries.

## II.    Absent a preliminary injunction, Plaintiffs face irreparable harm.

A preliminary injunction is warranted where Plaintiffs will imminently suffer irreparable harm. *Newby*, 838 F.3d at 7-8. If this Court does not maintain the *status quo*, irreparable harm will befall Plaintiffs and the people they serve. With disbursement presumably beginning soon and construction anticipated to begin as soon as this summer, the harm is imminent. Indeed, some preparatory work has already begun. *See* Herz Decl. Ex. 6.

### A.  Defendants' procedural violations and approval of the Project will cause Plaintiffs and the communities they serve irreparable harm.

EXIM's acts in violating clear procedures and approving critical Project funding have impaired Plaintiffs' programs, threatened the people Plaintiffs serve with environmental harm and further displacement, and will likely escalate the conflict and cause human rights abuses.

First, Plaintiffs will suffer harm, through new barriers to their existing work and diverted resources. *Supra* § I.G.1(a). These obstacles "provide injury for purposes both of standing and irreparable harm." *Newby*, 838 F.3d at 9. Plaintiffs also suffered procedural harm, which "bolster[s] plaintiffs' case for a preliminary injunction." *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003). Process violations often "cannot be fully cured by later remedial action"; once EXIM starts disbursing money, it will be "far less likely to be receptive to comments." *See N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18-19 (D.D.C. 2009).

Second, JA and the community members Plaintiffs counsel and serve—on whose behalf Plaintiffs have third party standing—will be grievously affected. The security risks and human rights abuses they will suffer if Total restarts the Project are clearly serious. *Supra* 11-13, 36-38.

41

"[D]eath, torture, and rape" constitute serious harm. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). "Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *Newby*, 838 F.3d at 8-9.

Those abuses aside, the environmental risks and loss of homes, farms, and livelihoods are more substantial than those harms courts have found merited an injunction. *See, e.g.*, *Norton*, 281 F. Supp. 2d at 220 (injury to plaintiffs' ability to view swans). All of these harms are irreparable.

### B.    These harms are imminent.

These harms are so "imminen[t] that there is a clear and present need for equitable relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up). Total plans to lift *force majeure* and begin construction this summer.[26] The immediate harms will be serious, and sufficient to merit an injunction. The loan will also permit the Project to proceed, causing harms that might manifest later. The Court should consider all the Project harms. And, it is unlikely this Court could retrieve the taxpayers' money once disbursed. The only way to prevent these harms while the Court considers the merits is through a preliminary injunction stopping EXIM from releasing funds and staying the approval.

### III.    The balance of equities and public interest favor a preliminary injunction.

In actions to enjoin the government, the last two factors—balancing the equities and the public interest—merge. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019). Both favor granting a preliminary injunction to stop EXIM from disbursing funds while the Court considers whether the loan violates Congress's directives.

---

[26] Herz Decl. Ex. 5; *"All Conditions Being Created" for the Resumption of TotalEnergies Mozambique LNG Megaproject – Government – Lusa*, Club of Mozambique (July 14, 2025), https://clubofmozambique.com/news/all-conditions-being-created-for-the-resumption-of-totalenergies-mozambique-lng-megaproject-government-lusa-286935/.

There is a substantial public interest in having government agencies abide by federal law. *Newby*, 838 F.3d at 12. Where a statute "sets out a categorical requirement," the equities favor an injunction because "Congress has already done the relevant balancing." *N.D. v. Reykdal*, 102 F.4th 982, 996 (9th Cir. 2024). Here, EXIM ignored categorical requirements that its Board have a quorum of Senate-confirmed members, that EXIM consider the domestic economic impacts at the time production will begin, that EXIM consider the Project's environmental effects, and that EXIM provide notice and consider comments. *Supra* §§ I.A-E. A high likelihood of success on the merits also strongly indicates that preliminary relief serves the public interest. *Newby*, 838 F.3d at 12. Because EXIM violated clear law, Plaintiffs are highly likely to succeed on the merits.

The equities favor a preliminary injunction that preserves the parties' positions until the merits can be resolved. *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 131 (D.D.C. 2020). Absent an injunction, Plaintiffs and local people will suffer the serious, irreparable harm described above. Conversely, a pause would merely temporarily prevent EXIM from disbursing money it could not have disbursed for the nearly five years this Project has been on hold—in part because its Board has not even considered whether the security conditions that required *force majeure* have been sufficiently addressed.

EXIM and Total would benefit from comment from parties knowledgeable about the conflict and the Project's risks to local people. And while Total may have to wait to learn whether the 2025 approval will stand, it has already waited years during the *force majeure*, which has not been lifted. The burden on Total—a multi-billion-dollar multi-national—is zero while *force majeure* remains in place, and even if it is lifted, the burden will be minimal compared to the dire risks the Project will place on some of the world's most vulnerable people.

