REDACTED

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE EARTH U.S. AND JUSTIÇA AMBIENTAL,

        Plaintiffs,

   v.

EXPORT-IMPORT BANK OF THE UNITED STATES *et al.*,

        Defendants,

and

TOTALENERGIES EP MOZAMBIQUE AREA 1, LIMITADA,

        Defendant-Intervenor.

Case No. 1:25-cv-02235-CJN

## DEFENDANT-INTERVENOR TOTALENERGIES EP MOZAMBIQUE AREA 1, LIMITADA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

REDACTED

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................3

    A.    The Export-Import Bank ......................................................................3

        1.    The Bank's Statutory Framework ....................................................3

        2.    The Bank's Leadership Structure .....................................................4

        3.    Discretionary Factors Impacting Bank Lending .............................4

        4.    Limited Notice-And-Comment Procedures for Bank Lending.................5

    B.    The Bank And The Mozambique Liquified Natural Gas Project ...........6

        1.    The Bank Approves A Final Commitment In 2019...................................6

        2.    The Bank Amends The Loan In 2020.........................................................8

        3.    TEPMA1 Invokes Force Majeure in 2021 .........................................9

        4.    The Bank Amends The Loan Again In 2025 .......................................9

    C.    Plaintiffs Belatedly Sue To Stop The Loan .........................................10

ARGUMENT ...............................................................................................................10

I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS...........................11

    A.    Plaintiffs Have Not Proven They Are Likely To Succeed In Establishing Standing .................................................................................11

        1.    Plaintiffs Lack Organizational Standing.......................................12

        2.    "Third Party Standing" Cannot Provide Plaintiffs Article III Standing ..........................................................................................18

    B.    Plaintiffs' Claims Fail On Their Merits ..............................................19

        1.    The Bank Had a Lawful Quorum When It Approved the Amendment..................................................................................19

        2.    Plaintiffs' Bevy of Other Procedural Objections All Fail...........................22

            a.    Amendments To An Executed Agreement Do Not Require Public Notice And Comment ....................................................23

            b.    The Bank Adequately Considered the Amendment's Economic Effects .......................................................................29

            c.    The Bank Adequately Considered Environmental Effects ...........33

        3.    Plaintiffs' NEPA Claim Fails.......................................................37

        4.    The Bank Has Not Unlawfully Withheld Information From The Public .........................................................................................39

II.    PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM ...........................41

III.    THE BALANCE OF THE EQUITIES FAVOR THE BANK AND TEPMA1 ...............44

CONCLUSION.................................................................................................................45

REDACTED

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Air Transport Ass'n of Am. v. Export-Import Bank*,
  878 F. Supp. 2d 42 (D.D.C. 2012), *judgment rev'd by Delta*, 718 F.3d 974 .........................35

*Al-Aulaqi v. Obama*,
  727 F. Supp. 2d 1 (D.D.C. 2010) .........................................................................................19

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
  946 F.3d 615 (D.C. Cir. 2020) ............................................................................................12

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) .............................................................................................................43

*Animal Legal Def. Fund, Inc. v. Espy*,
  23 F.3d 496 (D.C. Cir. 1994) ..............................................................................................17

*Aviel v. Gor*,
  __ F. Supp. 3d __, 2025 WL 1009035 (D.D.C. Apr. 4, 2025) ...........................................21

*Bernstein v. Kerry*,
  962 F. Supp. 2d 122 (D.D.C. 2013), *aff'd* 584 F. App'x 7 (D.C. Cir. 2014) ........................42

*Campaign Legal Ctr. v. FEC*,
  No. 22-cv-3319, 2024 WL 4263853 (D.D.C. Sept. 23, 2024) .............................................15

*Cayuga Nation v. Zinke*,
  302 F. Supp. 3d 362 (D.D.C. 2018) .....................................................................................11

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .........................................................................................2, 11

*Chesapeake Climate Action Network ("CCAN") v. Export-Import Bank*,
  78 F. Supp. 3d 208 (D.D.C. 2015) ................................................................................14, 18

*City & Cnty. of San Francisco v. Azar*,
  411 F. Supp. 3d 1001 (N.D. Cal. 2019) ..............................................................................27

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ...............................................................................................................16

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .............................................................................................................15

REDACTED

*Clarian Health W., LLC v. Hargan,*
  878 F.3d 346 (D.C. Cir. 2017) ............................................................34

*Cmty. Nutrition Inst. v. Young,*
  818 F.2d 943 (D.C. Cir. 1987) ............................................................34

*Common Cause v. FEC,*
  108 F.3d 413 (D.C. Cir. 1997) ............................................................18

*ConverDyn v. Moniz,*
  68 F. Supp. 3d 34 (D.D.C. 2014) ........................................................44

*Crowe v. Fed. Bureau of Prisons,*
  No. 24-cv-3582, 2025 WL 1635392 (D.D.C. June 9, 2025) ...............40

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.,*
  77 F.4th 679 (D.C. Cir. 2023) ........................................................20, 21

*Ctr. for Law & Educ. v. Dep't of Educ.,*
  396 F.3d 1152 (D.C. Cir. 2005) ..........................................................13

*Delta Air Lines, Inc. v. Export-Import Bank,*
  718 F.3d 974 (D.C. Cir. 2013) .......................................................31, 44

*Delta Air Lines, Inc. v. Export-Import Bank,*
  85 F. Supp. 3d 387 (D.D.C. 2015) ............................................28, 35, 36

*Edison Elec. Inst. v. EPA,*
  391 F.3d 1267 (D.C. Cir. 2004) ..........................................................37

*Elec. Priv. Info. Ctr. v. Dep't of Educ.,*
  48 F. Supp. 3d 1 (D.D.C. 2014) ..........................................................16

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) ............................................................17

*English v. Trump,*
  279 F. Supp. 3d 307 (D.D.C. 2018) ................................................21, 22

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ................................................................... *passim*

*Fontem US, LLC v. FDA,*
  No. 22-1076 (D.C. Cir. July 12 2022) .................................................41

*Food & Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) ............................................................11

REDACTED

*Fort Myer Constr. Corp. v. Shrensky*,
No. 1:23-cv-02275, 2024 WL 181075 (D.D.C. Jan. 17, 2025) ..............................................11

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) ....................................................................................................41

*Fund for Animals v. Norton*,
281 F. Supp. 2d 209 (D.D.C. 2003) ............................................................................................43

*Fund for Animals v. Thomas*,
127 F.3d 80 (D.C. Cir. 1997) ......................................................................................................38

*Guedes v. ATF*,
356 F. Supp. 3d 109 (D.D.C. 2019), *aff'd* 920 F.3d 1 (D.C. Cir. 2019)............................20, 22

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)..............................................................................................................12, 13

*Hooks v. Kitsap Tenant Support Servs., Inc.*,
816 F.3d 550 (9th Cir. 2016) ......................................................................................................22

*Idaho Conservation League v. Bonneville Power Admin.*,
826 F.3d 1173 (9th Cir. 2016) ....................................................................................................39

*Kowalski v. Tesmer*,
543 U.S. 125 (2004)....................................................................................................................19

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016).................................................................................................41, 42

*Lee Mem. Hosp. v. Burwell*,
109 F. Supp. 3d 40 (D.D.C. 2015) ..............................................................................................32

*Macht v. Skinner*,
715 F. Supp. 1131 (D.D.C. 1989), *aff'd*, 889 F.2d 291 (D.C. Cir. 1989)..............................45

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)....................................................................................................................39

*Miller v. Gruenberg*,
No. 1:21-cv-03035, 2022 WL 20699638 (D.D.C. Aug. 24, 2022)..........................................41

*Murthy v. Missouri*,
603 U.S. 43 (2024)......................................................................................................................42

*Mylan Pharms., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) ................................................................................................41

REDACTED

*Nat'l Ass'n of Home Builders v. EPA*,
    667 F.3d 6 (D.C. Cir. 2011) ...............................................................................13, 14

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ......................................................................................34

*Nat'l Veterans Legal Servs. Program v. DOD*,
    No. 14-cv-01915, 2016 WL 4435175 (D.D.C. Aug. 19, 2016) ..................14, 17, 18

*Navistar, Inc. v. EPA*,
    No. 11-cv-449, 2011 WL 3743732 (D.D.C. Aug. 25, 2011) .....................................42

*NLRB v. SW Gen. Inc.*,
    580 U.S. 288 (2017) ......................................................................................................20

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................................................40

*NRDC v. Kempthorne*,
    525 F. Supp. 2d 115 (D.D.C. 2007) ............................................................................45

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
    48 F. Supp. 3d 87 (D.D.C. 2014) ................................................................................41

*Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*,
    492 F. Supp. 3d 701 (E.D. Tex. 2020) ........................................................................45

*PETA v. USDA*,
    797 F.3d 1087 (D.C. Cir. 2015) ...................................................................................15

*Power Mobility Coalition v. Leavitt*,
    404 F. Supp. 2d 190 (D.D.C. 2005) ............................................................................41

*Scenic Am., Inc. v. Dep't of Transp.*,
    836 F.3d 42 (D.C. Cir. 2016) .......................................................................................42

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    145 S. Ct. 1497 (2025) ............................................................................................38, 39

*Siegel v. U.S. Dep't of Treasury*,
    304 F. Supp. 3d 45 (D.D.C. 2018) ..............................................................................16

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C.2013) .................................................................................43

*Sitka Sound Seafoods, Inc. v. NLRB*,
    206 F.3d 1175 (D.C. Cir. 2000) ...................................................................................37

*Sugar Cane Growers Coop. of Fla. v. Veneman,*
    289 F.3d 89 (D.C. Cir. 2002) ..................................................................................23

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ..............................................................................................14

*Syncor Int'l Corp. v. Shalala,*
    127 F.3d 90 (D.C. Cir. 1997) ................................................................................34

*Telecommunication Research & Action Center* ("*TRAC*") *v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ................................................................................40

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
    578 U.S. 590 (2016) ..............................................................................................24

*United States v. $215,587.22 in U.S. Currency Seized,*
    306 F. Supp. 3d 213 (D.D.C. 2018) ......................................................................27

*United States v. Smith,*
    962 F.3d 755 (4th Cir. 2020) ................................................................................22

*United States v. Wilson,*
    290 F.3d 347 (D.C. Cir. 2002) ..............................................................................26

*Vill. of Logan v. U.S. Dep't of Interior,*
    577 F. App'x 760 (10th Cir. 2014) ........................................................................45

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) ..................................................................................................10

*Workman v. Bissessar,*
    275 F. Supp. 3d 263 (D.D.C. 2017) ......................................................................37

## STATUTES

5 U.S.C.
    § 553(a)(2) ........................................................................................................5, 23
    § 662b(a)(1) ............................................................................................................21
    § 706 ........................................................................................................................33
    § 706(1) ..............................................................................................................39, 40
    § 706(1)-(2) ............................................................................................................35
    § 3345(a) ................................................................................................................20
    § 3345(a)(2) ............................................................................................................21
    § 3345(a)(3) ........................................................................................................4, 20
    § 3347(a) ................................................................................................................20
    § 3347(a)(1)(A) ......................................................................................................22
    § 3349c(1) ..............................................................................................................21

REDACTED

12 U.S.C.

§ 635.................................................................................................................1, 3
§ 635(a)(1) ............................................................................................................23
§ 635(a)(c)(10)(ii) .................................................................................................25
§ 635(a)(c)(10)(C)(i)(II).........................................................................................25
§ 635(a)(c)(10)(D) ...................................................................................................6
§ 635(a)(c)(10)(E) ....................................................................................................6
§ 635(a)(c)(10)(E) ..................................................................................................25
§ 635(a)(c)(10)(F) ....................................................................................................6
§ 635(a)(c)(10)(F) ..................................................................................................25
§ 635(b)(1)(A)-(B) ...................................................................................................4
§ 635(b)(3) ...............................................................................................................8
§ 635(c)(10) .............................................................................................................8
§ 635(e)(1) ...........................................................................................5, 30, 31, 33
§ 635(e)(3) ...............................................................................................................5
§ 635(e)(7) ...............................................................................................................5
§ 635(e)(7)(A) ........................................................................................................28
§ 635(e)(7)(B) .........................................................................................................28
§ 635(e)(7)(B)(i) .....................................................................................................28
§ 635 *et seq.* ...........................................................................................................3
§ 635a(b) .............................................................................................................4, 20
§ 635a(c)(1)......................................................................................................4, 20, 21
§ 635a(c)(6)(A) ........................................................................................................4
§ 635a(c)(10)(A) ...............................................................................................6, 24
§ 635a(c)(10)(C) ......................................................................................................6
§ 635a(c)(10)(C)(i)(I)..............................................................................................25
§ 635a(c)(10)(D) ....................................................................................................27
§ 635a(c)(10)(D)(ii) ...........................................................................................6, 27
§ 635i-5 .............................................................................................................33, 35
§ 635i-5(a)(1).......................................................................................5, 33, 35, 36
§ 635i-5(a)(2) ....................................................................................................33, 36
§ 635i-5(b) ..............................................................................................................34

