**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FRIENDS OF THE EARTH U.S.,** et. al,

*Plaintiffs*,

v.

**EXPORT-IMPORT BANK OF THE
UNITED STATES,** et. al.,

*Defendants*.

Civil Action No. 1:25-cv-02235-CJN

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION AND PARTIAL SUMMARY
JUDGMENT**

Richard L. Herz (*admitted pro hac vice*)
Tamara A. Morgenthau (D.C. Bar No. 90032827)
Lindsay A. Bailey (D.C. Bar No. 1723447)
Michelle C. Harrison (D.C. Bar No. 1026592)
EarthRights International
1400 K St. NW Suite 750
Washington, DC 20005
(202) 466 5188
rick@earthrights.org

Steven B. Herz (*admitted pro hac vice*)
The Law Office of Steven Herz
1954 Mountain Blvd.
Oakland CA 94661
*Counsel for Plaintiffs*

September 3, 2025

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

I.   Plaintiffs have standing. .............................................................................................. 3

   A.   Plaintiffs have organizational standing. .............................................................. 3

     1.   EXIM denied Plaintiffs and those they serve an avenue of redress. ............... 4

     2.   EXIM's loan will increase the need for Plaintiffs' direct services and the risk and burden to Plaintiffs to provide them. .......................................................... 8

     3.   EXIM failed to release information, causing Plaintiff organizations injury. ...... 12

     4.   EXIM's decision forced Plaintiffs to divert resources to respond to the Project. ... 13

   B.   Plaintiffs have informational injury due to EXIM's statutory violations. ............. 14

   C.   Plaintiffs have third party standing. ..................................................................... 15

II.  Plaintiffs will likely succeed on the merits. .............................................................. 17

   A.   Defendants' efforts to characterize the acting Board's approval as insignificant are contradicted by the facts and at odds with the statute. .......................................... 17

     1.   This was a new credit agreement that required Board approval. ...................... 18

     2.   Defendants' framing of EXIM's decision as an "amendment" has no meaning under the Bank Act and cannot override the Bank Act's clear procedural requirements. ... 19

     3.   Defendants' practical concerns are meritless. ................................................. 21

   B.   EXIM cannot base its 2025 approval on obsolete analysis conducted in 2016-19 that predated critical changes to the Project. .................................................................. 22

   C.   EXIM did not adequately consider the economic impacts in the United States. ..... 23

     1.   EXIM was required to conduct an economic analysis. ..................................... 24

     2.   EXIM failed to conduct a rigorous analysis based on current data. .................. 24

   D.   The Bank Act required EXIM to provide Congress and the public notice and allow comment prior to the 2025 loan approval. ............................................................. 26

     1.   The Bank Act requires notice and comment for large transactions and those with economic effects like this one. ......................................................................... 26

     2.   EXIM cannot rely on a years-old comment period to inform Board decisionmaking on a materially changed loan. ............................................................................ 27

     3.   The Bank Act's "materiality" provision also requires notice and comment. ...... 28

   E.   EXIM was required to do a NEPA analysis. ......................................................... 30

   F.   EXIM's failure to consider Project environmental and social risks violated the Bank Act and its own procedures. ................................................................................... 33

     1.   EXIM had to provide notice and permit comment prior to the 2025 approval. ... 33

     2.   EXIM's acting Board failed to consider the risk that the conflict poses. ........... 36

   G.   EXIM unlawfully withheld information from the public. ...................................... 37

H.    Because the acting Board lacked the statutorily-required quorum of Senate-confirmed members, its 2025 approval is void.                                               38

III.   Absent a preliminary injunction, Plaintiffs and the community members they serve will suffer imminent and irreparable harm.                                           42

IV.    The balance of equities strongly favors granting an injunction.                      46

CONCLUSION                                                                                   50

## TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. DOL*,
  No. 25-339 (JDB), 2025 U.S. Dist. LEXIS 72516 (D.D.C. Apr. 16, 2025) .............................. 6

*Air Transport Ass'n of Am.*,
  878 F. Supp. 2d 42 (D.D.C. 2012) ........................................................................... 36

*Air Transp. Ass'n of Am. v. FAA*,
  291 F.3d 49 (D.C. Cir. 2002) ................................................................................... 21

*Al Hela v. Trump*,
  972 F.3d 120 (D.C. Cir. 2020) ................................................................................. 29

*All. For The Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ................................................................................. 46

*Allina Health Services v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) ............................................................................... 21

*Am. Gateways v. United States DOJ*,
  No. 25-01370 (AHA), 2025 U.S. Dist. LEXIS 138893 (D.D.C. July 21, 2025) ..................... 45

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987).................................................................................. 43, 46

*Appalachian Voices v. Chu*,
  725 F. Supp. 2d 101 (D.D.C. 2010) .......................................................................... 43

*Benisek v. Lamone*,
  585 U.S. 155 (2018).............................................................................................. 50

*Bernstein v. Kerry*,
  962 F. Supp. 2d 122 (D.D.C. 2013) .......................................................................... 43

*Campaign Legal Center v. FEC*,
  No. 22-cv-3319, 2023 U.S. Dist. LEXIS 171971 (D.D.C. Sep. 23, 2024) ............................ 12

*Center for Biological Diversity (CBD) v. U.S. International Development Finance Corp.*,
  77 F.4th 679 (D.C. Cir. 2023) ................................................................................. 38

*Center for Law & Education v. Dep't of Educ.*,
  396 F.3d 1152, (D.C. Cir. 2005) ................................................................................ 7

*Chesapeake Climate Action Network ("CCAN") v. Exp.-Import Bank of the U.S.*,
  78 F. Supp. 3d 208 (D.D.C. 2015) ................................................................... 4, 7, 13

*Citizens Against Rails-To-Trails v. Surface Transp. Bd.*,
  267 F.3d 1144 (D.C. Cir. 2001) ............................................................................... 31

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)............................................................................................... 10

*Clarian Health W., LLC v. Hargan*,
  878 F.3d 346 (D.C. Cir. 2017) ................................................................................. 35

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*,
  No. 14-CV-953 (GK), 2016 U.S. Dist. LEXIS 174696 (D.D.C. Dec. 19, 2016) .................... 14

*Cmty. Nutrition Inst. v. Young*,
  818 F.2d 943 (D.C. Cir. 1987) ................................................................................. 35

*Comm. for A Constructive Tomorrow v. United States DOI*,
  No. 24-774 (LLA), 2024 U.S. Dist. LEXIS 93089 (D.D.C. May 24, 2024) .......................... 44

*Common Cause v. FEC*,
  108 F.3d 413 (D.C. Cir. 1997) ................................................................................. 14

iii

*Corner Post v. Bd. of Gov. of Federal Reserve Sys.*,
  603 U.S. 799 (2024)......................................................................................... 31
*Crowe v. Fed. Bureau of Prisons*,
  No. 24-cv-3582 (APM), 2025 U.S. Dist. LEXIS 109052 (D.D.C. June 9, 2025) ................... 38
*Ctr. for Biological Diversity v. United States Dep't of State*,
  Civil Action No. 18-563 (JEB), 2019 U.S. Dist. LEXIS 98527 (D.D.C. June 12, 2019)......... 13
*Ctr. for Biological Diversity v. United States Int'l Dev. Fin. Corp.*,
  585 F. Supp. 3d 63 (D.D.C. 2022)................................................................... 14
*Ctr. for Biological Diversity v. United States Int'l Dev. Fin. Corp.*,
  77 F.4th 679 (D.C. Cir. 2023)....................................................................... 14
*Damus v. Nielsen*,
  313 F. Supp. 3d 317 (D.D.C. 2018).................................................................. 35
*DeFoe v. Bd. of Pub. Instruction of Alachua Cnty., Fla.*,
  132 F.2d 971 (5th Cir. 1943)........................................................................ 30
*Delta Airlines, Inc. v. Exp.-Imp. Bank of U.S.*,
  85 F. Supp. 3d 387 (D.D.C. 2015).............................................................. 36, 45
*Delta Airlines v. Export-Import Bank of the U.S.*,
  718 F.3d 974 (D.C. Cir. 2013)....................................................................... 24
*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019)................................................................................ 9, 11
*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
  707 F.3d 462 (4th Cir. 2013) ................................................................... 22, 25
*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017)...................................................................... 15
*English v. Trump*,
  279 F. Supp. 3d 307 (D.D.C. 2018).................................................................. 41
*Epsilon Elecs., Inc. v. United States Dep't of the Treasury*,
  857 F.3d 913 (D.C. Cir. 2017)...................................................................... 29
*Equal Rights Ctr. v. Post Properties Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011)..................................................................... 11
*Esch v. Yeutter*,
  876 F.2d 976 (1989)................................................................................. 4
*Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
  28 F.3d 1268 (D.C. Cir. 1994)...................................................................... 11
*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)............................................................................ 3, 5, 16
*FEC v. Akins*,
  524 U.S. 11, 21 (1998)............................................................................. 14
*Fertilizer Inst. v. EPA*, 935 F.2d 1303 (D.C. Cir. 1991)............................................ 28
*Fisheries Survival Fund v. Jewell*,
  236 F. Supp. 3d 332 (D.D.C. 2017).................................................................. 43
*Found. on Economic Trends v. Heckler*,
  756 F.2d 143 (D.C. Cir. 1985)...................................................................... 32
*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016)...................................................................... 15

*Friends of the Everglades, Inc. v. Noem*,
    2025 U.S. Dist. LEXIS 163085 (S.D. Fla. Aug. 21, 2025)...................................... 32

*Guedes v. BATFE*,
    356 F. Supp. 3d 109 (D.D.C. 2019) ............................................................................... 42

*Hallstrom v. Tillamook Cty.*,
    493 U.S. 20 (1989).......................................................................................................... 19

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)........................................................................................................... 5

*Hirt v. Richardson*,
    127 F. Supp. 2d 833 (S.D. Mich. 1999) ....................................................................... 45

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ........................................................................................ 28

*Int'l Bhd. of Teamsters v. Transp. Sec. Admin.*,
    429 F.3d 1130 (D.C. Cir. 2005) ..................................................................................... 7

*June Med. Servs. LLC v. Russo*,
    591 U.S. 299 (2020)........................................................................................................ 16

*Kyle v. Wadley*,
    24 F. Supp. 884 (W.D. La. 1938)................................................................................... 30

*League of Women Voters of the United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .................................................................................... 45, 46

*Lepelletier v. FDIC*,
    164 F.3d 37 (D.C. Cir. 1999) ........................................................................................ 15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).......................................................................................................... 9

*Macht v. Skinner*,
    715 F. Supp. 1131 (D.D.C. 1989) ................................................................................. 46

*Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*,
    698 F. Supp. 3d 10 (D.D.C. 2023)................................................................................. 31

*Nat'l Ass'n for Latino Cmty. Asset Builders v. Consumer Fin. Prot. Bureau*,
    581 F. Supp. 3d 101 (D.D.C. 2022) .............................................................................. 12

*Nat'l Ass'n of Home Builders v. EPA*,
    667 F.3d 6 (D.C. Cir. 2011)........................................................................................ 5, 7

*Nat'l Conservative Political Action Comm. v. FEC*,
    626 F.2d 953 (D.C. Cir. 1980) ...................................................................................... 24

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014)....................................................................................... 36

*Nat'l Wildlife Fed'n v. Gorsuch*,
    693 F.2d 156, 172 (D.C. Cir. 1982) .............................................................................. 29

*Natural Resources Defense Council v. Kempthorne*,
    525 F. Supp. 2d 115 (D.D.C. 2007).............................................................................. 47

*Navistar, Inc. v. United States EPA*,
    No. 11-cv-449 (RLW), 2011 U.S. Dist. LEXIS 95128 (D.D.C. Aug. 25, 2011)...................... 43

*NRDC v. EPA*,
    464 F.3d 1 (D.C. Cir. 2006) ............................................................................................ 9

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2004) ........................................................................................ 32

*Optimus Steel, LLC v. United States Army Corps of Eng'rs*,
  492 F. Supp. 3d 701 (E.D. Tex. 2020) ............................................................. 47
*People for the Ethical Treatment of Animals (PETA) v. USDA*,
  797 F.3d 1087 (D.C. Cir. 2015) ............................................................... passim
*Powder River Basin Res. Council v. United States DOI*,
  No. 22-cv-2696, 2023 U.S. Dist. LEXIS 198463 (D.D.C. Nov. 6, 2023) ............... 50
*Powers v. Ohio*,
  499 U.S. 400 (1991) ........................................................................... 16
*Public Citizen v. Steed*,
  733 F.2d 93, 98 (D.C. Cir. 1984) ............................................................ 21
*S. Utah Wilderness All. v. Bernhardt*,
  512 F. Supp. 3d 13 (D.D.C. 2021) ........................................................... 44
*Safari Club Int'l v. Zinke*, Civ. A. No. 15-1026 (RCL),
  2017 WL 8222114 (D.D.C. May 2, 2017) ................................................... 12
*Samantar v. Yousuf*,
  560 U.S. 305 (2010) ........................................................................... 29
*Seven County Infrastructure Coal. v. Eagle County*,
  145 S. Ct. 1497 (2025) ........................................................................ 31
*Shawnee Tribe v. Mnuchin*,
  984 F.3d 94 (D.C. Cir. 2021) ................................................................. 46
*Siegel v. U.S. Dep't of Treasury*,
  304 F. Supp. 3d 45 (D.D.C. 2018) ........................................................... 11
*Sierra Club v. EPA*,
  671 F.3d 955 (9th Cir. 2012) ................................................................. 22
*Sierra Club v. U.S. Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.D.C. 2013) ............................................................ 44
*Sierra Club v. United States DOT*,
  125 F.4th 1170 (D.C. Cir. 2025) .......................................................... 9, 45
*Small Refiner Lead Phase-Down Task Force v. EPA*,
  705 F.2d 506 (1983) ........................................................................... 28
*Southwest Power Pool, Inc. v. FERC*,
  736 F.3d 994 (D.C. Cir. 2013) ............................................................... 22
*Steenholdt v. FAA*,
  314 F.3d 633 (D.C. Cir. 2003) ............................................................... 35
*Sugar Cane Growers Co-op of Florida v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) .............................................................. 8, 45
*Syncor Int'l Corp. v Shalala*,
  127 F.3d 90 (D.C. Cir. 1987) ................................................................. 35
*Telecommunication Research & Action Center v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ................................................................. 37
*Teton Historic Aviation Found. v. United States*,
  248 F. Supp. 3d 104 (D.D.C. 2017) ......................................................... 35
*Trump v. Comm. on Ways & Means*,
  415 F. Supp. 3d 38 (D.D.C. 2019) ............................................................ 9
*United States v. $215,587.22 in U.S. Currency*,
  306 F. Supp. 3d 213 (D.D.C. 2018) ......................................................... 29

