REDACTED

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE EARTH U.S. AND JUSTIÇA AMBIENTAL,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>EXPORT-IMPORT BANK OF THE UNITED STATES *et al.*,<br><br>　　　　　Defendants,<br><br>and<br><br>TOTALENERGIES EP MOZAMBIQUE AREA 1, LIMITADA,<br><br>　　　　　Defendant-Intervenor. | Case No. 1:25-cv-02235-CJN |

## DEFENDANT-INTERVENOR TOTALENERGIES EP MOZAMBIQUE AREA 1, LIMITADA'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

REDACTED

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................................................................. 1

I.      PLAINTIFFS LACK ORGANIZATIONAL STANDING......................................................... 2

II.     "THIRD PARTY STANDING" CANNOT PROVIDE PLAINTIFFS ARTICLE III
STANDING ........................................................................................................................... 17

CONCLUSION............................................................................................................................... 18

REDACTED

# **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) ...........................................................................5

*Al-Aulaqi v. Obama*,
    727 F. Supp. 2d 1 (D.D.C. 2010) .....................................................................17

*Am. Anti-Vivisection Soc'y v. USDA*,
    946 F.3d 615 (D.C. Cir. 2020) ...........................................................................3

*Am. for Immigrant Just. v. DHS*,
    No. 22-3118, 2023 WL 1438376 (D.D.C. Feb. 1, 2023) ......................................18

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
    659 F.3d 13 (D.C. Cir. 2011) ...........................................................................14

*Animal Legal Def. Fund v. Vilsack*,
    640 F. Supp. 3d 134 (D.D.C. 2022) (Nichols, J.) ........................................................6

*Animal Legal Def. Fund, Inc. v. Espy*,
    23 F.3d 496 (D.C. Cir. 1994) ...........................................................................12

*Campaign Legal Ctr. v. FEC*,
    No. 22-cv-3319, 2024 WL 4263853 (D.D.C. Sept. 23, 2024) ...........................13, 14

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .............................................................................................8

*Coal. for Humane Immigrant Rts. v. DHS*,
    780 F. Supp. 3d 79 (D.D.C. 2025) ..............................................................11, 15, 16

*Ctr. for Biological Diversity v. Dep't of Interior*,
    144 F.4th 296 (D.C. Cir. 2025) .....................................................................6, 11, 16

*Ctr. for Biological Diversity v. U.S. Dep't of State*,
    No. 18-563, 2019 WL 2451767 (D.D.C. June 12, 2019) ......................................13

*Ctr. for L. & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005) .........................................................................5

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) .........................................................................................14

REDACTED

*Davis v. FEC*,
554 U.S. 724 (2008) ........................................................................................... 15

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) ........................................................................................ 6, 7

*Elec. Priv. Info. Ctr. v. Dep't of Educ.*,
48 F. Supp. 3d 1 (D.D.C. 2014) ................................................................... 10, 11

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ................................................................ 12, 13, 14

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................................................. *passim*

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) (en banc) ............................................................. 3

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) ........................................................................ 12

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ......................................................................................... 5

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ....................................................................................... 18

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........................................................................... 16

*Lepelletier v. FDIC*,
164 F.3d 37 (D.C. Cir. 1999) .................................................................... 17, 18

*Lewis v. Casey*,
518 U.S. 343 (1996) ....................................................................................... 14

*Nat'l Ass'n of Home Builders v. EPA*,
667 F.3d 6 (D.C. Cir. 2011) ............................................................................. 5

*Nat'l Taxpayers Union, Inc. v. United States*,
68 F.3d 1428 (D.C. Cir. 1995) .................................................................... 8, 10

*Nat'l Veterans Legal Servs. Program v. DOD*,
No. 14-cv-1915, 2016 WL 4435175 (D.D.C. Aug. 19, 2016) ............................. 16

*PETA v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015) ........................................................................ 4

REDACTED

*Siegel v. U.S. Dep't of the Treasury,*
    304 F. Supp. 3d 45 (D.D.C. 2018) ..........................................................................8

*Steel Co. v. Citizens for a Better Envt.,*
    523 U.S. 83 (1998) ................................................................................14, 15

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ...........................................................................................3

*Whitman-Walker Clinic, Inc. v. HHS,*
    485 F. Supp.3d 1 (D.D.C. 2020) .......................................................................18

*Williams v. Johnson,*
    701 F. Supp. 2d 1 (D.D.C. 2010) .......................................................................9

## RULES

Fed. R. Civ. P. 12(h)(3) ........................................................................................2, 18

REDACTED

## INTRODUCTION

Plaintiffs fail to rebut TotalEnergies EP Mozambique Area 1, Limitada's ("TEPMA1") showing that Defendants are entitled to summary judgment. Plaintiffs made the strategic choice to move for summary judgment on their substantive claims. At the same time, they failed to meet their burden of proof to establish standing on summary judgment. That requires entry of judgment in TEPMA1's and Defendants' favor.

