# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRIENDS OF THE EARTH US, *et al.*,

        *Plaintiffs*,

    v.

EXPORT-IMPORT BANK OF THE
UNITED STATES, *et al.*,

        *Defendants*,

    &

TOTALENERGIES EP MOZAMBIQUE
AREA 1, LIMITADA,

        *Defendant-Intervenor.*

Civil Action No. 1:25-cv-02235 (CJN)

## MEMORANDUM OPINION

In September 2019, the Export-Import Bank of the United States approved a multibillion-dollar loan for a liquefied natural gas project in Mozambique. After security concerns delayed the project, in March 2025, EXIM approved a four-year extension of relevant dates in the loan. Several months later, two environmental nonprofits sued EXIM and the members of its Board of Directors alleging that the extension is unlawful on various theories. Plaintiffs then moved for a preliminary injunction to bar EXIM from releasing the loan funds. ECF 13. For the reasons that follow, the Court denies their motion.

## I.    BACKGROUND

### A.    Factual Background

In April 2015, an oil company asked EXIM to approve a loan up to $5 billion to finance an LNG project off the coast of northern Mozambique. ECF 13-1 at 5; ECF 28 at 2. In preparation

for evaluating this request, EXIM made public an Environmental and Social Impact Assessment and conducted a Detailed Economic Impact Analysis—the latter of which was subject to notice and comment.  ECF 13-1 at 5; ECF 25 at 7–8.  EXIM also notified Congress about the application for final approval of the project.  ECF 13-4 at 3.

In September 2019, EXIM's Board of Directors approved the loan application.  ECF 25 at 8.  A press release boasted that the project "will support an estimated 16,400 American jobs over the five-year construction period" and that "the transaction is also anticipated to generate more than $600 million in revenue for U.S. taxpayers."  ECF 25-1 at 13.  A few months later, in May 2020, the Board approved amendments to the loan, which reduced the loan amount from $5 billion to $4.7 billion and designated French energy company, TotalEnergies EP Mozambique Area 1, Limitada (Total), as the project's operator.  ECF 13-1 at 1, 5; ECF 25 at 8.

Although funds from the loan became available in March 2021, intervening events delayed the project.  ECF 28 at 5.  A conflict between the Islamic insurgency al-Shabaab and the Mozambican government spilled over into the surrounding area.  ECF 13-1 at 5–6; ECF 25 at 9.  After al-Shabaab attacked the town of Palma near the project, Total declared *force majeure* in April 2021 and halted work.  ECF 13-1 at 6; ECF 25 at 9.  Plaintiffs also allege that when Mozambican forces arrived to secure the area, they sexually assaulted, tortured, and killed many of the local residents—accusing them of being insurgents.  ECF 13-1 at 6.

In January 2024, Total asked EXIM to amend the loan to extend relevant dates, including the "Final Disbursement Date" and "Completion Date," by four years.  ECF 28-1 at 5.  Because a

Board Resolution dictates that senior officers at EXIM can only extend deadlines by a maximum of two years on their own, such changes required Board approval.  ECF 28 at 5–6.

Yet, as of January 2025, the Board only had one Senate-confirmed member, Spencer Bachus III.  ECF 13-1 at 8.  When every position is filled, the Board consists of five members: EXIM's President and First Vice President and three Senate-confirmed appointees.  *See* 12 U.S.C. § 635a(c)(1).  The Board must have "at least three members" to have a quorum.  *Id.* § 635a(c)(6)(A).  In February 2025, President Donald Trump appointed James Cruse to serve as the Acting EXIM President and James Burrows to serve as the Acting EXIM First Vice President. ECF 25 at 4 & n.1.

On March 13, 2025, Acting President Cruse, Acting First Vice President Burrows, and Board Member Bachus (acting as the Board, in EXIM's view) approved Total's request to extend relevant dates in the loan by four years.  ECF 13-1 at 8; ECF 25 at 9.  No new notice and opportunity for comment occurred before this extension.  ECF 13-1 at 8.  A press release from EXIM described the approval as a "second amendment" of the 2019 loan containing "no material change from the original approval."  ECF 25-1 at 26.  It further explained that "EXIM determined that the security risks to the project had been properly addressed, with substantial systems in place and appropriate management plans and mitigation applied to respond appropriately to evolving security concerns."  *Id.*

**B.    Procedural History**

On July 14, 2025, two environmental nonprofits, Friends of the Earth U.S. and Justiça Ambiental sued EXIM, Acting President Cruse, Acting First Vice President Burrows, and Board Member Bachus.  ECF 1.  Plaintiffs' Complaint asserts nine counts under the Administrative

Procedure Act and requests that the Court enjoin EXIM from disbursing any funds from the loan. *Id.* at 84–93.

On July 21, 2025, Plaintiffs moved for a preliminary injunction, partial summary judgment, and an expedited hearing. ECF 13. They argue that if the project proceeds, the Mozambicans who they serve will be harmed and there will be devastating environmental impacts. ECF 13-1 at 11–13. And they argue that a preliminary injunction is necessary because "[w]ith disbursement presumably beginning soon and construction anticipated to begin as soon as this summer, the harm is imminent." *Id.* at 41.

Thereafter, the Court granted Total's motion to intervene as a defendant, Min. Order of Aug. 5, 2025, and the Parties completed briefing on Plaintiffs' motion. *See* ECF 25; ECF 28; ECF 38. On September 25, 2025, the Court heard oral argument on that motion.

## II.    ANALYSIS

### A.    Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors merge where the government is a party because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Although the Court of Appeals has explained that the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.* "can be read to require movants to establish *each* preliminary injunction factor independently," the Court of Appeals has not explicitly rejected the sliding-scale approach under which a plaintiff's "failure to establish one of the four factors does not always doom its motion for a preliminary injunction."

*Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025).  Yet under either approach, it is clear that "[a] preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

**B.    Likelihood of Success on the Merits**

"The affirmative burden of showing a likelihood of success on the merits necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing."  *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (Williams, J.) (alteration adopted) (citation and internal quotation marks omitted).  The Court accordingly evaluates both whether Plaintiffs have standing to raise their claims and whether Plaintiffs' claims have merit.

**1.    Standing**

Because "Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies,'" *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1554 (2024), Plaintiffs must make a threshold showing that they possess standing to sue.  "[A] party who seeks a preliminary injunction must show a substantial likelihood of standing."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation and internal quotation marks omitted). At this stage, the Court "evaluate[s] Plaintiffs' standing to bring their claims under the heightened standard for evaluating a motion for summary judgment."  *Id.* at 912.  To establish standing under Article III, Plaintiffs ordinarily "must demonstrate (i) that [they] ha[ve] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by [Defendants], and (iii) that the injury likely would be redressed by the requested judicial relief."  *All. for Hippocratic Med.*, 144 S. Ct. at 1555.