43

EXIM cannot argue the loan supports U.S. companies, or workers. Because the Project will produce so much gas during a global glut, the Bank Act presumes it will substantially injure U.S. economic interests. EXIM has not done the required analysis, nor has the Board made the requisite findings, to overcome this presumption. *Supra* § I.C. The Project will also contribute to climate change, which threatens society writ large. *Supra* 13. EXIM flouted its governing legislation and procedures; it cannot claim to be burdened by pausing its illegal act.[27]

## SUMMARY JUDGMENT IS WARRANTED.

In addition to or instead of a preliminary injunction, Plaintiffs seek prompt summary judgment on the same claims. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and [the moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiffs need not show they would face irreparable harm in the absence of preliminary relief or that the balance of equities tip in their favor.

There is no genuine dispute as to any material fact regarding the dispositive claims set forth above. There is no dispute that the acting Board approved the loan without three Senate-confirmed members, that EXIM did not provide notice and permit comment prior to the 2025 approval, that EXIM failed to analyze the economic effects in the United States at the time the Project will come on line, based on current information, and the Board did not make the determination of net benefits necessary to overcome the presumption of "substantial injury," and

---

[27] Plaintiffs respectfully request that the Court exercise its broad discretion to require at most only a nominal bond. *Aviel*, 2025 U.S. Dist. LEXIS 65269, at *36 n.7. Plaintiffs cannot post a substantial bond; requiring one would effectively deny them access to judicial review, *id.*, risk deterring others from pursuing their right to judicial review of unlawful executive action, and contravene the interests of justice. *See LULAC*, 2025 U.S. Dist. LEXIS 78304, at *176 (collecting cases). Organizations protecting the environment against agency action need only post, at most, a nominal bond. *See, e.g.*, *Natural Res. Def. Council v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971). Even if EXIM could show potential revenue loss, "[i]t would be a mistake to treat [that] the same as a pecuniary damage to a private party." *Id.* at 169.

that EXIM's acting Board approved the loan without considering the conflict and the harms to neighboring communities, s*upra* § I.A-E. Any questions here are purely legal; this Court can grant summary judgment based on undisputed facts.

Courts often consider motions for a preliminary injunction and for summary judgment jointly. *E.g.*, *Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 58 (D.D.C. 2016); *Hedgeye Risk Mgmt., LLC v. Heldman*, 196 F. Supp. 3d 40, 46-47 (D.D.C. 2016); *Rigdon v. Perry*, 962 F. Supp. 150, 165 (D.D.C. 1997); *see also* Fed. R. Civ. P. 65(a)(2) (authorizing consolidated hearing of preliminary injunction and trial on the merits). Here, expeditious final disposition will benefit Plaintiffs and community members, who face imminent harm and have a strong interest in EXIM not funding this Project illegally and without the required consideration. It will also benefit Total and EXIM to know sooner rather than later whether EXIM's loan approval can stand, or instead whether EXIM needs to go through an approval process that complies with the law.

## CONCLUSION

Given Plaintiffs' likelihood of success on the merits and the serious and irreparable harm they will likely suffer from Defendants' unlawful acts, a preliminary injunction is warranted to preserve the *status quo*. Thus, Plaintiffs respectfully request that this Court preliminarily enjoin Defendants from releasing any funds or further obligating the United States under any loan agreement for the Project. Alternatively, because no material facts are disputed and EXIM's acts were contrary to law, Plaintiffs respectfully request that this Court grant summary judgment, and require a duly constituted Board to properly assess this loan, following all legal requirements.

45

Date: July 21, 2025                       Respectfully submitted

<u>/s/ Michelle Harrison</u>
Michelle C. Harrison (D.C. Bar No. 1026592)
Richard L. Herz[*]
Tamara A. Morgenthau (D.C. Bar No. 90032827)
Lindsay A. Bailey (D.C. Bar No. 1723447)
EarthRights International
1400 K St. NW Suite 750,
Washington, DC 20005
(202) 466 5188
michelle@earthrights.org

*Counsel for Plaintiffs*

---

[*] Based in CT; admitted in NY; does not practice in DC's courts.

**<u>CERTIFICATE OF SERVICE</u>**

    I hereby certify that this document will be served on Defendants in accordance with

Federal Rule of Civil Procedure 5(a).

DATE:  July 21, 2025                                  <u>/s/*Michelle C. Harrison*</u>
                                                                Michelle C. Harrison (D.C. Bar No.
                                                                1026592)