42 U.S.C.

§ 4332(2)(C)......................................................................................................37, 38
§ 4336e(10)(A)..................................................................................................37, 38
§ 4336e(10)(B)(iii).................................................................................................38
§ 4336e(10)(B)(vi).................................................................................................38

## REGULATIONS

12 C.F.R.

§§ 408.1-408.7 .......................................................................................................38
§ 408.3 ..............................................................................................................38, 39
§ 408.5(a) ...............................................................................................................38
§ 408.6...................................................................................................................39

REDACTED

83 Fed. Reg. 61,379 (Nov. 29, 2018)......................................................................8, 31

84 Fed. Reg. 44,303 (Aug. 23, 2019)...........................................................................8

## OTHER AUTHORITIES

132 Cong. Rec. S26471 (Sept. 26, 1986).....................................................................30

158 Cong. Rec. H2460 (2012)......................................................................................26

158 Cong. Rec. H2465 (2012)......................................................................................26

158 Cong. Rec. H2468..................................................................................................26

Economic Impact Procedures and Methodological Guidelines,
    https://tinyurl.com/53euznve ................................................................................5

Environmental Impact Assessment, ch. 5, § 5.5.1, https://tinyurl.com/4277dbaz......................45

ESPG, § I, https://tinyurl.com/4jxjdhxb ............................................................... *passim*

EXIM, Approved Transactions, https://tinyurl.com/5bs8ehz7 (last visited Aug. 15,
    2025) ......................................................................................................................7

EXIM, Pending Transactions for Environment Category A and B Projects
    (captured Oct. 25, 2016), https://tinyurl.com/2znhhkpb......................................7

Export-Import Bank, *Direct Loan: Fixed-Rate Term Financing for International
    Buyers* (Jan. 26, 2012), https://tinyurl.com/yc5ux4xt.........................................26

Export-Import Bank Financing of Fossil Fuel Projects, Cong. Rsch. Serv. (Nov.
    18, 2024), https://tinyurl.com/2wwas6bf ...........................................................35

Merriam-Webster.com Dictionary, https://www.merriam-
    webster.com/dictionary/material (accessed Aug. 14, 2025) ................................27

Mozambique LNG, Environmental and Social Impact Assessment (captured Dec.
    17, 2015), https://tinyurl.com/3nu3ty3j ...............................................................7

*President Trump Strengthens Export-Import Bank of the United States, Supports
    U.S. Jobs by Establishing Board Quorum Through Acting Appointments*,
    EXIM (Feb. 28, 2025), https://tinyurl.com/2a5zm4bh .........................................4

Press Release, EXIM, *President Biden Authorizes EXIM Board Transition Steps*
    (July 21, 2021), https://tinyurl.com/3jz2pjwe......................................................20

R *ex rel.* Friends of the Earth Ltd. v. The Secretary of State for International
    Trade/UK Export Finance [2023] EWCA Civ 14 [¶ 10],
    https://tinyurl.com/2m96as6m ............................................................................43

REDACTED

S. Rep. 105-250 (1998)................................................................................................22

S. Rep. No. 99-274 (1986)...........................................................................................4

Transcript: Donald Trump's Address at 'Winning the AI Race' Event (July 24,
    2025), https://tinyurl.com/ycy4m7e6.....................................................................6

Webster's Dictionary (2012).......................................................................................25

REDACTED

## INTRODUCTION

In 2019, the Export-Import Bank of the United States ("EXIM" or the "Bank") approved a nearly $5 billion loan to finance a project to develop a vast natural gas reserve off the coast of Mozambique ("the Project"). EXIM is a federally chartered bank that supports "maintaining or increasing employment of United States workers," promoting American prosperity, and increasing exports through a "general banking business" "to guarantee [and] insure . . . against political and credit risks of loss." 12 U.S.C. § 635. EXIM's lending to the Project is expected to support over 16,000 American jobs, and address increasing demand for cleaner-burning natural gas.

Before EXIM approved and made a final commitment to the loan ("the Final Commitment") in 2019, the Project underwent nearly a decade of environmental, social, and economic study, accompanied by multiple opportunities for public comment. Yet now, six years later, Plaintiffs Friends of the Earth U.S. and Justiça Ambiental, two affiliated issue-advocacy groups opposed to fossil fuels, are seeking extraordinary emergency relief to halt any disbursements under the loan agreement ("the Agreement"). Their purported basis for doing so is the March 2025 approval of an amendment to the Agreement, consisting of immaterial changes largely to extend the date by which the disbursements previously authorized under the original agreement must be completed. That extension became necessary because jihadist terrorists seeking to establish an Islamic state launched attacks across a region of Mozambique roughly the size of New Jersey that includes the Project area. Plaintiffs now seek to leverage that human tragedy to shut the Project down for good.

Plaintiffs' preliminary injunction motion should be denied. To obtain that "extraordinary" remedy, the moving party must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered

REDACTED

by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). None of these elements are satisfied, despite all four being required.

Plaintiffs are not likely to succeed on the merits. At the threshold, Plaintiffs fail to show they likely have Article III standing. Plaintiffs concededly are not based in the Project area, but over 1,000 miles away. Instead of showing any concrete, particularized injury from EXIM's lending, Plaintiffs' primary "injuries" are their claims that they desire more opportunities to provide comments on Bank activities, and their speculation that the EXIM loan will increase terrorist attacks. That is far afield from the sort of injury required for Article III standing.

Apart from Plaintiffs' lack of standing, their laundry list of claims fails on the merits. Plaintiffs' lead claim, that the President unlawfully appointed EXIM's Board members, conflicts with the unambiguous text authorizing the President to appoint those individuals under the Federal Vacancies Reform Act ("FVRA"). Second, Plaintiffs' assortment of claims that EXIM should have undertaken a variety of public notice and comment procedures, economic analyses, and environmental analyses, in connection with the 2025 Amendment, all suffer from a common flaw: Those procedures apply, if at all, to final commitments that result in executed loans, not *amendments* to such loans. EXIM discharged any such obligations in connection with the 2019 Final Commitment and the Agreement. While Congress undoubtedly wanted EXIM to keep itself and the public aware of some important issues, and conduct certain analyses, there is no indication in the Bank Act or anywhere else that Congress wanted to disable EXIM from actually functioning as a bank by endlessly re-doing notice-and-comment and other analyses for routine banking activities like changing deadlines for disbursing funds. Third, Plaintiffs' National Environmental Policy Act ("NEPA") claim cannot survive because the Amendment is not the type of agency decision that requires NEPA documentation. Finally, Plaintiffs cannot compel EXIM to publish

REDACTED

any purportedly withheld information because no information was "unlawfully withheld."

The remaining equitable factors also preclude preliminary relief. Plaintiffs fail to show they will suffer irreparable harm absent preliminary relief. Notably, even Plaintiffs seem to agree they have little to show for irreparable harm, spending approximately one page of their brief on the issue. The Court could simply find the issue waived and deny the motion on that ground alone.

In all events, Plaintiffs' conduct is inconsistent with any finding of "irreparable harm": Their unexplained delay in bringing this lawsuit for nearly *six years* after EXIM issued the Final Commitment—and four months after EXIM finalized the Amendment—negates their claims of urgency. That delay is perhaps unsurprising: Plaintiffs fail to identify any "great, certain, and imminent" injury to them, as required to show irreparable harm. The remaining equitable factors also disfavor preliminary relief: An injunction would harm Defendant-Intervenor TotalEnergies EP Mozambique Area 1, Limitada ("TEPMA1"), U.S. workers, and Mozambique, and courts routinely find that continuing infrastructure projects is in the public interest.

For these reasons and those set forth below, Plaintiffs' motion should be denied.

## BACKGROUND

### A.    The Export-Import Bank

#### 1.    The Bank's Statutory Framework

EXIM is a federally chartered bank that is an independent federal agency and corporation dedicated to "maintaining or increasing employment of United States workers," and promoting American prosperity and security, by providing credit liquidity, especially where private credit markets are unwilling or unable to finance international projects' risks. *See* 12 U.S.C. § 635.

EXIM took its current shape when Congress passed the Bank Act, 12 U.S.C. § 635 *et seq.*, in 1945. Congress authorized EXIM "to do a general banking business," including "to guarantee, insure, coinsure, and reinsure against political and credit risks of loss." *Id.* To be competitive

REDACTED

against other nations that seek to promote their own industries and jobs at the expense of U.S. jobs, Congress emphasized that EXIM must be flexible and have authority to respond to market conditions and foreign competition. *See id.* § 635(b)(1)(A)-(B) (EXIM's loans should "neutralize the effect of . . . foreign credit on international sales competition" and ensure the Bank remains "fully competitive" with other government-supported programs supporting "exporters [that] compete with United States exporters"); S. Rep. No. 99-274, at 8 (1986) (Amendments to the Bank Act "should . . . not reduce [EXIM]'s competitiveness and flexibility.").

### 2.    The Bank's Leadership Structure

EXIM is managed by its President and First Vice President, who are appointed by the U.S. President with the advice and consent of the Senate. 12 U.S.C. § 635a(b). EXIM is controlled by a five-member Board of Directors. *Id.* § 635a(c)(1). EXIM's President and First Vice President serve *ex officio* on the Board by virtue of holding their management offices. *Id.* (EXIM's President and First Vice President "shall serve" as Chairman and Vice Chairman.). The President appoints three other members to the Board with the Senate's advice and consent. *Id.*

Currently, Spencer Bachus, III is the only Senate-confirmed Board member. § 635a(c)(6)(A). James Cruse and James Burrows serve *ex officio* in their capacities as EXIM's Acting President and First Vice President, respectively, pursuant to acting appointments by President Trump under the FVRA, 5 U.S.C. § 3345(a)(3).[1]

### 3.    Discretionary Factors Impacting Bank Lending

Beyond its overarching mandate to promote American jobs, the Bank Act provides EXIM considerable discretion to take into account a range of policy concerns when evaluating a potential

---

[1] *See President Trump Strengthens Export-Import Bank of the United States, Supports U.S. Jobs by Establishing Board Quorum Through Acting Appointments*, EXIM (Feb. 28, 2025), https://tinyurl.com/2a5zm4bh.

REDACTED

loan.  For example, the Bank is prohibited from "extend[ing] any direct credit . . . for . . . expanding production of any commodity for export" by any foreign country "if the Bank determines that" (1) "the commodity is likely to be in surplus on world markets at the time [it] will first be sold" or "the resulting production capacity is expected to compete with United States production" ***and*** (2) the extension or credit will cause "substantial injury to United States producers."  12 U.S.C. § 635(e)(1).  Even if both conditions are met, the prohibition "shall not apply" if "in the judgment of the Board" the benefits to industry are likely to outweigh the costs.  *Id.* § 635(e)(3).

A "detailed economic impact analysis or similar study" is expressly *not* required to consider economic impacts on U.S. producers before extending credit, and EXIM need only provide an opportunity for public notice and comment "if" it decides to conduct such an economic analysis or study in its discretion.  *Id.* § 635(e)(7).  To guide such discretionary economic analyses, EXIM has developed its non-binding Economic Impact Procedures and Methodological Guidelines, https://tinyurl.com/53euznve.

Congress also directed that "the Bank shall establish procedures to take into account the potential beneficial and adverse environmental effects of goods and services" the bank finances in a manner "consistent with the objectives of section 635(b)(1)(A)" concerning job creation.  12 U.S.C. § 635i-5(a)(1).  EXIM must also establish procedures to make certain "environmental assessments and supplemental environmental reports required to be submitted to the Bank" available to the public.  *Id*.  EXIM accordingly developed its non-binding Environmental and Social Due Diligence Procedures and Guidelines ("ESPG") to guide its environmental analysis of credit "applications."  *See* ESPG, § I ¶ 2, https://tinyurl.com/4jxjdhxb.

### 4.    Limited Notice-And-Comment Procedures for Bank Lending

The Administrative Procedure Act's ("APA") notice and comment procedures do not generally apply to federal lending programs.  5 U.S.C. § 553(a)(2).