*VFD Consulting, Inc. v. 21st Servs.*,
    425 F. Supp. 2d 1037 (N.D. Cal. 2006) ............................................................... 30
*Viasat, Inc. v. FCC*,
    47 F.4th 769 (2022).............................................................................................. 14
*Vietnam Veterans of Am. v. Sec'y of the Navy*,
    843 F.2d 528 (D.C. Cir. 1988).............................................................................. 36
*Vill. of Logan v. United States DOI*,
    577 F. App'x 760 (10th Cir. 2014) ....................................................................... 46
*Whitman-Walker Clinic v. HHS*,
    485 F. Supp. 3d 1 (D.D.C. 2020).................................................................... 11, 16
*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008).................................................................................................. 42

**Statutes**

*12 U.S.C. § 635a ....................................................................... 5, 19, 26, 29, 40, 41
*12 U.S.C. § 635 ............................................................... 19, 23, 29, 35, 40, 41
*12 U.S.C. § 635i-5 .......................................................................... 19, 33, 34, 40
42 U.S.C. § 4336e.................................................................................................. 31, 32
5 U.S.C. § 3349...................................................................................................... 38

**Government Sources**

171 Cong. Rec. 55................................................................................................... 39
Application for Final Commitment for a Long-Term Loan or Financial Guarantee in Excess of
    $100 Million: AP700317XX, 86 Fed. Reg. 53055 (Sept. 24, 2021) ........................................ 21
Application To Amend Presidential Permit; Lake Erie Connector Transmission, LLC, 89 Fed.
    Reg. 65616 (Aug. 12, 2024)..................................................................................... 22
Donald Trump, (@realDonaldTrump), TRUTH SOCIAL,
    https://truthsocial.com/@realDonaldTrump/posts/114015154260594234 (last visited Feb. 16,
    2025)....................................................................................................... 39
EXIM, Environmental and Social Due Diligence Procedures and Guidelines
    ....................................................................................... 33, 34, 35, 36, 37, 38
EXIM Economic Impact Procedures and Methodological Guidelines at 2, 4 (August 2020)...... 24
James G. Burrows Jr., EXIM Website, (Sept. 9, 2025, 2:11 PM)
    https://www.exim.gov/leadership-governance/officers/james-g-burrows. ................................ 39
Press Release [U.S. Senate Committee on Banking, Housing and Urban Affairs], *Scott,
    Colleagues Advance Additional Trump Administration Nominees out of Senate Banking
    Committee* (Jul. 23, 2025), http://bit.ly/4p4lUBV ................................................... 40
EXIM, *President Trump Strengthens Export-Import Bank of the United States* ........................ 40
Senate Hearing 117-323 (October 26, 2021), https://bit.ly/3HEfHMo ................................... 40
*Test. of John Jovanovic Nominee of President Trump to be Chairman & President of Export-
    Import Bank of the United States: Hearing Before the U.S. S. Comm. on Banking, Hous., &
    Urb. Affs., 119th Cong.,* (June. 12, 2025), https://bit.ly/41CcXFY .................................. 40
*The White House, Fact Sheet: President Donald J. Trump Establishes the National Energy
    Dominance Council* (Feb. 14, 2025), https://bit.ly/4nafAaa.......................................... 48

**Other Authorities**

Armed Conflict Location & Event Data Project (ACLED), *Mozambique Conflict Monitor Update: 4 - 17 August 2025*, https://bit.ly/4g7RCKH (last visited Sept. 3, 2025). .............. 2, 10

Khalid Adnan Saeed, *Revisiting the natural resource curse: A cross-country growth study*, Cogent Economics & Finance 9(1) (2021) .............................................................. 49

Richard Halsey et. al., *Navigating Decisions: The risks to Mozambique from liquified natural gas export projects*, Int'l Inst. for Sustainable Dev. 6 (Decl. 13, 2023)......................................... 48

Robert Howarth, *The greenhouse gas footprint of liquefied natural gas (LNG) exported from the United States*, Vol. 12:11 Energy Science & Eng. 4843-59 (Nov. 2024), https://bit.ly/4lWrvY ................................................................................................................ 49

## INTRODUCTION

Defendants argue that EXIM could rubberstamp billions of dollars in government funding for a foreign corporation in 2025 because it considered doing so six years ago, even though the facts have fundamentally changed. In their view, it is irrelevant that the Project is now in a war zone, protected by a military that has years of documented human rights abuses, and that it is now clear the Project will hurt U.S. producers and workers. Defendants present nothing permitting such blinkered decision-making. In fact, Congress forbade it.

The Bank Act's procedural requirements and substantive limits plainly applied to the 2025 funding decision. In particular, Congress required EXIM to provide notice and permit comment before finally approving large transactions. And it barred EXIM from greenlighting projects, like this one, that compete with U.S. producers unless its Board found that the benefits to the U.S. outweigh the harms. EXIM did neither.

Defendants unpersuasively argue that the Board did not approve a loan at all, just a "mere" "amendment" making minor tweaks to insignificant details. But whatever Defendants call it, the question before the Board in 2025 was whether to make $4.7 billion in taxpayer funds available to Defendant TotalEnergies EP Mozambique Area 1 ("Total"). The Board could have said "no." What matters under the statute is that on March 12, the loan lacked Board approval and EXIM could not fund the Project. On March 14, it could.

Defendants claim nothing really changed since 2019; they just needed to alter some dates in the documents because the Project was delayed. One could just as easily say that winter just delayed the Donner Party. It is hornbook law that when changed circumstances knock the pins out from under an agency decision, it must consider the new facts. EXIM cannot decide based on history instead of reality.

Plaintiffs are also likely to prevail on the merits for additional reasons. EXIM's claim that it was free to ignore its own environmental and social policies is incorrect. But even if it sometimes could, it was arbitrary to do so here. Given the humanitarian crisis, no reasonable agency or person would have approved this loan without considering and accepting comments about the Project's impact on local people. And EXIM does not dispute the facts requiring it to conduct a NEPA analysis. Instead, it asks for blind deference to its refusal, even though it has never explained or tried to justify that decision. Finally, EXIM's Board lacked the required quorum of Senate-confirmed members. Defendants say this was allowed because the acting members were not appointed to the Board. But they explicitly were.

Absent temporary relief, Plaintiffs will suffer immediate and irreparable harm. The Project will take more people's land, destroy livelihoods, and make nearby communities an Al-Shabab target. Indeed, the same week Total told this Court that the security situation is stable, insurgents "mount[ed] three attacks, including in villages on the southern side of the [Project]."[1] All of this will require Plaintiffs to provide more and less effective services to those injured.

Plaintiffs have standing based on these injuries. Additionally, by foreclosing notice and comment and participation in due diligence, EXIM denied Plaintiffs and the communities they serve access to EXIM's own avenue of redress. Defendants' claim that Plaintiffs only engage in issue advocacy mischaracterizes this and ignores the other direct services Plaintiffs provide.

Given the harms to Plaintiffs and local people, the equities favor temporary relief. Defendants speculate that the Project will be good for U.S. jobs, Mozambique, and the climate, but they provide no evidence (and are wrong). The Court should not credit their bald assertions

---

[1] Armed Conflict Location & Event Data Project (ACLED), *Mozambique Conflict Monitor Update: 4 - 17 August 2025*, https://bit.ly/4g7RCKH (last visited Sept. 3, 2025).

when EXIM was required, but failed, to analyze those issues. And Defendants' claims just emphasize that while Total whispered its arguments in EXIM's ear through extensive lobbying, the public and Congress were denied the opportunity to provide the facts. But most importantly, Defendants' arguments are irrelevant. The question is not whether the Project's illusory benefits will ultimately exceed its many harms, but whether the equities favor *temporary* relief. Defendants show no injury from a temporary funding pause, let alone any that outweigh the immediate harms to Plaintiffs and local people.

Plaintiffs' preliminary injunction motion should be granted. Alternatively, because the material facts are undisputed, the Court could grant summary judgment on the merits now.

## I.    Plaintiffs have standing.

### A.    Plaintiffs have organizational standing.

Plaintiffs have standing because EXIM has denied them a means of redress, *People for the Ethical Treatment of Animals (PETA) v. USDA*, 797 F.3d 1087, 1094-95 (D.C. Cir. 2015), and "perceptibly impair[ed]" their ability to provide services to people harmed by the Project, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024); Pls. 29-36.

For nearly twenty years, Plaintiffs have assisted people affected by the Project in addressing injuries, including displacement, lost livelihoods, environmental harms, and human rights violations. JA is a centralized service hub for local communities, offering advice, research, social work, support for legal action, environmental monitoring, and representation. Pls. 9-12. JA Decl. ¶¶ 8-10, 12; JA Supp. Decl. ¶ 51. FOE provides services to affected people with and through JA. FOE Decl. ¶¶ 8, 10, 14. Together, Plaintiffs document harms, share Project information with local people, advise them on their rights, and assist them in seeking protections and remedies, including through the due diligence procedures and processes and other avenues of

redress of institutions like EXIM. Pls. 9-12; JA Decl. ¶¶ 14, 28, 30. When something goes wrong or concerns arise, community members turn to JA. JA Supp. Decl. ¶¶ 79-82.[2]

EXIM denied Plaintiffs' their right to comment and participate in the due diligence process on behalf of the people they serve. In so doing, it precluded Plaintiffs from accessing EXIM's avenues of redress. The flawed approval will also require Plaintiffs to provide more services to their clients to fulfill their missions, denied Plaintiffs information that they provide local people and use to protect their rights, and will require Plaintiffs to divert resources from other opportunities to advance their missions. Pls. 29-36. Plaintiffs have suffered "'concrete and demonstrable injury to [their] activities'" that is not just "'a setback to [their] abstract social interests' and thus suffices for standing." *PETA*, 797 F.3d at 1094 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Defendants' contrary arguments are unpersuasive.

1. <u>EXIM denied Plaintiffs and those they serve an avenue of redress.</u>

Denial of access to "avenues of redress [plaintiffs] wish to use" to serve their mission constitutes injury both where the organization provides a service of facilitating such access, and where, as in *PETA*, it seeks access for itself. 797 F.3d at 1094. EXIM denied Plaintiffs access to its redress procedures—notice and comment and due diligence processes—for themselves and those they serve. EXIM thus injured Plaintiffs.

Harm to an organization's issue advocacy may not confer standing, but Plaintiffs are not purely "advocacy organizations," Total 12-13; EXIM 14; they *also* provide direct services and participate in redress processes. Pls. 9-11. Plaintiffs' injury here is not to their broader advocacy, but to their ability to provide services to local people and seek redress. Total's claim that a

---

[2] Plaintiffs can rely on evidence outside the administrative record, Total 11 n.4, to establish standing, *Chesapeake Climate Action Network ("CCAN") v. Exp.-Import Bank of the U.S.*, 78 F. Supp. 3d 208, 217 (D.D.C. 2015), and for other issues. *Esch v. Yeutter*, 876 F.2d 976 (1989).

service must be "untethered" and "unrelated" to its issue advocacy—whatever that means—is invented. Total 13-14. Neither *FDA*, 602 U.S. at 395, nor *National Association of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011), required any such thing. Unless an organization has two entirely different missions, its services and advocacy will always be related. Thus, HOME's "issue-advocacy" and "counseling service" *both* promoted "equal opportunity in housing," *Havens*, 455 U.S. at 368 (cleaned up); *FDA*, 602 U.S. at 395 (discussing *Havens*, 455 U.S. at 368); PETA's advocacy and accessing USDA's means of redress both sought to prevent cruelty to animals. *See* 797 F.3d at 1094.[3] Both organizations had standing.

Defendants' attempt to recast participation in EXIM's redress procedures as issue advocacy fails. EXIM 14; Total 13-14. This case does not differ materially from *Havens*. Total 13-14. Denial of access to "avenues of redress" is "the same type of injury as. . . in *Havens*." *PETA*, 797 F.3d at 1094 (quotation marks omitted). Under *PETA*, accessing "a means by which to seek redress" is *not* issue advocacy, and denial of access provides standing. *Id.* at 1093-95. Prior to the 2025 approval, EXIM denied Plaintiffs access to its notice and comment and due diligence procedures. In *PETA*, the USDA precluded PETA from preventing cruelty to animals by submitting USDA complaints. *Id*. at 1094. Here, EXIM precluded Plaintiffs from preventing or remedying harm to local people by submitting comments. The injury is identical.

Submitting comments about a specific project, regarding specific harms to specific people, is a means of redress EXIM provides to allow commenters to prevent or remedy a project's harms. The Bank Act requires EXIM to solicit comments that go to the Board to inform its decision of whether, or on what conditions, to fund a project. 12 U.S.C. §§ 635a(c)(10)(C)(i);

---

[3] The suggestion that, by engaging in advocacy, Plaintiffs forfeit their standing based on other injuries raises obvious First Amendment concerns.

635a(c)(10)(E). EXIM's due diligence processes and procedures are also a critical avenue for redress; they require EXIM to permit notice and comment and engage with interested parties, in reviewing the environmental and social risks and impacts to local communities and the Project's plans to mitigate those risks. *See* JA Decl. ¶¶ 28-31, 42-51; FOE Decl. ¶¶ 12-25; JA Supp. Decl. ¶¶ 65-71; Pls. 29-31. As a result of this review, EXIM can condition or withhold financing. Pls. 23-24.[4] By failing to allow public input, EXIM deprived Plaintiffs and the people they support of means to remedy existing violations and prevent future ones.