Distilled to its essence, Plaintiffs' overarching response is that anyone who wishes to provide comments on a federal agency action possesses standing, so long as the aspiring commenter would submit comments "on behalf of" (whatever that means) unnamed third parties who allegedly *do* possess Article III standing, and regardless of whether any statute actually requires the agency to provide an opportunity for comment. That theory is completely unsupported by existing case law, which makes clear that would-be commenters do not suffer the necessary concrete, particularized injury from their inability to submit comments on behalf of others. And Plaintiffs' other theories of standing all derive from this same, core complaint: That if they had been permitted notice and opportunity for comment, Plaintiffs might have obtained their preferred policy outcome, and thus would have not had to spend as much effort on their issue advocacy activities opposed to global fossil fuel production. Those derivative theories of standing also fail.

It is worth taking a step back and considering what is really going on in this case. Plaintiffs allege a host of harms to a vague group of unidentified, unnamed third parties in Cabo Delgado, Mozambique. Despite Plaintiffs asserting a "close relationship" with these third parties located over 1,000 miles away from Plaintiffs, no such third party, who supposedly would possess standing in his or her own right, has seen fit to join in this case as a plaintiff, even on an anonymous John/Jane Doe basis. Nor has any such person, or any person located within 1,000 miles of the Project, submitted *any* declaration or other evidence to support standing. That is unsurprising:

REDACTED

Plaintiffs filed suit because they are ideologically opposed to fossil fuels. But that abstract concern apparently does not motivate participation by the actual local residents that Plaintiffs purport to represent, and cannot support Plaintiffs' alleged standing to represent them in a proceeding they did not join. Simply, under black-letter law, Plaintiffs cannot bootstrap themselves into standing by piggybacking on speculated harms to non-parties who saw fit *not* to participate in this suit.

For the reasons identified herein and in TEPMA1's Motion, summary judgment in favor of TEPMA1 and Defendants is warranted due to this Court's lack of subject matter jurisdiction, which in turn requires dismissal under Federal Rule of Civil Procedure 12(h)(3).[1]

## ARGUMENT

Plaintiffs' Reply Memorandum—which contains the substance of Plaintiffs' arguments opposing summary judgment which are in turn cross-referenced in Plaintiffs' opposition to TEPMA1's motion for summary judgment—confirms that Plaintiffs assert two overarching theories of standing: (1) that their organizational interests have been injured by approval of the Amendment, and (2) that they may rely on "third party standing" to bring suit on behalf of third parties who chose not to participate in this case. Pls.' Reply Mem., Dkt. 37-1 ("Reply") at 3-16. Each theory fails. Plaintiffs have therefore failed to carry their burden of establishing Article III standing, and summary judgment should be entered against them.

## I.  PLAINTIFFS LACK ORGANIZATIONAL STANDING

To possess standing "in its own right," an organization must make "the same showing

---

[1] In opposing TEPMA1's motion for partial summary judgment, Plaintiffs contend that TEPMA1's failure to include a contrary statement of material facts requires the Court to deem Plaintiffs' facts as "admitted." Dkt. 35 at 3-4. Plaintiffs brush aside the fact that statements of material facts are inapplicable in cases brought under the Administrative Procedure Act. *See* L. Cv. R. 7(h), (n). And in any event, TEPMA1 is not contending that Plaintiffs are *factually* wrong in their declarations' statements that Plaintiffs engage in extensive advocacy activities in an attempt to derail the Project. Rather, TEPMA1 contends that those facts do not give rise to standing.

REDACTED

required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020).[2]  Plaintiffs assert four sub-theories of organizational standing (at 4-14), but each of them fails under well-established law.

**"Redress" Theory.**  Plaintiffs assert (at 4) that EXIM denied Plaintiffs "access to 'avenues of redress [plaintiffs] wish to use,'" *i.e.*, have deprived Plaintiffs of an opportunity to participate in notice-and-comment rulemaking describing how EXIM-funded projects cause third-party harm. Plaintiffs thus claim that injury arises essentially *per se* from EXIM's approval of the Amendment without notice and comment, as to Plaintiffs—and other aspiring commenters.  Reply 4-8.

Putting to the side for now the dispositive problem that Plaintiffs *do not* have any right to engage in notice-and-comment on the Amendment, *see* TEPMA1's Prelim. Inj. Opp ("PI Opp"), Dkt. 24-1 at 22-38, Plaintiffs' argument ignores longstanding Supreme Court precedent:  Being "denied the ability to file comments on [agency] actions" is not on its own a cognizable injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  A would-be commenter has no standing to challenge the failure to allow comments "without some [separate] concrete interest that is affected by the deprivation."  *Id.*

This is true more generally of any alleged procedural violation:  In addition to showing a procedural violation, "the plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a *particularized interest of the plaintiff*."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (emphasis added). Plaintiffs cannot satisfy this requirement because, as the Supreme Court explained just last year, an organizational plaintiff does not have a concrete and particularized interest merely based on

---

[2] Unless otherwise noted, all internal quotation marks, alterations, and citations are omitted.