"Where plaintiffs allege injury resulting from violation of a *procedural* right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability, but not the issues of injury in fact or causation." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). To establish causation for a procedural injury, "a plaintiff must show two links: one connecting the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of compliance with that procedural requirement and one connecting that substantive decision to the plaintiff's particularized injury." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) (alteration adopted) (citation and internal quotation marks omitted). And to establish redressability for a procedural injury, "a plaintiff need not show that compliance with the procedure *would* alter the final agency decision, but only that the agency *could* reach a different conclusion if ordered to revisit its procedural error." *Id.* (citation and internal quotation marks omitted). "[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claim." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003); *see also Conf. Grp., LLC v. FCC*, 720 F.3d 957, 962 (D.C. Cir. 2013) (applying this principle in the context of an agency's alleged failure to engage in notice and comment as required by a statute).

Plaintiffs advance six theories of standing—four of which fall under the category of organizational standing, one of which falls under the category of third-party standing, and one of which falls under the category of informational standing. ECF 13-1 at 28–41. The government and Total respond that each theory is insufficient to establish standing. ECF 25 at 11–19; ECF 28

at 11–22.  The Court focuses on Plaintiffs' first and third theories of organizational standing

because they have the most merit.[1]

Under their first theory of organizational standing, Plaintiffs contend that they are suffering

an injury-in-fact because EXIM's failure to engage in notice and comment regarding the 2025

extension has denied them a means to redress their grievances with the project.  ECF 13-1 at 30–

31.  They argue that this harm is the same type of injury that was sufficient to confer standing in

*PETA v. United States Department of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015).  There, the

Court of Appeals explained that "if an organization expends resources in response to, and to

counteract, the effects of the defendants' alleged unlawful conduct rather than in anticipation of

---

[1] Plaintiffs' other theories of standing either suffer from notable defects or do not merit separate attention.  Plaintiffs' second theory of organizational standing asserts that they suffered an injury-in-fact because they will have to provide a larger amount of and more burdensome services to their clients due to the 2025 extension.  ECF 13-1 at 32–34.  And Plaintiffs' fourth theory of organizational standing contends that they suffered an injury-in-fact from the 2025 extension because it will force them to divert resources from other work.  *Id.* at 35–36.  But these theories are flawed because they are based on speculation about what third parties, namely Islamic insurgencies and the Mozambican government, will do in response to the 2025 extension.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (explaining that where a "theory of standing" is predicated on "a highly attenuated chain of possibilities," it "does not satisfy the requirement that threatened injury must be certainly impending").  In addition, Plaintiffs' theory of third-party standing, ECF 13-1 at 36–38, fails because they have not established, at this stage, that they fall within the "narrow class of litigants" that can "assert the legal rights of others."  *All. for Hippocratic Med.*, 144 S. Ct. at 1563 n.5; *see also Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010) ("Because third party standing is the exception rather than the norm, the burden is on the plaintiff to establish that he has third party standing, not on the defendant to rebut third party standing." (alteration adopted) (citation and internal quotation marks omitted)).  Plaintiffs contend that they share a "close relation" with the locals in Mozambique who they serve, *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999), but the Court declines to extend this narrow doctrine to encompass such a broad, generalized group as "people living near the Project who will be harmed by displacement, environmental devastation, impacts on their livelihoods, and human rights abuses," ECF 38 at 16.  Finally, the Court does not separately address Plaintiffs' theory of informational standing, ECF 13-1 at 38, because it substantially overlaps with Plaintiffs' third theory of organizational standing based on EXIM's failure to provide statutorily mandated information.

litigation, it has suffered a concrete and demonstrable injury that suffices for purposes of standing." *Id.* at 1097 (alteration adopted) (citations and internal quotation marks omitted).

The government and Total respond that "an organization cannot bootstrap itself into standing by choosing to comment and advocate on an issue impacting others."  ECF 25 at 12–15; ECF 28 at 13–14.  They argue that Plaintiffs did not suffer an injury-in-fact by not being able to engage in notice and comment because they had no statutory right to that form of redress where EXIM merely amended a previously approved loan.  And, citing *International Brotherhood of Teamsters v. TSA*, they contend that "the mere inability to comment effectively or fully, in and of itself, does not establish an actual injury."  429 F.3d 1130, 1135 (D.C. Cir. 2005) (citation and internal quotation marks omitted).

It is a close question whether Plaintiffs have established that EXIM's alleged procedural violations constituted an injury-in-fact under this theory.  An "injury result[ing] from the [agency]'s failure to provide public notice of the [guidance], thereby depriving it of the opportunity to comment thereon," does not, on its own, constitute an injury-in-fact for purposes of Article III. *Id.*  Instead, "to establish standing based on its inability to comment, an organization must show that at least one of its members is suffering immediate or threatened injury as a result of the challenged action."  *Id.* (alteration adopted) (citation and internal quotation marks omitted); *accord Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) ("[T]he plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff.").  The key question then is whether Plaintiffs suffered a particularized injury due to EXIM's approval of the 2025 extension without following various procedural requirements.  In *PETA*, the Court of Appeals held that the plaintiff had organizational standing because the agency's "allegedly unlawful failure to apply" statutory

requirements "perceptibly impaired [the plaintiff's] ability to both bring [statutory] violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public." 797 F.3d at 1095 (citation and internal quotation marks omitted).  Plaintiffs here suffered a comparable injury because EXIM's refusal to follow alleged procedural requirements removed an avenue (notice and comment) through which they could advocate against the extension, thereby forcing them "to dedicate even more time and resources to provide . . . local people with information and services to protect local people's rights and ameliorate harms from the Project."[2] ECF 13-3 at 18; *see also* ECF 14-2 (SEALED) at 15–16.  And they appear to satisfy the causation and redressability requirements for procedural violations given that EXIM is the entity that denied them means of redress and the Court could conceivably redress that injury by vacating the 2025 extension and requiring EXIM to follow its procedures and engage in notice and comment.