REDACTED

But, the Act requires EXIM "[i]n general" to "provide a notice and comment period" before "any meeting of the Board for final consideration of a long-term transaction the value of which exceeds $100,000,000." 12 U.S.C. § 635a(c)(10)(A). Specifically, EXIM must (1) "publish in the Federal Register a notice of the application proposing the transaction," (2) "provide a period of not less than 25 days for the submission to the Bank of comments on the application," and (3) "notify" certain Congressional committees, and seek comments on the application from the Department of Commerce and the Office of Management and Budget. *Id.* § 635a(c)(10)(C).

EXIM is not required to respond to comments or consider them in any particular way. *Id.* However, EXIM must summarize the comments to the Board before it "tak[es] final action on an application," *id.* § 635(a)(c)(10)(E), and must provide a summary of its decision after "a final decision of the Board . . . with respect to an application," *id.* § 635(a)(c)(10)(F).

EXIM must also update the notice and provide an additional comment period if there is a material change "to an application." *Id.* § 635(a)(c)(10)(D). A "material change" includes "an increase of at least 25 percent in the amount of a loan . . . requested." *Id.* § 635a(c)(10)(D)(ii).

**B.      The Bank And The Mozambique Liquified Natural Gas Project**

***1.      The Bank Approves A Final Commitment In 2019***

Natural gas has long been recognized as the cleanest fossil fuel and a key part of a more sustainable energy future. Decl. of Maxime Rabilloud ("Rabilloud Decl."), ¶ 10. It is a transitional energy source, offering significant reductions in emissions compared to other forms of energy, such as coal, while remaining flexible, reliable, and accessible. *Id.* Increasing natural gas use as part of the world's energy mix has been key to mitigating $CO_2$ emissions worldwide. *Id.* ¶ 11.[2]

---

[2] Obtaining access to additional energy is also a top federal strategic priority to win the race for an AI-enabled future, which will create tremendous demand for energy. Transcript: Donald Trump's Address at 'Winning the AI Race' Event (July 24, 2025), https://tinyurl.com/ycy4m7e6.

REDACTED

Large reserves of natural gas were discovered off the northern coast of Mozambique in 2010. *Id.* ¶ 7. The Project aims to develop this important resource. TEPMA1 operates the Project for a joint venture of global energy companies and in cooperation with the Government of Mozambique. *Id.* ¶ 14. The Project includes the construction of an onshore LNG export facility within Mozambique's Cabo Delgado Province and off-shore wells, as well as a pipeline. *Id.* ¶ 8. The Project is not just important to meeting global energy demand; it is a critical for the development of Mozambique, one of the poorest nations in the world. *Id.* ¶ 12.

EXIM's Board unanimously approved a loan to support the use of U.S. goods and services in the Project's construction in September 2019. Before that, the Project underwent nearly a decade of careful study, environmental, social, and economic review, and opportunity for public participation, consistent with the Bank Act. Starting in 2011, the Project conducted a multi-year environmental and social impact assessment. Mozambique LNG, Environmental and Social Impact Assessment (captured Dec. 17, 2015), https://tinyurl.com/3nu3ty3j. This assessment, along with follow-on studies, led to the development of an Environmental and Social Management Plan to "manage project-related environmental, social and health risks and impacts" and "to enhance positive impacts and opportunities associated with project development." *Id.* After the Project concluded its own review, EXIM made the environmental and social impact assessment public in January 2016, three years before EXIM approved the Final Commitment. EXIM, Pending Transactions for Environment Category A and B Projects (captured Oct. 25, 2016), https://tinyurl.com/2znhhkpb. It remains on EXIM's website. EXIM, Approved Transactions, https://tinyurl.com/5bs8ehz7 (last visited Aug. 15, 2025).

More than two years after publicizing the environmental and social impact assessment, EXIM published a "notice of intent to conduct detailed economic analysis" in the Federal Register.

REDACTED

83 Fed. Reg. 61,379 (Nov. 29, 2018).  After considering public comments, EXIM finalized its economic analysis on August 6, 2019.  *See* Dkt. 13-5 at 17.  The economic analysis concluded that an LNG supply-demand gap would open "in the early-to-mid 2020s," leading to a 5-10% gap by 2024 that "would grow from there."  *Id.* at 22.  It also predicted "that LNG demand is set to grow substantially over the next [10-15] years" (through the mid-2030s) and that "it is unlikely that structural oversupply develops in the LNG market any time in the foreseeable future."  *Id.* at 23.

After finalizing the economic analysis, EXIM notified Congress about the Project's application for a final commitment, *i.e.*, its application for final loan approval.  *See* Dkt. 13-4 at 3; 12 U.S.C. § 635(b)(3).  EXIM also sought public comment on the Project's application for a final commitment.  *See* 84 Fed. Reg. 44,303 (Aug. 23, 2019); 12 U.S.C. § 635(c)(10).

EXIM's Board unanimously granted the application for final commitment and finally approved the loan on September 26, 2019.  Rabilloud Decl. ¶ 27.  As EXIM has explained, the loan advances EXIM's mission "to contribute to [U.S.] employment" by supporting over 16,000 domestic jobs in our world-leading energy sector, including in states like Texas, Louisiana, Pennsylvania, Oklahoma, and New York.  Ex. A to Rabilloud Decl.  The loan advances America's competitive position relative to other countries, including China.  *Id.*  And it advances humanitarian goals by "providing the stimulus that Mozambique needs to jump-start its economy and improve the lives of its people."  *Id.*

## 2.    *The Bank Amends The Loan In 2020*

In May 2020, the EXIM Board unanimously voted to amend the Agreement.  The amendment decreased the loan amount from $5 billion to $4.7 billion, made TEPMA1 the Project's operator, and allocated approximately $1.8 billion of that total to support the Project's offshore production.  Rabilloud Decl. ¶ 31.  The amendment "support[ed] an increased number—from 16,400 to 16,700—of estimated American jobs over the five-year construction period."  Ex. B to

REDACTED

Rabilloud Decl.  It also increased the number of U.S. suppliers from 37 to 68, further "advanc[ing] American and African prosperity."  *Id.*

### 3.    *TEPMA1 Invokes Force Majeure in 2021*

Since 2017, Mozambique's remote, northern Cabo Delgado Province has faced an insurgency by ISIS-affiliated jihadists seeking to establish an Islamic state.  Rabilloud Decl. ¶ 33.

Militants captured the key port of Mocímboa da Praia twice in 2020.  *Id.* ¶ 35.  The Mozambican government was unable to regain control for a year.  *Id.*  In March 2021, al-Shabaab attacked the town of Palma, close to the LNG project at the Afungi site.  *Id.* ¶ 36.  The attack resulted in the death and displacement of many individuals.  *Id.*  As a result, TEPMA1 declared *force majeure* in April 2021 and suspended work on the Project.  *Id.* ¶ 37.

In the interim, the Project has continued investing in activities to support local communities during the conflict, support the delivery of basic public services, and fulfill its commitments to local communities.  *Id.* ¶¶ 41-42.  The Project has also continued to abide by its Environmental and Social Management Plan.  *Id.* ¶ 19.  By February 2025, the Project's resettlement plan, providing all 643 displaced households with new homes, had been completed.  *Id.* ¶ 49.

### 4.    *The Bank Amends The Loan Again In 2025*

Security in Cabo Delgado has improved significantly since 2021, after intervention by the Mozambican military and regional partners including South Africa.  Rabilloud Decl. ¶ 50.

TEPMA1 has since sought to resume work on the Project.  Due to the improved security situation, EXIM's Board unanimously approved an Amendment to the credit agreement on March 19, 2025 ("the Amendment").  Ex. C to Rabilloud Decl.  EXIM recounted the "lengthy and transparent" due diligence the Project underwent before the 2019 approval, and reaffirmed the original bases for approving the Final Commitment.  *Id.*  The Amendment principally "extends certain dates and makes related changes" to allow the already-authorized loan to be disbursed on

REDACTED

the Project's adjusted schedule, and "contains no material change from the original approval." *Id.* In other words, it is the sort of routine loan extension that banks around the country make hundreds of times every day.

Before approving the Amendment, EXIM "thoroughly reviewed the physical security situation" and "determined that the security risks to the project had been properly addressed, with substantial systems in place and appropriate management plans and mitigation applied to respond appropriately to evolving security concerns." *Id.* EXIM found the Project would "not compete in any harmful way with the production of U.S. LNG." *Id.* Instead, considering the economic impact and analysis, EXIM and "independent experts" found that "the transaction would likely have a net positive impact on the U.S. economy, based on supply/demand over the life of the loan." *Id.*

C.      **Plaintiffs Belatedly Sue To Stop The Loan**

Four months after EXIM approved the Amendment—and nearly six years after EXIM approved the Final Commitment—Plaintiffs filed this suit "challeng[ing] the . . . March 13, 2025" Amendment. Compl., Dkt. 1 ¶ 1. Plaintiffs then took several extra days of time over a weekend, eventually filing a motion for preliminary injunctive relief on July 21, 2025, requesting that the Court enjoin EXIM from "releasing any funds or further obligating the United States under any loan agreement for the Project," and, further, grant Plaintiffs summary judgment. Mot. 45.

**ARGUMENT**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).[3] To obtain preliminary relief, the movant must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested

---

[3] All internal quotation marks, citations, and alterations omitted unless otherwise noted.

REDACTED

parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel*, 454 F.3d at 297; *see also Fort Myer Constr. Corp. v. Shrensky*, No. 1:23-cv-02275, 2024 WL 181075, at *2 (D.D.C. Jan. 17, 2025) (Nichols, J.) (noting that "dicta in this jurisdiction" suggests that a "plaintiff must make a clear showing on each of the four" prongs). The last two factors merge when the government is a party. *See Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362, 374 (D.D.C. 2018). Plaintiffs fail to carry their burden on any factor.

## I.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

Plaintiffs are not likely to succeed on the merits, both because Plaintiffs do not demonstrate standing and because Plaintiffs' claims are marred by a host of substantive deficiencies.[4]

### A.      Plaintiffs Have Not Proven They Are Likely To Succeed In Establishing Standing

Tellingly, Plaintiffs dedicate nearly a third of their motion (at 28-41) to arguing they have standing to challenge the Amendment. Plaintiffs' evident concern is well-warranted: Their arguments all fail under well-established precedent.

To possess standing, a plaintiff must show an injury-in-fact, caused by the defendant, and redressable by the requested judicial relief. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Here, Plaintiffs assert two theories of standing (at 28-41): (1) that their organizational interests have been injured by approval of the Amendment, and (2) that they may rely on "third party standing" to bring suit on behalf of third parties. Each theory fails. Plaintiffs thus "fail[] to show a 'substantial likelihood' of standing" and are "not entitled to a preliminary injunction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

---

[4] Plaintiffs also inappropriately rely on a statement of material facts in support of their motion. Dkt. 13-2. The Court should not consider their half-hearted request for summary judgment on the merits of their APA claims: This is a record-review case properly determined on the basis of the administrative record, not Plaintiffs' own accounting of facts. *See* LCvR 7(n). Plaintiffs do not even attempt to satisfy the high burden of introducing extra-record evidence into an APA case.

REDACTED

### 1.    *Plaintiffs Lack Organizational Standing*

To possess standing "in its own right," an organization is required to make "the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). Plaintiffs assert four sub-theories of organizational standing (at 30-35): that (1) Plaintiffs have been denied a means to redress their grievances with the Project; (2) the restart of the Project will increase Islamist conflict and the need for Plaintiffs' "services"; (3) they have suffered an "informational injury" through denial of access to information; and (4) they will be forced to divert resources from other plans. No theory comes close to demonstrating the necessary concrete injury-in-fact, and the theory regarding an increase in services also lacks causation and redressability.

**"Redress" Theory.** Relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), Plaintiffs assert that EXIM has impaired Plaintiffs' ability to seek redress for affected third parties by cutting off "avenues of redress they wish to use." Mot. 31. In particular, Plaintiffs claim that they submit comments describing how EXIM-funded projects cause third-party harm, which is a "core service central to Plaintiffs' mission." *Id.* Plaintiffs thus claim injury arises essentially *per se* from EXIM's approval of the Amendment without notice and comment. *Id.* at 30-31.

But an organization cannot bootstrap itself into standing by choosing to comment and advocate on an issue impacting others. Under Article III, an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. An organization may show injury only where an agency action directly interferes with a core direct services program. *Id.* at 394-96. Harm to an organization's abstract social interests, including in issue advocacy and education, does not count. *Id.* (finding organizations' decision to "conduct their own studies" to "inform . . .