Take resettlement. Plaintiffs would have informed EXIM, among other things, that the Project has still not provided land to replace many of the farms it seized, and thus does not comply with EXIM's requirements. JA Decl. ¶¶ 61, 64; FOE Decl. ¶ 50; JA Supp. Decl. ¶¶ 4-11. EXIM could have withheld financing or imposed conditions requiring the Project to resolve these issues before disbursement. So too for other issues, like environmental degradation, lost livelihoods, and communities' security; EXIM's notice and comment and diligence processes are its means to prevent and remedy those harms. JA Decl. ¶¶ 44-45, 61-63; FOE Decl. ¶ 58; JA Supp. Decl. ¶¶ 6-11.

Thus, Plaintiffs' ability to present their and local peoples' objections through these processes is no different than an organization's ability to seek to prevent bird abuse or to present consumer complaints through an agency mechanism. *PETA*, 797 F.3d at 1094; *AFL-CIO v. DOL*, No. 25-339 (JDB), 2025 U.S. Dist. LEXIS 72516, at *30-31 (D.D.C. Apr. 16, 2025). In each

---

[4] Indeed, EXIM submitted documents stating that raising "project-specific concerns" led it to bring the concerns to the borrower "to be addressed in the Environmental and Social Management Plans" and that information gathered from the stakeholder consultation process "has led to the development of numerous mitigation measures." Swain Decl. Ex. 2, 85-86.

case, the procedure is a critical means of preventing and redressing particular harms. Here, as there, there is standing.

Defendants fail to distinguish *PETA*. EXIM merely repeats its (incorrect) *merits* argument that Plaintiffs have no right to comment. EXIM 13; Pls. 17-21; *infra* § II(D). Total cites cases that do not concern means of redress. Total 13. *National Association of Home Builders* held only that spending time and money *submitting* comments did not confer standing. 667 F.3d at 12. It did not address, let alone reject, the argument that the *denial* of a means of redress (like notice and comment) is a cognizable injury, as *PETA* later held. And *Center for Law & Education v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005), just reiterated that *lobbying* is pure issue-advocacy, but *PETA* distinguished lobbying from access to means of redress. 797 F.3d at 1093-94.

Defendants' further claim that deprivation of Plaintiffs' right to comment does not establish injury conflicts with *PETA*'s holding that denial of a means of redress is an injury. Total 14; EXIM 13-14. The cases they cite, *International Brotherhood of Teamsters v. Transportation Security Administration*, 429 F.3d 1130, 1135 (D.C. Cir. 2005) and *CCAN*, merely note that denying such a right is not itself an injury if the commenter is just a member of the public, lacking a "concrete interest." *CCAN*, 78 F. Supp. 3d at 237-38 (quotation marks omitted). But Plaintiffs seek to prevent specific harms, from a specific project, to specific people they serve, pursuant to their mission. Their interest is concrete. And the nub of *PETA* is that the denial of a means of redress "injured [plaintiff's] interests." 797 F.3d at 1094.

Total argues that even if EXIM had permitted access to means of redress, Plaintiffs would continue to use other tools anyway. Total 14-15. Not so. Had EXIM permitted comment and addressed Plaintiffs' concerns, Plaintiffs would *not* need to engage in these activities, at least

not to the same extent, because EXIM could have avoided or limited the harms. JA Decl. ¶¶ 61-62; FOE Decl. ¶¶ 55-58; JA Supp. ¶¶ 33, 48, 65, 67, 69-71, 84. Total presumes that commenting would make no difference. But a plaintiff deprived of a procedural right "never has to prove that if he had received the procedure the substantive result would have been altered." *Sugar Cane Growers Co-op of Florida v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

Last, EXIM suggests that its refusal to permit comment did not harm Plaintiffs because they submitted their views informally, EXIM 14, but *Sugar Cane Growers* rejected that argument, as it would "eviscerate[]" notice and comment. *Id.* at 96-97. EXIM staff must share formal comments with the Board, but can send letters to the trash. Plaintiffs' letter alleging grievous human rights abuses ███████████████████████████████████████████ ██ Although Plaintiffs "need not" identify additional concerns they would have raised, *Sugar Cane Growers*, 289 F.3d at 96-97, Plaintiffs would have provided new information about resettlement, human rights, the alleged containers massacre, and economic effects in the U.S., among other issues, FOE Decl. ¶¶ 50-51; JA Decl. ¶¶ 60-61; JA Supp. Decl. ¶ 23.

    2.   <u>EXIM's loan will increase the need for Plaintiffs' direct services and the risk and burden to Plaintiffs to provide them.</u>

Restarting the Project will displace more local people from their land, damage the environment, limit fisherpeoples' sea access and otherwise harm livelihoods, and exacerbate the conflict and abuses in the Project area. Pls. 32; JA Supp. Decl. ¶¶ 4-49. This will increase the number of people needing JA's services. Defendants do not claim these services, like educating local people about Project impacts and helping them navigate complex resettlement mechanisms, are issue advocacy. And a restart will render Plaintiffs' services more burdensome and less effective. Those are injuries to Plaintiffs. Pls. 32-34.

These harms are concrete. "[A]llegation[s] of future injury may suffice if either the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *See Trump v. Comm. on Ways & Means*, 415 F. Supp. 3d 38, 49 (D.D.C. 2019) (cleaned up). "[S]ubstantial" means "non-trivial," or not "hypothetical." *NRDC v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006). As in *Trump*, "Defendants ignore the substantial risk side of this standard." 415 F. Supp. 3d at 49. *See* Total 15. And Plaintiffs easily meet it.

Defendants argue that the injuries are speculative because they depend on third parties' acts. EXIM 15; Total 16. EXIM says this *necessarily* precludes standing, but that is wrong. Plaintiffs need only show that the "third parties will likely react in predictable ways." *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019); *accord Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

EXIM also argues the injuries depend on whether the Project will proceed. EXIM 14-15. But EXIM approved financing to allow it to, and Total has stated it will, proceed. Dkt. 13-12. Total is a defendant, not a third party, but even for third parties, "intent" to act is sufficient. *Sierra Club v. United States DOT*, 125 F.4th 1170, 1182 (D.C. Cir. 2025). "The risk of future harm . . . requires just a single step by a single actor . . . who is a party." *Trump*, 415 F. Supp. 3d at 49-50; *accord Lujan*, 504 U.S. at 560-61. That is present here.[5]

The Project's landgrabbing and environmental degradation flow directly from Project activities—not the conflict. Total 15, 17. ████████████████████████████ ████████, is already impacting the fishing grounds. JA Supp. Decl. ¶ 38. Neither Defendant

---

[5] Defendants further argue that the harms are caused by the 2019 approval, EXIM 17; Total 16, n.6, but Total has said it would not move the Project forward without the 2025 approval. *Supra* II(A)(1). A dormant or shuttered Project will not cause displacement or environmental harm and is less of an Al-Shabab target, and Defendants do not suggest otherwise.

argues that the coming environmental devastation is speculative. Total says resettlement has been completed, Total 9, but it has not provided promised replacement land for many of the farms it took. JA Decl. ¶¶ 80-81. Resuming the Project will make it far less likely that it will, and thus harms JA's ongoing efforts to seek redress for these individuals. JA Supp. Decl. ¶¶ 68-70. And once the Project resumes, Total and/or its subcontractors will take even more land. *Id.* ¶¶ 12-17; JA Decl. ¶¶ 64, 70, 84. JA has already been assisting over a thousand people with resettlement complaints and will need to assist more with the restart. JA Decl. ¶¶ 22, 80.

The threat that insurgents will attack the Project area is "real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Plaintiffs' expert is clear that ███████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████ *accord* JA Decl. ¶ 139; Pls. 11-12. That the conflict is prolonged, Total 15, is irrelevant to whether a Project restart will inflame it or bring it to the Project area. Defendants provide no contrary evidence.[6] Nor could they. In August 2025, Al-Shabab attacked villages near the Project.[7]

Total's unsupported suggestion that security forces might protect local civilians ignores the August attack, the forces' inability to provide security,[8] and additional, undisputed facts. Mozambican forces are *part of the problem*; they also commit abuses against local people. Pls. 12. And Total will create a security enclave *for the Project*—that requires more military

---

[6] *Compare* Rabilloud Decl. ¶ 52 (saying situation improved in 2023, not addressing increase in violence in 2024-2025), *with* Conflict Decl. ¶¶ 7-8, 30-45, 65-72; JA. Decl. ¶¶ 100-131, 139-140; SUMF, ¶¶ 4, 13-14.

[7] Armed Conflict Location & Event Data Project (ACLED), *Mozambique Conflict Monitor Update: 4 - 17 August 2025*.

[8] ██████████████████████████████████████████████████████ ████████████████████████████████████████████

checkpoints, resulting in more abuses—and leaves local people even *more* vulnerable to al-Shabab. *Id.*; Conflict Decl. ¶¶ 78-79, 80-85.[9] In short, that a Project restart will result in abuses against the Project's neighbors is entirely "predictable." *Dep't of Commerce*, 588 U.S. at 768. This case is nothing like *Siegel v. U.S. Dep't of Treasury*, 304 F. Supp. 3d 45, 53-55 (D.D.C. 2018), which declined to "pile conjecture on conjecture" in a five-step causal chain, or *Elec. Privacy Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (2018), where causation was "highly attenuated." No one disputes the Project is an al-Shabab target, and a "'single determinative variable'— EXIM funding" will trigger the injury. Total 16 (quoting *Siegel*, 304 F. Supp. 3d at 55).

It is equally "predictable" that local people will seek Plaintiffs' aid. Total 16. Organizations can accurately predict that people will seek their help as they have in the past. *See, e.g.*, *Whitman-Walker Clinic v. HHS*, 485 F. Supp. 3d 1, 21-22 (D.D.C. 2020). Plaintiffs have been assisting local people for two decades, JA Decl. ¶¶ 9, 12, 14, 15, 17-18, 20-23, 26-37, and have already begun to receive new requests for assistance. JA Supp. Decl. ¶¶ 79-80. EXIM argues having to provide more of the same *type* of services they already provide does not impair Plaintiffs' missions. EXIM 15-16. But the D.C. Circuit has held that plaintiffs suffer injury where they must serve *more* people, or provide their services less *effectively*. *Equal Rights Ctr. v. Post Properties Inc.*, 633 F.3d 1136, 1139 (D.C. Cir. 2011); *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994). Both are the case here. Pls. 32. The question is whether a plaintiff must "increase the resources it must devote to programs," to "counteract[]" defendants' acts. *Equal Rights Ctr.*, 633 F.3d at 1138-40 (cleaned

---

[9] Total hypothesizes an injunction might "undermine security" by keeping money out of state coffers, Total 16, but provides no evidence the state would devote any money (which, if any, is years away, *infra* § IV) to security, let alone to security for local people.

11

up). Thus, it was sufficient that PETA had to investigate and research, even though it doubtless already engaged in these types of activities. *PETA*, 797 F.3d at 1096.[10] So too here.

Enabling the Project to restart will also make Plaintiffs' efforts less effective; they will have to try to remedy individual injuries rather than preventing them. Pls. 33. And by enabling restart during an active conflict, EXIM's decision makes it far more difficult and dangerous for Plaintiffs to help local people. Pls. 33-34. This is true regardless of whether the Project causes increased violence. Defendants do not dispute that travelling to this active conflict zone is burdensome and unsafe. *Id.*; JA Decl. ¶¶ 144-166, 169; JA Supp. Decl. ¶¶ 68-75. ███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

3. <u>EXIM failed to release information, causing Plaintiff organizations injury.</u>

EXIM approved the Project behind closed doors and failed to release statutorily mandated information to Plaintiffs and the public. Pls. 27-28; *supra* I(A)(1).[11] This failure has

---

[10] Defendants cite district court cases that cannot overcome circuit precedent. Regardless, two clearly support Plaintiffs. *Nat'l Ass'n for Latino Cmty. Asset Builders v. Consumer Fin. Prot. Bureau*, 581 F. Supp. 3d 101, 106 (D.D.C. 2022) (defining impairment of ability to provide services as "something that makes it more difficult for the organization to conduct its activities"); *Safari Club Int'l v. Zinke*, Civ. A. No. 15-1026 (RCL), 2017 WL 8222114, at *5 (D.D.C. May 2, 2017) (recognizing organization that educates its members suffers injury if it expends costs beyond those normally expended).

[11] Total argues that Plaintiffs have not asserted a legal right to this information. Total 15 n. 5. They have. But *Campaign Legal Center v. FEC* acknowledged that while PETA had no statutory right, it "may nonetheless have a cognizable legal interest in those disclosures when the absence of this information interferes with its programmatic activities." No. 22-cv-3319, 2023 U.S. Dist. LEXIS 171971, at *23 (D.D.C. Sep. 23, 2024). Accordingly, there are two ways to establish standing based on an informational injury: one based on a legal right, and other based on a legally cognizable interest. *Id.*; *see also Ctr. for Biological Diversity v. United States Dep't of State*, Civil Action No. 18-563 (JEB), 2019 U.S. Dist. LEXIS 98527, at *7 (D.D.C. June 12,

impeded Plaintiffs' ability to educate and counsel local people, and to provide EXIM and other decision makers with informed feedback on current risks and the adequacy of mitigation. Pls. 34-35. Failure to give notice before its decision denied Plaintiffs the opportunity to warn communities, develop baseline studies, and prepare to address the coming issues. FOE Decl. ¶¶ 42; JA Supp. Decl. ¶¶ 55, 70-71. Since EXIM has withheld information Plaintiffs need to provide services, Plaintiffs have suffered injury.