REDACTED

"strong opposition to the government's conduct," nor may it "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

Plaintiffs ground their mistaken view of the law on *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015), which they claim held that "deny[ing] a means of redress (like notice and comment) is a cognizable injury." Reply 7; *id.* ("Defendants' further claim that deprivation of Plaintiffs' right to comment does not establish injury conflicts with *PETA*'s holding that denial of a means of redress is an injury."). Such a holding would have conflicted with the Supreme Court's decision that denying notice-and-comment is not on its own a cognizable injury in *Summers* and the D.C. Circuit's prior *en banc* holding in *Florida Audubon Society*. The *PETA* panel did not make such an error: *PETA* did not involve any alleged deprivation of a procedural right—much less "denying . . . notice and comment." *Id.* There, PETA challenged USDA's failure to promulgate regulations clarifying that the Animal Welfare Act ("AWA") applied to birds and sought to require USDA to "immediately extend enforcement of the AWA to birds." 797 F.3d at 1091.[3] Although the court said that the denial of a means of redress—along with other harm—sufficed to confer standing, it was not talking about a failure to accept comments. *See id.* at 1095. The problem was not that USDA did not accept public input or failed to provide any other procedure; it was that USDA did not "take action" on the complaints that PETA submitted because USDA did not believe the AWA gave it "jurisdiction [to] regulate birds." *Id.* Plaintiffs are thus wrong to assert that *PETA* established a rule—contrary to prior Supreme Court and D.C. Circuit *en banc* precedent—that agency denial of a right to comment is on its own a "cognizable injury." Reply 7.

---

[3] Plaintiffs misleadingly claim (at 5) *PETA* was about "USDA preclud[ing] PETA from preventing cruelty to animals by submitting USDA complaints." The reason the complaints did not "prevent[] cruelty to animals" was that USDA believed it lacked jurisdiction to act under the relevant law.

REDACTED

Aside from misreading *PETA* and ignoring Supreme Court and D.C. Circuit precedent, Plaintiffs seek (at 5) to analogize this case to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). But *Havens* was entirely different. That case involved not the loss of an opportunity to engage in notice and comment rulemaking, but rather the defendant's false statement to the organizational plaintiff's African-American employees that no apartments were available for rent. 455 U.S. at 368-69. That lie created a "concrete and demonstrable injury to the organization's activities," because it "perceptibly impaired" the organization's ability to provide housing referrals and counseling to housing seekers. *Id.* at 379. And as the Supreme Court cautioned last term, *Havens* was an "unusual case" involving actions that "directly affected and interfered with [the organization's] core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395-96.

*Havens* does not apply here. The D.C. Circuit has already held that *Havens* does not apply when "the only 'service' impaired is pure issue-advocacy—the very type of activity distinguished by *Havens*." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005). And under D.C. Circuit precedent, "submitting comments" is nothing more than issue advocacy. *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (holding that "submitting comments to the EPA" was a part of an "advocacy mission" and insufficient for standing (citing *Havens*, 455 U.S. at 379)). That Plaintiffs desired the opportunity to submit formal comments to EXIM that the Project does not "comply with EXIM's requirements" and that EXIM should have "withheld financing or imposed conditions requiring the Project to resolve these issues before disbursement," Reply 6, does not confer standing under *Havens*.

To be sure, opposing the Project (and EXIM's financing of it) is no doubt central to Plaintiffs' mission. But allegations that an organization's "mission has been comprised" are not enough to support standing. *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d

REDACTED

129, 133 (D.C. Cir. 2006); *see also Animal Legal Def. Fund v. Vilsack*, 640 F. Supp. 3d 134, 145

(D.D.C. 2022) (Nichols, J.) (similar), *aff'd on other grounds*, 111 F.4th 1219 (D.C. Cir. 2024).

Absent harm to their "own activities *apart from [their] advocacy*," Plaintiffs lack standing. *Ctr.*

*for Biological Diversity v. Dep't of Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) (emphasis added).

All of this makes good sense:  If an organization cannot provide its non-advocacy services

because of some agency action—if its day-to-day business operations are severely curtailed—then

it may have suffered an injury in fact.  "But if an action goes against an organization's values—

thus leading the organization to engage in investigation, litigation, or other advocacy—that is not

by itself sufficient.  In those circumstances, the organization itself has not been harmed, at least

not in the sense required by Article III." *Animal Legal Def. Fund*, 640 F. Supp. 3d at 145 (Nichols,

J.).  So too here.