Yet whether the injuries that were sufficient in *PETA* would still be enough under today's standing jurisprudence is less clear.  The Supreme Court recently clarified in *FDA v. Alliance for Hippocratic Medicine* that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." 144 S. Ct. at 1563–64.  It accordingly rejected the plaintiffs' arguments that they had suffered an injury-in-fact because the agency caused them "to conduct their own studies on [a drug] so that the[y] can better inform their members and the public about [a drug]'s risks" and "to expend considerable time, energy, and resources drafting citizen petitions to [the agency], as well as engaging in public advocacy and

---

[2] "Because this is an administrative review case involving a preliminary injunction, the court may consider the extra-record declarations attached to the parties' briefing." *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 35 (D.D.C. 2020); *see also Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).

public education." *Id.* at 1563 (citation and internal quotation marks omitted). The Court of Appeals has since recognized that *Alliance for Hippocratic Medicine* casts doubt on "the foundation of [its] organizational injury precedents," *Ctr. for Biological Diversity*, 144 F.4th at 315; *accord Coal. for Humane Immigrant Rts. v. DHS*, 780 F. Supp. 3d 79, 89 n.2 (D.D.C. 2025), further suggesting that it is far from certain that Plaintiffs' theory of standing based on the denial of means of redress has merit. It thus appears that Plaintiffs have not "show[n] a substantial likelihood of standing" under this theory. *Food & Water Watch*, 808 F.3d at 913 (citation and internal quotation marks omitted).

Plaintiffs' third theory of organizational standing, based on an informational injury, has more merit. Plaintiffs argue that they suffered an injury-in-fact because EXIM's failure to share statutorily mandated information before it approved the 2025 extension both removed a source of information that they ordinarily share with the communities they serve and forced them to seek out information from other sources to fill the gap. ECF 13-1 at 34–35, 38. They explain that they have already had to "conduct[] independent research" on their own and "spend time working with organizations in other countries to try to obtain this information from other public finance institutions involved in the Project." *Id.* at 35; ECF 13-3 at 15. The government and Total respond that Plaintiffs did not suffer an informational injury because they had no statutory right to any additional information before EXIM's approval of the 2025 extension. ECF 25 at 17–18; ECF 28 at 16–17.

Plaintiffs appear to have met their burden to "show a substantial likelihood of standing" under this theory. *Food & Water Watch*, 808 F.3d at 913 (citation and internal quotation marks omitted). "A plaintiff suffers sufficiently concrete and particularized informational injury where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute

requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."[3] *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). The first requirement turns on whether a plaintiff was deprived of statutorily required information based "*on its interpretation*" of the statute. *Id.* (emphasis added); *see also City of Waukesha*, 320 F.3d at 235 (explaining that, for purposes of standing, courts "assume that on the merits the plaintiffs would be successful in their claims"). Under Plaintiffs' interpretation of the relevant statutes, EXIM should have made public more economic and environmental information in conjunction with the 2025 extension. *See* 12 U.S.C. § 635i-5(a)(1) (requiring EXIM to "establish procedures" that "shall provide for the public disclosure of environmental assessments and supplemental environmental reports required to be submitted to the Bank"); 42 U.S.C. § 4332(2)(C) (requiring that an Environmental Impact Statement "shall be made available to the . . . public"). That showing is enough at this stage. Plaintiffs' alleged harms also align with Congress's intent in making available information that informs interested parties about the economic and environmental impacts of certain projects so that they can respond accordingly. *Cf. Found. on Econ. Trends v. Watkins*, 731 F. Supp. 530, 532 (D.D.C. 1990) ("The purpose of preparing environmental documentation under NEPA is to provide information."). And "[t]here is no reason to doubt [Plaintiffs'] claim that the information would help them" in providing more effective services to assist the communities they serve in Mozambique. *FEC v. Akins*, 524 U.S. 11, 21 (1998). Plaintiffs also appear to satisfy the causation

---

[3] *Alliance for Hippocratic Medicine* has not undermined this theory in the same way as the redress theory because the Supreme Court expressly noted that the plaintiffs "have not claimed an informational injury, and in any event [they] have not suggested that federal law requires [the agency] to disseminate such information upon request by members of the public." 144 S. Ct. at 1564. In contrast, Plaintiffs here affirmatively contend that the Bank Act and NEPA required EXIM to distribute information about environmental and economic impacts before the 2025 extension.

and redressability requirements for procedural violations given that EXIM is the entity whose inaction denied them the additional information and the Court could conceivably redress that injury by vacating the 2025 extension and requiring EXIM to provide the information.

But just because Plaintiffs can establish standing under this theory does not mean that they have standing to raise all their claims.  An informational injury confers standing only insofar as EXIM did not provide "information which must be publicly disclosed pursuant to a statute."  *Id.* Yet several of the claims that Plaintiffs raise—including that the Export-Import Bank Act required EXIM to conduct another round of notice and comment and to submit a detailed statement describing the project *to Congress*—do not fall under the purview of this theory because they do not constitute an informational injury *to Plaintiffs*.  "[A] plaintiff must demonstrate standing for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), so Plaintiffs cannot bootstrap those other claims based on a separate informational injury alone.

### 2.    Merits

Plaintiffs raise their claims under the Administrative Procedure Act.  *See* ECF 1 at 84–93. The APA, of course, requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C)– (D).  "Agency action is arbitrary and capricious if a reviewing court cannot discern from the record that the agency action was the product of reasoned decision making."  *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1025 (D.C. Cir. 2022).  And an agency action that "violates [a statute] is 'not in accordance with law' within the meaning of" the APA.  *Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979).

a.    **Board Approval**

Plaintiffs argue that EXIM's Board had no authority to approve the 2025 extension because it lacked a quorum.  ECF 13-1 at 15–17.  They contend that the Federal Vacancies Reform Act did not permit President Trump to appoint Acting President Cruse and Acting First Vice President Burrows to the Board given that the authority to appoint acting officers "shall not apply to . . . any member who is appointed by the President, by and with the advice and consent of the Senate to any board" that "is composed of multiple members" and "governs an independent establishment or Government corporation."  5 U.S.C. § 3349c(1).  And they assert that the Bank Act's process for the creation of a temporary Board when a quorum is unavailable for 120 days is the only mechanism that allows the Board to act when there are not enough Senate-confirmed members to establish a quorum.  *See* 12 U.S.C. § 635a(c)(6)(A), (B)(i).

The government and Total respond that the Vacancies Reform Act permitted President Trump to appoint Acting President Cruse and Acting First Vice President Burrows to their positions at EXIM, which in turn, allowed them to serve on the Board *ex officio* as Chairman and Vice Chairman.  ECF 25 at 19–22; ECF 28 at 22–25; *see* 5 U.S.C. § 3345(a)(3) (authorizing the President to "direct an officer or employee of [an] Executive agency [with a vacancy] to perform *the functions and duties of the vacant office* temporarily in an acting capacity" (emphasis added)).  And they cite as instructive a decision from the Court of Appeals that held that a different statute's use of the phrase "appointed to such a position" only applied to "Board members . . . appointed to the Board itself, not serv[ing] ex officio."  *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 688 (D.C. Cir. 2023).