REDACTED

members and the public about [] risks" and "expend considerable time, energy, and resources drafting citizen petitions" and "engaging in public advocacy" and "education" were insufficient).

Plaintiffs' arguments fail because their core activity is not providing direct services to individuals. Plaintiffs are environmental advocacy organizations. They "gather" and disseminate "information"; "facilitate community participation in public . . . processes"; and "investigate and analyze impacts on affected communities" in service of advocacy. Mot. 29-30.

Plaintiffs attempt to repackage their issue advocacy as "direct services" by claiming that they provide "services" when they "submit[] affected people's concerns and proposals . . . to institutions like EXIM." Mot. 31. This, however, is not a cognizable "service," but mere issue advocacy. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (organization's time and money spent "submitting comments to the EPA" was a part of an "advocacy mission" and insufficient for organizational standing (quoting *Havens*, 455 U.S. at 379)); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (holding that organizations failed to demonstrate standing where "the only 'service' impaired is pure issue-advocacy—the very type of activity distinguished by *Havens*"). Plaintiffs' activities rise nowhere close to the type of service found sufficient in *Havens*. That case involved an organization called HOME, which provided a housing counseling service untethered to its issue-advocacy activities. *All. for Hippocratic Med.*, 602 U.S. at 395. When the defendant provided HOME's "black employees false information about apartment availability," *id.*, the organization had standing because the defendant "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers," *Havens*, 455 U.S. at 379. "In other words, [the challenged] actions directly affected and interfered with HOME's core business activities—not

REDACTED

dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Alliance*, 602 U.S. at 395.

Here, Plaintiffs have identified no equivalent "service" unrelated to its advocacy efforts. *See Nat'l Ass'n of Home Builders*, 667 F.3d at 12. A "central part" of Plaintiffs' mission "is to assist communities harmed by dirty fossil fuel and other projects, especially those involving a U.S. government decision-maker." Dkt. 13-3 ¶ 8. And the "service" which Plaintiffs provide is synonymous with their mission—to "directly help Project-impacted people . . . to present their interests, questions, and concerns; draft materials for community members, and represent them overseas where they cannot be present." *Id.* ¶ 14. Because the "service" Plaintiffs identify is synonymous with their issue-advocacy efforts, it is distinguishable from that addressed in *Havens*. In any event, the Supreme Court cautioned last year that *Havens* "was an unusual case" and that it "has been careful not to extend the *Havens* holding beyond its context." *All. for Hippocratic Med.*, 602 U.S. at 396.

Moreover, even if Plaintiffs could prove that they provide "direct services," Plaintiffs' arguments fail for a second reason: "the deprivation of the right to participate in notice-and-comment rulemaking" does not itself give rise to injury-in-fact because the right to notice-and-comment inures to the public at large. *Chesapeake Climate Action Network ("CCAN") v. Export-Import Bank*, 78 F. Supp. 3d 208, 237-38 (D.D.C. 2015); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Not every aspiring commenter has standing to go to court.

And even if the court assumed the lack of a comment period "somehow limits [Plaintiffs'] ability to seek redress of its members' injuries through administrative channels," Plaintiffs do not show "how this alleged impairment would . . . force[] [them] to modify [their] services in any way." *Nat'l Veterans Legal Servs. Program v. DOD*, No. 14-cv-01915, 2016 WL 4435175, at *7

REDACTED

(D.D.C. Aug. 19, 2016).  Indeed, the examples Plaintiffs give of predicted changes to their work—using "grievance mechanisms," "meeting with Congress," and "engaging with the OIG"—are all things they did prior to the Amendment and would have done had the Amendment gone through notice and comment.  Dkt. 13-3 ¶ 53; *see also id.* ¶ 31 (discussing longstanding communications with Congress), ¶ 59 (discussing that, prior to the Amendment, Plaintiffs "spent time and resources" to "seek[] redress for existing harms").  As such, they fail to show a sufficient injury-in-fact based on their aspirations to engage in further issue advocacy that is traceable to the Amendment.[5]

**Increase in Services Theory.**  Plaintiffs argue (at 32-34) that without the Amendment, the Project could not restart.  They assert that restarting the Project will lead to more jihadist conflict, and thus make it harder for Plaintiffs to provide their "services."  *Id*.  These arguments fail for the reasons discussed above:  Issue advocates cannot spend their way into standing.  *Supra* at 14-15.

With respect to their theory that restarting the project will increase conflict, Plaintiffs do not demonstrate they will be *directly* harmed by conflict:  They are safely based over 1,000 miles away.  And as to third party harms, which might indirectly impact Plaintiffs' "services," Plaintiffs have come nowhere near meeting their burden of establishing a "certainly impending" injury.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("Allegations of possible future injury are not sufficient.").  The conflict pre-dates EXIM's 2019 funding commitment and has continued even during the years of the *force majeure* project standdown.  *See* ██████████████

████████████████████████████████████████████

---

[5] Plaintiffs' reliance on *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015), is also misplaced.  Mot. 30-31.  "At root, PETA turned on the existence of some cognizable legal interest in the underlying information."  *Campaign Legal Ctr. v. FEC*, No. 22-cv-3319, 2024 WL 4263853, at *8 (D.D.C. Sept. 23, 2024).  As discussed below, Plaintiffs have not asserted any legal right to the information they seek.

REDACTED

███████████████████████████████████████████████████████

██████████████████████████████████████████████ Nor do Plaintiffs

establish that Mozambique and its regional partners would be unable to mitigate any change in the

situation on the ground. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (past exposure to

violence did not "establish a real and immediate threat" that similar violence would again occur).

Plaintiffs thus leave the Court to speculate whether an injunction will prevent irrational acts of

terror, or will instead undermine security by blocking the Mozambican state from obtaining

additional financial capacity from the Project to maintain control within its borders. Courts rightly

hesitate to make predictions about "international responses to U.S. policy that Plaintiffs' theory of

causation posits" when assessing standing. *Siegel v. U.S. Dep't of Treasury*, 304 F. Supp. 3d 45,

55 (D.D.C. 2018). Plaintiffs cannot "reduce the complex decisions surrounding [terrorist] activity

. . . to a single determinative variable"—EXIM funding. *Id.*

On top of that, Plaintiffs further speculate that any increase in conflict would result in third

party Mozambicans turning to Plaintiffs, who are *not* now regularly present in the conflict region,

and cause them to travel to the Cabo Delgado region and incur related costs. *See* Mot. at 32-34.

Any one of these links is "sufficiently uncertain to break the chain of causation between the

Plaintiffs' injury and the challenged government action." *Siegel*, 304 F. Supp. 3d at 55.[6]

Plaintiffs also argue that they will need to expend "resources to help families whose lands

will be seized as a result of the restart to seek compensation." Mot. 33; █████████ This, they

---

[6] In any event, on Plaintiffs' telling, their theory of harm flows not from the Amendment, but from
the initial loan approval. Mot. 5 ("Since EXIM's approvals of the 2019 and 2020 loans, armed
conflict between government forces and Al-Shabab escalated and engulfed the area"). Because
Plaintiffs challenged only the Amendment, not the initial approval of the loan, they lack standing
for this reason too. *See Elec. Priv. Info. Ctr. v. Dep't of Educ.*, 48 F. Supp. 3d 1, 5 (D.D.C. 2014)
(no standing where plaintiffs' "harm does not even flow from the challenged [action]").

REDACTED

claim, will ██████████████████████████████████████████████████

Beyond this theory resting upon the same entirely speculative theory of causation between EXIM, Islamist conflict, and locals' speculated desire for Plaintiffs' services, this theory also fails because the resettlement process *has already been completed*. *Supra* at 9. Plaintiffs thus cannot show a likelihood of *future* injury from resettlement. *See All. for Hippocratic Med.*, 602 U.S. at 381.[7]

**"Informational Injury" Theory.** Plaintiffs next argue that EXIM injured Plaintiffs by precluding them access to statutorily mandated information. Mot. at 34-35, 38. This type of "informational" injury requires a plaintiff to show it (1) has been deprived of information that a statute requires the government to disclose to it, and (2) it suffers the type of harm Congress sought to prevent by requiring disclosure. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). A requirement to disclose information arises "only in very special statutory contexts," where a statutory provision "explicitly create[s] a right to information." *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C. Cir. 1994).

Plaintiffs do not show an informational injury. For the reasons described below, these arguments all fail because Plaintiffs have not identified a statutory provision requiring disclosure of additional information in this circumstance. *See infra* at 22-29. Nor do Plaintiffs even attempt to show that the second element that, due to any deprivation, they will suffer the type of harm Congress sought to prevent, *see Elec. Priv. Info. Ctr.*, 878 F.3d at 378, thus forfeiting the issue.

---

[7] Plaintiffs also claim that they are injured by the need "to provide immediate outreach to communities to explain why the Project is restarting." Mot. 33 (citing JA Decl. ¶¶ 56-57, 59). They provide no evidence for this fact. The Justiça Ambiental declaration ████████████ ████████████████████████████████████████████████████████████ *See infra* at 11-19 ████████████████████ It then vaguely states that it will need to ████████████████████████████████████ but does not establish what "outreach" it will need to take outside of its "basic programmatic services." *Nat'l Veterans Legal Servs. Program*, 2016 WL 4435175, at *7.

REDACTED

At bottom, Plaintiffs seek to enforce statutes and guidance documents in ways that they do not apply. Plaintiffs' general desire to enforce laws and obtain information is not sufficient to establish an informational injury. *See Common Cause v. FEC*, 108 F.3d 413, 418 (D.C. Cir. 1997) (general desire to enforce laws is not cognizable; plaintiff must request *specific* information).

**Resource Diversion Theory.** Finally, Plaintiffs claim that the Amendment will "force Plaintiffs to divert scarce resources away from previously planned projects." Mot. 35; ███████

███ They assert the Amendment will cause "many more people" to "need Plaintiffs' services," which will shift their focus away from other "ongoing legal cases" and "other projects." Mot. 36.

But shifting resources from one cause "to the detriment of other spending priorities" does not amount to injury-in-fact. *All. for Hippocratic Med.*, 602 U.S. at 394. In a different case against EXIM, a court highlighted that the plaintiffs did not show that their claimed "expenditures on monitoring Bank policy" was "a consequence of the Bank's decision and not an ordinary program cost or self-inflicted harm." *CCAN*, 78 F. Supp. 3d at 235. Although Plaintiffs claim that the restart of the Project will cause them to shift their focus and divert resources, this is not the type of "'perceptible impairment' of . . . daily operations required to establish organizational injury." *Nat'l Veterans Legal Servs. Program*, 2016 WL 4435175, at *7. Rather, it is "precisely the type of vague pronouncement of generalized injury that [the D.C. Circuit] routinely rejects." *Id.*

### 2. *"Third Party Standing" Cannot Provide Plaintiffs Article III Standing*

Plaintiffs also separately assert so-called "third-party standing," which "allows a narrow class of litigants to assert the legal rights of others." *All. for Hippocratic Med.*, 602 U.S. at 393 n.5. This assertion does not support Plaintiffs' ability to proceed here, and in fact, undercuts it.

"Third-party standing" does not *create* Article III standing where none exists, but *excuses* the additional requirements of *prudential* standing—which serve to limit claims to the potential plaintiff(s) most directly impacted by an agency action. *See id.* The upshot is that to assert third

REDACTED

party standing, the "litigants themselves still must have suffered an injury in fact, thus giving them a sufficiently concrete interest in the outcome of the issue in dispute." *Id.* Litigants must also have a "close" relationship to the third party and there must exist some "hindrance" to the third party's "ability to protect [its] interests." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010). "The first of these requirements is constitutional, while the latter two are prudential." *Id.*

For all the reasons discussed, Plaintiffs fail to establish their own Article III injury. *See supra* at 11-18. They cannot "shoehorn themselves into Article III standing simply by showing that [the community members they serve] . . . may suffer future injuries." *All. for Hippocratic Med.*, 602 U.S. at 393 n.5. Invoking third-party standing cannot give Plaintiffs Article III standing.