Plaintiffs will try to fill in the gaps, if possible, by conducting their own research. Pls. 35. EXIM claims this is insufficient to prove injury, because Plaintiffs regularly conduct research, EXIM 16-17, but it sufficed in *PETA*, *supra* § I(A)(1), and EXIM ignores the injury to Plaintiffs' education and counseling. Plaintiffs will also seek information elsewhere, and FOE detailed how they have expended time doing so from other banks. Pls. 35; *see* FOE Decl. ¶ 47.[12] Plaintiffs do not ordinarily spend resources seeking information about Total's operations from other banks. Seeking information EXIM withheld, and providing it to people in EXIM's stead, is the type of impairment of a "cognizable legal interest" described in *PETA*.

### 4. EXIM's decision forced Plaintiffs to divert resources to respond to the Project.

Plaintiffs will incur substantial expenses in order to respond to the impact of the Project restarting. Pls. 35-36. Defendants complain that "shifting resources" alone is not an injury, absent an impairment to the organization as a result of EXIM's decision. Total 18; EXIM 17-18. But that is what the preceding sections show. This is nothing like *Community Financial Services Association of America v. Federal Deposit Insurance Corporation*, where the plaintiffs diverted

---

2019) (elaborating on distinction). Plaintiffs met either standard. Pls. 34-35, 38; *infra* § I(B).

[12] These facts are far more specific than those in *CCAN*, where the plaintiff planned to increase public education efforts in an "unspecified manner." 78 F. Supp. 3d at 238; EXIM 17.

resources from "issue advocacy." No. 14-CV-953 (GK), 2016 U.S. Dist. LEXIS 174696, at *27 (D.D.C. Dec. 19, 2016).

Plaintiffs' declarations are not "conclusory." EXIM 17. Unlike in *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (2022), Plaintiffs detailed the specific work that they will be pulled away from, and the work that they will do, as a result of EXIM's 2025 funding decision. *See* JA Decl. ¶¶ 53, 63-66, 169; FOE Decl. ¶¶ 36-38.[13] And in an abundance of caution, JA submits additional information showing precise changes to staff workloads. JA Supp Decl. ¶¶ 76-78.

### B. Plaintiffs have informational injury due to EXIM's statutory violations.

Showing, as Plaintiffs have here "a [statutory] right . . . to obtain the information they seek, a specific denial of that right … and a resulting injury" from the denial "suffices" to establish statutory informational standing. *See Ctr. for Biological Diversity v. United States Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 72 (D.D.C. 2022). Plaintiffs were denied access to information that EXIM was legally obligated to disclose. Pls. 27-28; *infra* § II(G).[14] Plaintiffs' injury is not to their general desire to obtain information. Total 18. Plaintiffs suffered a specific "inability to obtain information," and "[t]here is no reason to doubt their claim that the information would help them" in their mission to ensure people have the information needed to mitigate harm. *See FEC v. Akins*, 524 U.S. 11, 21 (1998). Neither Defendant seriously argues

---

[13] EXIM describes JA ¶ 65 as referring to "unidentified" core activities, EXIM 17, but it specifically identifies them: JA will be forced to shift resources away from "defending other communities and addressing other issues . . . such as claims of intimidation and threats," "legal cases related to human rights abuses that are already underway," and "negotiations for [displaced] families."

[14] *Common Cause v. FEC*, 108 F.3d 413 (D.C. Cir. 1997), held only that the information denied under a statute cannot be "simply the fact that a violation of [the law] has occurred." *Id.* at 417. Plaintiffs are not seeking such information. Moreover, a Plaintiff need not receive a "specific denial to sustain an informational injury" if the statute provides for disclosure. *Ctr. for Biological Diversity v. United States Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023).

that Plaintiffs' injury was not the type Congress sought to prevent.[15] A plaintiff "generally need not allege any additional harm beyond the one Congress has identified." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (cleaned up). As EXIM admits, the purpose of these provisions in the Bank Act and the Environmental and Social Procedures (E&S Procedures) "is to inform the public of" EXIM's activities; EXIM 20, Plaintiffs suffered this very injury.

### C.    Plaintiffs have third party standing.

Plaintiffs satisfy third party standing's requirements: they have their own injury, and a close relationship with the people whose rights they assert and who face hindrances to pursuing their own rights. Pls. 37-38. Poverty, displacement, conflict and fear of reprisals are substantial hindrances here. Pls. 38; Pls. Mem. in Supp. of Mtn to Seal Docs. and Proceed Under Pseudonym, DE 14-1, 3-7. Neither Defendant denies that Project-affected people meet the hindrance requirement, nor that they would have standing because the Project will harm them.

Instead, Defendants seek to silence Project-affected people by arguing Plaintiffs lack a "close relation" to them. EXIM 21, Total 19. But that requires only "an identity of interests" such that plaintiffs will effectively advocate their interests. *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999). Plaintiffs have done so for years, on issues within their own missions, and will do so here. Pls. 10-11, 37. Total claims a "relationship . . . in connection with … issue-advocacy . . . cannot support third-party standing." Total 19 (citing *Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004)). *Kowalski* says nothing of the sort. And Plaintiffs' services are not issue advocacy. *Supra*

---

[15] EXIM contends that Plaintiffs addressed the issue too cursorily. EXIM 20. But Plaintiffs discussed their specific injuries, and noted that they are "the types of injuries Congress sought to prevent by ensuring that EXIM conducted its business in the open, with public review." Pls. 38. And *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017), is clearly distinguishable, Total 17; the Bank Act is aimed at the public, Congress, and affected groups—not just individuals.

§ I(A)(1)-(2). Plaintiffs do not merely share local people's goals, EXIM 21; Plaintiffs provide

them services and represent them before various institutions, across years. Pls. 37. While

attorney-client, vendor-vendee, and employer-employee are close relations, EXIM 20, no

specific relationship is required. *See Powers v. Ohio*, 499 U.S. 400, 415 (1991) (defendants and

discriminatorily excluded jurors); *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 318 (2020)

(plurality opinion) (medical providers and patients). That JA is based in Maputo is irrelevant;

Total's attorneys are in the United States and that does not lessen their relationship. ████

█████████████████ JA Supp. Decl. ¶ 72. Defendants cast no doubt that Plaintiffs will

effectively advocate for these individuals. They already do.

Plaintiffs need not specifically identify individuals. EXIM 21. True, Plaintiffs cannot rely

on a hypothetical relationship, Total 19, but JA's relationships with community members are not

hypothetical. JA Decl. ¶¶ 11, 22; ████████████████████████████

█████████████ And, courts allow third-party standing in cases of "potential patients"

where that pool involves a "limited universe of third parties," like people who might seek a

specific medical procedure. *Whitman-Walker Clinic*, 485 F. Supp. 3d at 36 (citing *June Med.*

*Servs.*, 591 U.S. at 318). Here, the universe is limited: people living near the Project who will be

harmed by displacement, environmental devastation, impacts on their livelihoods, and human

rights abuses.

Finally, Plaintiffs do not seek to "shoehorn themselves into Article III standing" by

showing that the people they serve will suffer future injuries. *FDA*, 602 U.S. at 393 n.5; Total

18-19. Plaintiffs have their own injuries and standing; *supra* § I(A)(1)-(2); they rely on third

party standing to also raise community members' rights and injuries, in, for example, the

irreparable harm analysis. *Infra* § III; Total 42-43.

II.    **Plaintiffs will likely succeed on the merits.**

In March 2025, EXIM's Board approved $4.7 billion in taxpayer funds that EXIM was not obligated to disburse, and Total could not access, before that approval. Defendants label EXIM's actions as approving an "amendment" or "minor technical changes" in an effort to evade the Bank Act's procedural requirements—notice and comment, economic analysis, and due diligence. But they cannot gloss over the actual effect of the Board's approval, or the fact that it triggers the Bank Act's requirements.

Defendants ask this Court to find that nothing of consequence happened since the Board last considered this Project, and worse, that EXIM could ignore all that did. But agreeing to fund a Project in a war zone after four years of *force majeure* was hardly "the sort of routine loan extension that banks" make "every day." Total 10. Banks rarely engage with *force majeure* declarations; by definition, they are extraordinary. And it is now clear that global LNG markets have changed such that this Project will hurt U.S. producers and workers. Pls. 21-23. Thus, the 2025 approval did far more than cleaning up some insignificant contract provisions; it implicated profoundly consequential issues that Congress required the Bank to consider, with input from Congress and the public—and with a properly constituted Board.

### A.  Defendants' efforts to characterize the acting Board's approval as insignificant are contradicted by the facts and at odds with the statute.

Defendants portray what the acting Board did as minor technical edits towards an inevitable and insignificant approval. But the documents they submit—and their own actions— make clear that the March 2025 approval was required to authorize billions of dollars of funding. That decision triggers the Bank Act's requirements. Defendants' efforts to circumvent the procedural safeguards Congress enacted by calling this action an "amendment," EXIM 25-26; Total 2, 22-23, fail for two reasons: (1) they inaccurately describe the substance of the acting

17

Board's 2025 approval, and (2) the plain language of the Bank Act does not exempt amendments. An unelected agency cannot escape the limits Congress placed upon it by relabeling its decisions. Defendants' fearmongering about the burdens Plaintiffs' claims would impose are exaggerated and addressed in EXIM's procedures.

    1.   <u>This was a new credit agreement that required Board approval.</u>

When the Board met on March 13, there was no credit agreement that Total could draw on, and substantial revisions and Board approval were needed before EXIM could be obligated to disburse any funds. █████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████████████ Absent the adoption of new terms, EXIM could not disburse funds for " ████████████████████████████████████████ ██████████████████████████

As Defendants admit, Board approval of a new agreement was needed. EXIM 26; Swain Decl. ¶¶ 17, 18; Total 26 n.10. Thus, in January 2024, Total "requested" EXIM make the changes needed to allow the loan to proceed, Swain Decl. ¶ 17, lobbied for the changes, and ███████████████████████████████████████████████████████████████ ████████ When Total lobbied EXIM for financing, the Board could have said "no." That would not have meant funding was available to Total under the 2019 terms; it would have meant Total could not access any EXIM money at all. Instead, the acting Board chose to approve nearly five billion dollars of funding. That decision is subject to the Bank Act's requirements.

2.  <u>Defendants' framing of EXIM's decision as an "amendment" has no meaning under the Bank Act and cannot override the Bank Act's clear procedural requirements.</u>

The Bank Act does not exempt "amendments"; such an exception would conflict with the Act's plain language. Courts cannot "create an exception where Congress has declined to do so." *Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 27 (1989). Defendants would allow EXIM to avoid its obligations by simply opting to amend an earlier contract rather than create a new one. That would allow EXIM to eviscerate the purpose of the Act. This is not what Congress intended.

It makes no difference under the Bank Act whether the acting Board approved a new loan or an amendment to an existing loan. Rather, the Act's provisions are triggered when the Board gives "final consideration of a long-term transaction," 12 U.S.C. § 635a(c)(10)(A), "extend[s]" "direct credit" or a "financial guarantee," 12 U.S.C. § 635(e)(1), "finally approv[es]" a "loan or financial guarantee," *id.* § 635(b)(3), "authorize[s] a loan," 12 U.S.C. § 635a-1(b), or provides "support" "under its direct lending program." 12 U.S.C. § 635i-5(a)(1). Defendants' arguments that EXIM's 2025 approval is not any of these things all fail. *See infra* §§ II(C), II(D).

Defendants insist that the Bank Act does not apply to the 2025 approval because it was not a final commitment to fund a transaction after an application for funding. In their eyes, the loan was an "already approved," already "executed" loan for "already committed" funds, and only the 2019 approval matters or even involved an application. *E.g.* Total 22-26, 35; EXIM 1, 4, 19-20, 25-27, 35. But the 2019 approval was useless in 2025. The loan could not proceed without the Board's 2025 approval. *Supra* § II(A)(1). The acting Board's decision was a "decision to fund the transaction at all," precisely what Total says the Bank Act requires. Total 25. Whether EXIM previously committed funds to Total is irrelevant. The Bank Act is triggered by the "final" decision on a transaction or application. Defendants assume that the "final" decision was not the *last* time the Board considered it, but the *first*. Plain meaning permits no such assumption.

Even if, as Total wrongly argues, the Bank Act only applies to decisions on "pending" applications, it clearly applies here.[16] The claim that there was no application, and no change to an application, is mistaken. *E.g.* EXIM 7, 19, 35; Total 25-27. Total, "the applicant," requested credit, modifying the application before the Board.[17] EXIM compiled "analyses of the application." EXIM 4. "[T]he Board approved of the 2025 Amendment to the loan application." *Id.* 25. That is an application.[18] Nowhere does the Bank Act require an "original" application as EXIM suggests. *Id.* And nonetheless, changes made the application "original." *Infra* § II(a)(3).

The arguments that "[t]here was no proposed transaction before the Board in March 2025," EXIM 19, and no final commitment, Total 25-26, are equally illogical. EXIM described this as a "transaction."[19] Board approval that "commits the Bank's funds to the proposed transaction" is a "final commitment." EXIM 4. The 2025 approval committed funds to the transaction, *supra* § II(A)(1), so it was a final commitment. It is not true that an amendment is

---

[16] Total reads "pending" into the statute and suggests that if Congress wanted the Act to apply more broadly, it would not have referred to an "application" but to something like "any decision related to a transaction." Total 25. But that is exactly what Congress did: EXIM must provide notice and comment before a Board meeting for "final consideration of a long-term transaction." 12 U.S.C. § 635a(c)(10)(A).

[17] Swain Decl. ¶ 12 (application number), Ex. 1 (application with terms that new loan changed), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[18] Total's argument that the only relevant application is one that's approval "generat[es]" authority to enter into a binding contract per the commitment's terms," Total 26, proves Plaintiffs' point. The commitment's terms changed since 2019; the 2025 approval gave the authority to enter a new contract with new terms.

[19] *See* Rabilloud Decl. Ex. C; Management Advisory: EXIM's Process for Advancing Oil and Gas Transactions for Board Approval Needs Improved Transparency, Office of Inspector General, at 5 (Mar. 31, 2025) (March 2025 transaction underwent review by Transaction Review Committee).