**Increase in Services Theory.**  Plaintiffs next pivot to arguing (at 8-12) that without the

Amendment, the Project could not restart.  They assert that restarting the Project will lead to more

jihadist conflict, and thus make it harder for Plaintiffs to provide their "services." *Id.*  Plaintiffs

also contend that restarting the Project will cause increased social and environmental harms and

will, in turn, cause more individuals to seek more of Plaintiffs' advocacy services.

The closest that Plaintiffs come to showing EXIM's action will impede their services is

their claim that the Project's resumption will inflame the longstanding jihadist conflict.  But this

argument is too many steps removed from EXIM's funding decision to support standing.  Plaintiffs

claim they need not show that restarting the Project *will in fact* harm Plaintiffs or third-parties, but

claim they "need only show" that "third parties will likely react in predictable ways," *i.e.*, through

*possible* terrorist activity. *Id.* at 9 (quoting in part *Dep't of Commerce v. New York*, 588 U.S. 752,

768 (2019)).  But the causal chain in *New York* was straightforward:  A change in a census question

REDACTED

would directly alter respondents' response to the census.  *See* 588 U.S. at 768.  Here, by contrast, Plaintiffs propose a highly attenuated causal chain, that (1) a restart in the Project may increase the risk of jihadist terrorist attacks by third parties, (2) Mozambican and allied forces may fail to counteract the increased terror, and (3) local populations may turn to Plaintiffs—who do not provide security-related services—as a result.  Reply 8-11; █████████████  As the Supreme Court has repeatedly affirmed, "[t]he causation requirement" forbids such "attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects."  *All. for Hippocratic Med.*, 602 U.S. at 383.

Nor have Plaintiffs proven that the first link—an increase in jihadist terrorist attacks—will in fact occur *due to the Project*.  Plaintiffs' opposition brief is carefully hedged, speaking to the "threat" that jihadists may attack the general "area," and that the restart "will likely lead to attacks." Reply 10.  That hedging makes sense:  Even a charitable reading of Plaintiffs' evidence █ ████████████████████████████████████████████ ████████████████████████████  No wonder:  As Plaintiffs now concede (at 10), the conflict predates EXIM's 2019 funding commitment and has continued during the years of the *force majeure* project standdown.  ███████████████████████████████ Indeed, Plaintiffs' latest brief further emphasizes the point:  Their cited evidence shows that attacks across a province the size of New Jersey, including locations hundreds of miles away from the Project site, have continued *prior to* the restart of the Project.[4]  The years-long, ongoing jihadist conflict is a human tragedy, but the anticipated restart is not its cause.

Plaintiffs also do not establish that Mozambique and its regional partners would be unable

---

[4] Reply 10 n.7 (citing Armed Conflict Location & Event Data Project (ACLED), Mozambique Conflict Monitor Update: 4 - 17 August 2025).

REDACTED

to mitigate any change in the situation on the ground at and around the Project site.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (past exposure to violence did not "establish a real and immediate threat" that similar violence would again occur).  Indeed, Plaintiffs do not seem to even be arguing that they meet that standard.  Reply 10 & n.8 (arguing that Mozambique's army cannot hold *entirety* of Cabo Delgado province "*on their own*" without regional partners (emphasis added)).  Plaintiffs thus leave the Court to speculate whether an injunction will prevent acts of terror, and the effectiveness of the police and military response to them.  Courts rightly hesitate to make predictions about "international responses to U.S. policy that Plaintiffs' theory of causation posits" when assessing standing.  *Siegel v. U.S. Dep't of the Treasury*, 304 F. Supp. 3d 45, 55 (D.D.C. 2018).

Plaintiffs next claim that "[r]estarting the Project will displace more local people from their land, damage the environment . . . and otherwise harm livelihoods," which "will increase the number of people needing JA's services," and that "Defendants do not claim these services, like educating local people about Project impacts . . . are issue advocacy."  Reply 8.  That assertion both misunderstands TEPMA1's position in this matter, and is contrary to binding Circuit precedent:  Plaintiffs' "self-serving observation that [they have] expended resources to educate . . . others regarding [the contested government action]," and that Plaintiffs may also see fit to do so in the future, "does not present an injury in fact."  *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995); *see also All. for Hippocratic Med.*, 602 U.S. at 394 (efforts to "inform . . . members and the public about [] risks" and engage in public "education" were insufficient to convey standing).