As a threshold matter, Plaintiffs likely do not have standing to raise this claim.  Their challenge regarding the composition of the Board does not involve any informational injury, *see*

*Friends of Animals*, 828 F.3d at 992, nor does it affect their ability to access avenues of redress, *see PETA*, 797 F.3d at 1095. Instead, Plaintiffs object that the 2025 extension was not approved by a quorum of the Board. Yet a plaintiff "does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally." *All. for Hippocratic Med.*, 144 S. Ct. at 1556. And a plaintiff may not "sue based only on an asserted right to have the Government act in accordance with law." *Id.* (citation and internal quotation marks omitted). Because Plaintiffs have failed to establish that the Board's approval of the 2025 extension affects them "in a personal and individual way," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992), they have not made the requisite showing of standing for this claim.

In any event, Plaintiffs are unlikely to succeed on the merits of this claim. Plaintiffs concede that Cruse and Burrows were lawfully appointed to serve as Acting President and First Vice President of EXIM, respectively. Under the Bank Act—which directs that the President "shall serve as Chairman" and the First Vice President "shall serve as Vice Chairman,"[4] 12 U.S.C. § 635a(c)(1)—they served on the Board *ex officio* as a result of those appointments. The Vacancies Reform Act's limitation on the President's ability to make acting appointments to certain

---

[4] Plaintiffs suggest that the roles of President of EXIM and Chairman of the Board and First Vice President of EXIM and Vice Chairman of the Board are "inseparable for purposes of" the appointment process because "[a]ll the key actors—the President, the Senate, EXIM, and the appointees themselves—routinely treat the Chair and President positions as one and the same." ECF 38 at 39. This attempt to reframe the relationship between these positions is unconvincing. The Bank Act dictates that the President "shall serve as chief executive officer of the Bank" and that the First Vice President "shall serve as President of the Bank during the absence or disability of or in the event of a vacancy in the office of President of the Bank, and who shall at other times perform such functions as the President of the Bank may from time to time prescribe." 12 U.S.C. § 635a(b). And by Plaintiffs' own admission, ECF 38 at 41, the President is statutorily required to conduct certain tasks that are separate from his duties as Chairman, including providing information to small and rural companies and writing reports to Congress, 12 U.S.C. § 635(b)(1)(I), (*l*)(3)(C). So even if some of these non-Board-related tasks are "mundane," as Plaintiffs describe them, ECF 38 at 41, the Bank Act clearly dictates that the roles of President and First Vice President encompass more than just serving on the Board.

multimember boards therefore is inapplicable because it concerns "any member who is appointed . . . to any board." 5 U.S.C. § 3349c(1). Here, President Trump did not appoint Cruse and Burrows "*to* [EXIM's] board." *Id.* (emphasis added); *see also English v. Trump*, 279 F. Supp. 3d 307, 318 (D.D.C. 2018) (concluding that section 3349c(1) "d[id] not cover the acting CFPB Director or his *ex officio* membership on the FDIC board" because "[t]he CFPB Director is not appointed to the FDIC board in that manner, but rather serves in that position *ex officio* by operation of statute"); *Ctr. for Biological Diversity*, 77 F.4th at 688. Instead, he appointed them to be Acting President and Vice President of EXIM, which necessarily meant that they would be Chairman and Vice Chairman of the Board by operation of the Bank Act. Plaintiffs' contrary reading of the Bank Act ignores the statutory distinction between the *ex officio* members who "shall serve" on the Board based on their executive positions versus the "three additional" members who serve on the Board because they were "appointed by the President." 12 U.S.C. § 635a(c)(1). And because an acting officer can "perform the functions and duties of the vacant office," 5 U.S.C. § 3345(a)(3), the Board had a valid quorum when it approved the 2025 extension—making it unnecessary to wait 120 days for the creation of a temporary Board, *see* 12 U.S.C. § 635a(c)(6)(A), (B)(i).

### b.    Notice and Comment

Plaintiffs contend that EXIM ignored multiple requirements to provide notice and an opportunity for comments before it approved the 2025 extension. ECF 13-1 at 17–21. For the reasons already discussed, Plaintiffs have failed to make a substantial showing that they have standing for these claims. *See supra* at 6–12; *All. for Hippocratic Med.*, 144 S. Ct. at 1563–64.

The Court nonetheless addresses in turn the merits of two such alleged requirements from the Bank Act and EXIM's internal policies.[5]

*Bank Act*.  Plaintiffs argue that the Bank Act required another round of notice and comment before the 2025 extension.  ECF 13-1 at 17–21.  They contend that the Bank Act's requirement that EXIM "shall provide a notice and comment period" "[b]efore any meeting of the Board for final consideration of a long-term transaction the value of which exceeds $100,000,000" applied to EXIM's approval of the 2025 extension because that approval made the loan operative again.[6] 12 U.S.C. § 635a(c)(10)(A).  And they argue, in the alternative, that the 2025 extension constituted a "material change" to the loan because the situation on the ground in Mozambique had changed significantly and the project would now be producing LNG at least five years later than originally planned.  *Id.* § 635a(c)(10)(D)(i).  Plaintiffs also relatedly contend that the Bank Act required EXIM to send Congress "a detailed statement describing and explaining the transaction" and to provide time for Congress to comment before it approved the 2025 extension because that was when the loan was "finally approved."  *Id.* § 635(b)(3).

The government and Total respond that the Bank Act requires notice and comment only for the final approval of a pending application for a loan, not the amendment of an already approved loan.  ECF 25 at 23–28; ECF 28 at 25–26.  As support, they contend that the provisions of the Bank Act requiring notice and comment are concerned only with final actions taken regarding an *application* for a loan.  *See, e.g.*, 12 U.S.C. § 635a(c)(10)(C)(i)(I) (requiring EXIM

---

[5] Plaintiffs also argue that EXIM ignored requirements in a different portion of the Bank Act and NEPA to consider public input about the loan's economic and environmental impacts before it approved the 2025 extension.  ECF 13-1 at 18.  The Court addresses those arguments in the later subsections concerning economic and environmental analysis.

[6] The government and Total concede that Total could not have drawn down the funds from the original loan absent the 2025 extension.  *See* ECF 28 at 1.

to "publish in the Federal Register a notice of the application proposing the transaction); *id.* § 635a(c)(10)(C)(i)(II) (requiring EXIM to permit at least 25 days for the submission of "comments on the application"). And they argue, in the alternative, that extending the dates of the original loan by four years did not constitute a "material change," as narrowly defined in the Bank Act. *See id.* § 635a(c)(10)(D)(ii) ("[T]he term 'material change', with respect to an application for a loan or guarantee, includes an increase of at least 25 percent in the amount of a loan or guarantee requested in the application.").

When deciphering the meaning of a statute, courts must "interpret the relevant words not in a vacuum, but with reference to the statutory context." *Abramski v. United States*, 573 U.S. 169, 179 (2014). Because this issue of notice and comment turns on the meaning of "final consideration of a long-term transaction," 12 U.S.C. § 635a(c)(10)(A), the Court focuses on the statutory context surrounding that phrase.