At most, Plaintiffs' allusion to prudential standing emphasizes why Plaintiffs' suit *cannot* proceed. Even if Plaintiffs could somehow show a cognizable Article III injury and organizational Article III standing (they cannot, *supra* at 11-18), they still fail to meet the prudential requirements of third-party standing they themselves invoke. The necessary "close relationship" for third-party standing is something like an "*existing* attorney-client relationship"—not a "*hypothetical* attorney-client relationship." *Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004). To the extent Plaintiffs have any relationship with community members over 1,000 miles away, it is in connection with their issue-advocacy activities, which cannot support third-party standing. *Id.*

## B.    Plaintiffs' Claims Fail On Their Merits

### 1.    The Bank Had a Lawful Quorum When It Approved the Amendment

As its lead claim, Plaintiffs argue that EXIM's Board lacked the three-member quorum to approve the Amendment in 2025, because EXIM's President and First Vice President serve on an acting basis. Mot. 15-17. This is incorrect. Under the FVRA and the Bank Act, President Trump had the authority to appoint these individuals to serve as EXIM President and First Vice President on an acting basis, which, in turn, entitled them to serve on the Board, *ex officio*. Indeed, President

REDACTED

Biden directed the same two senior EXIM employees to serve as acting EXIM President and First Vice President "to maintain the quorum" at the start of his term.  Press Release, EXIM, *President Biden Authorizes EXIM Board Transition Steps* (July 21, 2021), https://tinyurl.com/3jz2pjwe.

To help an agency function when key offices are vacant, the FVRA empowers the President "to appoint acting officials to temporarily perform the functions of a vacant [principal] office without first obtaining Senate approval."  *NLRB v. SW Gen. Inc.*, 580 U.S. 288, 294 (2017).  It is typically "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office" for which Senate confirmation is required.  5 U.S.C. § 3347(a).

The FVRA's unambiguous text permitted the President to designate an acting EXIM President and First Vice President.  Under the FVRA, when an office filled by appointment "by the President, by and with the advice and consent of the Senate" is vacant, the President may "direct" an agency employee to "perform the functions and duties of the vacant office temporarily in an acting capacity."  *Id.* § 3345(a)(3); *see Guedes v. ATF*, 356 F. Supp. 3d 109, 138-39 (D.D.C. 2019), *aff'd* 920 F.3d 1 (D.C. Cir. 2019).  Because the EXIM President and First Vice President are both "appointed by the President of the United States by and with the advice and consent of the Senate," 12 U.S.C. § 635a(b), the President may use his authority under the FVRA to designate an acting EXIM President and First Vice President to carry out the "functions and duties of the vacant office," 5 U.S.C. § 3345(a).  And while the EXIM President and First Vice President function to *manage* the Bank and are not directly *appointed to the Board* by the U.S. President, the "functions and duties" of those two offices also include serving *ex officio* as EXIM's Board Chairman and Vice Chairman.  12 U.S.C. § 635a(c)(1).  (An individual serves "*ex officio*" when they serve in a position "by virtue of [their] appointment[] . . . to a non-Board position within the same agency."  *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 684, 687-

REDACTED

88 (D.C. Cir. 2023)).  Thus, the FVRA permitted Burrows and Cruse to be designated as acting EXIM President and First Vice President, and to then fulfill the duties of those positions by serving *ex officio* on the EXIM Board.

Citing 5 U.S.C. § 3349c(1), Plaintiffs argue that the FVRA "does not provide authority for acting appointments to EXIM's Board."  Mot. 15-16.  Perhaps, but that is irrelevant to the EXIM President and First Vice President, who serve *ex officio* on the Board and are not "appointed to" it.  The default under the FVRA is for acting officials to "perform the functions and duties of the vacant office."  5 U.S.C. § 3345(a)(2).  Section 3349c(1) is a carefully drawn exception to the President's FVRA authority that applies only to vacancies caused by a "member appointed . . . to [a] board."  This exception applies to the three Board members who are *appointed* directly *to* the Board under 12 U.S.C. § 635a(c)(1).  But as a matter of ordinary English usage, to be "appointed to . . . [a] board," *id.*, is to "be appointed to the Board itself, not serve *ex officio*" "by virtue of [a] separate office."  *Ctr. for Biological Diversity*, 77 F.4th at 684, 687-88 (interpreting "appointed to [a board] position" in 5 U.S.C. § 662b(a)(1)).  In other words, unless the acting official is appointed directly to the Board, the default presumption under the FVRA that other acting officials may perform duties of the Board *ex officio* remains undisturbed.  Another court in this district has used this same logic to conclude § 3349c(1) does not apply to the Consumer Protection Financial Bureau's Director, even though he serves *ex officio* on the FDIC board, because the Director is "not 'appointed . . . to' the FDIC board."  *English v. Trump*, 279 F. Supp. 3d 307, 318 (D.D.C. 2018).  The same is true here.  Because the EXIM President and First Vice President are not "appointed to" the Board, § 3349c(1) does not apply.[8]

---

[8] *Aviel v. Gor*, is similarly inapposite, as it did not deal with *ex officio* board members; the Inter-American Foundation's board at issue there consisted entirely of members appointed to the board. __ F. Supp. 3d __, 2025 WL 1009035, at *1 (D.D.C. Apr. 4, 2025).

REDACTED

Because the FVRA applies by its terms, Plaintiffs' argument (at 15) that the Bank Act "does not contemplate Presidential appointment of an acting official and specifically provides an alternative mechanism" to provide for a Board quorum is of no moment. When another statute "expressly . . . designate[s] an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity," the FVRA still applies—it is just no longer the "exclusive means" of temporarily filling the vacancy. 5 U.S.C. § 3347(a)(1)(A). Every court to consider the issue agrees. *United States v. Smith*, 962 F.3d 755, 763 n.1 (4th Cir. 2020) ("[A]gency-specific succession statutes . . . supply an alternative to the FVRA, but not a mutually exclusive one."); *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 555-56 (9th Cir. 2016); *Guedes*, 356 F. Supp. 3d at 138-39; *English*, 279 F. Supp. 3d at 319. Legislative history confirms this plain-text result. S. Rep. 105-250, at 17 (1998) ("[T]he [FVRA] would continue to provide an alternative procedure for temporarily occupying the office" where specific statutes govern vacancies.); *accord Kitsap*, 816 F.3d at 556. So the President is "permitted to choose" between using the FVRA and the temporary board procedure to address vacancies on the Board. *See id*.

Because Plaintiffs' argument that the Board lacked a quorum ignores the plain text of the Bank Act and the FVRA, it should be rejected. The Board had the necessary quorum.

### 2.    *Plaintiffs' Bevy of Other Procedural Objections All Fail*

Plaintiffs' claims go downhill from there. Plaintiffs raise a bevy of other procedural objections to the Amendment, focusing on notice-and-comment and environmental and economic analyses. All of these objections suffer from a common flaw: The cited notice-and-comment procedures and analyses were only relevant, if at all, prior to the Bank's Final Commitment to the loan in 2019. Plaintiffs, of course, could have sued back in 2019, but despite their current claim of an emergency, they did not. That is telling in and of itself, but, in any event, that strategic litigation choice does not change the text of the statute that makes none of those procedures

REDACTED

applicable to the *mere extension* of the payment schedule of the long-ago Final Commitment and resultant loan.  And Plaintiffs' claims suffer many more claim-specific deficiencies besides.

a.    Amendments To An Executed Agreement Do Not Require Public Notice And Comment

Plaintiffs claim (at 17-21) that EXIM failed to comply with statutory and non-binding, sub-regulatory notice-and-comment procedures.  These arguments fail several times over.

Plaintiffs start with a basic framing error, suggesting (at 17) that typical APA notice-and-comment requirements apply to Bank decisionmaking.  They do not.  In the absence of an express statutory requirement, all agency decisions "relating to . . . loans . . . or contracts" are entirely exempt from notice and comment requirements.  *See* 5 U.S.C. § 553(a)(2); *see also Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) (discussing exemption).  This is black letter administrative law that Plaintiffs just entirely disregard.

Federal contracts need to provide commercial certainty *and* accommodate mutually agreed updates as required.  Congress thus decided that it would determine, on an agency-by-agency and case-by-case basis, what notice-and-comment procedures, if any, it would prescribe for contracting actions.  *See* 5 U.S.C. § 553(a)(2)*.*  EXIM is not a typical administrative agency as we would normally think about it.  It is, literally, a bank.  And Congress provided EXIM flexibility to engage in "a general banking business" and related "negotiation[s]" by providing only a more-limited notice-and-comment process.  12 U.S.C. § 635(a)(1).  Congress provided a default norm of *no* notice-and-comment for Bank loans, subject to two narrow exceptions for certain large transactions and economic analyses, neither of which applies to the Amendment.

Plaintiffs also argue that public notice was required under the ESPG.  These guidelines are not legally binding obligations, but rather non-binding policy.  And even if the ESPG were binding, the guidelines apply only to "applications," and not amendments.  ESPG § I ¶ 2.

23

REDACTED

> i. *The Exception Requiring Notice and Comment For Applications For Final Consideration Involving Large Transactions Does Not Apply*

The first exception to the norm of *no* notice and comment is for applications for final consideration of certain large transactions. EXIM engaged in notice and comment for the 2019 final loan commitment. Nothing further was required for the Amendment.

Initially, Plaintiffs' theory that notice and comment was required prior to the Amendment makes no sense even taken on its own terms. The statute provides that "*[b]efore any meeting* of the Board for *final consideration of a long-term transaction* the value of which exceeds $100,000,000 . . . the Bank shall provide a notice and comment period." *Id.* § 635a(c)(10)(A) (emphases added). Plaintiffs' core contentions are that (1) the "final consideration of a long-term transaction" occurred in March 2025, and (2) the Bank only engaged in notice-and-comment back in 2019. On its own terms, then, Plaintiffs' argument proves that the Bank *complied* with its obligations: Assuming Plaintiffs were right (they are not) that the March 2025 Board meeting to approve the Amendment was "final consideration of a long-term transaction," EXIM engaged in notice-and-comment in 2019, "before" that meeting. *Id.* That alone should resolve this issue.

Plaintiffs seem to believe that there is some sort of implicit, unwritten requirement that notice-and-comment "before" the final Board meeting means "before but reasonably close in time" to the final Board meeting. But even then, Plaintiffs' theory fails: The "final consideration of a long-term transaction" in fact occurred in 2019 with the Board's decision to approve the loan's Final Commitment, shortly after notice-and-comment was completed. *Supra* at 6-8.

Although the Bank Act does not define "final consideration of a long-term transaction," the plain text makes clear that the phrase refers to the decision on a final commitment of project funding. "Final" in the context of agency decisionmaking refers to the "consummation of the agency's decisionmaking process" "from which legal consequences will flow." *U.S. Army Corps*

REDACTED

*of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).  And "consideration" refers to "continuous and careful thought."  Webster's Dictionary (2012).  This "final consideration" applies to the "*transaction*," meaning the decision to fund the transaction at all, not whether minor edits are made to the executed loan documents after that decision is made.

Taken together, then, "final consideration of a long-term transaction" means the time when the Board engages in "careful thought" on the long-term transaction that results in the final decision whether to commit to funding the transaction.  The surrounding text makes clear this is the time at which the *proposed* transaction in a *pending application* is converted to a *final* funding commitment, here, in 2019.  Congress was explicit that the required notice pertain to a *pending* "application" for a final commitment "*proposing* the transaction."  12 U.S.C. § 635a(c)(10)(C)(i)(I) (emphasis added).  The same provision allows for "comments on *the application*" and dictates that the "content" of the notice is "with respect to *an application* for a loan."  *Id.* §§ 635(a)(c)(10)(C)(i)(II), (ii) (emphases added).  The Bank Act requires EXIM to summarize commenters' views for the Board before it "tak[es] final action on *an application*."  *Id.* § 635(a)(c)(10)(E) (emphasis added).  EXIM must then provide a summary of its decision after "a final decision of the Board . . . with respect to *an application*."  *Id.* § 635(a)(c)(10)(F) (emphasis added).  If Congress had intended notice and comment to apply more broadly than a pending "*application*," it could have said so, by replacing references to a "application" with references to something like "any decision related to a transaction."  It did not.