*per se* not a final commitment. EXIM itself has called an "amendment" to another loan "a final commitment."[20]

It is "the substance of what the [agency] has purported to do and has done which is decisive." *Public Citizen v. Steed*, 733 F.2d 93, 98 (D.C. Cir. 1984) (internal citations omitted). The D.C. Circuit has condemned agency efforts to evade procedural requirements by spuriously relabeling its actions. *See, e.g.*, *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014) (calling cases where an "agency seeks to promulgate a rule by another name" the "most egregious" breaches of notice and comment obligations); *Air Transp. Ass'n of Am. v. FAA*, 291 F.3d 49, 55 (D.C. Cir. 2002) (agency may not relabel changes to avoid notice and comment). This Court should likewise reject EXIM's attempt to avoid its obligations by calling an approval of a financing commitment an "amendment."

3.  Defendants' practical concerns are meritless.

Total says that following the Bank Act's plain language for "amendments" would "derail a transaction years after EXIM" had approved it and lead to "uncertainty." Total 26, 44. Insurrection and *force majeure* derailed this transaction, not the Bank Act. This is not a case about insignificant tweaks to an existing contract. When EXIM decides to extend new credit to Total, it must follow the law. The Bank Act already prevents any undue burden. The notice and comment provisions for Board approval only apply to the largest transactions and provide only a short comment window. *Infra* § II(D).[21] Moreover, EXIM has procedures to bypass the Board

---

[20] *See* Application for Final Commitment for a Long-Term Loan or Financial Guarantee in Excess of $100 Million: AP700317XX, 86 Fed. Reg. 53055 (Sept. 24, 2021).

[21] EXIM took over a year to grant Total's application; the comment period would not have slowed them down. EXIM has previously followed these procedures for amendments. *See* Application for Final Commitment for a Long-Term Loan or Financial Guarantee in Excess of $100 Million: AP700317XX, 86 Fed. Reg. 53055 (Sept. 24, 2021). Other agencies regularly allow comment on even minor amendments, such as a change in an entity's legal name. *See*

and delegate less important decisions to staff, including certain *minor* amendments. *See* Swain

Decl. Ex. 7. Tellingly, EXIM's policies do not exempt all amendments from Board approval,

recognizing that decisions like the one at issue here are too significant to be delegated. *Id*.

**B.    EXIM cannot base its 2025 approval on obsolete analysis conducted in 2016-19 that predated critical changes to the Project.**

Defendants claim that because EXIM followed these procedures six or more years ago,

the Bank Act required nothing further before its 2025 approval. EXIM 25-28; Total 22-40. APA

precedent forbids ignoring easily available, current information about relevant changes.

Agency action is arbitrary and capricious if the agency fails to "'examine the relevant

data and articulate a satisfactory explanation for its action including a rational connection

between the facts found and the choice made.'" *Southwest Power Pool, Inc. v. FERC*, 736 F.3d

994, 997 (D.C. Cir. 2013) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983)). Thus, it is arbitrary for an agency to rely on outdated or plainly

erroneous analysis when more accurate, up-to-date evidence is readily available. *Sierra Club v.

EPA*, 671 F.3d 955, 965-66 (9th Cir. 2012). Courts should not "rubber stamp agency action that

is arbitrary and capricious in its reliance on old data without meaningful comment on the

significance of more current compiled data." *Dow AgroSciences LLC v. Nat'l Marine Fisheries

Serv.*, 707 F.3d 462, 473 (4th Cir. 2013).

The Bank Act directed EXIM and its Board to consider a range of factors, including

environmental impacts, impacts on U.S. economic interests, and repayment prospects. Pls. 4-5.

EXIM violated these directives and the APA by ignoring critical developments on the ground.

Since EXIM's 2019 approval, an insurgency overran the area, forcing Total to shut down for

---

Application To Amend Presidential Permit; Lake Erie Connector Transmission, LLC, 89 Fed.
Reg. 65616 (Aug. 12, 2024).

years, and presenting new risks for the Project and local people. The global LNG market has

changed enormously, such that LNG will now be in glut when the Project begins to produce,

fundamentally altering the Project's impact on the U.S. economy and U.S. jobs. Pls. 21-23.

These changes mean the new agreement also involves new risks to EXIM.

       The Bank's 2019 notice and comment, due diligence, and economic analysis relied on

facts that have substantially changed; thus, the analysis is no longer accurate. EXIM's reliance

on inaccurate information is not rational decision-making. Indeed, the changed circumstances

here are so important that even if EXIM had no independent duty to consider them, it was

arbitrary and capricious to ignore them. *See* Pls. 23-25.

       **C.**     **EXIM did not adequately consider the economic impacts in the United States.**

       Congress barred EXIM from "extend[ing] any direct credit" that will cause adverse

economic impacts in the United States. 12 U.S.C. § 635(e)(1). Defendants do not dispute that (1)

LNG will be in global surplus in 2029-2030 when the Project's output "will first be sold," (2) the

output will compete with U.S. LNG production, and (3) the output far exceeds one percent of

U.S. production and thus "will cause substantial injury" to U.S. producers. Pls. 21-22. Because

these statutory conditions have been met, the Bank Act and EXIM's policies required EXIM to

analyze the economic harms in the United States in 2029-2030, and consider the public and

interested parties' views. And it could not approve this Project without affirmatively finding that

the benefits of the Project will outweigh the substantial injuries to U.S. producers and

employment in 2029-2030. Pls. 21-23. EXIM did none of this. Defendants suggest EXIM could

ignore overwhelming, undisputed evidence that the loan will cause "substantial injury," and

approve the 2025 transaction based on an outdated 2019 analysis that is now plainly wrong. But

that violated the Bank Act and EXIM's own policies and was arbitrary and capricious.

1.  EXIM was required to conduct an economic analysis.

Total asserts that EXIM must consider domestic economic interests "only before credit is extended" the first time—that is, in 2019. Total 29-31. Not so. The 2019 credit agreement was not operative, and EXIM credit was not available to Total prior to the 2025 approval. *Supra* 18-19. Indeed, it was specifically the old agreement's credit terms that were unusable. EXIM had to extend key credit dates[22] and rewrite other terms to make financing available. Total takes the mind-bending position that making an inoperative agreement usable somehow did not "extend credit." But since EXIM undeniably "extended credit" to Total in 2025, it was required to follow the Bank Act's economic analysis requirements.

EXIM cannot bypass Congress's clear directive to avoid causing domestic harm by simply refusing to look into the matter. EXIM's own Economic Impact Procedures require that "*all* transactions are screened for economic impact implications," and that transactions that will enable a foreign buyer to produce more than 1% of U.S. production "are subject to Detailed Economic Impact Analysis." EXIM Economic Impact Procedures and Methodological Guidelines at 2, 4 (Aug. 2020) (emphasis added). EXIM can only avoid this requirement if it provides a reasonable justification for doing so.[23] It offer no such explanation.

2.  EXIM failed to conduct a rigorous analysis based on current data.

Defendants suggest that the 2019 analysis, or "referenc[ing]" that analysis, discharged EXIM's duty to consider economic impacts. EXIM 6; Total 31. But reliance on six-year-old

---

[22] ██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

[23] *See also Nat'l Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980) (Agencies must follow their own procedures "or provide a rational explanation for their departures."); *see also Delta Airlines v. Export-Import Bank of the U.S.*, 718 F.3d 974, 977 (D.C. Cir. 2013) (courts can review EXIM's implementation of its Economic Impact Procedures to ensure compliance with the Bank Act.).

analysis and market assumptions is not meaningful consideration of the 2025 decision's economic impacts.

The 2019 analysis is woefully out-of-date, preceding numerous transformational market shocks including the COVID-driven collapse in demand, the largest LNG buildout in history, Russia's invasion of Ukraine, and the EU's efforts to reduce its reliance on imported gas. Neither Defendant disputes that the analysis is obsolete, or that the best forecasting available to EXIM before the 2025 approval predicted a considerable glut in 2030. Williams-Derry Decl. ¶¶ 19-24. EXIM says nothing on the matter, while Total claims that EXIM can rely on the old analysis regardless of its evident faults. Total 31.

At a minimum, there is enough evidence that LNG will be in oversupply in 2029-30 that EXIM was required to analyze that possibility using up-to-date data and forecasts. Instead, EXIM "rel[ied] on old data" without explaining why. *Dow AgroSciences LLC*, 707 F.3d at 473 (internal quotations omitted); *see* ███████████████ That is arbitrary and capricious. *Supra* 23-24. It also contradicts EXIM's Economic Impact Procedures and Methodological Guidelines, which provide that EXIM's oversupply analysis should consider the "most recently available" global supply and demand forecasts. *Id.* n.23 (disregard of policies is arbitrary and capricious).

In any event, Total's claim that the 2019 analysis ruled out the risks of a glut in 2030 is flatly contradicted by the report's analytical core, a graph of the "Emerging LNG supply-demand gap" (Figure 3). It forecasts the possibility of a massive oversupply that grows considerably from 2023-2030 and persists through 2034-2035. Swain Decl. Ex. 2, 117. Defendants do not dispute that this possible oversupply has materialized.

25

Rather than rely on six-year-old projections that have proven wrong, EXIM must evaluate anticipated 2030 impacts based on current data. EXIM's failure to do so violates the Bank Act and its own policies and is arbitrary and capricious.

**D.     The Bank Act required EXIM to provide Congress and the public notice and allow comment prior to the 2025 loan approval.**

1.     <u>The Bank Act requires notice and comment for large transactions and those with economic effects like this one.</u>

The Bank Act's text is unambiguous: EXIM must provide notice and comment to Congress and the public before "final consideration of a long term transaction" or "final approval" of a loan valued at more than $100 million. 12 U.S.C. §§ 635a(c)(10)(A), (C)(i)(II); 12 U.S.C. § 635(b)(3). Defendants' arguments that the Act exempts amendments or only applies to "first" final commitments or "new" applications, or that there was no application here, EXIM 26, Total 27, all fail. *Supra* § II(A)(2). Likewise, EXIM errs in claiming that it only needed to permit comment if there was "'a material change'" to the application. EXIM 26 (quoting 12 U.S.C. § 635(e)(7)(B)(iii)(I)). That provision *requires* EXIM to restart notice and comment if it makes a material change during the comment period. It thus ensures that eleventh hour changes do not undermine Congress's and the public's right to comment. It does not *exempt* EXIM from notice and comment before a final consideration or approval.

Total equates "final consideration" with a final commitment to fund. Total 24-26. But that happened in 2025. *Supra* § II(A)(1). Regardless, "final commitment" appears nowhere in the Bank Act. The question is whether this was a "final consideration" or "final approval." It was. Total says that "final" refers to the consummation of the decisionmaking process from which legal consequences flow, and that "final consideration" means when the Board gave "careful thought" to the transaction that results in the final decision to fund. Total 24-25 (quotation marks

omitted). That precisely describes the Board's 2025 action: the Board "considered," decided to fund, and "approved" the loan. *Supra* § II(A)(1). The 2025 approval was final since it was the last time the Board will consider the loan and it defines the rights and obligations of the Parties under the new terms and provisions. The definition of "consideration" only helps Defendants if EXIM did not give "careful thought" to the 2025 approval, in which case it was arbitrary.

The Bank Act also requires EXIM to consider public input on the loan's economic impacts. Pls. 21-22. Because EXIM had a duty to conduct an economic analysis, *supra* § II(C), it also had a duty to issue notice and seek public comment about these impacts.

Total's claim that the Bank Act's notice and comment requirements are an exception to a general rule is neither here nor there. Total 23. The Act's plain text controls. And Congress required notice and comment for good reason: EXIM's agreements are not like typical government purchases; EXIM lends billions of taxpayer dollars to foreign projects, with enormous policy implications.

2. <u>EXIM cannot rely on a years-old comment period to inform Board decisionmaking on a materially changed loan.</u>

Grasping at straws, Total argues that notice and comment was not required in 2025 because the Bank Act requires notice "[b]efore" any Board meeting for final consideration*, but does not say *how long* before. Thus, it says, the notice and comment EXIM conducted six years before the 2025 approval suffices, notwithstanding the consequential changes to the Project that have occurred in the interim. Total 24, 29. That is false. This was a new final approval that requires its own notice and comment period.

Even if this were not a new final approval, the Board approved substantial changes to the agreement that necessitate new notice and comment. *Supra* § II(B). Notice and comment improves the quality of agency decisionmaking. *Small Refiner Lead Phase-Down Task Force v.*

*EPA*, 705 F.2d 506, 547 (1983). Agencies cannot rely on stale notice and comment periods because "[t]he opportunity to participate is not meaningful unless it occurs reasonably close to the time in which the [agency] makes a decision." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). Further, the public must be given a new opportunity to comment on a decision if "the basis" for a decision "changed significantly," *id.*, or provides the "first occasion to offer new and different criticisms which the agency might find convincing," *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) (citation omitted). While Total argues that EXIM can rely on notice and comment prior to *force majeure*, the risks from the conflict are a central topic for comment.

EXIM's Board could learn little of value from a stale notice and comment period six years ago. Plaintiffs represent the communities most directly affected by the Project.[24] Yet EXIM denied them the opportunity to raise concerns that have arisen since 2019, including how the Project's operations and security plan will affect local people during the conflict, and egregious human rights abuses. Senator Merkley likewise expressed a desire to comment on these issues.[25] These are not "small" matters. Total 26.

3.  The Bank Act's "materiality" provision also requires notice and comment.

If, as Total claims, there was a notice and comment period in 2019 that applies to this new final approval in 2025, Total 24, then the Bank Act's material change provisions apply, 12

---

[24] Total selectively reads the notice and comment provision's legislative history, arguing its purpose was just "to ensure [EXIM] has information it needs to confirm it is not supporting . . . compet[ition] with American companies." Total 26. But Congress was concerned with far more. The provision is a "transparency provision" that "gives the public the opportunity to comment." 158 Cong. Rec. H2460, H2465 (2012). In any event, plain language trumps legislative history.

[25] *Merkley Slams EXIM Bank for Failing to Provide Congressional Notification of Mozambique LNG Project*, Jeff Merkley Senator for Oregon (Aug. 5, 2025), https://bit.ly/4p5x2yn.