Plaintiffs also gesture toward JA's alleged service of assisting individuals "navigate complex resettlement mechanisms."  Reply 10.  Beyond this theory resting upon the same entirely

8

REDACTED

speculative theory of locals' desire for Plaintiffs' services, this theory also fails because the
resettlement process has already been completed.  Decl. of Maxime Rabilloud ¶ 49, Dkt. 25-1
("Rabilloud Decl.").   Plaintiffs' latest declaration reaffirms this, ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████    Plaintiffs suggest    ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    Instead, the declaration    ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

But collecting, compiling, and sharing complaints regarding the alleged *adequacy* of the
government's resettlement process, again, is not a qualifying *impediment* to Plaintiffs providing
their day-to-day non-advocacy services, as opposed to Plaintiffs fulfilling their mission by
increasing issue advocacy.  *See All. for Hippocratic Med.*, 602 U.S. at 370 (organizations'
decisions to "inform . . . members and the public about [] risks" and "expend considerable time,
energy, and resources drafting citizen petitions" and "engaging in public advocacy" and
"education" cannot create standing); ████████████████████████████████████████

████████████████████████████    Reply 10 ("JA has already been assisting over a
thousand people with resettlement complaints and will need to assist more with the restart.").[5]

---

[5] Plaintiffs also speculate (at 9-10) that restarting the Project will result in "landgrabbing" because
"once the Project resumes, Total and/or its subcontractors will take even more land."  But a review
of the cited declarations shows nothing but speculation about future displacement:  Plaintiffs
speculate without any showing of personal knowledge that ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    *Williams v. Johnson*, 701 F. Supp. 2d 1, 9-10 (D.D.C. 2010)

REDACTED

Other examples Plaintiffs give of predicted changes to their work—using "grievance mechanisms," "meeting with Congress," and "engaging with the OIG"—are all things they did before the Amendment. FOE Decl. ¶ 53, Dkt. 13-3; *see also id.* ¶ 31 (discussing longstanding communications with Congress), ¶ 59 (discussing that, prior to the Amendment, Plaintiffs "spent time and resources" to "seek[] redress for existing harms"). Likewise that Plaintiffs will continue to "gather" and disseminate "information"; "facilitate community participation in public . . . processes," and "investigate and analyze impacts on affected communities" does not constitute Article III injury. Pls.' Mem. in Supp. ("Mem."), Dkt. 13-1; *see also* FOE Decl. ¶¶ 9-14, 18-19; ████████████████████████ Plaintiffs' purported "services" include helping people "present their interests, questions, and concerns; draft materials for community members, and represent them overseas where they cannot be present." FOE Decl. ¶ 14; *see also* ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ By Plaintiffs' own admission, these activities are a "normal and critical part of [their] mission and operations." *Elec. Priv. Info. Ctr. v. Dep't of Educ.*, 48 F. Supp. 3d 1, 23-24 (D.D.C. 2014); *see Nat'l Taxpayers Union, Inc.*, 68 F.3d at 1434 (A plaintiff "cannot convert its ordinary program costs into an injury in fact."). Any alleged continuation or expansion of those activities is not injury in fact. *Nat'l Taxpayers Union, Inc.*, 68 F.3d at 1434.

The D.C. Circuit's decision just weeks ago addressing *Alliance for Hippocratic Medicine*

---

(concluding that the plaintiff's "unsubstantiated speculation" without personal knowledge was "insufficient to create a dispute of material fact"). Putting aside that the Project's resettlement process is in fact complete, contrary to Plaintiffs' ungrounded speculation, Rabilloud Decl. ¶ 49, the more fundamental point is that, even taking all Plaintiffs' speculation as true, advocating against government resettlement efforts and collecting and disseminating complaints related to speculated future displacement do not constitute Article III injury, *see supra* at 8-10.

REDACTED

and *PETA* confirms that standing is lacking here. *Ctr. for Biological Diversity*, 144 F.4th at 314-15. Explaining that "expenditure of resources on advocacy is not a cognizable Article III injury," it follows that where an organization "identifies no harm to its own activities apart from its advocacy, it has failed to demonstrate that it suffered the required injury." *Id.* Instead, an organization must demonstrate "an injury to its non-advocacy operations," *i.e.*, that those day-to-day activities are *prevented or curtailed* by the challenged agency action. *Id.* at 315. Here, Plaintiffs allege that they may need to *expand* their operations, *i.e.*, "work harder to gather information and expend additional resources to lobby the federal government, file [comments], request improved policies, and in other ways urge the government to better protect" the Project area. *Id.* That does not support standing. *Id.*

The bottom line is that when "a nonprofit merely expands its operations to address increased demands in the communities it serves, its activities have not been tampered with." *Coal. for Humane Immigrant Rts. v. DHS*, 780 F. Supp. 3d 79, 88-91 (D.D.C. 2025), *appeal filed*, No. 25-5152 (D.C. Cir. Apr. 28, 2025). Even on Plaintiffs' own speculative and unsupported theory of the case, a restart to the Project will not keep Plaintiffs from continuing their essential day-to-day operations, but instead "contribut[e] to [their] pursuit of [their] purpose" by expanding their advocacy activities. *Elec. Priv. Info. Ctr.*, 48 F. Supp. 3d at 23.