Two pieces of statutory context suggest that the 2025 extension did not constitute a "final consideration of a long-term transaction." *Id.* First, the subsection of the Bank Act requiring notice and comment repeatedly makes clear that this procedural requirement is concerned with applications for a loan. Among other references to applications, the statute requires EXIM to "publish in the Federal Register a notice of the *application* proposing the transaction," describes the required notice "with respect to an *application*," and imposes an additional obligation that EXIM must follow "[b]efore taking final action on an *application*." *Id.* § 635a(c)(10)(C)(i)(I), (C)(ii), (E) (emphases added). EXIM's decision to extend the dates in a previously approved loan by four years therefore appears fundamentally different than the kind of "final consideration of a long-term transaction" at the end of the application process contemplated by the Bank Act. *Id.* § 635a(c)(10)(A). Second, that the relevant subsection of the Bank Act narrowly defines and lays

out procedures for how EXIM must proceed where there is a "material change" to an application for a loan confirms that some types of modifications do not trigger additional notice and comment. *Id.* § 635a(c)(10)(D).  And merely extending several dates in a previously approved loan without changing the covered parties, financial obligations, or anything else of substance is significantly different than increasing "the amount of a loan . . . requested in the application" by "at least 25 percent"—concepts included in the definition of a "material change" in the statute.[7]  *Id.* § 635a(c)(10)(D)(ii).

To be sure, Plaintiffs' argument that the Bank Act required EXIM to submit to Congress "a detailed statement describing and explaining the transaction" before the approval has more merit than their other claims about notice because nothing in the text surrounding that provision expressly indicates that it is concerned with applications or only applies where there is a material change.  *See* 12 U.S.C. § 635(b)(3).  But courts "ordinarily presume that the same words used in different parts of a statute have the same meaning."  *Goldstein v. SEC*, 451 F.3d 873, 882 (D.C. Cir. 2006).  This principle of statutory interpretation counsels against Plaintiffs' interpretation given that—like the other notice provisions discussed above—this requirement applies only for "final" approvals.  12 U.S.C. § 635(b)(3).  In addition, the provisions limiting notice and comment to final consideration of applications and defining material change cross-reference this

---

[7] Plaintiffs argue that the Court should interpret the Bank Act's definition of "material change" broadly because the statute uses "includes" instead of "means" before stating that an increase of at least 25 percent in a loan amount qualifies as a "material change."  ECF 38 at 29–30.  Although "[i]t is true that use of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive," *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010), an "illustrative list *illustrates* what type of conduct is encompassed by the definition, and so other unlisted forms of conduct must fit that same mold," *United States v. Brock*, 94 F.4th 39, 57 (D.C. Cir. 2024).  A four-year extension of dates, on its own, does not "fit th[e] same mold" of the kind of material change—significant alterations to the size of the loan—that Congress chose to codify in the statute.  *Id.*; *see also Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (explaining that "the term 'including' is not one of all-embracing definition").

requirement.  *See id.* § 635a(c)(10)(A) (directing that EXIM engage in notice and comment for "final consideration of a long-term transaction . . . concurrent with any statement required to be submitted under section 635(b)(3)").  That these requirements run "concurrent[ly]" suggests that the same events trigger their applicability.[8]  *Id.*

*EXIM's Internal Procedures and Guidelines.*  Plaintiffs contend that EXIM's internal policies also required another round of soliciting comments before the 2025 extension.  ECF 13-1 at 17–18, 20; ECF 38 at 33–36.  They point out that EXIM's Environmental and Social Due Diligence Procedures and Guidelines (ESPG) require it to post information about a project at least 30 days before "any Bank action with respect to financing of the application" and "any decision by EXIM Bank to authorize a Final Commitment" so that "interested parties have sufficient time to review and provide information and comments."  EXIM, Environmental and Social Due Diligence Procedures and Guidelines, §§ I.9.2, IV.B.2, https://www.exim.gov/policies/exim-bank-and-environment/procedures-and-guidelines.  Plaintiffs argue that these procedures applied to the 2025 extension because "any Bank action" covers any kind of amendment or extension to a loan.  *Id.* § I.9.2.  And they contend that the ESPG are binding because agencies must "follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions."  *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003).

The government and Total respond that the ESPG are non-binding policy statements.  ECF 25 at 29, 33–35; ECF 28 at 28.  They also argue that although EXIM enacted these procedures as part of its obligation to "establish procedures to take into account the potential beneficial and

---

[8] It is also unlikely that Plaintiffs have standing to challenge this type of injury suffered by (if anyone) Congress, not themselves.  *See Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Ent., Inc*., 659 F.3d 13, 23 (D.C. Cir. 2011) ("For purposes of informational standing, a plaintiff is injured-in-fact . . . because he did not get what the statute entitled *him* to receive." (emphasis added) (citation and internal quotation marks omitted)).

adverse environmental effects of goods and services for which support is requested under its direct lending and guarantee programs," 12 U.S.C. § 635i-5(a)(1), they are not binding because the Bank Act makes clear that these procedures merely assist EXIM in determining whether, "*in its judgment*, to withhold financing from a project for environmental reasons," *id.* § 635i-5(a)(2) (emphasis added). And they contend, in the alternative, that the ESPG did not apply to the 2025 extension because, like the Bank Act's requirements for notice and comment, they concern "applications," not amendments to previously approved loans. *See* ESPG §§ I.2, 9, IV.B.2.

The Court need not reach all of these arguments because the ESPG state that "[a]ll *applications* for which EXIM Bank's financial exposure is greater than $10.0 million will be screened and categorized as to their potential for environmental and social risks and impacts . . . and the extent, if any, of subsequent review under these Procedures and Guidelines." *Id.* § I.2 (emphasis added). This overarching consideration suggests that the ESPG are principally concerned with *applications* for a loan—not amendments to a previously approved loan. Although Plaintiffs nonetheless contend that EXIM violated two specific provisions of the ESPG when it approved the 2025 extension, the Court is unconvinced that either provision applied. First, the ESPG's requirement that EXIM publish a link to the relevant Environmental and Social Impact Assessment on its website at least 30 days "prior to any Bank action with respect to financing of the application" likely did not apply to the 2025 extension because modifying the dates of a previously approved loan does not concern the "financing of [an] application."[9] *Id.* § I.9.2. Second, the ESPG's separate requirement to make the same Assessment available to interested parties at least 30 days "prior to any decision by EXIM Bank to authorize a Final Commitment"