Here, the "application" for a loan took place in 2019, not 2025.  *Supra* at 6-8.  Indeed, EXIM's "application" procedures confirm that the only form of "application" that *can* result in a "final" decision on a long-term lending "transaction" is the one for final commitment.  As of 2012, EXIM then had, and still has, three types of applications for direct loans:  a request for letter of

REDACTED

interest, an application for preliminary commitment, and an application for final commitment.[9] As their names suggest, the first two options are preliminary and non-binding, while an application for final commitment is the submission from the borrower that can be approved, generating authority to enter into a binding contract per the commitment's terms. *Id.* In adopting notice-and-comment procedures in 2012, Congress is presumed to have been aware of the Bank's practices, and clearly intended EXIM to provide notice and comment on applications for final commitment, not amendments. *See United States v. Wilson*, 290 F.3d 347, 356 (D.C. Cir. 2002) (considering "relevant practices of the Executive Branch" in interpreting statute because "Congress is presumed to preserve, not abrogate, the background understandings against which it legislates").[10]

Requiring notice and comment in this context, for minor amendments to an already committed agreement also would undermine Congress' intent in enacting the requirement. The provision's purpose was "to ensure [EXIM] has information it needs to confirm it is not supporting transactions used to support products that could be used to compete with American companies." 158 Cong. Rec. H2460, H2465 (2012). It was not intended to be an unbounded opportunity for nonparties to comment on any matter, no matter how small, related to any decision affecting a transaction. Congress's intent was not to delay routine banking operations: "[O]ur intent is that the board proceed with consideration of a pending application as soon as legally and practically possible." *Id.* at H2468. Still less was it intended as a tool to derail a transaction years after EXIM had thoroughly considered the application and approved it.

---

[9] Export-Import Bank, *Direct Loan: Fixed-Rate Term Financing for International Buyers* (Jan. 26, 2012), https://tinyurl.com/yc5ux4xt. A nonbinding letter of interest contains "terms for the specific transaction" valid for 6 months. *Id.* An application for preliminary commitment seeks a "nonbinding expression of interest" from EXIM. *Id.*

[10] That the terms of the Agreement required Board approval is immaterial to this statutory analysis. The statement by TEPMA1's parent company and the Board's statement suggesting that the Board must approve the Amendments relied upon by Plaintiffs are thus irrelevant. *Contra* Mot. 19-20.

REDACTED

> ii.    *The Exception Requiring Notice and Comment For "Material Changes" To Applications Does Not Apply*

Congress also considered that limited circumstances could arise warranting an updated notice to the public for "materially changed applications." 12 U.S.C. § 635a(c)(10)(D). Plaintiffs argue (at 20-21) that the Amendment triggered this procedure, too. They are wrong.

Specifically, "[i]f a material change is made *to an application* . . . after a notice . . . is published . . . the Bank shall publish in the Federal Register a revised notice of the application and provide for an additional comment period." *Id.* (emphasis added). But the 2025 Amendment did not involve a "change . . . made to an application," since the Amendment was approved in accordance with the terms of the executed Agreement. *Id.* There was no "application" pending in 2025, and no "change" to any application. Confirming as much, the statute makes clear that it governs a change to "an application to which this paragraph applies." *Id.* And as explained above, "this paragraph" governs notice and comment upon a *pending* application for final commitment. *Supra* at 24-26.

In any event, even if they were changes to an application, the "change[s]" that Plaintiffs identify (at 20)—the declaration of *force majeure* and the date changes approved in the Amendment—are not "material changes." Congress "defined" "material change," with respect to an application for a loan or guarantee, to include "an increase of at least 25 percent in the amount of a loan or guarantee requested in the application." 12 U.S.C. § 635a(c)(10)(D)(ii); *see also* Material ("[H]aving real importance or great consequences."), Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/material (accessed Aug. 14, 2025). When a definition is inclusive, the definition still cannot be "inflated with terms lacking the defining essence of those in the list." *City & Cnty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001, 1016 (N.D. Cal. 2019); *see also United States v. $215,587.22 in U.S. Currency Seized*, 306 F. Supp. 3d

REDACTED

213, 218 (D.D.C. 2018) (interpreting "includes" restrictively based on "the statutory language and the structure and purpose of the statute"). The Amendment is nothing like an increase of 25% or more in the amount of the loan: The Amendment made no change in the amount of the loan at all, just the disbursement schedule. These *de minimis* changes were far more like a change in loan amount *under* 25%, which does *not* amount to a "material change," than a change exceeding 25%. There was no "material change" to any application requiring renewed notice and comment.

        *iii.*    *The Exception For Certain Economic Analyses And Studies Does Not Apply*

Plaintiffs also gesture at a supposed requirement to provide notice and comment on EXIM's economic analysis related to the Amendment. *See* Mot. 18, 22. But EXIM's decision to conduct an economic study that triggers a public notice requirement is discretionary. The statute requires EXIM to consider "the views of the public and interested parties" only "if" EXIM decides to "conduct[] a detailed economic impact analysis or similar study." 12 U.S.C. § 635(e)(7)(A). And only "if" EXIM determines to conduct such a study, does it need to "publish in the Federal Register a notice of the intent" to conduct the study and allow comment. *Id.* § 635(e)(7)(B).

Courts have recognized that EXIM has discretion in determining what economic studies are warranted and when one is warranted at all. *See, e.g.*, *Delta Air Lines, Inc. v. Export-Import Bank*, 85 F. Supp. 3d 387, 411 (D.D.C. 2015) ("Congress's use of the conditional language 'if' strongly suggests that detailed economic impact analysis is not expected to be performed for every financing decision."). So even if, as Plaintiffs claim, EXIM did not conduct a "detailed economic impact analysis or other similar study" here, no notice and comment requirement was triggered. 12 U.S.C. § 635(e)(7)(B)(i).

        *iv.*    *No Public Notice Was Required For Environmental and Social Due Diligence Procedures and Guidelines Review*

REDACTED

Plaintiffs also claim (at 17-18) that EXIM violated the Bank Act by failing to provide notice of certain information in accordance with the ESPG. But their argument rests on a misconception: the ESPG are not legally binding obligations; they are non-binding policy statements. *See infra* at 33-35. Deviation from the ESPG, then, does not violate the Bank Act. *Id.*

And in any event, EXIM complied with the ESPG, which contemplate public notice for "applications," not amendments. The ESPG contemplate screening "applications" for "their potential for environmental and social risks." *See* ESPG § I ¶ 2. The ESPG ask "[a]pplicants" to "provide information sufficient to permit EXIM Bank to evaluate the nature and extent of risks and impacts of a projects," *id.* § I ¶ 7, and encourage "[a]pplicants" to submit any environmental data "at the time the application for financing is made," *id.* § II (Category A). And EXIM commits to disclosing "information concerning the risks and impacts of projects" when it "receives and processes a final application." *Id.* § I ¶ 8. As described above, all of these conditions were met, and fulfilled, in 2019, when the ESPG process was completed, the final application was processed, and the commitment issued. No further notice was required under the ESPG in 2025.

       *b.*    *The Bank Adequately Considered the Amendment's Economic Effects*

Plaintiffs are unlikely to succeed on their claims (at 21-23) that EXIM failed to adequately consider economic effects of the Project for the simple reason that EXIM is required to undertake such consideration only before credit is extended to a borrower—*i.e.*, before a credit agreement is executed. Nothing in the Bank Act requires EXIM to undertake the same analysis when it approves an amendment to an existing agreement. And even if some economic analysis were required, EXIM's analysis adequately considered the economic effects of the Project.

       *i.*    *Consideration of Economic Effects Is Required Only When Credit Is Initially Extended To A Borrower*

REDACTED

Contrary to Plaintiffs' claims, Congress provided for specific, required consideration of economic effects *upon extending credit*, but did not require the same procedures for amendments.

In general, EXIM "may not *extend any direct credit* . . . for . . . expanding production of any commodity for export" by any other country, "if the Bank determines that"—(1) "the commodity is likely to be in surplus on world markets at the time the resulting commodity will first be sold" or that "the resulting production capacity is expected to compete with United States production"; *and* (2) "*the extension of such credit or guarantee* will cause substantial injury to United States producers" of such commodity.  12 U.S.C. § 635(e)(1) (emphases added).

The threshold condition for § 635(e)(1) to apply at all is that EXIM acts to "extend any direct credit or financial guarantee."  The Act does not define "extend any direct credit."  "Extend" means "to make available" such as "[extend]ing credit to customers."  *Extend*, Websters Ninth New Collegiate (1988).  "Credit" is defined as "an amount or sum placed at a person's disposal by a bank."  *Credit*, Websters Ninth New Collegiate (1988).  Together, "extend credit" means "to make available" "an amount or sum placed at a person's disposal by a bank," for example, when a bank agrees to issue a credit card for a borrower to draw on.  *See id.*; *see also* 132 Cong. Rec. S26471 (Sept. 26, 1986) (explaining that the statute "prohibits the Bank from *making any loans or guarantees* that will result in the production abroad of any commodities that will compete with U.S. production of the same or similar commodity." (emphasis added)).  The statute only prescribes this specific analysis *before* credit is extended, for the Bank to determine whether "the extension of such credit or guarantee will cause substantial injury to United States producers."  12 U.S.C. § 635(e)(1).  The provision was intended to restrict the Bank from *extending credit* in the first place without analyzing the effects of giving that credit, not to hamstring routine amendments to loan agreements executed many years earlier.

REDACTED

Applying this plain-meaning understanding here:  EXIM extended credit when it entered into a loan agreement with the borrower because it made available credit for the borrower to draw upon in executing the Project.  *Supra* at 6-8.  EXIM undisputedly considered economic effects before that time.  *Id.*  When the Board approved the Amendment, it extended no additional credit. So the Amendment did not "extend . . . credit" under § 635(e)(1), and no specific economic analysis was required.

> ii.    *Even if the Bank was Required to Consider Economic Effects of the Amendment, It Discharged this Obligation*

Even if EXIM needed to consider economic effects of the project at the time of the Amendment, the 2025 Amendment expressly relied upon the 2019 Economic Impact Analysis and therefore sufficiently considered the economic effects of the Project.

EXIM conducted a detailed economic impact analysis, complete with notice published in the Federal Register, before it approved the loan in 2019, as Plaintiffs acknowledge.  Notice of Intent to Conduct a Detailed Economic Analysis, 84 Fed. Reg. 61379 (Nov. 29, 2018); Mot. 5; *see also* Dkt. 13-5 at 17-23.  That analysis concluded that LNG "is not currently, and is not likely to become, in structural oversupply during the repayment of the EXIM Bank facility," a term of 12.5 years, lasting until approximately 2031.  Dkt. 13-5 at 17-18.  When EXIM approved the Amendment, it referenced this analysis, explaining that the Project "will not compete in any harmful way with the production of U.S. LNG" and reaffirming that EXIM "concluded with independent experts that the transaction would likely have a net positive impact on the U.S. economy, based on supply/demand analysis over the life of the loan."  Ex. C to Rabilloud Decl. The 2025 consideration of the 2019 analysis discharged any obligation to consider economic impacts.  *See Delta Air Lines, Inc. v. Export-Import Bank*, 718 F.3d 974, 978 (D.C. Cir. 2013) (acknowledging that categorical assessments of economic impact may be permissible).

REDACTED

EXIM's economic analysis also considered the entire period of the amended Agreement, analyzing market conditions running until at least 2031, and thoroughly explained its conclusions. Noting that there were initial "fears of an oversupply of LNG capacity occurring in the early 2020s," the memorandum discussed why that fear was misplaced and goes on to say that "industry observers generally agree that there will be a supply-demand gap opening in the early-to-mid 2020s." Dkt. 13-5 at 21-22. Bank staff wrote that "there is little doubt that currently producing and under construction projects will fall short by 5-10% of satisfying demand sometime in the next five years," until 2024, and that the "gap would grow from there." *Id.* at 22. Importantly, the memorandum also explained that "additional sources indicate that LNG demand is set to grow substantially over the next ten to fifteen years, beyond the 2025 level." *Id.* at 23.

Plaintiffs fail to acknowledge any of these statements and conclusions. Instead, they rely (at 21-23) on a purported declaration from an anti-fossil fuel advocate—not an economist. He asserts that there is "strong reason to believe" a natural gas surplus will exist in 2030, before conceding his "uncertainties" in conditions five years into the future in light of potential future "curtailment of output" and "significant financial challenges" facing the industry. Decl. of Clark Williams-Derry ¶¶ 24-25, Dkt. 13-16. But EXIM's conclusions may only be judged on the basis of the administrative record, comprising what the decisionmaker considered at the time the decision was made. *Lee Mem. Hosp. v. Burwell*, 109 F. Supp. 3d 40, 46-47 (D.D.C. 2015). An "expert" declaration prepared by an advocate of Plaintiffs' choosing and submitted for the first time in post-decisional litigation does not, and cannot, be used to evaluate the agency's decision when made.

Indeed, the Bank's statute makes this express, explaining that a prohibition on extending credit may only arise if "*the Bank* determines that" the product is likely to be in surplus or compete

REDACTED

with U.S. production.  12 U.S.C. § 635(e)(1) (emphasis added).  The Bank made the opposite determination in 2019, and reaffirmed it in 2025.  Nothing more was required.