U.S.C. §§ 635a(c)(10)(D); 635(e)(7)(B)(iii)(I)); EXIM made material changes to the application in 2025, and thus was required to provide notice and permit comment. Pls. 20.

█████████████████████████████████████████████████████████

███████████████████████████████████████ EXIM's own internal guidance makes clear that the date changes alone were "material," as well as a long list of other changes. *Id.* Ex. 7; *id.* Ex. 4 (describing *inter alia* a change in the Project operator, financing offshore exports, and transfer restrictions as material).

Nevertheless, Defendants now claim there is no "material" change here, untenably reading the Bank Act's definition to contain an exclusive list of material issues. EXIM 26. But the Act defines "material change" to "include" certain things. 12 U.S.C. §§ 635a(c)(10)(D)(ii), 635(e)(7)(B)(iii)(II). "'[I]nclude'" signals "that the list that follows" is "illustrative rather than exhaustive" and "is usually a term of enlargement, and not of limitation." *Samantar v. Yousuf*, 560 U.S. 305, 317 & n.10 (2010) (quotation marks omitted); *accord Al Hela v. Trump*, 972 F.3d 120, 131 (D.C. Cir. 2020) ("[I]ncluding' typically introduces specific examples rather than a comprehensive definition.") EXIM's reading "subvert[s]" the meaning of the word. *Epsilon Elecs., Inc. v. United States Dep't of the Treasury*, 857 F.3d 913, 921-22 (D.C. Cir. 2017).

If Congress intended to restrict "material change," it would have used the term "means," "rather than includes." *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 172 (D.C. Cir. 1982). The Bank Act uses "means" to define terms six times. *See* 12 U.S.C. § 635. EXIM has not shown that the Act is one of the "rare statutes where includes should be read as means." *United States v. $215,587.22 in U.S. Currency*, 306 F. Supp. 3d 213, 218 (D.D.C. 2018).[26] Defendants would also

---

[26] Total acknowledges that "includes" is "inclusive," yet asserts that a list "still cannot be inflated with terms lacking the defining essence of those in the list." Total at 27-28 (citation omitted). That is an argument to limit the changes to those that are material, as it is hard to see what the

"subvert the ordinary meaning of the word material," *Epsilon Elecs.*, 857 F.3d at 921-22, since they would exclude issues "having real importance." Total 27 (citation omitted).

Defendants downplay the importance of the loan's changes, describing them as mere changes to dates. But EXIM changed the dates for disbursement, construction and the start of production by four years. That is consequential on its own, particularly for the economic analysis based on the date of production. *Supra* § II(C). The duration of a contract and time for disbursement, performance, and repayment are fundamental terms, particularly in finance documents and contracts for resource development. *See VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037, 1053 (N.D. Cal. 2006); *DeFoe v. Bd. of Pub. Instruction of Alachua Cnty., Fla.*, 132 F.2d 971, 972 (5th Cir. 1943); *Kyle v. Wadley*, 24 F. Supp. 884, 887 (W.D. La. 1938). Any modification of those terms is material, which EXIM's delegation policy acknowledges.

Finally, EXIM's suggestion that only changes to the loan's terms matter is spurious. Creating a new loan that Total can draw upon is a substantial change from the status quo. *Supra* § II(A)(1). Factors outside of the loan document—like the enormous changes in the security context—are also material as they affect the loan, are relevant to the Bank Act's requirements, and impact whether approval can be delegated to staff.[27]

### E.    EXIM was required to do a NEPA analysis.

EXIM was required to perform a NEPA review because its loan was a "major Federal action" that will significantly affect the environment in the United States. Pls. 25-27. Defendants do not deny that the Project's country-scale greenhouse gas emissions will harm the United

---

"defining essence" of these examples are, other than their materiality. Total does not suggest what other changes are "included" in the definition. And date changes are surely material.

[27] EXIM's own policies recognize that changes to the operating environment are so important that the Board needs to approve the transaction, including changes that could affect the borrower's ability to repay its loans. Swain Decl. Ex. 7.

States. And whether the loan is a "major action" turns on whether EXIM has control over the use

of its funds. 42 U.S.C. § 4336e(10)(B)(iii). But Defendants do not deny that EXIM has control.

So, how does EXIM justify its refusal to conduct a NEPA review? It never has. It simply

declared that the multi-billion-dollar loan was not a major federal action, with no explanation at

all. Herz Decl. Ex. 8. Defendants' efforts to defend that are meritless. EXIM 26-28; Total 37-39.

Defendants' mantra that the 2025 approval was just an amendment, is wrong. *Supra* §

II(A)(1). Regardless, the 2016 refusal to apply NEPA, and thus the 2019 approval, were unlawful

too. And the claim is timely. EXIM 27. EXIM ignores *Corner Post v. Board of Governors of*

*Federal Reserve System*, 603 U.S. 799, 809 (2024), which held that 28 U.S.C. § 2401(a)'s statute

of limitations "does not begin to run until [plaintiff] is injured." Even using the September 2019

approval date EXIM insists on, there was no injury before then, so the claim is timely.

EXIM says its refusal to apply NEPA is entitled to deference, even though it provided

zero basis for that decision, and does not now. But "[w]hat is before the Court is the decision *not*

*to comply with NEPA* . . . [a]nd on that, the Government has no discretion." *Mass. Coal. for*

*Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10, 38 (D.D.C. 2023). The

question is one of law, and a conclusion that NEPA does not apply has never received deference.

Pls. 26; *see Citizens Against Rails-To-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150-51

(D.C. Cir. 2001). EXIM makes no legal argument that this is not a major federal action.

Defendants' reliance on *Seven County Infrastructure Coal. v. Eagle County*, 145 S. Ct.

1497 (2025), is misplaced. *Seven County* required deference "when determining whether an

agency's EIS complied with NEPA," "[s]o long as the EIS addresses environmental effects." 145

S. Ct. at 1511-13. But EXIM did not apply NEPA. And "when an agency interprets a statute,

judicial review of the agency's interpretation is *de novo*." *Id*. at 1511 (citing *Loper Bright Enter. v. Raimondo*, 603 U. S. 369, 391-392 (2024)).

Moreover, a court reviewing an agency's determination not to prepare an EIS must ensure the determination "accords with traditional norms of reasoned decisionmaking." *Found. on Economic Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir. 1985); *see Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865-66 (9th Cir. 2004) (finding NEPA analysis inadequate where agency failed in two FONSIs to provide any reason why it did not prepare an EIS). But EXIM provided no explanation whatsoever. And since it does not dispute the factual predicates requiring NEPA's application, its decision was not reasonable.

EXIM just says that Congress left it to them to reasonably "determine[ ]" whether the "action," *i.e.* the loan, "is subject to substantial Federal control and responsibility." EXIM 27-28 (quoting 42 U.S.C. § 4336e(10)(A)). Whether to issue the loan was *entirely* in EXIM's control. And EXIM has substantial control over use of the loan, too. 42 U.S.C. § 4336e(10)(B)(iii). EXIM's loan includes a myriad of conditions on financing and compliance monitoring. That is why EXIM has never denied control.

Moreover, deference is not abdication. EXIM's position that the Court must defer to its unexplained conclusion asserts that its conclusion is beyond judicial review. But the determination of whether an action is a major Federal action, including whether it is subject to substantial Federal control and responsibility, is reviewed under the APA. *See, e.g.*, *Friends of the Everglades, Inc. v. Noem*, 2025 U.S. Dist. LEXIS 163085, at *69-86 (S.D. Fla. Aug. 21, 2025) (finding agency possessed authority to influence or control a non-federal activity and therefore its actions were major federal actions).

32

Total suggests that EXIM could decide that *any* level of emissions, no matter how large, does not trigger NEPA. Total 39. That is false, but irrelevant; EXIM never made any such decision. And Total again misstates *Seven County*, which held that agencies need not address effects from *projects* that are separate from the project at hand. 145 S. Ct. at 1515. The Court was "clear" that "the *effects* of the project at issue may fall within NEPA" even if they extend outside the project area, for example, "emissions that travel downwind." *Id*.

**F.    EXIM's failure to consider Project environmental and social risks violated the Bank Act and its own procedures.**

The Bank Act, and EXIM's own E&S Procedures required EXIM to provide notice and comment and the Board to consider the Project's security, humanitarian, and human rights risks. They failed on both counts. EXIM's failure to follow its own procedures violated the Bank Act and the APA and was arbitrary and capricious.

1.    <u>EXIM had to provide notice and permit comment prior to the 2025 approval.</u>

EXIM's E&S Procedures clearly required it to provide notice and comment prior to the 2025 approval. E&S Procedures, s.I, ¶¶ 8, 9, s.IV, B, ¶ 2; Pls. 17-18. EXIM did not. The procedures "shall apply" to a "transaction involving" projects like this one, 12 U.S.C. § 635i-5(a)(1), and require notice and comment before "any Bank action with respect to financing of the application," E&S Procedures, s.I, ¶9(2), or "any decision" "to authorize a Final Commitment," *id*. s.IV, B, ¶ 2. The March 2025 approval was both. *Supra* § II(A)(1),(2). EXIM's failure to do the necessary notice and comment pursuant to its own procedures violates the APA.

Defendants say the E&S Procedures only apply to applications, not amendments, Total 23, 29; EXIM 25-26, but "any Bank action with respect to financing of the application," certainly covers amendments. Regardless, there was an application before the Board. *Supra* §II(A)(2). Total cherry picks language focusing on the initial stages of an application, and claims EXIM

completed "the ESPG process"in 2019, Total 29; but the E&S Procedures apply throughout the life of a loan. E&S Procedures, s.I ¶ 21, s. III, C, s.IV, B, ¶ 6, s.V.

The stale notice and comment prior to approval in 2019 cannot satisfy the Bank's obligation. *Supra* II(D)(2); Total 29. Final commitments "are approved by EXIM Bank only after all … environmental analyses have been completed," E&S Procedures, s. IV, B ¶ 2, and notice and comment is a critical component, *id.* s.I ¶¶ 8-9, s.III, C, s.IV, B, ¶ 2. Any EXIM evaluation of the Project's security measures is inherently flawed without the input from groups like Plaintiffs who could share Project-affected people's concerns.

Defendants suggest they can ignore the E&S Procedures because they are non-binding. EXIM 28; Total 23, 29, 33-35. This argument lacks merit. First, Defendants ignore the Bank Act, which *requires* Bank staff and the Board to consider the environmental effects prior to approval, and requires EXIM to "establish procedures" to do so. 12 U.S.C. § 635i-5(a)(1)(2); Pls. 23-24. The E&S Procedures are those procedures, and they "shall apply to any transaction involving a project" like this one. *Id.* § 635i-5(a)(1). EXIM's loan is such a transaction, *Supra* § II(A),[28] and thus the procedures "shall apply."  Moreover, the statute only permits the Board to "approve financing after considering the potential environmental effects of a project." 12 U.S.C. § 635i-5(a)(2). Thus, the Board cannot approve financing where EXIM did not apply the Procedures.

The E&S Procedures also implement an international agreement—the OECD Common Approaches for Officially Supported Export Credits and Environmental and Social Due Diligence—that the Bank Act requires EXIM adhere to. 12 U.S.C. § 635(b)(1)(B), § 635i-5(a)(1)(A); E&S Procedures, Introduction.

---

[28] ███████████████████████████████████████████████████
████████████████████████████████████

Second, "agencies [must] follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions." *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003). Internal guidelines, procedures, and policies that have not been formally promulgated are binding, particularly when intended by the agency and if the deviation prejudices others. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 335-36 (D.D.C. 2018) (collecting cases).

EXIM intended to abide by its procedures (as the statute requires). EXIM describes them as "requirements," for which they assess "compliance," provides that they apply to *all* applications, and states EXIM "will" follow its processes. [29] Thus, contrary to Total's assertion otherwise (but notably, not EXIM's), Total 34, approving a loan without following the E&S procedures would violate the statute, and EXIM's own procedures and practice. *Supra* n. 28.

The procedures are intended to benefit others by minimizing harm to the environment and communities, E&S Procedures, s.I ¶ 3, Annex A-1, s.2, 4, and the failure to properly apply them here has prejudiced Plaintiffs and the people they support. *Supra* § I(A); *Teton Historic Aviation Found. v. United States*, 248 F. Supp. 3d 104, 111 (D.D.C. 2017) ("settled law" that this principle applies if there are effects on a member of the public's concrete interest).

Defendants' cases are inapposite. EXIM 28, Total 33-35. The majority address whether an agency action was a legislative rule whose promulgation required notice and comment.[30] This issue "is quite independent of whether [agency] procedures will be binding." *Vietnam Veterans of Am. v. Sec'y of the Navy*, 843 F.2d 528, 538 (D.C. Cir. 1988). *Nat'l Mining Ass'n v.*

---

[29] *See* E&S Procedures, *generally* (EXIM *will,* and setting out "requirements"); Annex A-1 s.3 ("Requirements"); Swain Decl. ¶ 4 ("requirements"); *Id.* Ex. 2, 32-35, 85-93 (EXIM assessed "compliance" with E&S "requirements" prior to 2019 approval); Rabilloud, Ex. A, 16 (due diligence required "in accordance with the [Bank Act] and international commitments").

[30] *Cmty. Nutrition Inst. v. Young,* 818 F.2d 943, 947 (D.C. Cir. 1987); *Syncor Int'l Corp. v Shalala,* 127 F.3d 90, 93, 96 (D.C. Cir. 1987); *Clarian Health W., LLC v. Hargan,* 878 F.3d 346, 357 (D.C. Cir. 2017).

*McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014), addressed whether the challenged guidance was

"final agency action." In *Delta Airlines, Inc. v. Export-Import Bank*, the court was assessing

whether to apply *Chevron* deference—a question it did not answer. 85 F. Supp. 3d 387, 408-09

(D.D.C. 2015); *accord Air Transport Ass'n of Am.,* 878 F. Supp. 2d 42, 72 (D.D.C. 2012).

Third, even if EXIM could sometimes ignore its own procedures, it was arbitrary and

capricious to do so here. EXIM's approval would restart a project in a war zone, with potentially

grave consequences for local people. It was unreasonable for EXIM to take that plunge without

accepting comments to inform the decision.