**"Informational Injury" Theory.** Plaintiffs assert two types of informational injury: One based on a "legal right" to the information, and another based on a "legally cognizable interest" in information. Reply 12-15; *id.* at 12 n.11. While Plaintiffs' asserted distinctions between these two theories are unclear, both theories are unavailing.

As to the first theory, Plaintiffs argue that EXIM injured Plaintiffs by precluding them access to statutorily mandated information. Reply 14-15. This type of "informational" injury

REDACTED

requires a plaintiff to show it (1) has been deprived of information that a statute requires the government to disclose to it, and (2) the plaintiff thus suffers the type of harm Congress sought to prevent by requiring disclosure. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). As TEPMA1 previously explained, Plaintiffs have not identified a statutory provision requiring disclosure of additional information in this circumstance. PI Opp. 22-29. Plaintiffs continue to maintain (at 14-15) that the Bank Act requires disclosure of information, but they do not demonstrate a statutory entitlement to information based upon these statutes. *Id.* Plaintiffs also suggest that non-binding guidance amounts to a binding legal requirement because it was enacted pursuant to a statute and implements international agreements. Reply 34, 38 n.32. Plaintiffs' mere protestations, however, cannot transform a guidance document into a specific "statutory" provision that "explicitly create[s] a right to information." *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C. Cir. 1994). And in any event, TEPMA1 already explained that EXIM complied with this guidance document. PI Opp. 33-37.

Nor do Plaintiffs show that, due to any deprivation, they will suffer the type of harm Congress sought to prevent. *See Elec. Priv. Info. Ctr.*, 878 F.3d at 378. Plaintiffs now claim, without support, that their injury is the type that Congress sought to prevent in passing the Bank Act because Congress passed the Bank Act to inform the public writ large. Reply 15 n.15. But determining whether a harm is the type Congress sought to prevent depends on a review of the "nature of the statutory disclosure provision at issue," and depending on the provision, may include a review of whether Congress "sought to protect individuals or organizations." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). Plaintiffs seemingly claim a right to information based upon three statutory provisions and EXIM's guidance. Mem. 27-28 (citing 12 U.S.C.

REDACTED

§§ 635i-5(a)(1), 635a(c)(10)(C)(i)(I) & (ii), 635(e)(7)(B)(i) & (iii)(I); Env't & Soc. Due Diligence Proc. & Guidelines § 1 ¶¶ 9, 18).  Plaintiffs do not demonstrate that these provisions show that Congress sought to prevent harm to Plaintiffs specifically, or to environmental advocacy groups more generally, and thus cannot satisfy the requirements of informational injury.  *See Elec. Priv. Info. Ctr.*, 878 F.3d at 378 (concluding that organization was not the type of plaintiff that could suffer an informational injury under statute).

Next, relying on an unpublished district court case, Plaintiffs press an alternative theory that they need not show a "legal right" to information, because it is enough that they were denied information to which they had a "legally cognizable interest."  Reply 12-13; 12 n.11 (*misquoting Campaign Legal Ctr. v. FEC*, No. 22-cv-3319, 2023 U.S. Dist. LEXIS 171971, at *23 (D.D.C. Sept. 26, 2023), *apparently intending to quote Campaign Legal Ctr. v. FEC*, No. 22-cv-3319, 2024 WL 4263853, at *8 (D.D.C. Sept. 23, 2024)).  It is unclear what exactly Plaintiffs are intending to argue in this alternative theory, or why they think a "legal right" to information differs from a "legally cognizable interest."  As best as TEPMA1 can tell, Plaintiffs are arguing that even if they do not have a *direct* statutory entitlement or private right of action to obtain information (akin to FOIA), they may have standing to enforce a *more abstract* requirement that an agency make information available to the *public in general*.  But if that is Plaintiffs' argument, it fails for the identical reasons discussed above:  *First*, Plaintiffs' key case, *Campaign Legal Center*, makes clear that Plaintiffs cannot ground standing on an interest in information that an agency *need not disclose under governing law*.  *See* 2024 WL 4263853, at *6 (recognizing an organizational injury may arise where an agency deprives an organization of a "mandatory disclosure"); *see also Ctr. for Biological Diversity v. U.S. Dep't of State*, No. 18-563, 2019 WL 2451767, at *4 (D.D.C. June 12, 2019) (even under Plaintiffs' theory, a court "examines the statutory . . . authority to determine

13

REDACTED

whether a disclosure obligation exists").