---

[9] Plaintiffs' argument that "Bank action" is broad enough to encompass amendments to a loan, ECF 13-1 at 20, is unpersuasive given that the ESPG expressly limit this phrase to actions "with respect to the financing of the application," ESPG § I.9.2.

likely did not apply here. *Id.* § IV.B.2. As already discussed, an amendment to the dates of a previously approved loan is distinct from a decision by EXIM regarding "an application for a Final Commitment." *Id.*

      **c.**    **Economic Analysis**

Plaintiffs argue that the Bank Act required EXIM to conduct additional economic analysis before it approved the 2025 extension. ECF 13-1 at 21–23. They contend that EXIM ignored the Bank Act's requirements to consider "any serious adverse effect" of a loan on industry, the availability of supplies, and employment in the United States, 12 U.S.C. § 635(b)(1)(B), to not "extend any direct credit or financial guarantee for establishing or expanding production of any commodity for export by any country other than the United States" if it determines that certain conditions about the commodity are met, *id.* § 635(e)(1), and to prepare a "detailed economic impact analysis or similar study" subject to notice and comment and input from Congress, *id.* § 635(e)(7)(A). And they assert that EXIM's reliance on the economic analysis prepared for the 2019 loan application when considering the 2025 extension was arbitrary and capricious because "[s]ince EXIM conducted its analysis in 2019, the outlook for the LNG market has fundamentally changed." ECF 13-1 at 23.

Unlike the claims discussed above, this claim does appear to involve the kind of informational injury that conveys standing. *See Friends of Animals*, 828 F.3d at 992; *supra* at 10–12. Yet the government and Total contend that the claim fails on the merits regardless. ECF 25 at 29–33; ECF 28 at 25–26. They argue that EXIM did not "extend any direct credit," 12 U.S.C. § 635(e)(1), which is the triggering condition for additional economic analysis, when it approved the 2025 extension because the changing of dates in the previously approved loan did not make any additional credit available for Total to draw down upon. They further contend, in the

alternative, that EXIM properly relied on the Detailed Economic Impact Analysis prepared for the 2019 loan when considering the economic effects of the 2025 extension given that such analysis concluded that LNG "is not currently, and is not likely to become, in structural oversupply during the repayment of the EXIM Bank facility," which was scheduled to last through 2031.  ECF 13-5 at 17–18. And they emphasize that the Bank Act's requirements regarding economic analysis are not triggered unless EXIM *itself* determines that a commodity is likely to be in surplus or compete with production in the United States.  *See* 12 U.S.C. § 635(e)(1) ("The Bank may not extend any direct credit . . . *if* . . . the Bank determines that . . . the commodity is likely to be in surplus . . . [or] the resulting production capacity is expected to compete with United States production." (emphasis added)).

In the Court's view, nothing in the Bank Act expressly required EXIM to engage in further analysis or to respond to public comments here.  To the contrary, the Bank Act's substantive prohibitions on extending credit apply only if "the Bank determines" that the triggering conditions were met.  *Id.*  And consideration of "the views of the public and interested parties" and additional notice and comment are similarly only necessary "if . . . the Bank conducts a detailed economic impact analysis or similar study."  *Id.* § 635(e)(7)(A), (B)(i).  "Congress's use of the conditional language 'if' strongly suggests that detailed economic impact analysis is not expected to be performed for every financing decision."  *Delta Air Lines, Inc. v. Exp.-Imp. Bank of United States*, 85 F. Supp. 3d 387, 411 (D.D.C. 2015).  In any event, EXIM considered the updated state of the LNG market before it approved the 2025 extension and reasonably relied on the Detailed Economic Impact Analysis prepared for the 2019 loan in doing so given that it forecasted economic trends through 2031 and concluded that "it is unlikely that structural oversupply develops in the

LNG market any time in the foreseeable future."[10]  ECF 13-5 at 17–23; ECF 27-1 (SEALED) at 65–66.

### d.    Societal Risk Analysis

Plaintiffs contend that EXIM acted arbitrarily by failing to consider the environmental and social harms associated with the escalating conflicts in Mozambique before approving the 2025 extension.  ECF 13-1 at 23–25.  They argue that the Bank Act required EXIM to evaluate "the potential environmental effects of a project" when approving or withholding financing. 12 U.S.C. § 635i-5(a)(2).  They assert that EXIM ignored its own guidance to consider "the project-related impacts on the local communities directly affected by the project and the people involved in the construction and operation of the project."  ESPG § I.3.  And they accuse EXIM of acting recklessly—and therefore arbitrarily and capriciously—by failing to appreciate the impacts of the ongoing conflict and deficiencies in Total's security plan.

Total responds that EXIM did not violate any law or act arbitrarily regarding security and humanitarian risks before it approved the 2025 extension.[11]  ECF 25 at 35–37.  It argues that "EXIM was not required to consider these factors when approving the 2025 Amendment, but nevertheless did so."  *Id.* at 35.  It emphasizes that the portions of the Bank Act cited by Plaintiffs contemplate consideration of environmental, not sociopolitical, impacts.  *See* 12 U.S.C. § 635i-5(a)(2).  And it contends that the ESPG are non-binding, and that even if EXIM were required to

---

[10] As Plaintiffs acknowledge, their Motion for a Preliminary Injunction—unlike their Complaint—does not challenge "the adequacy of the Bank staff's due diligence" in advising the Board about its decision to approve the 2025 extension.  ECF 38 at 37.  The Court therefore relies on the memorandum that EXIM staff prepared for the Board only to the extent that it refutes Plaintiffs' suggestions that EXIM did not consider certain issues at all.

[11] The government does not appear to address this issue directly in its response.

follow them, it did so when it determined that the mitigation plans were sufficient to address the evolving security concerns.

As an initial matter, Plaintiffs likely lack standing to pursue this claim because it does not involve an informational injury, *see Friends of Animals*, 828 F.3d at 992; *supra* at 10–12, and any resulting injuries to Plaintiffs are too attenuated to be certainly impending and traceable back to EXIM's alleged refusal to consider sociopolitical concerns, *Clapper*, 568 U.S. at 410. In any event, the security concerns that Plaintiffs raise are simply not the kind of environmental concerns contemplated by the Bank Act. *See* 12 U.S.C. § 635i-5(a)(2) (discussing "withhold[ing] financing from a project for *environmental* reasons" and "considering the potential *environmental* effects of a project" (emphases added)). As far as the ESPG, for the reasons discussed earlier, these procedures concern "applications" for a loan, not extensions of the dates in a previously approved loan, *see, e.g.*, ESPG § I.2, so any alleged requirement to consider "social impacts" was inapplicable to the 2025 extension, *id.* § I.3. Furthermore, the record at this stage again establishes that EXIM did consider security concerns arising from the Islamic insurgency and response by the Mozambican government before it approved the 2025 extension.[12] ECF 27-1 (SEALED) at 60–62.