### c.    The Bank Adequately Considered Environmental Effects

Plaintiffs claim (at 23-25) that EXIM failed to consider environmental and social harms before approving the Amendment.  Plaintiffs' arguments lack merit.

### i.    The Bank Did Not Act Contrary to Law

Plaintiffs claim (at 23-25) that the Board's approval of the Amendment violated the ESPG and 12 U.S.C § 635i-5.  Plaintiffs' arguments rest on a fundamental misapprehension: the ESPG are not "law."  And EXIM complied with the text of the Bank Act when it considered, and made publicly available, the environmental assessment for the Project.

### (i)    The ESPG are non-binding guidance

The ESPG implement Congress's directive to EXIM to "establish procedures to take into account the potential beneficial and adverse environmental effects of goods and services" and to "provide for the public disclosure of environmental assessments and supplemental environmental reports required to be submitted to [EXIM]."  12 U.S.C. § 635i-5(a)(1); *see* ESPG § I ¶ 2.  These procedures permit (not require) the Board "in its judgment, to withhold financing from a project for environmental reasons" or to "approve financing after considering the potential environmental effects."  12 U.S.C. § 635i-5(a)(2).  But they are nothing more than non-binding policy statements and are thus not subject to the APA's contrary-to-law provisions at 5 U.S.C. § 706.

EXIM first adopted procedures and guidelines to assess environmental impacts in 1995.  ESPG (Introduction).  EXIM has amended its procedures several times, all without notice and comment.  The Board adopted the current version, the ESPG, in 2013, to provide procedures the Bank follows to review "applications."  *See, e.g.*, *id.* § I ¶ 2. ("All applications . . . greater than $10.0 million will be screened and categorized as to their potential for environmental and social

REDACTED

risks and impacts . . . .").  Among other things, the ESPG creates categories of applications to denote the level of information needed for evaluations, and ensures that the Bank will monitor certain projects "through the term of its financial support."  ESPG § V.

The ESPG are quintessential non-binding policy statements.  A policy statement "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad . . . permitting discretion under some extant statute or rule."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).  Policy statements "appris[e] the regulated community of the agency's intentions [and] inform[] the exercise of discretion by agents and officers in the field," *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987), but bind neither the agency nor the public, *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997).

The ESPG explain the procedures EXIM uses to guide its discretion.  They do not purport to impose legal rights or obligations.  *Nat'l Mining Ass'n*, 758 F.3d at 252 ("The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question.").  Instead, the ESPG describe the categories of applications, the types of information about risks and impacts that an applicant should provide, the sources of environmental information that the Board will consider, and the information it will share.  ESPG §§ I-V.  EXIM does not itself describe these guidelines as legally binding, *see generally* ESPG, and they are not published in the Federal Register or Code of Federal Regulations.  *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017) (using these factors to assess whether a rule is non-binding policy).  And critically, the Board remains free to exercise its discretion in approving a loan notwithstanding the ESPG. *See id.* (considering whether a rule has binding effects); 12 U.S.C. § 635i-5(b).

In evaluating EXIM's analogous economic procedures, at least two courts in this district have noted that they "might more accurately be described as non-binding internal guidelines,"

REDACTED

*Delta*, 85 F. Supp. 3d at 409, as it was unclear they "carry the force of law," *Air Transport Ass'n of Am. v. Export-Import Bank*, 878 F. Supp. 2d 42, 72 (D.D.C. 2012), *judgment rev'd by Delta*, 718 F.3d 974.  The government has described the ESPG as mere "agency policy."  Export-Import Bank Financing of Fossil Fuel Projects, Cong. Rsch. Serv. (Nov. 18, 2024), https://tinyurl.com/2wwas6bf.  Because the ESPG are not law, any departure from them was not "without observance of procedure[s] required by law" or "not in accordance with law."  5 U.S.C. § 706(1)-(2).

> (ii)     The Bank did not violate the Bank Act in failing to consider the environment and jihadist conflict

Nor did EXIM violate the Bank Act by failing to consider "the current security, humanitarian, and human rights risks" in Mozambique or provide Plaintiffs' requested information about these issues.  *Contra* Mot. 24, 27-28.  EXIM was not required to consider these factors when approving the 2025 Amendment, but nevertheless did so.

Section 635i-5 directs EXIM to create procedures to "take into account" environmental effects and disclose any "environmental assessments and supplemental environmental reports required to be submitted to the Bank, including remediation or mitigation plans and procedures, and related monitoring reports."  12 U.S.C. § 635i-5(a)(1).  Once again, this analysis is to take place *before* credit is extended, to evaluate projects "for which support is *requested* under its direct lending . . . program," depending on the amount "*requested* from the Bank."  *Id.*  (emphases added).  Yet again, the relevant moment of analysis is when support is *requested* in an application for a final commitment, not in connection with an amendment for already committed funds.  *See id.*

Against this backdrop, EXIM's environmental evaluation is consistent with the Bank Act.  It is undisputed that the Project underwent nearly a decade of careful environmental study, which was made publicly available on EXIM's website, and led to the development of an Environmental and Social Management Plan.  *See supra* at 7.  The Bank expressly relied on these findings in

REDACTED

connection with its Amendment.  *See id.*  Although Plaintiffs would prefer the Board to redo this process to amend a loan, that is not what the Bank Act requires.  It merely directs EXIM to establish procedures and permits the Board, "in its judgment," to withhold or "approve financing after considering the potential environmental effects of a project."  12 U.S.C. § 635i-5(a)(1).  EXIM conducted this analysis when it approved the loan, and its approach in amending the loan was "an eminently reasonable interpretation of what the Bank Act demands."  *Delta*, 85 F. Supp. 3d at 414.

Moreover, the thrust of Plaintiffs' argument focuses on EXIM's failure to consider the "current security, humanitarian, and human rights risks" when approving the Amendment.  Mot. 24-25 (similar).  In other words, Plaintiffs claim that EXIM did not consider the sociopolitical effects of the Project.  But the Bank Act directs EXIM to consider only environmental effects, not sociopolitical ones.  12 U.S.C. § 635i-5(a)(2).  The Bank was not required to do anything more.

ii.    *The Bank Did Not Act Arbitrarily and Capriciously in Considering Environmental and Social Concerns*

EXIM did not act arbitrarily and capriciously in applying the ESPG.  The core of Plaintiffs' argument is that EXIM failed to consider the "current security, humanitarian, and human rights risks."  Mot. 24; *see also id.* at 24-25.  EXIM analyzed these considerations when it approved the loan in 2019 and was not required to start anew to approve the Amendment.  *See supra* at 29.

Nevertheless, before approving the Amendment, EXIM "thoroughly reviewed the physical security situation" and "determined that the security risks to the project had been properly addressed, with substantial systems in place and appropriate management plans and mitigation applied to respond appropriately to evolving security concerns."  *See supra* at 10.  Plaintiffs can point to nothing but their own assertions to the contrary.  That cannot carry their burden for a

REDACTED

preliminary injunction.  *See Workman v. Bissessar*, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).[11]

Even if the Bank departed from the ESPG in approving the Amendment, its departure was not arbitrary and capricious.  Where guidance does not bind an agency, "any deviation from the [guidance] is not *per se* arbitrary and capricious."  *Edison Elec. Inst. v. EPA*, 391 F.3d 1267, 1269 n.3 (D.C. Cir. 2004).  An agency, at most, must "account[] for any departures."  *Id.* at 1269; *see also Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1182 (D.C. Cir. 2000) (where a manual did not bind the agency, the court must only decide whether, apart from the manual, the agency acted reasonably).  EXIM did so.  It concluded the Amendment "contain[ed] no material change from the original approval" and instead, simply "extends certain dates and makes related changes in connection with the restart" of construction operations.  Ex. C to Rabilloud Decl.  EXIM thus appropriately explained why it did not restart the environmental review process under the ESPG. Its actions, therefore, are not arbitrary and capricious.  *See Edison Elec. Inst.*, 391 F.3d at 1269 n.3.

### 3.    *Plaintiffs' NEPA Claim Fails*

Plaintiffs fail to show that they are likely to succeed on the merits of their claim that EXIM was required to prepare a NEPA environmental impact statement for the Amendment.

NEPA requires federal agencies to prepare an environmental impact statement for only "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Congress in 2023 amended the statute to define "major Federal action" to "mean[] an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility."  *Id.* § 4336e(10)(A).  The statute expressly excludes "agency activities

---

[11] Plaintiffs suggest (at 25) that EXIM could not have considered the security plans, because TotalEnergies updated its security strategy in May 2025, after the approval of the amendment.  But the ESPG do not require EXIM to complete a full review each time a loan recipient updates a detail of the Project.  *See, e.g.*, ESPG, § I ¶ 2 (applying only to "applications").

REDACTED

or decisions with effects located entirely outside of [U.S.] jurisdiction." *Id.* § 4336e(10)(B)(iii), (vi). Given the international nature of EXIM's activities, its NEPA implementing procedures, 12 C.F.R. §§ 408.1-408.7, acknowledge that it anticipates only "relatively rare cases where [EXIM] financing . . . may affect environmental quality in the United States." *Id.* § 408.3. Plaintiffs' claims fail because here neither the original loan decision, nor the Amendment under review, is a "major Federal action[]" subject to NEPA. 42 U.S.C. § 4332(2)(C).[12]

As an initial matter, even the 2019 approval was not a "major Federal action" for which an environmental impact statement was required. EXIM expressly concluded as much, and Plaintiffs have not challenged that determination here. *See* Dkt. 13-14 at 4. That determination was entitled to deference, both as to whether the action is subject to sufficient federal control and responsibility to trigger NEPA[13] and as to whether the action affects environmental quality *in the United States*. 42 U.S.C. § 4336e(10)(B)(vi) (excluding "extraterritorial activities" with effects outside the United States); *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1512 n.2 (2025) ("Courts must conduct their review with significant deference to the agency. When reviewing compliance with NEPA, courts are to play only a limited role.").

It follows that an Amendment to EXIM's loan is also not a "major Federal action." It simply maintains the "substantive *status quo*" of the Agreement—it does not make any material change from the 2019 approval. *See Fund for Animals v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997); 12 C.F.R. § 408.5(a) (focusing on "evaluating applications"). Nothing in the NEPA statute, EXIM's NEPA implementing procedures, or the ESPG requires an environmental impact

---

[12] EXIM gave the public the notice of its "NEPA determination associated with the pending transaction" for the original 2019 decision. ESPG § I ¶ 18; *see* Dkt. 13-14 at 4.

[13] Plaintiffs are wrong to contend otherwise. Mot. 26. Congress confirmed that with the 2023 amendment, tasking the *agency* with "determin[ing]" whether "an action . . . is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A).

REDACTED

statement for a loan amendment—particularly where, as here, it does not make any material change from the original approval. *See Idaho Conservation League v. Bonneville Power Admin.*, 826 F.3d 1173, 1177 (9th Cir. 2016) ("Requiring an agency to prepare an [environmental impact statement] every time it takes an action consistent with past conduct would grind agency decisionmaking to a halt."); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 370, 373 (1989).

Plaintiffs base their argument that EXIM has sufficient control and responsibility to trigger the need for an environmental impact statement on case law (at 27) that predates the 2023 statutory amendment defining "major Federal action." And straining for any U.S. nexus, Plaintiffs argue (at 26) only that the Project will cause $CO_2$ emissions. However, EXIM determines case-by-case whether "CO2 emitting Projects" require NEPA analysis, ESPG, § I ¶ 18; *see* 12 C.F.R. § 408.6, and anticipates only "relatively rare cases" affecting environmental quality in the United States, 12 C.F.R. § 408.3. It found no such rare case here. Plaintiffs wrongly assert (at 26) that the Project's $CO_2$ emissions "trigger NEPA," without citing any precedent holding that a particular emissions amount triggers effects in the United States. The relevant precedent is *Seven County. Infrastructure Coalition v. Eagle County*, which just this term held that agencies need not "address environmental effects from projects that are separate in time or place from the . . . project at hand." 145 S. Ct. at 1515. And Plaintiffs' passing reference (at 26) to the ESPG is irrelevant to any alleged emissions threshold for NEPA—that non-binding guidance just suggests thresholds for posting the Project to EXIM's Pending Transactions List. *See* ESPG, § I ¶ 9; *id.*, § I ¶ 18.