2.   EXIM's acting Board failed to consider the risk that the conflict poses.

Plaintiffs argued that the acting Board did not consider the current security, humanitarian,

and human rights risks at all. Pls. 23-25. EXIM indicates that the Board "received an update" on

environmental and social "issues" in 2025, EXIM 28, ███████████████████████

█████████████████████ — ███████████████████████

███████████████████████████████████████

██████████████████████ If the Board did not consider these issues, it violated

the Bank Act and acted arbitrarily. Pls. 23-25; *supra* § II(B). But if it did ████████████

██████████ it is just further evidence that the Board was not, as Defendants repeatedly

argue, simply considering—and making—technical amendments to certain dates—and they did

so without notice and comment.

Total's argument that the Board was not required to consider anything in 2025, Total 35,

fails for the reasons noted above, as do Defendants' arguments about the E&S procedures. *Supra*

§ II(A), (D)(3), (F). Similarly, while Total asserts that the Board does not need to consider the

sociopolitical situation, Total 36, EXIM has set out that considering "environmental effects"

includes social impacts. E&S Procedures, s. I, ¶ 3, Annex A; Rabilloud Decl. Ex. A (In

accordance with Bank Act, EXIM considers "social effects."). Last, Total argues EXIM did

"approve financing after considering the [Project's] potential environmental effects," § 635i-

5(a)(2)—*six years* "after." Total 36. But EXIM must make such decisions based on *current*

information. *Supra* § II(B).

 Even if Defendants could show that the acting Board considered the "update" on "issues"



However, Plaintiffs' complaint also challenged

the adequacy of the Bank staff's due diligence ⬛⬛⬛⬛⬛ DE 1 at 43-58, 85-87. This

motion did not raise that claim, because Plaintiffs do not yet have the administrative record. Pls.

3, n.1. Although the Board and the Bank have distinct duties in this respect (despite Total

conflating the two), § 635i-5(a)(1)(2), the issues are related. Thus to the extent the Court believes

the Board may have considered these issues, it should reserve consideration of the claim

regarding the Board's duty until it addresses the other claim Plaintiffs have reserved.

  **G.** **EXIM unlawfully withheld information from the public.**

 EXIM failed to release to Plaintiffs and the public a wide variety of information. Pls. 27-

28. Defendants' only real response[31] is that EXIM was not obligated to follow procedures when

it approved nearly five billion dollars in funding, *See* Total 39-40; EXIM 7-8, 18-20. But this

---

[31] The "TRAC" test applies to agency delay or failure to meet a deadline, not agency inaction. Total 40; *see Telecommunication Research & Action Center ("TRAC"), v. FCC*, 750 F.2d 70 (D.C. Cir. 1984); *Crowe v. Fed. Bureau of Prisons*, No. 24-cv-3582 (APM), 2025 U.S. Dist. LEXIS 109052, at *51 (D.D.C. June 9, 2025). Defendants argue that they need not act, not that they need more time.

argument fails under the Bank Act and NEPA. *Supra* § II(A)-(F). Moreover, the E&S

Procedures' environmental disclosure obligations are ongoing, with the Bank Act requiring

supplemental environmental and monitoring reports. Pls. 27-28.[32] The requirement to make

available supplemental reports, including remediation or mitigation plans and related monitoring

reports could not possibly only apply the first time EXIM considers a loan; it is explicitly aimed

at supplemental reports and monitoring reports.

### H.    Because the acting Board lacked the statutorily-required quorum of Senate-confirmed members, its 2025 approval is void.

All Parties agree that the Vacancies Act "shall not apply" to appointments "to any board .

. . that (A) is composed of multiple members; and (B) governs an independent establishment or

Government corporation," 5 U.S.C. § 3349c(1), and that EXIM is governed by such a board.

Defendants seek to evade this restriction by asserting that Defendants Cruse and Burrows were

appointed exclusively as acting President and First Vice President and serve on the Board only

by virtue of those roles. Total 19-22; EXIM 22-24. But that overlooks the fact that President

Trump explicitly appointed them to the Board.

Defendants rely principally on *Center for Biological Diversity (CBD) v. U.S.*

*International Development Finance Corp. (DFC)*, 77 F.4th 679, 687-90 (D.C. Cir. 2023). EXIM

23; Total 20-21. But the relevant statute and facts are markedly different than here. The question

in *CBD* was whether the President's appointment and Senate confirmation of the Chief

Executive of the DFC qualified as an appointment to a position on the DFC's Board for purposes

of the Sunshine Act. 77 F.4th at 687-88. The court found "no reason" to "treat the President's

---

[32] Total's argument that these procedures are mere guidelines is false. *Supra* II(F)(1).

appointment" of the Chief Executive "with no mention of the Board" role as an appointment to a position on the Board. *Id.*

Here, by contrast, the appointments of Cruse and Burrows to acting roles as Chair and Vice Chair of the Board were not "unmentioned," but front and center. President Trump appointed Cruse "Acting EXIM President and Chairman of the Board" and Burrows "Acting First Vice President and Vice Chairman of the Board of Directors."[33] Cruse informed Congress that his appointment filled "a vacancy in the position of President and Chairman of the Board of Directors," 171 Cong. Rec. 55, 1870; Burrows' official EXIM biography highlights that he was appointed "Acting First Vice President and Vice Chairman of the EXIM Board of Directors."[34]

Moreover, unlike the DFC, the President's dual appointments here reflect the settled understanding that the EXIM Board and management roles are inseparable for purposes of nomination and confirmation. All the key actors—the President, the Senate, EXIM, and the appointees themselves—routinely treat the Chair and President positions as one and the same, and typically emphasize the more important role of Board Chair. For example, President Trump announced John Jovanovic's nomination "as Chairman and [President]."[35] EXIM's public announcement focused exclusively on his nomination as "Chairman of EXIM." [36] Likewise, the

---

[33] *President Trump Strengthens Export-Import Bank of the United States, Supports U.S. Jobs by Establishing Board Quorum Through Acting Appointments*, EXIM (Feb. 28, 2025). https://www.exim.gov/news/president-trump-strengthens-export-import-bank-united-states-supports-jobs-establishing-board.

[34] James G. Burrows Jr., EXIM Website, (Sept. 9, 2025, 2:11 PM) https://www.exim.gov/leadership-governance/officers/james-g-burrows.

[35] Donald Trump, (@realDonaldTrump), TRUTH SOCIAL, https://truthsocial.com/@realDonaldTrump/posts/114015154260594234 (last visited Feb. 16, 2025).

[36] *See President Trump Strengthens Export-Import Bank of the United States* (quoting former EXIM President and Chair endorsing "the President's outstanding EXIM Chairman nominee").

Chairman of the Senate Committee on Banking, Housing and Urban Affairs, opened the

confirmation hearings saying Jovanovic was "nominated to serve as Chairman."[37] And Mr.

Jovanovich submitted written testimony as "Nominee of President Trump to be Chairman &

President."[38] Mr. Jovanovic's nomination to the role of Chair was thus the focus of both the

nomination and hearings. [39]

This focus on the role as Board Chair makes perfect sense: the Chair is the head of the

Bank and Congress has vested nearly all authority in the Chair and the Board, and very little in

the President. *C.f. CBD*, 77 F.4th at 688 (finding it "unsurprising" that DFC CEO's board role

was not mentioned in the appointment and confirmation process, because the CEO was only a

"member of board," with no specified role). EXIM's Board Chair controls the Board agenda, 12

U.S.C. § 635a(c)(9), and the Board has authority to: finally approve large loans 12 U.S.C. §

635(b)(3)); name officers id. § 635(b)(1)(C),(b)(1)(E)(iii)); set interest rates, id. § 635(b)(1)(B));

withhold or approve financing after considering a project's environmental effects 12 U.S.C. §

635i-5(a)(2); ensure EXIM loans do not adversely affect U.S. economic interests, 12 U.S.C. §

635(e), and discharge myriad other responsibilities to align EXIM's operations with

Congressional goals. The Chair, on their own, also has the responsibility to create a fund for

---

[37] Press Release [U.S. Senate Committee on Banking, Housing and Urban Affairs], *Scott, Colleagues Advance Additional Trump Administration Nominees out of Senate Banking Committee* (Jul. 23, 2025), http://bit.ly/4p4lUBV.

[38] *Test. of John Jovanovic Nominee of President Trump to be Chairman & President of Export-Import Bank of the United States: Hearing Before the U.S. S. Comm. on Banking, Hous., & Urb. Affs., 119th Cong.,* (June. 12, 2025), https://bit.ly/41CcXFY.

[39] Similarly, in 2021, President Biden nominated Reta Jo Lewis to be "President and Chair of [EXIM]," and the Senate Banking Committee held a hearing on the "Nomination[] Of: Reta Jo Lewis, Of Georgia, To Be President And Chair, [EXIM]." Senate Hearing 117-323 (October 26, 2021), https://bit.ly/3HEfHMo

certain kinds of foreign aid. 12 U.S.C. 635q. All of the Bank's key decisions, and its accountability to Congress, run through the Board and its Chair.

Conversely, EXIM's President does more mundane tasks, like writing reports to Congress, 12 U.S.C. § 635(l)(3)(C); providing information to small companies, *Id.* § 635(b)(1)(I), and recommending Advisory Committee members for Board approval. 12 U.S.C. § 635a(d)(1)(A). It strains credulity to believe, as Defendants argue, that the President and Senate nominate and confirm EXIM's President to perform these relatively unimportant tasks, but do not nominate and confirm its Board Chair to execute their far weightier obligations.

Defendants' reference to *English v. Trump*, 279 F. Supp. 3d 307, 311 (D.D.C. 2018) is misplaced. Total 21; EXIM 24. English argued the President's appointment of the Consumer Financial Protection Bureau ("CFPB") Director was impermissible because the Director also serves on the FDIC Board. But the CFPB Director's role on the FDIC Board is, at most, a footnote in their job description, and surely was not a priority of the President or Senate in the nomination and confirmation process. Moreover, *English* asked whether the appointee could serve as acting CFPB Director, a role that is not limited by the Vacancies Act. Here, Plaintiffs challenge the President's appointments *to the EXIM Board*, a role that is proscribed by the Vacancies Act.

Defendants say EXIM did not violate the temporary board provision because it had not been without a quorum for 120 days. EXIM 24-25. That misses the point. The Vacancies Act prohibits acting appointments to multi-member boards; the temporary board provision—enacted *after* the Vacancies Act—ensures that the prohibition on acting Board appointments will not leave EXIM without a Board quorum for an extended period. 12 U.S.C. § 635a(c)(6)(B). Accordingly, this is not a situation like the cases cited by Total, where agency succession statutes

were read together with the Vacancies Act's *authorization* to make acting appointments to provide two alternatives for the President to fill vacant positions. Total 22. None of those cases concerned an agency specific succession statute that fills a gap left by the Vacancies Act's explicit *exclusion* of an officer from the acting appointment option. *C.f. Guedes v. BATFE*, 356 F. Supp. 3d 109, 142 (D.D.C. 2019) (distinguishing AG role, which can be filled with the VRA, from positions like board members that are explicitly excluded). EXIM's temporary board provision is not an alternative option for the *President* to fill a particular vacancy. It is the only option for EXIM to make Board-level decisions where it lacks a quorum for 120 days.

### III.    Absent a preliminary injunction, Plaintiffs and the community members they serve will suffer imminent and irreparable harm.

Plaintiffs have shown that, absent preliminary relief, they will "likely" suffer irreparable harm. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Indeed, Plaintiffs and the people they serve will be severely harmed if the Project restarts. Local people will suffer environmental devastation, as construction will cause air and water pollution, jeopardizing health and livelihoods. They will also lose their farmland, as the Project or its subcontractors will require more land. Fishermen will lose access to fishing grounds. Moreover, Al-Shabab has already attacked the Project's environs in August, and will likely continue to do so. Plaintiffs must address these harms; they will face increased demand for their services, which will be more difficult and dangerous to provide. *Supra* § I(A)(2).[40] None of this is really in dispute.

EXIM argues that harm is not imminent because Plaintiffs do not know *precisely* when the Project will fully resume. EXIM 29. But that is in Total's hands; they cannot avoid an

---

[40] Total's allegation that Plaintiffs' discussion of the harm they will experience is "cursory" is absurd. Total 41. Plaintiffs describe these harms at length. Pls. 11-13, 29-36. Rather than restating this, Plaintiffs made the obvious point that the harms are imminent and irreparable. *Id*.

injunction by hiding the ball. EXIM relies on cases where harm was *years* away. *See Appalachian Voices v. Chu*, 725 F. Supp. 2d 101, 106 (D.D.C. 2010); *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 337 (D.D.C. 2017). Total notably does not make this argument; it has stated that it will resume full operations imminently, and reports suggest they began preparations soon after EXIM committed funding. DE 13-12.

Harms from the conflict are hardly speculative. *Supra* § I(A)(2). Nor is it speculative that al-Shabab will attack in the Project area before this Court can rule on the merits. It just did. *Id.* Total faults Plaintiffs for not "explain[ing] how an injunction would prevent [conflict-related] harm." Total 42. But the answer is clear. Total said the Project will not proceed without EXIM funding. *Supra* § II(A)(1). A preliminary injunction will pause a Project restart, and a paused Project will be a far less attractive target for al-Shabab. Conflict Decl. ¶ 72. The cases Total cites, by contrast, involved relief that would not remedy the injury, *Navistar, Inc. v. United States EPA*, No. 11-cv-449 (RLW), 2011 U.S. Dist. LEXIS 95128, at *8 (D.D.C. Aug. 25, 2011) or clearly speculative injury. *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 129 (D.D.C. 2013).