And second, even if Plaintiffs could overcome that hurdle, they would still need to show that the lack of information "impair[ed]" their "daily operations." *Campaign Legal Ctr.*, 2024 WL 4263853, at *8. Plaintiffs claim (at 13) that absent legally prescribed disclosures, Plaintiffs must conduct their own research and request information from other banks. But any resources Plaintiffs expended to counteract the lack of information from EXIM—information in which Plaintiffs had no cognizable interest—again constitute non-qualifying issue advocacy, as "a self-inflicted budget choice that cannot qualify as an injury in fact." *Elec. Priv. Info. Ctr.*, 878 F.3d at 379 (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011)); *supra* at 5-6. Plaintiffs' claim to standing based on informational injury fails.[6]

Finally, Plaintiffs' informational injury theory is utterly divorced from the relief that Plaintiffs seek: vacating the Amendment and enjoining any actions pursuant to the Amendment. *See* Compl. at 89-90 (Requested Relief), Dkt. 1 ("Compl."). Any informational injury, if it existed, could not give rise to Article III standing in this case. "Relief that does not remedy the injury suffered" fails to satisfy redressability. *Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 107 (1998). Thus, any "remedy must of course be limited to the inadequacy that produced the injury in fact." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Here, Plaintiffs complain of a deprivation of information in Count IX.

---

[6] At times, Plaintiffs seem to suggest that they propose an "informational" injury *separate and distinct* from organizational injury. While Plaintiffs' argument in this regard is unclear, the case upon which Plaintiffs seemingly rely rejects the distinction that they at times seem to draw. *Campaign Legal Ctr.*, 2024 WL 4263853, at *7 ("Organizational standing is best conceived not as an entirely separate injury, but rather as a means for groups to vindicate their legal rights and interests, just as any individual person can. When the asserted injury stems entirely from the deprivation of certain information— . . . any organizational injury predicated on that information should rise and fall with Plaintiffs' informational injury.").

REDACTED

Compl. ¶¶ 397-400.  But the remedy they seek is not to be provided information, but to void the

Amendment and enjoin disbursement of the loan.  *Id.* at 89-90 (Requested Relief).  So their alleged

harm, if it existed, would not be redressed by the instant lawsuit, which does not seek the release

of any withheld information.  That mismatch between the claimed injury and the requested relief

deprives the Court of standing based on any alleged informational injury.  *See Steel*, 523 U.S. at

107; *see also Davis v. FEC*, 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing

for each claim he seeks to press and for each form of relief sought.").

**Resource Diversion Theory:** Plaintiffs argue (at 13-14) that they will "incur substantial

expenses in order to respond to the impact of the Project restarting."  In a supplemental declaration,

they detail that ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████  This, they assert (at 13) demonstrates an "impairment

to the organization."  They also contend that the potential ████████████████████

████████████████████████████████████████

But as detailed above, to show injury, an organization must demonstrate that the

defendant's conduct has forced it to "expend resources in a manner that keeps it from pursuing its

true purposes" and thus has "directly affected and interfered with the organization's core

activities."  *Coal. for Humane Immigrant Rts.*, 780 F. Supp. 3d at 88 (cleaned up).  Thus,

"insufficient to support standing" are claims that an organization will "have to increase the

resources that it spends" on its mission, *id.*, as are broad claims that Plaintiffs will need to "divert[]

[their] resources in response to a defendant's actions," *All. for Hippocratic Med.*, 602 U.S. at 395.

When an advocacy organization expands or reorients its operations to address (allegedly) increased

demands in the communities it serves, its activities have not been restricted or curtailed, and no

REDACTED

organizational injury is present.  *See id.*; *Cf. League of Women Voters of U.S. v. Newby*, 838 F.3d

1, 8 (D.C. Cir. 2016) (holding mission of voting rights organizations was impaired where proof-

of-citizenship laws "presented formidable obstacles to [the organizations'] registration efforts.").

      In *Coalition for Humane Immigrant Rights v. DHS*, the court confronted a similar question

to the one here:  Whether an organization's claim that it "expect[ed] thousands of individuals" to

"reach out for assistance and advice" which would "impact multiple programs" and "strain its staff

and budget" amounted to an organizational injury.  780 F. Supp. 3d at 89.  But the court held that

"[w]hen a nonprofit merely expands its operations to address increased demands in the

communities it serves, its activities have not been tampered with."  *Id.* at 90.  Indeed, the court

held that while the agency's action caused the organization "to rearrange some labor and resources

to meet the increased demand from this unexpected policy" it had not "suffered a concrete injury

just because shifts in government policy demand shifts in internal operations."  *Id.* at 90-91.  "If

that were the case, an organization could claim injury-in-fact nearly any time there was a change

in the law relevant to its mission.  That cannot be the law."  *Id.*

      Plaintiffs' arguments similarly fail.  They assert that they might need to ██████████

████████████████████████████████████████████ but their

activities, at bottom, "have not been tampered with," *Coal. for Humane Immigrant Rts.*, 780 F.