e.    **Environmental Analysis**

Plaintiffs argue that EXIM violated the National Environmental Policy Act by never preparing an Environmental Impact Statement—and thereby triggering additional notice and

---

[12] Plaintiffs argue that if EXIM did consider the changes in the security situation, such an evaluation "is just further evidence that the Board was not, as Defendants repeatedly argue, simply considering—and making—technical amendments to certain dates." ECF 38 at 36. But nothing in the Bank Act suggests that if EXIM reviews information about the status of a previously approved project, any future alteration that it makes to a previously approved loan constitutes a new final approval of an application.

comment—for the project.  ECF 13-1 at 25–27.  They contend that the project is a "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  They assert that the exception for "extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States" is inapplicable because the project has effects in the United States.  *Id.* § 4336e(10)(B)(vi).  As evidence that it is "reasonably foreseeable" that the project will "significantly affect[]" the global climate, *id.* § 4332(2)(C), they emphasize that the project will produce 13 million metric tons of carbon dioxide annually, ECF 13-1 at 13.  And they argue that this NEPA claim is timely because the statute of limitations for a claim under the APA "does not begin to run until [the plaintiff] is injured."  *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2450 (2024).

This claim is based on an informational injury that can convey standing.  *See Friends of Animals*, 828 F.3d at 992; *supra* at 10–12.  But "the central principle of judicial review in NEPA cases is deference."  *Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1511 (2025); *accord Sierra Club v. FERC*, 145 F.4th 74, 80 (D.C. Cir. 2025).  Given that "[t]he agency is better equipped to assess what facts are relevant to the agency's own decision than a court is," courts give the agency wide latitude to "determine *whether* and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process."  *Seven Cnty.*, 145 S. Ct. at 1512 (emphasis modified) (citation and internal quotation marks omitted).  Compounding the deference here, NEPA's definition of "major Federal action" hinges on whether "*the agency . . . determines*" that the action "is subject to substantial Federal control and

responsibility."[13]  42 U.S.C. § 4336e(10)(A) (emphasis added); *see also Seven Cnty.*, 145 S. Ct. at 1512 ("[T]he question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court.").

At this stage, Plaintiffs have not established that EXIM's decision not to prepare an EIS was arbitrary or contrary to law.  EXIM's determination that the project was not "subject to substantial Federal control and responsibility," 42 U.S.C. § 4336e(10)(A), (B)(iii), is not clearly outside "a broad zone of reasonableness,"[14] *Seven Cnty.*, 145 S. Ct. at 1513.  Although Plaintiffs make much of the fact that "EXIM decide[d] whether to provide funding or not and set[] [the] financing's terms and conditions," ECF 13-1 at 26–27, that degree of control exists over almost any loan that an agency makes.  NEPA requires more for a loan to qualify as a "major Federal action"—the control must be "substantial," as "the agency carrying out such action determines." 42 U.S.C. § 4336e(10)(A), (B)(iii).  Additionally, Plaintiffs' focus on how the project will increase carbon dioxide omissions in Mozambique is insufficient, on its own, to establish that it will have effects within "the jurisdiction of the United States."  *Id.* § 4336e(10)(B)(vi).  EXIM's contrary determination is hardly surprising given that the project is located on the other side of the world. Indeed, EXIM's implementing regulations for NEPA recognize that it is only in "relatively rare

---

[13] The 2023 amendments to NEPA call into question earlier decisions that interpreted "major Federal action" more expansively.  *See Appalachian Voices v. FERC*, 139 F.4th 903, 927 (D.C. Cir. 2025) (Henderson, J., concurring) (suggesting that "a lot of our atextual NEPA precedent is no longer good law" after "Congress's 2023 NEPA amendments").

[14] Admittedly, "it is difficult for the Court to make this determination without benefit of the full administrative record, which makes it harder for [Plaintiffs] to carry [their] heavy burden at the preliminary injunction stage."  *AARP v. EEOC*, 226 F. Supp. 3d 7, 24 (D.D.C. 2016).

cases where [EXIM] financing of U.S. exports may affect environmental quality in the United States." 12 C.F.R. § 408.3.

### f.      Unlawfully Withheld Information

Plaintiffs contend that EXIM's failure to distribute information required by the Bank Act and the ESPG, including posting about whether further NEPA analysis was required, publishing notices in the Federal Register, and making available supplemental environmental reports, constituted "agency action unlawfully withheld." 5 U.S.C. § 706(1); ECF 13-1 at 27–28. Total responds that this provision of the APA does not apply because the Bank Act and the ESPG did not require the distribution of more information before the 2025 extension.[15] ECF 25 at 39–40.

This claim also appears to allege the kind of informational injury that confers standing to Plaintiffs. *See Friends of Animals*, 828 F.3d at 992; *supra* at 10–12. But "a claim under [section] 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). For all the reasons already discussed, the Bank Act and the ESPG did not require EXIM to conduct additional analysis nor engage in further notice and comment before it approved the 2025 extension. As such, there was no "discrete" information-sharing action that it was "required to take." *Id.* (emphases omitted).

## C.      Irreparable Harm

The standard for "irreparable" harm is "high." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). A plaintiff must establish that "[t]he injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm" and that the injury is "beyond remediation." *Id.* (citation and internal

---

[15] Again, the government does not appear to address this issue directly in its response.

quotation marks omitted).  In other words, the "injury must be both certain and great." *Clevinger*, 134 F.4th at 1234.

Plaintiffs argue that they face irreparable harm absent a preliminary injunction because EXIM's approval of the 2025 extension "impaired Plaintiffs' programs, threatened the people Plaintiffs serve with environmental harm and further displacement, and will likely escalate the conflict and cause human rights abuses."  ECF 13-1 at 41–42.  They contend that these harms are irreparable and "cannot be fully cured by later remedial action" because if Total draws down the loan funds, EXIM will be "far less likely to be receptive to comments."  *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18 (D.D.C. 2009).  And they argue that these harms are imminent given that Total has resumed construction and plans to lift *force majeure* soon.

The government and Total respond that Plaintiffs' injuries are speculative and not imminent.  ECF 25 at 41–44; ECF 28 at 28–31.  They take issue with Plaintiffs' "unexcused delay" in waiting four months after EXIM's approval of the 2025 extension before seeking a preliminary injunction, arguing that it "implies a lack of urgency and irreparable harm."  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (citation and internal quotation marks omitted).  They contend that it is far from certain that a preliminary injunction would stop any harms related to security and environmental risks because such injuries depend on the actions of third parties and several mitigation efforts are already in place.  And they argue that Plaintiffs' theory of irreparable harm also fails because it is unlikely that the kind of vacatur needed to undo EXIM's approval of the 2025 extension would ever be merited.