### 4.    *The Bank Has Not Unlawfully Withheld Information From The Public*

Finally, Plaintiffs invoke 5 U.S.C. § 706(1), asserting that "[t]he Bank Act and EXIM's procedures require EXIM to share vital Project information during the approval and notice and comment periods," such as "listing the Project and posting a determination of whether further NEPA analysis is required on its Pending Transactions page, publishing notices in the Federal

REDACTED

Register regarding the 2025 loan, and making available supplemental environmental reports, remediation or mitigation plans, or related monitoring reports." Mot. 27-28. They assert that failure to disclose this information amounted to agency action "unlawfully withheld." *Id.*

Section 706(1) provides that a court may "compel agency action unlawfully withheld." It allows a court to compel an agency to perform a "ministerial or non-discretionary act" amounting to "a specific, unequivocal command." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 63-64 (2004). This limitation "precludes . . . broad programmatic attack[s]." *Id.* at 64. As such, § 706(1) cannot be used "to enter general orders compelling compliance with broad statutory mandates." *Id.* at 66. Plaintiffs' arguments fail because, as explained above, EXIM was not required by law to provide additional NEPA analysis, environmental reports, or public notices. *See supra* at 37-39. Its action, therefore, cannot be considered "unlawful." *SUWA*, 542 U.S. at 65. Plaintiffs' § 706(1) claim must also satisfy the six-factor test *in Telecommunication Research & Action Center* ("*TRAC*") *v. FCC*, 750 F.2d 70 (D.C. Cir. 1984), which they do not even attempt to satisfy.[14]

And in any event, Plaintiffs' request is discordant with the relief they seek. Plaintiffs only ask the Court to "preserve the status quo" by enjoining EXIM from "releasing any funds or further obligating the United States under any loan agreement for the Project." Mot. 45. But § 706(1) only permits a court to "compel" the "unlawfully withheld" action—here, providing information. 5 U.S.C. § 706(1). That is not the relief Plaintiffs seek in their motion.

---

[14] Mot. 27-28; *Crowe v. Fed. Bureau of Prisons*, No. 24-cv-3582, 2025 WL 1635392, at *17 (D.D.C. June 9, 2025) (concluding that six-factor test in *TRAC* applies to "unlawfully withheld" claims under § 706(1)).

REDACTED

## II.     PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM

Despite demanding the Court's expedited attention to this matter, Plaintiffs cursorily address irreparable harm in roughly one page of their motion.  Mot. 41-42.  It is clear why: Plaintiffs' claimed irreparable injuries are wholly speculative, attenuated, and/or have already come to pass.  Irreparable harm must be "certain"—not speculative—"great," and "so imminent that there is a clear and present need" for interim relief while the Court reviews a case.  *League of Women Voters v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016).  Establishing irreparable injury is thus a "considerable burden," *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005), that Plaintiffs have not seriously attempted to meet.  Indeed, they have not even attempted to address the relevant time horizon for irreparable harm, *i.e.*, that any speculative harms will occur in the short time period prior to final judgment.  The entire issue could simply be held forfeited.

Before analyzing Plaintiffs' cursory "harms," Plaintiffs own conduct conclusively rebuts any showing of irreparable harm.  Plaintiffs' "unexcused delay" in seeking a preliminary injunction "implies a lack of urgency and irreparable harm."  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).  Plaintiffs knew about the Amendment, *see* Dkt. 13-3 ¶ 41, yet waited for over four months to seek emergency relief.  That is wholly inconsistent with the sort of irreparable harm signaling a judicial emergency, and courts in this district have repeatedly held that similar or lesser delays show a lack of irreparable harm.  *See Open Top Sightseeing USA*, 48 F. Supp. 3d at 90 (36-days, plus request for 95-day continuance); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (44 days); Order, *Fontem US, LLC v. FDA*, No. 22-1076 (D.C. Cir. July 12 2022) (two months); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (two months); *Miller v. Gruenberg*, No. 1:21-cv-03035, 2022 WL 20699638, at *1 (D.D.C. Aug. 24, 2022) (Nichols, J.) (eight months).  And that makes sense—

REDACTED

when irreparable harm is really "certain" and "great," litigants do not sit on their hands, as Plaintiffs chose to do here. *League of Women Voters*, 838 F.3d at 7-8.

Turning to Plaintiffs' list of alleged "harms," as explained, Plaintiffs do not satisfy the requirements of Article III standing. *See supra* at 11-19. It therefore follows that Plaintiffs have failed to establish irreparable harm sufficient for a preliminary injunction. *Murthy v. Missouri*, 603 U.S. 43, 69 (2024) (preliminary injunction must redress the alleged irreparable harm). And even if Plaintiffs could meet the "concrete and particularized" threshold for standing, they do not meet the far higher "great, imminent, and certain" standard for irreparable harm occurring in the short window before a final judgment. Plaintiffs argue (at 41-42) that EXIM's disbursements will increase security risks and human rights abuses. Those are third-party harms, not irreparable harms *to Plaintiffs*. They are also entirely speculative: Plaintiffs' own expert ███████████ ████████████████████████████████████ much less that is "certain" to do so in the brief period of time it will take the Court to resolve this case on the merits. ████████████ *see also* Mot. 11 (asserting that restarting the Project would "*likely* exacerbate the conflict" (emphasis added)). Plaintiffs do not even attempt to explain how an injunction would prevent that harm. *See Bernstein v. Kerry*, 962 F. Supp. 2d 122, 129 (D.D.C. 2013) ("It is nothing more than conjecture to argue that changing U.S. funding policies will reduce terrorism or plaintiffs' subjective fears"), *aff'd* 584 F. App'x 7 (D.C. Cir. 2014); *Scenic Am., Inc. v. Dep't of Transp.*, 836 F.3d 42, 50 (D.C. Cir. 2016). "Because an injunction will not redress" their alleged harms, Plaintiffs' "claim that it will suffer irreparable harm in the absence of a preliminary injunction is tenuous at best." *Navistar, Inc. v. EPA*, No. 11-cv-449, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011).

Plaintiffs' claimed irreparable injuries stemming from "environmental risks" fare no better. Mot. 42. Although Plaintiffs insist that an injunction preventing the Project from moving forward

REDACTED

will prevent environmental harms, the Project could "potentially reduce emissions" to the extent

its LNG is used to "displace coal in power generation in China, India and Indonesia."[15]  And

TEPMA1 has in place extensive mitigation measures to prevent environmental harm.  S*upra* at 7;

*Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C.2013) ("extensive

mitigation plans" weighed against irreparable harm).  That *any* such harm (much less "great" harm)

will occur in the short time this Court decides the case is entirely speculative.

Next, Plaintiffs argue (at 41-42) that irreparable injury could arise from a potential "loss of

homes, farms, and livelihoods" when the Project restarts.  Aside from being vague and speculative

*third party* harm, because TEPMA1 has finished providing new homes to all 643 displaced

households, any claimed third party injury from *past* resettlement has already occurred and does

not "establish a sufficient likelihood of future injury."  *All. for Hippocratic Med.*, 602 U.S. at 381.

Plaintiffs also contend (at 41) that their claim of irreparable harm is "bolster[ed]" by

procedural harms.  But there are no other bases of irreparable harm that any procedural harm could

"bolster."  *Supra* at 41-43.  And even if EXIM violated any procedure (it did not), bare procedural

violations cannot show irreparable harm.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531,

545-46 (1987) (rejecting presumption of irreparable harm based on statutory violation); *Fund for

Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) ("[T]he procedural harm arising from

a NEPA violation is insufficient, standing alone, to constitute irreparable harm.").[16]

---

[15] R *ex rel.* Friends of the Earth Ltd. v. The Secretary of State for International Trade/UK Export
Finance [2023] EWCA Civ 14 [¶ 10], https://tinyurl.com/2m96as6m.

[16] Even if some procedural harms are irreparable, that is not the case here.  Before approving the
loan, EXIM studied the Project's environmental effects for nearly 10 years.  *See supra* at 7-8.  And
before approving the Amendment, it considered the conflict and the security situation.  *See supra*
at 9-10.  Having already considered the factors Plaintiffs cite, there is no possibility that any further
procedure would lead three Board members to a different decision.

REDACTED

Finally, Plaintiffs' entire theory of irreparable harm turns on the notion that the remedy for their claimed harms will be, eventually, to vacate the Amendment, and that the Court should therefore *change* the status quo, under which the Amendment *is effective*, to render it ineffective, in anticipation of a later *vacatur*. But Plaintiffs have not even *attempted* to show that vacatur is or will ultimately be warranted. This is problematic because Plaintiffs' claims principally rely on failures of notice and explanation that would be readily cured on remand, and vacatur would result in substantial disruption. *See Delta Air Lines, Inc.*, 718 F.3d at 978 (remanding EXIM decision without vacatur). So Plaintiffs are seeking to *alter* the status quo beyond any *ultimate relief* they even arguably have entitlement to. That is far afield from the necessary showing that *preserving* the status quo would prevent irreparable harm during the brief pendency of judicial proceedings.[17]

## III. THE BALANCE OF THE EQUITIES FAVOR THE BANK AND TEPMA1

Not only have Plaintiffs failed to prove that the final elements—the balance of equities and public interest—tip in their favor, but they lean decisively in favor of TEPMA1 and EXIM.

Plaintiffs largely speculate that a preliminary injunction will prevent harm to the environment and local residents, but a preliminary injunction will not redress these speculative harms. *See supra* at 11-19. Meanwhile, a preliminary injunction would significantly injure TEPMA1—not have "zero" or "minimal" burden, as Plaintiffs suggest. Mot. 43-44. A preliminary injunction should be denied if issuing it would "cause[] injury to [an]other" party. *See ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 53 (D.D.C. 2014). The entire point of Plaintiffs' claims is to disrupt the Project, and, in their view, ideally unwind the Project altogether. Mot. 45. And in this multi-billion dollar Project with complex international financing structures, enjoining

---

[17] For essentially the same reasons, Plaintiffs' alternative request for summary judgment is nonsensical and wrong. The administrative record has not been produced, and Plaintiffs have not even presented argument relevant to *vacatur*, which would require additional remedies proceedings including supplemental declarations on the potential harm of *vacatur.*

disbursements, even temporarily, would have a cascading effect of creating uncertainty with other lenders and foreign governments, and potentially upending or delaying other parts of the financing. Rabilloud Decl. ¶ 58-61.  A pause in funding may also jeopardize services the Project provides to local communities in the Project region—effects antithetical to Plaintiffs' aims and Mozambique's goals.

The Project is also expected to support "16,400 good-paying American jobs," including "workers and families at more than 68 companies across 14 states."  Ex. C to Rabilloud Decl.  The economic benefits and American jobs from the Project are in the public interest.  *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 727 (E.D. Tex. 2020) (noting the public's interest in promoting investment in "the Nation's energy infrastructure").

A preliminary injunction would also injure the interests of Mozambique itself.  The Project aligns with its economic and policy goals, *see* Environmental Impact Assessment, ch. 5,  § 5.5.1, https://tinyurl.com/4277dbaz, and is an important step in helping the country transition to clean energy, Rabilloud Decl. ¶¶ 10-12.

Courts thus routinely find that allowing large public infrastructure projects to proceed on schedule is in the public interest.  *See, e.g.*, *Macht v. Skinner*, 715 F. Supp. 1131, 1137 (D.D.C. 1989) ("There is a substantial public interest in the construction of mass transit systems designed to ease the burden on overcrowded local roadways."), *aff'd*, 889 F.2d 291 (D.C. Cir. 1989); *NRDC v. Kempthorne*, 525 F. Supp. 2d 115, 127 (D.D.C. 2007) (holding the public interest would be harmed by delaying development of energy resources that would also "generate millions of dollars in revenue"); *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 768 (10th Cir. 2014) (further delaying a needed water project was not in the public interest).  So too here.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

REDACTED

Respectfully submitted,

Dated: August 15, 2025

*/s/ Andrew D. Prins*
Andrew D. Prins (DC Bar No. 998490)
Stacey L. VanBelleghem (DC Bar No. 988144)
Jonathan L. Williams (DC Bar No. 999708)
Rachael L. Westmoreland* (DC Bar No. 90034032)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com
         stacey.vanbelleghem@lw.com
         jonathan.williams@lw.com
         rachael.westmoreland@lw.com

Nicholas L. Schlossman (DC Bar No. 1029362)
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel:  (737) 910-7300
Fax:  (737) 910-7301
Email: nicholas.schlossman@lw.com

*Application for admission to the U.S. District Court for the District of Columbia pending*

*Attorneys for Defendant-Intervenor TotalEnergies EP Mozambique Area 1, Limitada*