Regardless, the environmental devastation, displacement, and loss of livelihoods will happen, *supra* § I(A)(2); JA Decl. ¶¶ 45, 64, 70, 85-94; JA Supp. Decl. ¶¶4-49, and are irreparable.[41] Environmental harm alone suffices; such injury "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Defendants say Total has a "plan" that may minimize harm. EXIM 30-31; Total 42-43. But the mere existence of such plans does not erase irreparable harm. Defendants' cases

---

[41] Total's speculation about emissions is irrelevant to these other harms. Total 42. And the Court should not credit it anyway; NEPA required EXIM to actually assess this, but it refused. And those claims cannot be squared with the best available science. *Infra* § IV.

determined that the environmental *impact*, after mitigation, or of relatively minor projects, would likely be "minimal."[42] These cases did not involve terrorist attacks, human rights abuses, massive underwater drilling in sensitive marine areas, or relocation of communities. Neither Defendant argues that these harms will be minimal or that mitigation measures will *actually* prevent them.

EXIM vaguely points to Total's "efforts" to "address environmental, economic, and social concerns." EXIM 30-31. But in 2025 ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ That will be too late. EXIM also cites a plan based on the "Rufin Report." EXIM 30-31. The Report was from 2023 (the conflict has since escalated), is not comprehensive, and Total has disregarded some of Mr. Rufin's suggestions. JA Supp. Decl. ¶¶ 24-27. For example, he advised *against* displacing Patacua's residents; Total did it anyway. *Id.* ¶ 27.

Total cites an outdated Environmental and Social Management Plan, Total 7, 42-43, that does not account for the current conflict or resettlement issues. Nor does Total provide evidence of how or whether the plan is being implemented. Plaintiffs have highlighted gaps in enforceability and the lack of proper baseline studies, which cannot be remedied later. FOE Decl. ¶¶ 19, 24; JA Decl. ¶¶ 25,45, 58; JA Supp. Decl. ¶¶ 29-49. EXIM already found Total's plan lacking. FOE Decl. Ex. 2 at 4. A plan alone is worthless.

---

[42] *Sierra Club v. U.S. Army Corps of Eng'rs,* 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (finding record did not support claim that pipeline construction would have significant impact on wildlife given mitigation plan and pipeline design); *S. Utah Wilderness All. v. Bernhardt*, 512 F. Supp. 3d 13, 22 (D.D.C. 2021) (holding that mitigation plans for limited project—a pre-existing access road and a new well pad—could minimize damage and ensure area was repaired); *Comm. for A Constructive Tomorrow v. United States DOI*, Civil Action No. 24-774 (LLA), 2024 U.S. Dist. LEXIS 93089, at *13 (D.D.C. May 24, 2024) (holding plaintiffs had not shown "why these measures would not be sufficient to protect the Right Whale during … litigation").

Total's claim that harms to local people are irrelevant, Total 42-43, is wrong. Plaintiffs have third-party standing to raise these harms. *Supra* § I(C). They therefore count as irreparable harm. *See, e.g.*, *Am. Gateways v. United States DOJ*, No. 25-01370 (AHA), 2025 U.S. Dist. LEXIS 138893, *20, 31 (D.D.C. July 21, 2025). And Plaintiffs will have to provide services to help the injured. Pls. 32-34; *supra* § I(A)(2). Neither Defendant disputes that the need to provide more, more difficult services "provide[s] injury for . . . irreparable harm." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

EXIM's denial of Plaintiffs' right to comment is also irreparable injury. Pls. 41. Plaintiffs lost the ability to influence the due diligence process, including the conditions placed on financing. Similarly, EXIM's failure to conduct a NEPA analysis is an injury to the decision making process that cannot be repaired without a preliminary injunction. *Hirt v. Richardson*, 127 F. Supp. 2d 833, 846 (S.D. Mich. 1999). Defendants argue that procedural harm is insufficient, *standing alone*. EXIM 30; Total 43. But here, the procedural harms accompany other injuries, including the resources Plaintiffs will expend providing services to injured people. Pls. 41.

Total claims that even if the Board considers comments, "there is no possibility" it would decide differently. Total 43, n.16. EXIM notably does not make this troubling claim, nor can this Court presume EXIM will ignore the record. Plaintiffs need not show that compliance with the procedure would alter the agency's decision. *Sugar Cane Growers*, 289 F.3d at 94-95.[43]

---

[43] Total claims Plaintiffs are not entitled to vacatur. Total 44. But "[r]emand with vacatur is the ordinary remedy for unlawful agency action." *Sierra Club v. United States DOT*, 125 F.4th 1170, 1186 (D.C. Cir. 2025). By contrast, courts remand where the agency decision was "insufficiently explained" and the court permits it to more fully articulate its reasoning. *Delta*, 85 F. Supp. 3d at 405. Even if remand were ultimately proper, that would not make the harms Plaintiffs will suffer repairable.

**IV.    The balance of equities strongly favors granting an injunction.**

The certain and severe harms to Plaintiffs, local people, and the U.S. economy easily outweigh the speculative injuries Defendants claim will occur from a temporary pause on disbursement while this Court determines if it is legal. Pls. 42-44. Contrary to Total's assertion, preventing EXIM from disbursing money it has not released *maintains* the *status quo*. Total 43-44. Indeed, it would maintain the situation that has existed for the last five years. And there is "no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12.

Total's claim that *Plaintiffs'* harms are speculative and will not be redressed by a preliminary injunction, Total 44, is refuted above. *Supra* § I(A)(2). Total also argues that allowing public infrastructure projects to proceed on schedule is in the public interest, Total 45, but no unlawfully approved project is too big to pause; particularly this one, which is already paused and threatens grave irreparable harm, including to the U.S. economy. Regardless, Total's cases involve public projects, that were likely lawful, and where delay would have had specific, quantifiable impacts on the public. *Vill. of Logan v. United States DOI*, 577 F. App'x 760, 767-68 (10th Cir. 2014); *Macht v. Skinner*, 715 F. Supp. 1131, 1137 (D.D.C. 1989). Here, Plaintiffs seek to temporarily pause an unlawful loan to a foreign, private energy company for a foreign project to prevent irreparable harm while continuing the *status quo*. *See All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (finding public interest in avoiding irreparable environmental injury and "careful consideration of environmental impacts" outweighed "economic concerns"); *Amoco Prod. Co.*, 480 U.S. at 545 (holding if environmental injury is "sufficiently likely" equities "usually favor" an injunction). This is in the public interest.

The benefits that Defendants argue the public stands to lose are speculative, and unaffected by a temporary pause in loan disbursal. They are therefore irrelevant. *See Shawnee*

*Tribe v. Mnuchin*, 984 F.3d 94, 103 (D.C. Cir. 2021) (rejecting equities argument based on consequences of potential underlying merits decision when preliminary injunction was temporary). And Defendants' arguments only highlight EXIM's failure to undertake analyses that the Bank Act, NEPA and EXIM's own policies require.

For example, Defendants say, without proof, that the Project is expected to "support" (not create) 16,000 U.S. jobs. EXIM 33-34; Total 45. That ignores the U.S. jobs the Project will *cost* in the domestic renewable energy and domestic LNG sectors. *Supra* § II(C). EXIM does not assert any *net* gain. The Bank Act creates a presumption that this Project will cause "substantial injury" in the United States. To overcome this, EXIM needed to conduct a detailed analysis and the Board was required to specifically find that the benefits outweighed the costs. *Supra* § II(C). In the absence of that analysis and finding, the Court should not credit speculation. *Id.*

EXIM cites a press release referencing a letter from companies looking to profit from the Project, but the letter contemplated a world "without EXIM's approval," and did not assert any consequences of a *temporary* delay in EXIM's disbursement. EXIM 34-35. EXIM also says the loan will generate $600 million for the Treasury, but again provides no evidence supporting that number or showing that temporary relief threatens any U.S. government revenue. Unlike here, the project in *Natural Resources Defense Council v. Kempthorne*, 525 F. Supp. 2d 115 (D.D.C. 2007), was likely lawful and threatened no irreparable harm. *Id.* at 120-27.[44] And there, the company explained exactly how *specific losses* would occur *as a result* of the preliminary injunction. *Id.* at 126 ($4 million on a fixed-bid contract and $63,000 per day as rigs sat idle).

---

[44] So too in *Optimus Steel, LLC v. United States Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 726-27 (E.D. Tex. 2020).

Here, neither Defendant details any concrete injury, let alone one from temporarily preserving the *status quo* while the Court determines if EXIM's 2025 loan was lawful.

EXIM presents no evidence that the Project is needed to provide "energy security to allies," EXIM 35; nor could it, since there will be a global glut when the Project begins production, which EXIM was required, but failed, to consider. EXIM's notion that helping to increase foreign production during a glut somehow promotes U.S. "energy dominance" is risible. The government's "energy dominance" strategy is about "[d]eveloping American energy."[45] Regardless, these interests are not threatened by a temporary pause in loan disbursement.

EXIM argues the Project will generate revenue for Mozambique and increase employment and economic opportunity, EXIM 35-36, but offers only public relations material from the Project's website to support these rosy predictions. *Id.* The Project is unlikely to provide local people jobs, and under Total's new security plan, they will not be able to sell the Project goods and services. Conflict Decl. ¶¶ 65, 79; JA Supp. Decl. ¶¶ 16, 28. Government revenues "are uncertain and may not arrive until far in the future, if at all," and certainly not during a preliminary injunction. Richard Halsey et. al., *Navigating Decisions: The risks to Mozambique from liquified natural gas export projects*, Int'l Inst. for Sustainable Dev. 6 (Decl. 13, 2023). Any early profits mostly go to the companies; they will only share *later* profits with the government if costs have been covered. *Id*. at 6. Most potential government revenue would not arrive until the 2030s and 2040s, and depends on a favorable LNG market for the next 20 years, transferring the risk of the anticipated oversupply to the state. *Id*. at iii, 6, 8-9. Mozambique may receive *no* net revenue. *Id*. at 6, 12. The benefits of oil and gas projects in low-

---

[45] *The White House, Fact Sheet: President Donald J. Trump Establishes the National Energy Dominance Council* (Feb. 14, 2025), https://bit.ly/4nafAaa.

income countries consistently fail to materialize. More often, such projects fuel corruption, conflict, repression, and worse development outcomes, what economists call the "resource curse,"[46] a dangerous prospect for Mozambique, which has a long history of conflict, governance challenges, and repression. This all counsels against crediting predictions from those with the most to gain.

Total's claim that the Project will help Mozambique transition to "clean energy" is also false. Total 45. The Project will produce LNG mainly for export, even though as of 2021, only a third of Mozambicans had access to electricity. *Halsey* at 5. Total recycles the myth that natural gas is "the cleanest fossil fuel," Total 6, which is like advertising the healthiest cigarettes. But even that is a bait-and-switch, because the Project will not produce gas, but dirtier LNG, with climate harms up to one-third *larger* than coal.[47] This is partly due to emissions from extraction and processing, underscoring that EXIM never analyzed the Project's direct emissions, as NEPA requires. But even if these benefits are real, a temporary injunction will not eliminate them.

The closest Total gets to suggesting a harm from a preliminary injunction is to speculate that it would "create[] uncertainty" for lenders and foreign governments and "potentially upend[] . . . other parts of the financing." Total 44.[48] This conclusory statement lacks the specificity provided in Defendants' own cases, and is unsupported. Rabilloud Decl. ¶¶ 58-61. Total provides no evidence lenders would change course due to a temporary pause in EXIM's disbursements.

---

[46] Khalid Adnan Saeed, *Revisiting the natural resource curse: A cross-country growth study*, Cogent Economics & Finance 9(1) (2021); *accord* JA Decl. ¶ 140.

[47] Robert Howarth, *The greenhouse gas footprint of liquefied natural gas (LNG) exported from the United States*, Vol. 12:11 Energy Science & Eng. 4843-59 (Nov. 2024), https://bit.ly/4lWrvY.

[48] Total also states that an injunction "could" jeopardize services to communities, Total 45, but fails to explain how maintaining the status quo would affect any services Total claims to provide.

Last, EXIM claims Plaintiffs waited too long, but a delay in filing "is not a proper basis for denial of a preliminary injunction." *Gordon v. Holder*, 632 F.3d 722, 724 (2011). EXIM counts from the 2019 or 2020 approval, EXIM 32-33, but the *challenged* approval was in 2025, and the primary basis is EXIM's failure to developments that occurred after 2020. Plaintiffs could not have predicted, for example, the Palma attack and the containers massacre. And it would have been premature to assert imminent harm when the Project was stalled. Nor does it make sense to count from March, Total 41; it was not clear that harm was imminent until Total announced in July it was moving expeditiously to restart construction. Dkt. 13-12. Plaintiffs swiftly filed their motion the *same month*. Defendants' cases address *unexplained* delays that indicate a *lack of urgency* on part of plaintiffs, and most involve periods longer than here, some by years. *See, e.g.*, *Powder River Basin Res. Council v. United States DOI*, No. 22-cv-2696, 2023 U.S. Dist. LEXIS 198463, at *45 (D.D.C. Nov. 6, 2023) ("unexplained"); *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) ("unnecessary"). Plaintiffs should not be penalized for not seeking relief prematurely.[49]

## CONCLUSION

Defendants argue that officials lacking Senate confirmation may hand over billions of taxpayer dollars to a foreign project that will exacerbate an ongoing humanitarian crisis in a war zone, and compete with U.S. producers, without allowing comment or considering the consequences. The Court should pause disbursement while it decides whether Defendants are right. Alternatively, because Defendants are clearly wrong, the Court should grant partial summary judgment at this time.

---

[49] EXIM cursorily asks for a bond, EXIM 36, which would be inappropriate. Pls. 44 n.27.

Date: September 3, 2025

Respectfully submitted

/s/ Richard Herz
Richard L. Herz (*admitted pro hac vice*)*
Tamara A. Morgenthau (D.C. Bar No. 90032827)
Lindsay A. Bailey (D.C. Bar No. 1723447)
Michelle C. Harrison (D.C. Bar No. 1026592)
EarthRights International
1400 K St. NW Suite 750
Washington, DC 20005
(202) 466 5188
rick@earthrights.org

Steven B. Herz (*admitted pro hac vice*)
The Law Office of Steven Herz
1954 Mountain Blvd
Oakland CA 94661
*Counsel for Plaintiffs*

* Based in CT; admitted in NY; does not practice in DC's courts