Supp. 3d at 90-91 (explaining that an adverse agency decision "has not impeded [organization's]

programmatic concerns and activities, but fueled them").  Without a "'perceptible impairment' of

. . . daily operations required to establish organizational injury," *Nat'l Veterans Legal Servs.

Program v. DOD*, No. 14-cv-1915, 2016 WL 4435175, at *7 (D.D.C. Aug. 19, 2016), *i.e.*, some

way in which the Amendment "directly affected and interfered with [a plaintiff's] core business

activities," *Ctr. for Biological Diversity*, 144 F.4th at 314, Plaintiffs' "resource diversion" theory

REDACTED

of Article III standing fails.

Accordingly, Plaintiffs have not provided evidence showing that they possess Article III standing, and judgment should be entered in favor of TEPMA1 and Defendants.

## II. "THIRD PARTY STANDING" CANNOT PROVIDE PLAINTIFFS ARTICLE III STANDING

Plaintiffs finally assert so-called "third-party standing," which "allows a narrow class of litigants to assert the legal rights of others." *All. for Hippocratic Med.*, 602 U.S. at 393 n.5. Plaintiffs now concede (at 16) that "third-party standing" does not *create* Article III standing where none exists. As already discussed, Plaintiffs fail to establish their own Article III injury. Plaintiffs' invocation of "third party standing" therefore cannot save their case from dismissal.

And as TEPMA1 has already explained, PI Opp. 18-19, even if Plaintiffs could somehow show a cognizable Article III injury and standing (they cannot, *supra* at 1-16), Plaintiffs' arguments confirm that Plaintiffs fail to meet the *prudential* requirements of third-party standing as well. Litigants must have a "close" relationship to the third party and there must exist some "hindrance" to the third party's "ability to protect [its] interests." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010). A "close relationship" requires an "identity of interests" between the litigant and the third party, *id.* at 31, such that the "plaintiff will act as an effective advocate of the third party's interests," *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999).

Plaintiffs assert they have a sufficiently close relationship with all "people living near the Project who will be harmed by displacement, environmental devastation, impacts on their livelihoods, and human rights abuses" such that they have an identity of interests with this vague group of hundreds of (unidentified) community members. Reply 16. As proof of this "close relationship," JA gestures to statements in their declaration that the organization has █████ ███████████████████████████████████████████████ and assisted in ███████████

17

REDACTED

███████████████████████████████ And in their supplemental declaration, JA notes that

█████████████████████████████████████████████████████████

██████████████████████████████████████

Even though JA ███████ community members ██████████████████ it is conjectural to claim that Plaintiffs have an "identity of interests" with every person, or any specific person, living near the Project.  Although courts have found that medical providers and their patients or vendors and their customers have sufficiently close interests, *see e.g.*, *Lepelletier*, 164 F.3d at 44; *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp.3d 1, 35 (D.D.C. 2020), courts have not found the required relationship between issue advocates and legal services providers, on the one hand, and vague classes of purported constituents on the other, *see, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004) (no third party standing where the case did not "involve[] the representation of known claimants," so the attorneys "ha[d] no relationship at all" "with their alleged 'clients'"); *Am. for Immigrant Just. v. DHS*, No. 22-3118, 2023 WL 1438376, at *9 (D.D.C. Feb. 1, 2023) (holding that "legal-services organization cannot establish a close relationship with only a hypothetical client").  Indeed, courts have noted that "even lawyers often fail to achieve standing to rely on the rights of their clients."  *Am. for Immigrant Just.*, 2023 WL 1438376, at *9.  It follows that *unspecified non-clients* cannot meet this test.  *See id.*

Ultimately, Plaintiffs do not have a "close relationship" with this unspecified and amorphous group of individuals with disparate complaints and varying relationships (if any) to Plaintiffs.  And without a sufficiently "close" relationship, Plaintiffs fail to show "third party standing."  *Id*.

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment to TEPMA1 and Defendants and dismiss this action under Federal Rule of Civil Procedure 12(h)(3).

REDACTED

Respectfully submitted,

Dated: September 10, 2025

/s/ Andrew D. Prins
Andrew D. Prins (DC Bar No. 998490)
Stacey L. VanBelleghem (DC Bar No. 988144)
Jonathan L. Williams (DC Bar No. 999708)
Rachael L. Westmoreland (DC Bar No. 90034032)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com
         stacey.vanbelleghem@lw.com
         jonathan.williams@lw.com
         rachael.westmoreland@lw.com

Nicholas L. Schlossman (DC Bar No. 1029362)
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel:  (737) 910-7300
Fax:  (737) 910-7301
Email: nicholas.schlossman@lw.com

*Attorneys for Defendant-Intervenor TotalEnergies EP Mozambique Area 1, Limitada*