The irreparable harm factor slightly favors Plaintiffs.[16]  Plaintiffs have made a strong showing that the Court's refusal to grant a preliminary injunction could be beyond remediation. "In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made *only after* affording interested persons notice and an opportunity to comment."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979) (emphasis added).  The procedural requirements governing EXIM's approval of loans are predicated on the idea that input from Congress and the public will lead to more informed decisions, so a loan approval that fails to adhere to such statutory requirements would be unlawful. And if the Court ultimately concluded that EXIM needed to engage in notice and comment before the 2025 extension, requiring it to follow such procedural requirements after the fact would not, on its own, remedy those violations.  *See Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981) ("[P]ermitting the submission of views after the effective date (of a regulation) is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way." (citation and internal quotation marks omitted)).

Furthermore, the irreparability of Plaintiffs' injuries is heightened given the risk that the funds for the loan—even if later determined to have been improperly approved—will be unrecoverable once withdrawn by Total.  The Supreme Court recently explained while granting a partial stay in *NIH v. American Public Health Ass'n*, that although "the loss of money is not typically considered irreparable harm, that changes if the funds cannot be recouped and are thus

---

[16] This conclusion follows despite Plaintiffs' failure to establish a likelihood of success on the merits only because "[w]ithin the irreparable harm analysis itself—which assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law—[courts] examine only whether that violation, if true, inflicts irremediable injury." *Chaplaincy*, 454 F.3d at 303.

irrevocably expended." 145 S. Ct. 2658, 2658 (2025) (citation and internal quotation marks omitted). This case differs from *NIH* in several ways—most relevantly in how Plaintiffs here do not claim themselves to have an entitlement to the loan funds. But the underlying principle that the disbursement of funds can constitute an irreparable injury if they cannot be recovered informs the Court's analysis. Under the status quo, Total could draw down on the loan at any time due to EXIM's approval of the 2025 extension. Given that there is no guarantee that those funds could ever be recovered if Total withdraws them and Total "do[es] not state that [it] will repay [the] money if [Plaintiffs] ultimately prevail[]," *id.*, Plaintiffs have established that their injury could be "beyond remediation" absent a preliminary injunction, *Chaplaincy*, 454 F.3d at 297.

But this factor does not weigh too strongly in Plaintiffs' favor because it is less clear that Plaintiffs' injuries are certain and imminent. Plaintiffs' theory is predicated on the assumption that Total will soon draw down on the loan to fund the resumption of the project. As Plaintiffs themselves put it, "disbursement *presumably* begin[s] soon," "construction [is] *anticipated* to begin as soon as this summer," and the project "will *likely* escalate the conflict and cause human rights abuses." ECF 13-1 at 41 (emphases added). Such speculation about future actions would ordinarily not be enough to meet the high standard to establish irreparable harm. Nevertheless, Plaintiffs have a fair rebuttal that even though they "do not know *precisely* when the Project will fully resume," they should not be penalized for this lack of complete certainty because the imminence of when the harm would become irreparable is "in Total's hands." ECF 38 at 42–43. Because "[t]he standard is not that irreparable harm will occur at some point in the future, but that plaintiffs suffer irreparable harm before a decision on the merits can be reached," *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288–89 (D.D.C. 2017), the Court declines to allow Total (and the government) to prevail on this factor merely because it is unknown exactly

when Total will access the loan.  There is sufficient evidence at this stage to conclude that Total

will likely withdraw the funds at a time before the Court would rule on the merits in the ordinary

course of the litigation, as preparations to resume construction have commenced and Total has

publicly suggested that access to EXIM's loan is central to its ability to proceed.  *See* ECF 13-2 at

8 n.37; ECF 13-12 at 2.

### D.    Balance of Equities/Public Interest

"The balance of the equities weighs the harm to [Plaintiffs] if there is no injunction against

the harm to the [government and Total] if there is."  *Pursuing Am.'s Greatness*, 831 F.3d at 511.

Plaintiffs argue that the equities favor granting a preliminary injunction because there is "a

substantial public interest in having government agencies abide by federal law."  ECF 13-1 at 42–

44.  And they contend that a preliminary injunction will not significantly burden the government

and Total given that there has already been a multiyear delay to the project.  The government and

Total argue that a preliminary injunction would severely disrupt a multibillion-dollar project that

is projected to support over 16,000 American jobs and generate $600 million in revenue for the

United States.  ECF 25 at 44–45; ECF 28 at 31–36.

The balance of equities is in relative equipoise.  On the one hand, Plaintiffs have

demonstrated that they and the communities they serve will likely be harmed in certain ways if the

project proceeds.  On the other hand, disrupting such a large project significantly harms the

reliance interests of several countries and corporations that have been working for over a decade

to extract LNG from Mozambique.  And Plaintiffs' four-month delay in seeking a preliminary

injunction after the 2025 extension has likely increased the magnitude of the harm that would result

from such relief given that many parties have been operating under the assumption that the loan is

available.  Because both granting and denying a preliminary injunction would result in harm to

one side or the other, this factor has minimal influence in the Court's determination of whether to grant a preliminary injunction.

E.        **Weighing the Preliminary Injunction Factors**

Balancing the foregoing factors, the Court concludes that Plaintiffs are not entitled to a preliminary injunction.  The "most important factor" in the preliminary injunction inquiry is whether Plaintiffs "have established a likelihood of success on the merits."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  Here, Plaintiffs have failed to establish that they are likely to succeed on the merits of any of their claims, and as discussed above, likely lack standing to pursue many of them.  Although they have established that they suffered a cognizable informational injury for some of their claims, it is far from clear that the Court would have jurisdiction over several of their other claims.

That the irreparable harm factor marginally favors Plaintiffs and the balance of the equities is in relative equipoise does not alter the Court's conclusion.  Where "plaintiffs are not likely to succeed on the merits, it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiffs' favor."  *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 366 (D.C. Cir. 1999).  Plaintiffs have not made such a showing here.  There is admittedly a risk that Plaintiffs could not be fully remedied later if Total were to draw down from the loan before the Court resolves this case.  But the risk that such a harm will materialize is neither fully certain nor indisputably imminent.  As such, the irreparable harm factor weighs only slightly in Plaintiffs' favor.  The balance of equities factor is even less favorable toward Plaintiffs because the government and Total would be harmed if the Court enjoined EXIM from disbursing the loan funds.  In light of these considerations, the "extraordinary remedy" of a preliminary injunction is not merited.  *Winter*, 555 U.S. at 24.

### III.    CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' Motion for a Preliminary Injunction,

ECF 13.  The Court will issue an order contemporaneously with this decision.


DATE:  October 10, 2025

CARL J. NICHOLS
United States District Judge