**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FRIENDS OF THE EARTH U.S.,** et. al,<br>*Plaintiffs*,<br>v.<br>**EXPORT-IMPORT BANK OF THE UNITED STATES,** et. al.,<br>*Defendants*. | Civil Action No. 1:25-cv-02235-CJN |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Richard L. Herz (*pro hac vice*)
Lindsay A. Bailey (D.C. Bar No. 1723447)
EarthRights International
1400 K St. NW Suite 750
Washington, DC 20005
(202) 466 5188
rick@earthrights.org

*Counsel for Plaintiffs*

October 15, 2026

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..... iii

**INDEX** ..... viii

**INTRODUCTION** ..... 1

**BACKGROUND** ..... 5

I. Conflict forced the Project to declare force majeure after EXIM's 2019 approval ..... 5

II. EXIM approved the 2025 Project loan without following the required procedures. ..... 6

III. EXIM's funding enabled the Project restart, which has harmed and will continue to harm the Individual Plaintiffs and local communities. ..... 7

IV. The organizational Plaintiffs provide services to communities the Project harms. ..... 11

V. Procedural history. ..... 11

**A PRELIMINARY INJUNCTION IS WARRANTED.** ..... 12

I. Plaintiffs have standing to challenge EXIM's 2025 loan approval. ..... 12

A. The Individual Plaintiffs have standing for each claim. ..... 15

B. The organizational Plaintiffs have informational standing to challenge EXIM's inadequate analysis and failure to provide required information. ..... 17

II. EXIM's approval violated the Bank Act and EXIM's own rules and was arbitrary and capricious ..... 19

A. EXIM's failure to conduct notice and comment violated the Bank Act because the 2025 approval was the "final consideration of a long-term transaction." ..... 20

B. EXIM's Board violated the Bank Act by ignoring the conflict and the harms the Project will inflict on local people. ..... 28

C. EXIM's refusal to permit comment under its ESPGs violates the APA ..... 30

D. EXIM's failure to properly assess the Project's substantial economic harms to U.S. companies and workers violated EXIM's rules and procedures. ..... 31

E. EXIM's 2025 loan over-subsidizes exports in excess of the Bank Act's limits. ..... 34

F. EXIM failed to produce statutorily mandated information.................... 37

G. EXIM's failure to consider new comments and new information was arbitrary and capricious........................................................................ 38

III. Plaintiffs have suffered irreparable harm because EXIM's approval permitted the Project to restart......................................................................... 40

IV. The balance of equities and public interest favor temporary relief because the harms to Plaintiffs outweigh the harms to EXIM and Total......................... 42

**CONCLUSION** ............................................................................................................ 44

## TABLE OF AUTHORITIES

### Cases

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
937 F.3d 559 (D.C. Cir. 2019) ............ 15

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ............ 41

*Animal Legal Defense Fund, Inc. v. Glickman*,
154 F.3d 426 (D.C. Cir. 1998) ............ 13

*Aviel v. Gor*,
780 F. Supp. 3d 1 (D.C.C. 2025) ............ 44

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) ............ 14

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ............ 41

*Citizens for Const. Integrity v. Census Bureau*,
669 F. Supp. 3d 28 (D.D.C. 2023) ............ 15

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir 2017) ............ 17

*Ctr. for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026) ............ 19

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) ............ 14

*Delta Airlines v. Export-Import Bank of the U.S.*,
718 F.3d 974 (D.C. Cir. 2013) ............ 32

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ............ 19

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
707 F.3d 462 (4th Cir. 2013) ............ 40

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ........ 13

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 16

*Fertilizer Inst. v. EPA*,
935 F.2d 1303 (D.C. Cir. 1991) ........ 38

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.*,
528 U.S. 167, 183 (2000) ........ 13

*Fund for Animals v. Norton*,
281 F. Supp. 2d 231 (D.D.C. 2003) ........ 42

*Gordon v. Holder*,
632 F.3d 722 (2011) ........ 43

*Healthy Gulf v. Burgum*,
775 F. Supp. 3d 455 (D.D.C. 2025) ........ 15

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ........ 38, 39

*Jibril v. Mayorkas*,
20 F.4th 804 (D.C. Cir. 2021) ........ 12

**League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........ 12, 41, 42, 43

**Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 20, 21

*LULAC v. Exec. Office of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ........ 44

*Med. Imaging & Tech. All. v. Libr. of Cong.*,
103 F.4th 830 (D.C. Cir. 2024) ........ 19

**Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ........ 13, 15, 16

*N.D. v. Reykdal*,
102 F.4th 982 (9th Cir. 2024) ........ 43

*Nat'l Conservative Political Action Comm. v. FEC*,
626 F.2d 953 (D.C. Cir. 1980) .......... 19

*Natural Res. Def. Council v. Morton*,
337 F. Supp. 167 (D.D.C. 1971) .......... 44

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) .......... 21

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) .......... 12

*S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*,
165 F.4th 356 (5th Cir. 2026) .......... 15

*Sierra Club v. EPA*,
671 F.3d 955 (9th Cir. 2012) .......... 40

*Sierra Club v. FERC*,
827 F.3d 59 (D.C. Cir. 2016) .......... 13

*Sierra Club v. U.S. Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025) .......... 14

*Steenholdt v. FAA*,
314 F.3d 633 (D.C. Cir. 2003) .......... 32

*TSC Indus. v. Northway, Inc.*,
426 U.S. 438 (1976) .......... 25

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 19

*United States v. Johnson*,
529 U.S. 53, 58 (2000) .......... 23

*VFD Consulting, Inc. v. 21st Servs.*,
425 F. Supp. 2d 1037 (N.D. Cal. 2006) .......... 26

*Vill. of Barrington v. Surface Transp. Bd.*,
636 F.3d 650 (D.C. Cir. 2011) .......... 23

*Vote Forward v. DeJoy*,
490 F. Supp. 3d 110 (D.D.C. 2020) .......... 42

**Statutes**

*12 U.S.C. § 635 .......... *passim*

*12 U.S.C. § 635a .......... *passim*

12 U.S.C. § 635a-2 .......... 31

12 U.S.C. § 635g-1 .......... 36

12 U.S.C. § 635i-3 .......... 36

12 U.S.C. § 635i-9 .......... 36

12 U.S.C. § 635i-5 .......... 28, 38

5 U.S.C. § 704 .......... 19

*5 U.S.C. § 706 .......... 19, 28, 38, 39

**Defendants' Materials**

*Environmental impact assessment*, Mozambique LNG .......... 10, 16

*EXIM, *Economic Impact Procedures and Methodological Guidelines* (Feb. 2025) .......... 32, 33, 34

*EXIM, *Environmental and Social Due Diligence Procedures and Guidelines* (Apr. 2025) .......... *passim*

EXIM, *Local Cost* .......... 37

Letter from Patrick Pouyanne, CEO of TotalEnergies to Gina Raimondo, US Sec. of Commerce (Dec. 3, 2024) .......... 6

*Mozambique LNG announces the full restart of all its activities onshore and offshore in Mozambique*, Total (Jan. 29, 2026) .......... 8

Press Release, EXIM, *EXIM Board of Directors Votes to Proceed with $4.7 Billion LNG Equipment and Services Transaction After Four-Year-Delay* (Mar. 19, 2025) .......... 6, 7, 34

*Resettlement Plan*, Mozambique LNG .......... 9, 16

**Other Authorities**

Alex Perry, *TotalEnergies accused of complicity in war crimes over Mozambique container massacre,* Politico (Nov. 18, 2025) .......... 5, 7

Armed Conflict Location & Event Data Project, *Mozambique Conflict Monitor Update: 4 - 17 August 2025* .......... 10

Armed Conflict Location & Event Data Project, *Mozambique Conflict Monitor Update:* 13-26 October 2025 .......... 10

Black's Law Dictionary (4th ed. 1968) .......... 21

Black's Law Dictionary (6th ed. 1990) .......... 24

China's Global Energy Finance Database, https://www.bu.edu/cgef/#/all/EnergySubSector/Other .......... 35

Christian Drolshagen, *TotalEnergies warns of 2030s overbuild*, InstaNext (Oct. 3, 2025), .......... 33

Clean Energy Transition Partnership, *Members*, .......... 35

Csongor Körömi, *Netherlands Starts Inquiry Into Mozambique Gas Plant Massacre*, Politico (Mar. 5, 2025) .......... 6

European Commission, *Emissions Database for Global Atmospheric Research, GHG emissions for all world countries, 2025 Report* .......... 10

GreenPeace, *Permit to Kill* (Aug. 2024), https://bit.ly/4hJj8k5 .......... 10

IEEFA, *The LNG glut has been delayed, not cancelled* (Sept. 16, 2026) .......... 33

Merkley Slams EXIM Bank for Failing to Provide Congressional Notification of Mozambique LNG Project, Jeff Merkley Senator for Oregon (Aug. 5, 2025) .......... 39

*Mozambique: Access Snapshot - Cabo Delgado Province, as of 31 January 2025*, U.N. Office for the Coordination of Humanitarian Affairs (UNOCHA) (Mar. 7, 2025) .......... 6

Nicholas Earl, *UK, Netherlands drop funding for TotalEnergies' massacre-linked gas project*, Politico (Dec. 1, 2025) .......... 7

OECD Arrangement .......... 36

The Editorial Board, *Trump and a Mozambique LNG Boondoggle*, The Wall Street Journal (Dec. 5, 2025), .......... 2

U.S. Env. Protection Ag., Particulate Matter Basics (Sept. 18, 2026)........................................... 9

U.S. EPA, Learn about how mobile source pollution affects your health (Aug. 28, 2026) ........... 9

## INDEX OF EXHIBITS AND REFERENCES TO THE RECORD

New Exhibits:

Ex. A: Redacted Declaration of Jane Doe 1 (sealed version attached to motion to seal).

Ex. B: Redacted Declaration of Jane Doe 2 (sealed version attached to motion to seal).

Ex. C: Redacted Declaration of Jane Doe 3 (sealed version attached to motion to seal).

Ex. D: Redacted Declaration of John Doe 1 (sealed version attached to motion to seal).

Ex. E: Redacted Declaration of John Doe 2 (sealed version attached to motion to seal).

Ex. F: Redacted Declaration of John Doe 3 (sealed version attached to motion to seal).

Ex. G: Redacted Declaration of John Doe 4 (sealed version attached to motion to seal).

Ex. H: Redacted Declaration of John Doe 5 (sealed version attached to motion to seal).

Ex. K: Second Conflict Declaration (sealed version attached to motion to seal).

References to the Record:

Dkt. No. 13-3: Declaration of Kate DeAngelis

Dkt. No. 13-9: Declaration of Richard Herz, Exhibit 3

Dkt. No. 13-12: Declaration of Richard Herz. Exhibit 6

Dkt. No. 13-13: Declaration of Richard Herz, Exhibit 7

Dkt. No. 13-15: Declaration of Richard Herz, Exhibit 9.

Dkt. No. 13-16: Declaration of Clark Williams-Derry

Dkt. No. 14-3: Sealed Declaration of Justiça Ambiental (redacted version at Dkt. No. 71)

Dkt. No. 14-4: Sealed Conflict Declaration

Dkt. No. 25: Total Response to Preliminary Injunction

Dkt. No. 25-1: Declaration of Maxime Rabilloud, with Exhibits

Dkt. No. 27-1: Exhibits to Declaration of Paula Swain (under seal)

Dkt. No. 28: Defendant EXIM's Opposition to Preliminary Injunction

Dkt No. 28-1: Declaration of Paula Swain, with Exhibits

Dkt. No. 37-2: Sealed Supplemental Declaration of Justiça Ambiental (redacted version at Dkt. No. 38-1)

Dkt. No. 38: Plaintiffs' Reply in Support of Preliminary Injunction

Dkt. No. 52: Memorandum Opinion

## INTRODUCTION

Defendant Export-Import Bank of the United States ("EXIM") unlawfully approved a $4.7 billion loan to subsidize a foreign corporation's construction of a highly controversial liquefied natural gas (LNG) project ("the Project") in Mozambique. Because the 2025 approval violated the Bank Act and EXIM's own procedures, Plaintiffs seek a preliminary injunction temporarily preventing EXIM from disbursing unrecoverable taxpayer funds while the Court determines whether EXIM's authorization was even legal.

Plaintiffs Friends of the Earth U.S. ("FOE") and Justiça Ambiental ("JA"), non-profit organizations that provide services to people the Project harms, originally brought this action. This Court denied their motion for temporary relief, and the D.C. Circuit affirmed, largely on the grounds that those organizations lacked standing. But eight local people who have been personally injured by the Project have now joined this suit, and they obviously have standing.

Although EXIM originally approved a Project loan in 2019, it never disbursed any money. In 2021, the operator, French company TotalEnergies SE ("Total"), halted construction and declared *force majeure* after al-Shabab, a brutal insurgency, seized the nearby town where many Total contractors were based, killing (sometimes beheading) hundreds of people, including dozens of contractors. Soon after, Mozambican forces protecting the Project reportedly gathered civilians at the Project, raped women, and imprisoned, tortured, and murdered hundreds of men in shipping containers at Total's gate. The conflict remains complex and dangerous, security forces still commit abuses, and al-Shabab still targets the Project and surrounding villages.

For most, this would counsel caution. Indeed, the U.K. and Dutch export credit agencies withdrew $2.2 billion in Project support. Not EXIM. With *force majeure* still in effect, in March 2025, its acting Board hurriedly approved this loan, dispensing with notice-and-comment

requirements in the Export Import Bank Act of 1945 ("the Bank Act"), 12 U.S.C. §§ 635-635t, and EXIM's own procedures that would have gathered critical input from the public and Congress. Moreover, the Board failed to consider the deadly risks that al-Shabab and the Mozambican forces securing the Project pose to local people and how the violence would increase because of the loan. It ignored local environmental economic harms. It declined to determine whether the supposed benefits to U.S. exporters outweigh the substantial economic harms subsidizing this foreign project will inflict on U.S. companies and workers. Each of these acts and omissions violates clear provisions of the Bank Act and EXIM's procedures.

Parties from across the political spectrum have opposed EXIM's financing, including: local people; human rights and environmental organizations; Congressmembers from both parties; President Trump's first Energy Secretary; and opponents of U.S. government subsidies for foreign corporations. Noting that the deteriorating security situation renders the Project "a calamity waiting to happen," the Wall Street Journal asked: "Why should U.S. taxpayers finance an energy project that Europeans won't and that would compete with American LNG exports?"[1]

All three preliminary injunction factors—likelihood of success, irreparable harm, and balance of the equities—favor temporary relief. *First*, Plaintiffs' claims are likely to succeed. EXIM's approval without notice and comment has permitted the Project restart. The Individual Plaintiffs have standing to challenge that approval because the restart has already injured them. They are subsistence farmers and fisherpeople, and the Project restart has blocked them from fishing in parts of the ocean and harmed fish populations, decreasing their catch, caused noise pollution and dust, and eliminated the possibility that Total will let them return to their homes

[1] The Editorial Board, *Trump and a Mozambique LNG Boondoggle*, The Wall Street Journal (Dec. 5, 2025), https://bit.ly/4ym8XH5.

and farms that Total took. And FOE and JA have standing to challenge the fact that EXIM denied Plaintiffs information central to their activities that EXIM was required to produce.

Plaintiffs' claims that EXIM violated the Bank Act and its own rules and procedures likely have merit. Plaintiffs recognize this Court previously found otherwise, but respectfully submit that their position is mandated by the clear text of the Act and Procedures.

Because EXIM's overseas financing can raise sensitive foreign policy, economic, environmental, and social concerns, Congress strictly limited EXIM's authority. For instance, the Bank Act requires EXIM to provide notice and allow comment before any Board meeting for "final consideration of a long-term transaction" worth more than $100 million. 12 U.S.C. § 635a(c)(10)(A). EXIM's 2025 approval was the "final" time the Board "consider[ed]" whether to make $4.7 billion in taxpayer funds available to Total; it could have said "no." Yet EXIM did not permit comment and actually consider the loan's consequences.

EXIM also failed to enforce Congress's prohibition on foreign loans that harm U.S. economic interests. The Bank Act and EXIM's procedures require the Board to take into account "any serious adverse effect" on U.S. industry and employment before authorizing support, 12 U.S.C. § 635(b)(1)(B), and prohibits lending in specified circumstances that are present here, unless the Board determines that the benefits to U.S. exporters outweigh the harm to Americans. But EXIM ignored undisputed current forecasts that LNG will now be in oversupply when production begins, so this loan will cause "substantial injury," as defined in the Bank Act, to the U.S. producers and workers. It relied instead on outdated predictions from 2019 that are now plainly wrong. And it did not find that the benefits currently outweigh the harms.

In addition to violating the Bank Act's and its own Procedures' specific requirements, circumstances have changed so dramatically since 2019 that EXIM's reliance on stale comments

and obsolete analyses is patently arbitrary. Since 2019, the smoldering conflict has ignited. The Project and nearby villages have become insurgent targets. Security forces guarding the Project have reportedly committed human rights abuses. Total has not replaced land it took. And the economics have changed; production will now begin during an LNG glut. These are the kind of harms Congress sought to ensure EXIM would *not* facilitate when subsidizing foreign projects.

*Second*, as this Court previously recognized, the Project restart will cause (and it now has caused) irreparable harm. Mem. Op. 29, Dkt. No. 52. This Court found that FOE, JA, "and the communities they serve will likely be harmed" if the loan proceeds. *Id*. at 31. The Project's restart has and will make local people al-Shabab targets, exacerbate the conflict, harm the environment, and displace even more people from their land and fishing grounds. And taxpayer money, if disbursed, is likely unrecoverable. *Id*. at 29.

*Third,* the balance of equities favors maintaining the status quo by temporarily preventing EXIM from disbursing funds while the Court considers Plaintiffs' claims. The harms to the Individual Plaintiffs and other local people are immediate and devastating, and the environmental impact irreversible. Any harms to EXIM and Total are comparably minimal; the Project was paused for over four years, [redacted], and the public interest favors not disbursing billions of taxpayer funds without being sure the loan is legal.

For these reasons, this Court should briefly stop EXIM from sending billions of unrecoverable taxpayer dollars to Mozambique while the Court decides whether EXIM has violated Bank Act and its own procedures.[2]

[2] Pursuant to Local Rule 65.1(d), Plaintiffs respectfully request oral argument on this motion as soon as possible, should the court deem it necessary.

## BACKGROUND

### I. Conflict forced the Project to declare *force majeure* after EXIM's 2019 approval.

In April 2015, a then-American-led consortium asked EXIM for a $5 billion loan for the Project, a LNG facility in Mozambique. Decl. of Paula Swain ¶ 9, Dkt No. 28-1. EXIM provided notice and sought comment from Congress and the public. *Id.* ¶¶ 12–13. And it conducted a Detailed Economic Impact Analysis based on 2019 predictions for market conditions when production was scheduled to start in 2024. *Id.* Ex. 2, Ap'x I. EXIM's Board approved the loan in September 2019. *Id.* ¶ 13. In May 2020, the Board approved a revised loan, changing the lead sponsor and Project operator to Total, a French oil giant. *Id.* ¶ 14.

Before EXIM disbursed any funds, *id.* Ex. 9, Ap'x E, 1, al-Shabab's insurgency engulfed Cabo Delgado, where the Project is located. Conflict Decl. ¶¶ 15–49, Dkt. No. 14-4. In January 2021, the Project suspended activities due to nearby insurgent attacks, including at a village the Project built to resettle people it displaced. *Id.* ¶ 21. In March 2021, al-Shabab seized Palma, many Project contractors' base of operations, killing hundreds of people, beheading many victims. *Id.* ¶¶ 22, 68. Total declared *force majeure*, halting the Project. Swain Decl. ¶ 36.

Soon after the Palma massacre, Mozambican forces protecting the Project out of Total's gatehouse reportedly lured hundreds of men, women, and children to the Project site, accused them of being insurgents, raped women, locked the men in shipping containers at the entrance to Total's facilities, and starved and tortured them for months, ultimately murdering most of them.[3]

The conflict has caused a humanitarian crisis, killing thousands and displacing hundreds of thousands of people. Conflict Decl. ¶ 49. The displacement and violence continue today.

---

[3] *See* Alex Perry, *TotalEnergies accused of complicity in war crimes over Mozambique container massacre*, Politico (Nov. 18, 2025), https://bit.ly/4hHaliz.

Second Conflict Decl. ¶¶ 13–22. There are widespread and ongoing reports of the insurgents and Mozambican forces protecting the Project committing human rights violations against civilians.[4]

## II. EXIM approved the 2025 Project loan without following the required procedures.

In 2024, Total began to seek financing to restart the Project, despite the conflict and ongoing *force majeure*. Total could not access EXIM funding unless the Board approved new loan terms and conditions. Mem. Op. 16 n.6. Total lobbied EXIM, [redacted] stating it [redacted]" EXIM approving new financing. Swain Decl. Ex. 9, 2, 7, Dkt. No. 27-1.[5] Total requested Board approval of a new agreement that included a four-year extension of the completion and repayment dates in the old loan [redacted]. *Id.* at Ap'x E, 2–4, 6–8. Under these terms, production would not commence until at least 2029. *Id.* at 7.

Other funders expressed hesitancy, given the conflict, the Project's environmental impact, the allegations of associated human rights abuses and Total's responsibility for them, and investigations into the alleged Project site massacre in multiple jurisdictions.[6] In early March 2025, the United Nations noted that "violence against civilians and armed clashes intensified."[7]

On March 11, EXIM posted the agenda for its board meeting two days later, listing the

---

[4] *See* Conflict Decl. ¶¶ 18, 22, 32–39, 42–45, 52, 56–57; Decl. of Justiça Ambiental (JA Decl.) ¶¶ 103-33, Dkt. No. 14-3; Second Conflict Decl. ¶¶ 14–15, 21.

[5] *See also* Letter from Patrick Pouyanne, CEO of TotalEnergies to Gina Raimondo, U.S. Sec. of Commerce (Dec. 3, 2024), https://bit.ly/3VJ1jZL (stating that without EXIM's loan, "work on the Mozambique LNG project may not be resumed or completed"); Press Release, EXIM, *EXIM Board of Directors Votes to Proceed with $4.7 Billion LNG Equipment and Services Transaction After Four-Year-Delay* (Mar. 19, 2025), https://bit.ly/4dCUtv3 (explaining that EXIM's approval "is essential" and that without it, "the project . . . will be jeopardized").

[6] Herz Decl. Ex. 3, Dkt. No. 13-9; Csongor Körömi, *Netherlands Starts Inquiry Into Mozambique Gas Plant Massacre*, Politico (Mar. 5, 2025), https://bit.ly/4yKPoct.

[7] *Mozambique: Access Snapshot - Cabo Delgado Province, as of 31 January 2025*, U.N. Office for the Coordination of Humanitarian Affairs (Mar. 7, 2025), https://bit.ly/4B1smj5.

Project for approval with the statement: "review required: none." Herz Decl. Ex. 7, Dkt. No. 13-13. EXIM provided no other notice nor any opportunity to comment. On March 13, EXIM's Board approved the $4.7 billion loan. Swain Decl. ¶ 18.

EXIM admitted that while *staff* "reviewed the [Project's] physical security situation," the Board considered only changes to the dates in the loan documents and unspecified "related changes" necessary to reflect the start of construction.[8] Thus, the Board did not consider how the Project restart might exacerbate the conflict and put local people at risk, or whether Total's security measures protect them. *See* Swain Decl. Ex. 9. Nor did it consider the militarization of the area, people killed and displaced, or the rapes and murders Project security allegedly committed at the Project's gate. EXIM also did not analyze the Project's harms to the U.S. economy based on current information about production that would now start in 2029, not 2024.

Days after EXIM's 2025 approval, as FOE had warned EXIM, Decl. of Kate DeAngelis ¶ 34, Dkt. No. 13-3 ("FOE Decl."), a French prosecutor opened an investigation into Total.[9] A few months later, a criminal complaint in France accused Total of complicity in war crimes in the containers massacre, and the United Kingdom and the Netherlands withdrew $2.2 billion in Project support—due in part to increased security risks since 2020 and human rights concerns.[10]

## III. EXIM's funding enabled the Project restart, which has harmed and will continue to harm the Individual Plaintiffs and local communities.

Once Total had EXIM's funding approval in hand, it lifted *force majeure* and restarted

[8] Press Release, EXIM, *supra* note 5.

[9] *See* Perry, *TotalEnergies accused of complicity*, *supra* note 3.

[10] *See id.*; Nicholas Earl, *UK, Netherlands drop funding for TotalEnergies' massacre-linked gas project*, Politico (Dec. 1, 2025), https://bit.ly/4ztc1lF.

the Project, despite the raging conflict.[11] The restart has seriously harmed community members living alongside the Project, including the Individual Plaintiffs.

*First*, the restart has entrenched the displacement of thousands of people from their homes and farms. The onshore portion of the Project, which will include liquefaction and storage facilities, occupies 27 square miles on the Afungi Peninsula. Swain Decl. Ex. 2, 1, 79–80. Before *force majeure*, Total fenced off the Project area, evicting and taking homes, farms, crops, and/or cultural and religious sites from Jane Does 1, 2, and 3, John Does 1, 2, 3, and 5, and thousands of others, often without their consent.[12] This displacement has caused severe economic and emotional harm to Jane Does 1, 2, and 3, John Does 1, 2, 3, and 5, and other community members, who no longer have access to adequate farmland to grow the subsistence crops they depend on to survive and have deep emotional and cultural ties to their homes and land. Total has not adequately compensated many families for these losses, including Individual Plaintiffs.[13]

The Project's restart in 2025 eliminated the possibility that Total might return community members' land. Total had committed to returning land that it was not using,[14] [redacted] Now, additional displacement is all but inevitable, Supp. JA Decl. ¶¶ 12–17, Dkt. No. 37-2, given the Project's need for more land for subcontractors and staff. *E.g.* Jane Doe 2 Decl. ¶ 9; Jane Doe 3 Decl. ¶ 11.

---

[11] *See Mozambique LNG announces the full restart of all its activities onshore and offshore in Mozambique*, Total (Jan. 29, 2026), https://bit.ly/3UiqHoR.

[12] *See* John Doe 1 Decl. ¶¶ 4–15; John Doe 2 Decl. ¶¶ 3–6; John Doe 3 Decl. ¶¶ 4–7; John Doe 5 Decl. ¶¶ 3–9; Jane Doe 1 Decl. ¶¶ 4–9; Jane Doe 2 Decl. ¶¶ 2–6; Jane Doe 3 Decl. ¶¶ 3–9; JA Decl. ¶¶ 69–84; Supp. JA Decl. ¶¶ 6–11, 18. So far, 643 families lost or will lose their homes, and another 952 families lost or will lose their farms. JA Decl. ¶ 70.

[13] JA Decl. ¶¶ 71–72, 75–76, 80; Jane Doe 1 Decl. ¶ 9; John Doe 1 Decl. ¶ 13; Jane Doe 3 Decl. ¶ 9; John Doe 3 Decl. ¶ 8; John Doe 2 Decl. ¶ 6.

[14] Jane Doe 3 Decl. ¶ 10; John Doe 3 Decl. ¶ 9; Jane Doe 2 Decl. ¶ 8; John Doe 5 Decl. ¶ 15; Jane Doe 1 Decl. ¶ 19; John Doe 1 Decl. ¶ 29.

*Second*, to construct deep-water wells and pipelines and create shipping channels for marine vessels as part of the restart, the Project has closed large swaths of the ocean and shoreline, restricting the times and places John Does 1, 4, and 5, Jane Doe 1, and other local people can fish.[15] Dredging, construction of pipelines and marine infrastructure and movement of large ships has degraded water quality, will destroy pristine mangroves and reefs, and harms fish and shellfish.[16] Fish populations and Plaintiffs' catch have decreased since the restart.[17] A pipeline spill could kill the remaining shellfish or fish, "destroy the ecosystem" Plaintiffs rely upon, and end their way of life. *Id.* ¶¶ 28–29; John Doe 1 Decl. ¶ 28. As John Does 1, 4, and 5, and Jane Doe 1 rely on fishing and shellfish gathering for income and to feed their families, the decrease in marine populations and limitations on fishing directly injure them.[18]

*Third*, individual Plaintiffs [redacted].[19] New construction and vehicle traffic causes noise and vibrations of heavy machinery at all hours, throws dust in the air, and generates vehicle emissions, which cause respiratory distress, contaminate food and water, impede crop growth, and can have negative health impacts.[20] The

---

[15] Jane Doe 1 Decl. ¶ 7; John Doe 1 Decl. ¶¶ 6, 10, 13-15, 19-20; John Doe 5 Decl. ¶¶ 4, 12, 18; John Doe 4 ¶¶ 6–7. The Project planned to displace 1,580 fisherpeople and intertidal collectors. *Resettlement Plan* xix, Mozambique LNG, https://bit.ly/4dBdy0z.

[16] John Doe 4 Decl. ¶ 8; John Doe 5 Decl. ¶ 18; Jane Doe 1 Decl. ¶ 25–27; John Doe 1 Decl. ¶ 22-24; JA Decl. ¶¶ 85–91; Supp. JA Decl. ¶¶ 29–49.

[17] John Doe 5 Dec. ¶ 17; John 4 Dec. ¶ 8, 11; Jane Doe 1 Dec. ¶¶ 25–27; John Doe 1 Dec. ¶ 24.

[18] John Doe 4 Decl. ¶ 12; Jane Doe 1 Decl. ¶ 29; John Doe 1 Decl. ¶ 21; John Doe 5 Decl. ¶ 18.

[19] Jane Doe 1 Decl. ¶ 11; John Doe 5 Decl. ¶ 3; John Doe 3 Decl. ¶ 3; Jane Doe 3 Decl. ¶ 3; Jane Doe 2 Decl. ¶ 2; John Doe 2 Decl. ¶ 2; John Doe 4 Decl. ¶ 3.

[20] Jane Doe 3 Decl. ¶¶ 13-15; John Doe 3 Decl. ¶¶ 14–16; Jane Doe 2 Decl. ¶¶ 11–13; John Doe 2 Decl. ¶¶ 11–13; John Doe 5 Dec. ¶¶ 22–24; Jane Doe 1 Dec. ¶¶ 14–16; John Doe 1 Dec. ¶¶ 36–38; *see also* U.S. Env. Protection Ag., Particulate Matter Basics, https://bit.ly/3TDIaYF (Sept. 18, 2026); U.S. EPA, Learn about how mobile source pollution affects your health, https://bit.ly/4s4cuIL (Aug. 28, 2026).

LNG export terminal will "emit levels of air pollution that cause serious health harms."[21] The Project will also contribute to climate change, with estimated annual direct emissions of 13 million metric tons of $CO_2$ equivalent, exceeding that of 73 countries.[22]

*Fourth*, the Project will exacerbate the conflict, and lead to attacks on surrounding communities, exposing local people to further violence. JA Decl. ¶¶ 132–40; Conflict Decl. ¶¶ 7–8, 65, 70–72. EXIM has long understood that "the insurgency is highly likely to target the Project throughout its lifecycle." Swain Decl. Ex. 2, 35. The government militarized the area to protect the Project. Conflict Decl. ¶¶ 26–27, 70, 73–75, 78–80. Since the insurgents see significant propaganda value in attacks near the Project, they target nearby villages. *Id.* ¶¶ 5–8, 21–23, 66–72. As Total lifted *force majeure*, al-Shabab "expand[ed] their reach across Cabo Delgado," attacked villages near the Project, and the nearby town of Palma, and beheaded a Project security guard.[23] In August 2026, the U.N. reported that "[t]he frequency, severity and spread of attacks on civilians has increased over the past year." Second Conflict Decl. ¶ 15.

Because of the ongoing risks, soon after EXIM approved the loan, Total scrapped the security plan it had in place when EXIM issued its approval. It announced that it will instead create a security enclave for the Project that permits access only by ship and air. Conflict Decl. ¶ 77. This eliminates economic opportunities for local people. *Id.* ¶ 79. And while the Project makes nearby villages an insurgent target, Total's creation of an enclave *for itself* leaves these

---

[21] *See, e.g.*, GreenPeace, *Permit to Kill* (Aug. 2024), https://bit.ly/4hJj8k5.

[22] *2014 EIA Chapter 12: Onshore Environmental Impact Assessment and Mitigation*, Mozambique LNG 12-4 (2014), https://bit.ly/47ReGty; European Commission, *Emissions Database for Global Atmospheric Research, GHG emissions for all world countries, 2025 Report*, https://bit.ly/47hoqgw; JA Decl. ¶¶ 92-93.

[23] Armed Conflict Location & Event Data Project (ACLED), *Mozambique Conflict Monitor Update: 4 - 17 August 2025*, https://bit.ly/4jMKS8I; ACLED, *Mozambique Conflict Monitor Update: 13-26 October 2025*, https://bit.ly/4jexJ8h.

villages outside Total's security perimeter, and thus more vulnerable to insurgent attack. *Id.* ¶¶ 33, 69, 72, 77–85. And it requires more security forces. *Id.* ¶ 78. That may benefit Total, but Mozambican forces are implicated in abuses against civilians. *Supra* Background §§ II–III.

## IV. The organizational Plaintiffs provide services to communities the Project harms.

JA and FOE are nonprofit organizations that safeguard human health, defend human rights, protect the environment and help people protect themselves from threats from projects like this one. FOE Decl. ¶¶ 7–34; JA Decl. ¶¶ 3, 7–14. Plaintiffs gather information about the Project, share this information to help local people understand the Project's effects, assess whether Total and its financiers are meeting their legal obligations, and help people protect their rights, including through procedures that enable communities to raise their rights and concerns and seek remedies. JA Decl. ¶¶ 15–52; FOE Decl. ¶¶ 12–30.

## V. Procedural history.

FOE and JA filed suit in July 2025 challenging EXIM's March 2025 decision to approve the loan. Within days, Plaintiffs moved for a preliminary injunction to prevent EXIM from releasing funds until this case is resolved. Total intervened.

In October 2025, this Court denied Plaintiffs' motion for temporary relief. The Court concluded that FOE and JA likely did not have organizational standing to challenge EXIM's failure to permit comment, Mem. Op. 7–10, but likely do have informational standing for their environmental and economic analysis claims. *Id.* at 10–12. It further found that the Bank Act did not impose any obligations on EXIM in 2025, *id.* at 15–24, Plaintiffs had shown irreparable harm and the balance of the equities were relatively equal. *Id.* at 27–31.

Plaintiffs appealed, and the D.C. Circuit affirmed. It found that FOE and JA lacked organizational standing, Slip. Op. 10–17, and lacked informational standing to require EXIM to

produce an economic analysis, because the Bank Act did not give them a right to such information. *Id.* at 18–20. It held that FOE and JA had standing to seek environmental information under EXIM's Environmental and Social Due Diligence Procedures and Guidelines (ESPGs), but that Plaintiffs were not likely to succeed on the merits of these claims because they had not alleged that Total submitted supplemental environmental reports. Slip Op. 22–23, 25–26.

Concurrently with this motion, Plaintiffs have filed an Amended Complaint that, among other things, adds the Individual Plaintiffs: local people injured by the Project restart.

## A PRELIMINARY INJUNCTION IS WARRANTED.

A plaintiff seeking a preliminary injunction must show "that four factors, taken together, warrant relief: [1] likely success on the merits, [2] likely irreparable harm in the absence of preliminary relief, [3] a balance of the equities in its favor, [4] and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted). The last two factors merge where the government is a party because "the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). Here, all of the factors favor a preliminary injunction. This Court cannot deny relief where no factor weighs against it. *Newby*, 838 F.3d at 7. The Court should grant temporary relief to prevent irreparable harm while the Court reviews Defendants' actions.

### I. Plaintiffs have standing to challenge EXIM's 2025 loan approval.

A party has standing where it has or likely will suffer an injury, that was or likely will be caused by defendant, and the injury likely would be redressed by the requested relief. *Jibril v. Mayorkas*, 20 F.4th 804, 813-14 (D.C. Cir. 2021). For a preliminary injunction, plaintiffs must provide evidence "that, if taken to be true, demonstrate[s] a substantial likelihood of standing." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371,

377 (D.C. Cir. 2017) (citation omitted). For a claim to proceed, just one plaintiff needs standing. *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 429 (D.C. Cir. 1998) (*en banc*).

Here, the Individual Plaintiffs have standing for all of the claims against EXIM because its approval without following its legal obligations has injured and will imminently injure them. FOE and JA have informational standing to bring claims seeking economic analysis and release of information because EXIM withheld information it was obligated to produce that FOE and JA would use in providing services, causing them the type of harm the Bank Act aims to prevent.

**A. The Individual Plaintiffs have standing for each claim.**

**1. The Individual Plaintiffs have suffered concrete injury from EXIM'S illegal approval.**

EXIM approved funding for the Project without following the procedures the Bank Act and EXIM's own procedures require, and in a manner that was arbitrary and capricious. To show standing, Plaintiffs "must show that the government act performed without the procedure in question will cause a distinct risk to [plaintiff's] particularized interest." Slip. Op. 11 (citation omitted). Thus, Plaintiffs may challenge an action taken without required procedural safeguards, such as notice and comment, if it threatens their concrete interest, rather a general interest common to the public. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). EXIM's decision to fund the Project and thus permit the restart harms the Individual Plaintiffs in a variety of particularized ways, including ways that the D.C. Circuit has specifically held confer standing.

Take, for example, Plaintiffs who support their families by fishing or harvesting shellfish. "[D]iminish[ed] use" of waterways and "inconvenience" from marine traffic or a "large exclusion zone" is a cognizable injury. *Sierra Club v. FERC*, 827 F.3d 59, 66 (D.C. Cir. 2016). It is sufficient if Plaintiffs "use the affected area" and the area's value "will be lessened." *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000). The Project has barred Jane

Doe 1 and John Does 1, 4, and 5 from fishing in certain places, and at certain times, and Project marine traffic otherwise disrupts their ability to fish. *Supra* Background § III. Similarly, environmental harms to fisheries that Plaintiffs rely upon are cognizable injuries. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015). Environmental devastation from construction has already decimated fish and shellfish populations. *Supra* Background § III.

Even a dollar of lost income gives a plaintiff standing. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017). Jane Doe 1 and John Does 1, 4, and 5 have been less able to feed their families and suffered economic losses from both the restrictions on fishing and the plunging fish populations. *Supra* Background § III. This may end their way of life, and leave them and their children unable to support themselves and their loved ones. *Id*.

The Project's restart also eliminates the possibility that Total might return Individual Plaintiffs' homes, farms, fishing grounds, and religious sites, *id.*, further depriving them of their property and perpetuating the emotional and economic harm Plaintiffs suffer.

An "increased disruption to [the] peace and quiet [plaintiffs] enjoy in their homes" from LNG operations also confers standing. *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1180 (D.C. Cir. 2025). Here, the Project disrupts Plaintiffs' ability to enjoy their homes and farms; construction causes noise and vibrations from heavy machinery at all hours, and dust makes it hard to breathe, kills crops, and contaminates food. *Supra* Background § III.

Defendants have previously argued that the *organizational* Plaintiffs' injuries to their *services* are too speculative. But the Individual Plaintiffs have already suffered injuries; an existing (and continuing) injury cannot be "speculative."[24] The harms suffice for standing.

---

[24] Further impacts, including additional devastation of fisheries, air pollution, and exacerbation of the conflict, are imminent. Plaintiffs need only show "a substantial probability that local conditions will be adversely affected." *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559,

### 2. Plaintiffs easily satisfy any causality and redressability requirements.

*Causation*. As this Court held, causation for procedural violations requires only a link "'connecting the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of compliance with that procedural requirement and [a link] connecting that substantive decision to the plaintiff's particularized injury.'" Mem. Op. 6 (quoting *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025)). Thus, Plaintiffs "need not" show that if EXIM had permitted comment or adequately considered the Project's economic, environmental, and social harms its "action would have been different." *Mendoza*, 754 F.3d at 1010. "[C]ourt[s] will assume the causal relationship between the procedural defect and the final agency action." *Id.* (citation modified).

Here, the "omitted procedural step"—comment prior to the approval—is obviously linked to the "decision that may have been wrongly decided"—the approval itself. *See* Mem. Op. 6. And a link connects EXIM's approval to Plaintiffs' injury. *See id.* EXIM intended its approval to enable the Project to restart; Total could not move forward without EXIM approving the 2025 loan. *Supra* Background § III. Where a new approval is necessary, it "achieves the same goal as the [initial approval]—the project can go on." *S. Tex. Env't Just. Network*, 165 F.4th at 367 (finding standing to challenge decision that let LNG project proceed). Had EXIM had said no in

592-93 (D.C. Cir. 2019) (citations omitted). Courts regularly find standing *before* construction begins. *E.g. Mendoza*, 754 F.3d at 1010 (noting neighbor of proposed dam has standing to challenge agency's procedural failure, even though dam would not be completed for years) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)); *S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*, 165 F.4th 356, 366 (5th Cir. 2026) ("projected air pollution" from LNG plant conferred standing on those who worship, fish, and hike nearby). The fact that Total is currently inflicting similar harms and there is already an increase in conflict violence "gives credence to . . . assertions that" further operations will "compound" Plaintiffs' injuries. *Healthy Gulf v. Burgum*, 775 F. Supp. 3d 455, 473 n.10 (D.D.C. 2025) (citations omitted).

2025, there would have been no restart to injure Plaintiffs. The 2025 approval is a but-for cause of the Project restart, and thus of Plaintiffs' harms.

Where the causal link involves a third party's acts, plaintiffs need only show that the "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quotation marks omitted). When EXIM approved the 2025 loan, it was apparent Total would harm people like Plaintiffs. Plaintiffs and the Project anticipated these injuries.[25] They were not just "predictable," but predicted.

Thus, as the D.C. Circuit suggested, the link connecting EXIM's Project funding to the Individual Plaintiffs' Project-inflicted injuries is sufficiently short and clear. The Circuit specifically contrasted *FOE and JA*'s injuries—which were too attenuated, because there were too "many steps" between EXIM's 2025 approval and the burden on FOE and JA's *services* that would result from the Project's restart, Slip Op. 14–15—with those of local people "the Project directly harms." Slip Op. 17.

*Redressability.* For procedural injuries, the redressability requirement is "relaxed." *Mendoza*, 754 F.3d at 1010. As this Court noted, "'a plaintiff need not show that compliance with the procedure *would* alter the final agency decision, but only that the agency *could* reach a different conclusion if ordered to revisit its procedural error.'" Mem. Op. 6 (quoting *Ctr. for Biological Diversity*, 144 F.4th at 184).

This Court rightly found that FOE and JA satisfy the redressability requirement: "EXIM's refusal to follow alleged procedural requirements removed an avenue (notice and comment)" of redress and the Court could "redress that injury by vacating the 2025 extension

[25] Compl. ¶¶ 75, 212-14, Dkt. No. 1; *Resettlement Plan* xvii-xix, Mozambique LNG, *supra* note 15; *Environmental impact assessment*, Mozambique LNG, https://bit.ly/4zPxPbB.

and requiring EXIM to follow its procedures." Mem. Op. 9 (citation modified). Individual Plaintiffs' injuries can be redressed the same way.

For instance, had EXIM permitted comments or considered issues it was required to address, EXIM would have learned about among other things: the risks of exacerbating the conflict and making local villages a target, Total's failure to provide adequate compensation to those whose land and farms it took, the U.S. economic costs, and the Project's degradation of the environment and harm to local people's livelihoods. Unless EXIM intends to arbitrarily ignore information before it, there is "at least the possibility" that if EXIM follows the required procedures it could withhold financing or impose conditions. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 185 (D.C. Cir 2017); 28 U.S.C. § 635i-5(a)(2); *ESPG* § I.22.

**B. The organizational Plaintiffs have informational standing to challenge EXIM's inadequate analysis and failure to provide required information.**

A plaintiff has standing where: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." Slip Op. 18 (citation omitted); *accord* Mem. Op. 10–11. EXIM deprived Plaintiffs of information regarding economic and environmental impacts that statutes and EXIM's procedures require EXIM to disclose. This harmed FOE and JA's ability to provide services to community members. The D.C. Circuit held that this shows FOE and JA have a substantial likelihood of establishing informational standing to challenge EXIM's failure to disclose environmental information. Slip Op. 20–24. It also suffices for standing to challenge EXIM's 2025 failure to conduct the economic analysis its procedures require.

**1. EXIM violated Plaintiffs' entitlement to public disclosure of environmental information and economic analyses.**

The D.C. Circuit has held that Plaintiffs "identified statutory provisions requiring the public disclosure of environmental information." Slip Op. 22 (citing 12 U.S.C. § 635i-5(a)(1); 42 U.S.C. § 4332(2)(C)). EXIM did not disclose this information. *See* FOE Decl. ¶¶ 42–44.

Plaintiffs also challenge EXIM's 2025 failure to conduct an economic analysis. The D.C. Circuit found that Plaintiffs had no *statutory* entitlement to economic information, because the *Bank Act* allows EXIM discretion to decide "if" it will conduct a detailed economic analysis. Slip Op. 18-20. But neither the D.C. Circuit nor this Court addressed Plaintiffs' separate claim that EXIM's *rules and procedures*—adopted at Congress's direction—required EXIM to conduct a detailed economic analysis in 2025 based on updated data.[26] Since it "is enough" for standing that this is required under Plaintiffs' interpretation of the law, Mem. Op. 11, Plaintiffs show EXIM's rules require it to conduct this analysis in the merits section below. *Infra* § II.D.

**2. EXIM's violation denied Plaintiffs information they would normally use in their counselling work.**

The D.C. Circuit found that EXIM denied FOE and JA access to information "they ordinarily rely upon and share with their clients." Slip Op. 22. This "forced them to undertake independent factfinding" and "impaired their ability to carry out their organizational missions, including advising and supporting communities." *Id.* at 22–23 (citing FOE Decl. ¶¶ 45–48).

These "harms . . . align with Congress's intent in making available information that informs interested parties about the economic and environmental impacts of certain projects so

[26] The D.C. Circuit explicitly declined to consider this claim, finding Plaintiffs had not raised it in this Court. Slip Op. 19–20. Plaintiffs did raise it, Reply 24–25, Dkt. No. 38, but miscited "ECF 38" as "ECF 28." Appellant Reply Br. 31 n.7. Regardless, Plaintiffs raise the issue now.

that they can respond accordingly." Mem. Op. 11; *accord* Slip Op. 23 (addressing environmental information). EXIM thus "caused the type of harm Congress sought to prevent." Slip Op. 23.

### 3. Plaintiffs easily show causation and redressability.

As both this Court and the D.C. Circuit held, Plaintiffs "adequately established causation and redressability" for their informational injury. Slip Op. 23; *accord* Mem. Op. 12. Their injury is "traceable to [EXIM's] failure" to conduct analyses and "disclose the information" and "a favorable decision, such as vacatur" requiring further analyses and disclosure "could redress that injury." Slip Op. 23 (citing FOE Decl. ¶¶ 44-46; JA Decl. ¶¶ 54-61); *accord* Mem. Op. 11-12.

## II. EXIM's approval violated the Bank Act and EXIM's own rules and was arbitrary and capricious.

"Agencies must operate within the legal authority conferred by Congress and when those limits are transgressed," plaintiffs "may seek recourse." *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 838 (D.C. Cir. 2024). Courts "shall . . . set aside agency action . . . found to be [1] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [; 2] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right [; or 3] without observance of procedure required by law[.]" 5 U.S.C. § 706(2). The APA permits judicial review of "final agency action." *Id.* § 704. Action is "final" if it "mark[s] the consummation of the agency's decisionmaking process" and is one "from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).

When an agency fails to satisfy a statutory requirement, as EXIM has, the action is "not in accordance with law" in violation of the APA. *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 376 (D.C. Cir. 2026) (citations omitted). And agencies must follow "their own regulations [and] procedures. . . or provide a rational explanation for their departures." *Nat'l Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980). Moreover,

action is arbitrary and capricious when it is not the product of "reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation modified).

The Board's 2025 final approval was "final agency action" subject to APA review. That action—made without satisfying statutory notice-and-comment requirements or considering the U.S. economic harms the Project would cause or its dire impacts on the environment and local people—was arbitrary, capricious, and violated the Bank Act and EXIM's own procedures.

### A. EXIM's failure to conduct notice and comment violated the Bank Act because the 2025 approval was the "final consideration of a long-term transaction."

Courts "independently interpret" statutes; they do not defer to an agency's interpretation. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395, 408 (2024). Instead, they must apply the "single, best meaning" of a statute; no other interpretation is permissible. *Id.* at 400.

The Bank Act requires that before "any meeting" of the Board for "final consideration of a long-term transaction" worth more than $100 million, EXIM "shall provide a notice and comment period." 12 U.S.C. § 635a(c)(10)(A). The March 2025 approval was a "meeting" for "final consideration" of a long-term, multi-billion-dollar transaction. But EXIM failed to provide a notice and comment period. That conflicts with the Bank Act's plain text.

EXIM claims that the statute exempts amendments, *sub silentio*, and the 2025 approval was merely an amendment of a prior loan that, because of *force majeure*, was never disbursed. EXIM Opp. to Prelim. Injunction, 25–26, Dkt. No. 28. And this Court held that the "context" of the Act indicates that the question is whether this was an application. Mem. Op. 17–19. The D.C. Circuit did not reach this issue. And neither reading comports with the text. The question is not whether the Board approved an amendment, or an application, but simply whether this was a "final consideration of a long-term transaction." But even if this Court were to look beyond the

plain text, the Act's context and purpose confirm what the text says: notice and comment is required for a final consideration, like the one here. When Congress required comment before "final consideration" of a "transaction," it did not mean "first consideration of an application."

The "single, best" interpretation is the plain meaning: EXIM must permit comment before "final consideration of a long-term transaction." *See Loper Bright*, 603 U.S. at 400.

**1. EXIM's March 2025 approval was a "final consideration of a long-term transaction."**

Courts interpreting a statute "look to the ordinary meaning of its key terms." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024). The definition of a "transaction," when the word was added to the statute, was an "act or agreement, or several acts or agreements having some connection with each other . . . by which the legal relations of [] persons between themselves are altered." Transaction, Black's Law Dictionary (4th ed. 1968).

The Board was obviously considering a "transaction." EXIM described the Board's 2025 approval as "[v]ot[ing] to [p]roceed" with the "transaction." Press Release, EXIM, *supra* n.5.

[redacted]

And the approval altered the parties' legal relations. As Defendants admit, Total could not access EXIM funds absent the 2025 approval. Mem. Op. 16, n.6. EXIM could have decided in 2025, as its U.K. and Dutch counterparts did, not to fund the Project. *Id*; Swain Decl. ¶¶ 17–18. That establishes EXIM considered and approved a "transaction."

The Board did not just approve an amendment. Since the 2025 approval was necessary *to permit funding*, the Board approved a loan where no operative loan existed. To Defendants, the 2019 approval is like Schrödinger's cat: dead, since it concededly did not authorize the 2025 loan, yet also alive to satisfy the Act's requirements. The text precludes such a reading.

Even assuming (incorrectly) that the Board merely approved an extension of dates in an existing contract, that would still be a "transaction" because it changed the parties' legal obligations. EXIM's documents show that the date changes were [redacted] *E.g.* Swain Decl. Ex. 9, Ap'x C, 1, Ap'x E, 1–2, 8. But EXIM did *not* merely change dates; it approved, among other things, [redacted]. The new provisions clearly changed the Parties' legal obligations.

Because the Board approved a loan where there was *no* operative loan, and that loan included a variety of new provisions, the new loan changed the Parties' legal obligations and the Board thus approved a "transaction." It does not matter if the Board previously considered the Project, because a "transaction" may refer to a series of agreements. Nor does it matter if the new loan was an amendment, because an amendment that alters legal relations is still a "transaction."

The March 2025 meeting was the Board's "final consideration" of the transaction. "Final" means "last." Nothing in the Bank Act that limits "final consideration" to when the Board *first* considered supporting the Project and approved a loan. As Total conceded, "final consideration of a long-term transaction" means the decision on a "final commitment of project funding," *i.e.* the "consummation of the agency's decisionmaking process from which legal consequences will flow." Total Response to Prelim. Injunction, 24–25, Dkt. No. 25 (quotation marks omitted). The 2025 meeting was the Board's last—indeed *only*—consideration of the new terms and conditions that will govern this transaction. And since the 2025 approval was

necessary to permit financing, it, not the prior, inoperative approval, was the Board's "final consideration" of this discretionary "transaction."

### 2. Statutory context confirms the ordinary meaning.

Looking to "statutory context," this Court found that the 2025 approval was not a "final consideration," Mem. Op. 17, and thus that in this case, the "final" consideration was not the *last* time the Board considered a Project loan, but the *first.* But because section 635a(c)(10)(A) comprehensively distinguishes decisions that require notice and comment from those that do not, there is no basis to look beyond its text.

Where Congress creates one exception, courts may not infer others. *United States v. Johnson*, 529 U.S. 53, 58 (2000). The Board's "final consideration" of "long-term transaction[s]" over $100,000,000 require notice and comment, but its "final consideration" of less valuable or short transactions, its interim decisions, its decisions unrelated to transactions, and decisions delegated to staff, do not. *See* Swain Decl. Ex. 7, 6-8. Congress provided no exception for where EXIM extends dates, let alone where it changes other terms and where there would be no loan without Board approval. Thus, the statute's clear text required EXIM to permit comment before agreeing to provide Total $4.7 billion in taxpayer funds.

The Court should stop there. But even if it does not, no other provision absolves EXIM from complying with section 635a(c)(10)(A)'s notice and comment requirement. To the contrary, the context confirms the text's plain meaning.

#### i. The Bank Act's references to "applications" do not exempt final considerations of transactions from notice and comment.

The Court previously noted that *other* provisions of Section 635a(c)(10) refer to "applications," and found notice and comment is therefore "concerned with applications for a loan." Mem. Op. 17. But Section 635a(c)(10)(A) details when notice and comment is required,

and it refers to a "transaction" *not* an "application." Where Congress includes particular language in one subsection but omits it in another, it presumably acts intentionally. *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 661 (D.C. Cir. 2011).

References to "application" elsewhere do not *narrow* section 635a(c)(10)(A)'s general notice and comment requirement. Section 635a(c)(10)(C)(i)(I) requires EXIM to publish notice "of the application proposing the transaction." But a requirement about *how* to provide notice does not change the requirement of *when* to seek comment: before "final consideration of a long-term transaction." And section 635a(c)(10)(E) requires EXIM staff to provide comments to the Board before the Board "tak[es] final action on an application." The last approval, the 2025 approval, was the Board's "final action" on the application. Neither provision obviates the requirement to solicit comment before "any" "final consideration" of a "transaction."

But even if "application" narrows the meaning of "final consideration of a [] transaction," the 2025 Board considered Total's application. The 2025 Memoranda [redacted] Swain Decl. Ex. 9, and "analy[zed] the application." EXIM Opp. 4.

The Court assumed that only a *first* request for financing is an application, and subsequent or amended requests are not. Mem. Op. 17–20. But nothing in the text suggests that comment is only necessary before a new application. "[A]pplication" refers to *any* "request or petition." Application, Black's Law Dictionary (6th ed. 1990). Even if Total was seeking to amend a previous application, Total was still requesting, *i.e.* "applying," for financing.

More importantly, analysis of the word "application" is far afield from the controlling text. The Act requires notice and comment before the "final consideration" of a "transaction," not the first consideration of an "application."

#### ii. The material change provision does not exempt EXIM from notice and comment.

In addition to requiring notice and comment before final consideration of a transaction, Congress also mandated that "[i]f a material change is made to an application . . . after a notice with respect to the application is published," EXIM must provide an "additional" comment period. 12 U.S.C. § 635a(c)(10)(D)(i). This Court previously asked whether there was a material change, not whether the 2025 approval was a "final consideration of a long-term transaction." Mem. Op. 17-18. But this provision does not apply, and even if it did, it would require comment.

This provision only applies to changes made "after notice" is published, 12 U.S.C. § 635a(c)(10)(D)(i); it requires an "additional" comment period where EXIM makes a material change *during* or *after* a comment period, but before the Board finally considers the transaction. This ensures the comment period's integrity is not undermined by eleventh-hour changes. But the provision says nothing about whether EXIM must permit comment in the first place. Thus, it does not *exempt* EXIM from *actually publishing* notice (and permitting comment) before "final consideration." Here, the issue is not whether the Board needed to permit "additional" comment, but whether it needed to allow *any* comment. In 2025, EXIM did not change the loan after a comment period started. It failed to permit comment at all.

Even if the material change provision governs, notice and comment was required, because, as EXIM's 2025 Board memo concedes, [redacted] Swain Decl. Ex. 9, Ap'x C, 1. This Court previously concluded that a "four-year extension of dates" was not material, Mem. Op. 18 & n.7, while seeming to acknowledge that changing "financial obligations or anything else of substance" *would* be material. A fact is material if there is "a substantial likelihood" it "would have assumed actual significance in [a reasonable investor's] deliberations." *TSC Indus. v. Northway, Inc.*, 426

U.S. 438, 449 (1976). Here, the date changes alone, and other changes, are material.

*First*, Total could not draw on the old loan. *Supra* Background § II. Approving financing changes the parties' "financial obligations." Mem. Op. 17-18.

*Second*, extending dates changes the parties' "financial obligations," because [redacted] and loan schedule are different. Swain Decl. Ex. 9, 8; *id.* Ap'x E, 1-2, 8. EXIM specifically noted that the four-year extension here was [redacted] *Id.* Ap'x E, 1–2, 8. It is double the two-year extension EXIM deems so material as to require Board approval. *Id.* Ex. 7, 7. The time for disbursement, performance, and repayment are terms of "substance." *See, e.g.*, *VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037, 1053 (N.D. Cal. 2006). These changes are no different from the statute's illustrative example of increasing the loan amount by 25 percent.

*Third*, EXIM recognized that changes to [redacted] Swain Decl. Ex. 9, Ap'x C, 1. Indeed, because the Bank Act requires EXIM to assess economic harm based on when products "will first be sold," 12 U.S.C. § 635(e)(1)(A)(i), delaying the start of production is material. The LNG market has changed since 2019, now clearly predicting a glut when production begins five years later than originally planned. Decl. of Clark Williams-Derry ¶¶ 14-22, Dkt. No. 13-6. Since the production date is material, changing it is a material change.

*Fourth*, [redacted], Swain Decl. Ex. 9, Ap'x E, 2–4, 6–8, change the parties' financial obligations. New [redacted] are, by any measure, material. *See id.* at 8 (describing [redacted]).

*Fifth*, EXIM characterized [redacted] *Id.* Ex. 9, Ap'x C, 1.

*Sixth*, EXIM's own policies recognize that changes to the terms and conditions that could affect the borrower's ability to repay its loans are "material." Swain Decl. Ex. 7, 3. Total

declared *force majeure* as conflict ravaged the region, dramatically altering the security risks Total and local people face. Forces protecting the Project allegedly committed abuses. And a coming LNG glut will render this Project not just unnecessary, but harmful to U.S. economic interests. These changes to the operating environment entail substantial legal, financial, and reputational risk to EXIM, and can affect Total's ability to repay. These changes are material.

#### iii. Statutory context confirms EXIM must permit comment before a new final consideration.

Far from altering section 635a(c)(10)(A)'s clear requirement that EXIM consider comments before its 2025 final consideration of this transaction, the Bank Act's goals and the surrounding statutory provisions confirm that Congress required EXIM to consider comments.

In addition to notifying the public, EXIM must also notify Congress prior to "final approval[]" of a loan over $100 million, 12 U.S.C. § 635(b)(3). The public notice period is "concurrent with" the Congressional notice period. *Id.* § 635a(c)(10)(A). As this Court noted, "nothing in the text surrounding [the Congressional notice] provision expressly indicates that it is concerned with applications or only applies where there is a material change," Mem. Op. 18, and "that these requirements run concurrently suggests the same events trigger their applicability." *Id.* at 19. The fact that EXIM must provide the public and Congress notice "concurrent[ly]," combined with the fact that the purportedly limiting "applications" or "material change" language does not limit Congress's notice, confirms it does not limit the public's notice. Otherwise, EXIM would be required to provide notice to Congress that is not "concurrent with" any public notice.

This Court concluded that since the congressional notice requirement only applies to a "final" approval, it did not apply. *Id.* at 18. But the 2025 approval was final. *Supra* § II.A.1.

Permitting EXIM to avoid comment would also undermine the Bank Act's goals. Congress required EXIM to permit comment for its largest projects for good reason: EXIM lends vast sums of taxpayer dollars to foreign projects that can have huge economic, environmental and foreign policy implications, and harm domestic producers and the public fisc. Notice and comment informs the public about, and allows public input into, whether and how EXIM accounts for these concerns when it spends taxpayer money.

This Court should interpret the statute in a way that meets these goals, by ensuring that EXIM has the information it needs to make a reasoned decision. Indeed, no other interpretation is permissible under the Bank Act's mandate that EXIM permit comment before "final consideration of a long-term transaction."

### B. EXIM's Board violated the Bank Act by ignoring the conflict and the harms the Project will inflict on local people.

EXIM's Board finally approved the 2025 loan without considering the current security risks, Project security's abysmal human rights record and the various ways in which the Project will harm local people. That was arbitrary and "not in accordance with law" and the "procedure required by law." 5 U.S.C. § 706(2).

The Bank Act requires the Board to consider "the potential environmental effects of a project," prior to approving financing, 12 U.S.C. § 635i-5(a)(2), and requires EXIM to "establish procedures" for staff to assess these issues. *Id.* § 635i-5(a)(1). Accordingly, EXIM adopted the ESPGs for assessing and managing project impacts on the environment, workers, and "local communities directly affected by the project." ESPG § I.3, https://bit.ly/4hJCQMx. "Environmental effects" includes social impacts. *Id.*, s. I.3, Annex A; Rabilloud Decl. Ex. A, Dkt. No. 25-1 ("In accordance with" the Bank Act, EXIM considers "social effects"). The Act authorizes the Board to withhold financing from a project with unacceptable impacts, 12 U.S.C.

§ 635i-5(a)(1)-(2); that is, if a project does not comply with the Procedures. ESPG § I.22. Given these provisions, the Board could not lawfully authorize the loan without considering the Project's environmental and social harms.

But the Board did not consider these issues; it only considered changes to dates. EXIM claimed the Board "received an update" on environmental and social "issues" in 2025, EXIM Opp. 28, but staff explicitly told the Board [redacted]. *E.g.*, [redacted]

Even if the acting Board considered the "update," the memo itself was inherently flawed, both because it failed to consider the key information that should have been provided through public comment, and because it gave at best only a cursory mention to issues like [redacted]. *Id.* at 1–9, Ap'x B, D.[27] Nor did the Board consider Total's failure to adequately compensate local people for land it took. *See id.*

Any assurances the memo gave about whatever plan Total had for Project security were demonstrably false. In May 2025, Total scrapped the plan it had in March 2025, when EXIM approved the loan, presumably because that plan was inadequate. *Supra* Background § III. The Board *could not* have considered Total's present security plan, because it did not exist.

Moreover, the Board was required to consider not only Project site security, but also that of "local communities." ESPG § I.3. Resuming operations will exacerbate the conflict, likely leading to further al-Shabab attacks on neighboring communities. *Supra* Background § III. And site security depends on government forces. Since the Board's original consideration, forces

[27] Plaintiffs also challenged the adequacy of the Bank staff's due diligence. Compl. ¶¶ 43–58, 85–87. Plaintiffs are awaiting the administrative record to raise this claim.

guarding the Project allegedly committed a massacre at the Project's gate, and have a documented pattern of other abuses. *Supra* Background § II–III. Yet the Board did not consider the risk of similar abuses.[28]

Since the Board failed to consider these critical issues, the Board's final approval was without observance of procedure required by law. If the Board did consider this update, it further confirms that the Board was not, as Defendants argue, simply considering—and making—technical amendments to certain dates, and they did so without notice and comment.

**C. EXIM's refusal to permit comment under its ESPGs violates the APA.**

EXIM failed to provide interested parties the opportunity to comment on the Project's environmental and social impacts that its ESPGs require. "To help elicit useful information concerning [projects'] risks and impacts," EXIM must post information on its website when it "receives and processes a final application" for higher risk projects. ESPG § I.8–9, § IV.B.2. For the riskiest projects like this one, it must also publish its Environmental and Social Impact Assessment before "any Bank action with respect to financing of the application," *id.* § I.9.2, and "any decision . . . to authorize a Final Commitment," so that "interested parties have sufficient time to review and provide information and comments." *Id.* § IV.B.2.

The D.C. Circuit only addressed whether EXIM had to release information under the ESPGs, not whether it had to permit comment. Slip. Op. 25–26. This Court stated that "an amendment to the dates" is "distinct from a decision by EXIM regarding 'an application for a Final Commitment'" and "does not concern the 'financing of [an] application.'" Mem. Op. 20–21. But whether this was an amendment is not relevant. "*[A]ny* decision … to authorize a Final

[28] The new security plan will draw security away from communities and focus on the Project, leaving local people vulnerable. Conflict Decl. ¶¶ 33, 80–83. And there has been an increase in violence, and attacks on communities, since the Project restart. Second Conflict Decl. ¶ 20–24.

Commitment" and "*any* Bank action with respect to financing of the application," ESPG § I.8–9, § IV(B).2 (emphasis added), surely include decisions or actions addressing an amendment.

Because the previous loan was inoperative, and EXIM was not committed to fund the Project, the Board considered an "application" when deciding to issue a loan, and the 2025 approval was EXIM's "Final Commitment." *Supra* § II.A.1–2. Moreover, the dates are specifically "with respect to," the financing. Approving date changes that make the loan operable "concern the 'financing of the application." Even if EXIM previously took such "action" or decided "to authorize a Final Commitment," it did so again in 2025.

Regardless, EXIM changed far more than just dates. *Supra* § II.A.1, 2(iii). [redacted] These are actions that impact financing. *Id.*

### D. EXIM's failure to properly assess the Project's substantial economic harms to U.S. companies and workers violated EXIM's rules and procedures.

The Bank Act bars EXIM from "extend[ing] any direct credit" to facilitate the overseas production of a commodity for export if EXIM determines that either: (i) "the commodity is likely to be in surplus on world markets at the time the resulting commodity will first be sold"; or (ii) "the resulting production capacity is expected to compete with United States production"; and the funding "will cause substantial injury" to U.S. producers. 12 U.S.C. §§ 635(e)(1)(A)-(B). By definition, there is "substantial injury if the [resulting production] equals or exceeds 1 percent of United States production." *Id.* § 635(e)(4).

If the statutory conditions are met, the prohibition on funding projects can only be overcome if EXIM's Board determines, after considering the analysis and comments, that "the short- and long-term benefits to industry and employment in the United States are likely to outweigh the short- and long-term injury to United States producers and employment of the

same, similar, or competing commodity." *Id*. § 635(e)(3).

Section 635a-2 requires EXIM to implement "regulations and procedures … to insure full consideration" of the adverse economic effects of its financing. 12 U.S.C. § 635a-2. The D.C. Circuit found that the Bank Act affords EXIM discretion whether to conduct a detailed economic analysis, but did not consider whether EXIM's internal rules require that review. *Supra* § I.B.1. Under those rules, a Detailed Economic Analysis is mandatory.

The *Economic Impact Procedures and Methodological Guidelines* ("*Economic Procedures*") EXIM adopted under section 635a-2 require EXIM to conduct a "Detailed Economic Impact Assessment" for all transactions where: "(1) the foreign project will produce exportable goods, (2) the EXIM financing is more than $10 million, and (3) the new foreign production poses the risk of substantial injury (i.e., the new, foreign production will be equal to or greater than 1% of U.S. production)." *Economic Procedures*, 4-5, 8 (Feb. 2025).

Transactions over $10 million "are evaluated" for substantial injury (*i.e*. whether they will enable foreign production of more than 1 percent of U.S. production). *Id*. at 4. All transactions that meet this substantial injury threshold "are subject" to a Detailed Economic Impact Assessment. *Id.* There is no discretion here: the procedures mandate the analysis, and once EXIM adopted mandatory procedures, it was obliged to follow them. *Delta Airlines v. Export-Import Bank of the U.S.*, 718 F.3d 974, 977 (D.C. Cir. 2013) (holding that EXIM's implementation of its procedures was subject to judicial review and not "committed to agency discretion."); *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) (agency must follow even "gratuitous procedural rules that limit otherwise discretionary actions."); *supra* Section II.

EXIM recognized that the Project will produce seven times the "substantial injury" threshold. Swain Decl. Ex. 2, 113. Under its *Economic Procedures* then, EXIM was required to

conduct a Detailed Economic Impact Analysis of this transaction. And from that Analysis, the Board would have determined that the statutory conditions of oversupply and substantial injury both exist here. *Id.*; *see generally* Williams-Derry Decl. Accordingly, EXIM could not extend credit unless Section 635(e)(3)'s "[e]xception" was met. But EXIM's Board never found that the benefits to U.S. industry and employment will "outweigh" the harm to U.S. producers and employment. That violated the Bank Act.

To ensure rigor, this Detailed Economic Impact Analysis must assess the impacts using the "most recently available information." *Economic Procedures*, 8. This Court found that "EXIM considered the updated state of the LNG market" in 2025 and "reasonably relied" on the 2019 analysis because that analysis predicted that a global oversupply was unlikely to emerge through the currently expected date of first production. Mem. Op. 22–23. The Court should reconsider that finding.

*First*, EXIM did *not* "consider[] the updated state of the LNG market" in 2025. *Id.* at 22. Rather, it has conceded that it relied exclusively on the 2019 analysis. EXIM Appellee Br. 50. By 2025, the 2019 analysis was woefully out-of-date and not the "most recently available" forecast of 2030 trends. By 2025, it was unreasonable to predict that LNG markets would be relatively balanced in 2029-2030. In the six-year interim, supply and demand shocks roiled global markets, such that it is clear that the Project will compete with U.S. LNG and LNG will be in global surplus in 2029-2030 when the Project's output "will first be sold." Williams-Derry Decl. ¶¶ 6–11. Neither EXIM nor Total dispute this. Nor could they: Total agrees a global glut is coming.[29]

---

[29] Christian Drolshagen, *TotalEnergies warns of 2030s overbuild*, InstaNext (Oct. 3, 2025), https://instanext.com/insights/daily-first-look/2025-10-03. The Iran war has "delayed, not cancelled" the glut. IEEFA, *The LNG glut has been delayed, not cancelled* (Sept. 16, 2026), https://ieefa.org/resources/lng-glut-has-been-delayed-not-cancelled.

*Second*, EXIM's 2019 analysis actually *did* forecast the possibility of oversupply growing from 2023-2030 and persisting through 2034-2035. Swain Decl. Ex. 2, 117. Even if EXIM could rely on the 2019 analysis in 2025, it could not ignore the inconvenient parts of that analysis. Disregarding the risk of a massive glut emerging well before 2030 was arbitrary and capricious.

*Third*, this Court reasoned that the 2019 analysis was sufficient because it looked out to 2031, after the Project's output will first be sold. While the time of first sale is used for the "oversupply analysis," the *Economic Procedures* also require EXIM to conduct a "trade flow analysis" to determine "the competitive impact of the new foreign production on U.S. producers" over the *entire* "length of EXIM support." *Economic Procedures*, 8, 9. [redacted] Swain Decl. Ex. 4, Ex. 9, 1–2 ([redacted]), EXIM needed to analyze out until [redacted] which far exceeds the time horizon of the 2019 analysis. At best, the 2019 analysis incompletely assessed the Project's economic impacts. And because an adverse trade flow analysis "may be grounds for Ex-Im denial of the transaction," *id.* at 8, EXIM's analysis did not fully assess a potentially disqualifying consideration.

By using an obsolete and cherry-picked analysis to support this transaction, and failing to assess impacts over the life of the loan, EXIM violated its *Economic Procedures*.

### E. EXIM's 2025 loan over-subsidizes exports in excess of the Bank Act's limits.

#### 1. EXIM's subsidies do not "neutralize" foreign competition.

The Bank Act strictly limits the subsidies EXIM may provide. It may only "neutralize the effect of [] foreign credit on international sales competition." 12 U.S.C. § 635(b)(1)(B). That is, it may only offer financing where a foreign Export Credit Agency (ECA) is actually supporting a direct competitor's bid, and may not provide more generous "rates, terms and conditions" than

the foreign ECA. *Id.* The record EXIM produced thus far indicates that EXIM has flouted these requirements.

EXIM never evaluated whether U.S. exporters faced *bona fide* competition for specific work from foreign companies that are receiving equivalent ECA support. Rather, in 2019, EXIM claimed (citing no evidence) that it had "been told" that Russia and China might fund the Project. Press Release, EXIM, *supra* n.5. Such self-serving hearsay, without more, does not meet Congress's stringent "neutralize" requirements.

It appears EXIM did no analysis in 2025. It did not assess which [redacted]. Swain Decl. Ex. 9. And the prospect that foreign ECAs would fund a U.S. competitor has diminished substantially since 2021. The Export-Import Bank of China and China Development Bank rarely fund deepwater natural gas drilling projects or LNG facilities.[30] Russia's ECA cannot participate due to sanctions. Many other leading ECAs have restricted their support for fossil fuel projects.[31] As a result of these policies and the horrific human rights abuses associated with this Project, both the U.K. and Dutch ECAs revoked funding commitments and refused to support their exporters' participation. *Supra* Background § II.

But even if the Project would have received funding from a foreign ECA, that alone does not justify EXIM's involvement. *First*, the supposed financing must subsidize a foreign bidder that directly competes with the U.S. contractor; EXIM support for exports used on one part of a project does not "neutralize" foreign ECA support for exports used on another part. 12 U.S.C.

[30] *See, e.g.*, China's Global Energy Finance Database, https://www.bu.edu/cgef/#/all/EnergySubSector/Other (listing one instance from 2000-2022).

[31] For example, the United Kingdom, many E.U. countries, Canada, and Australia have all adopted restrictions. *See* Clean Energy Transition Partnership, *Members*, https://cleanenergytransitionpartnership.org/who-we-are/ (last accessed Oct. 15, 2026).

§ 635(b)(1)(B). EXIM has never claimed that a foreign ECA was subsidizing a bidder competing for the same work as each of the U.S. exporters EXIM seeks to support.

*Second*, even if there were direct competition, EXIM can only "neutralize" the effect of foreign credit. *Id.* There is no evidence that EXIM ensured that the "rates, terms, and conditions" of its support did not exceed the purported foreign ECA support, *id.,* including after it changed the "rates, terms and conditions" of the original loan in 2025. Thus, EXIM never even considered whether it was unnecessarily and illegally over-subsidizing Total.

**2. EXIM is funding excess local costs.**

EXIM may only "support United States exports at rates and on terms and conditions which are … consistent with international agreements." 12 U.S.C. § 635(b)(1)(B). The OECD *Arrangement on Officially Supported Export Credits* is clearly such an agreement on rates, terms and conditions, as is the WTO *Agreement on Subsidies and Countervailing Measures (ASCM)*, which prohibits export subsidies that do not comply with the Arrangement. Annex I, sec. k. Accordingly, the Bank Act and the ASCM require EXIM to provide financing at "rates, terms and conditions" allowed under the Arrangement.[32]

The Arrangement caps the amount of support an ECA can provide at 135 percent of the value of the export contract: 85 percent of the contract's value, plus an additional "50% of the export value in "local costs." OECD Arrangement, art. 11(c), (d). "Local costs" include

---

[32] Multiple sections of the Bank Act show that Congress intended that EXIM adhere to the Arrangement. *E.g.* 12 U.S.C. § 635i-9(b) (defining when EXIM may deviate from the Arrangement); *Id.* § 635g-1(a)(9) (requiring report on financing that does not comply with Arrangement); *Id.* § 635(l)(3)(B) (empowering Treasury Secretary to reduce or eliminate program if China complies with Arrangement); *Id.* §§ 635i-3(a)(5)-(a)(6), (b)(1)(A), (b)(5)(B), (d) and (g)(2) (creating program to encourage countries to follow Arrangement).

expenditures "in the buyer's country that are necessary either for executing the exporter's contract or for completing the project…." *Id.* app. II(g).

EXIM has violated the Bank Act by providing more subsidies than the OECD Arrangement allows, over-subsidizing the Project by $650 million to $1.25 billion. When EXIM approved a $5 billion Project loan in 2019, it asserted that its subsidies would support about $3 billion in U.S. exports. Swain Decl. Ex. 2, 31. EXIM has not publicly estimated the value of the subsidized exports since it reduced the loan to $4.7 billion in 2020. Assuming that the reduced loan still supports $3 billion of exports, EXIM's loan should have been limited to $3.45 billion under the OECD's "85 percent" and 30% "local cost" rules in place in 2020, ($3 billion x 115% = $3.45 billion) and to $4.05 billion under the rules in place now ($3 billion x 135% = $4.05 billion). It has over-subsidized the Project by $650 million to $1.25 billion.[33]

Moreover, EXIM likely funds considerably more local costs than its competitor ECAs, in violation of the Bank Act's restriction that it only provide funding that approximates and "neutralizes" the terms and conditions provided by foreign ECAs. For example, whereas the OECD requires that local costs be "necessary" for executing the contract or completing the Project, EXIM allows local costs that are "beneficial" to the Project.[34]

For all of these reasons, EXIM's loan would subsidize the Project in violation of the Bank Act and was arbitrary and capricious.

**F. EXIM failed to produce statutorily mandated information.**

The Bank Act requires EXIM to share vital Project information. Slip Op. 22. EXIM's procedures also require the release of "Environmental and Social Management Plans prepared

---

[33] The 2020 cap was ($3 billion x 85%) + ($3 billion x 30%) = $3.45 billion. If the current cap is applied, the cap would be ($3 billion x 85%) + ($3 billion x 50%) = $4.05 billion.

[34] EXIM, *Local Cost*, https://www.exim.gov/policies/local-cost.

for projects and supplemental environmental reports, including remediation or mitigation plans and related monitoring reports that it requires the borrower to submit." ESPG § I.9(3).

This Court held that the "ESPG did not require EXIM to conduct additional analysis nor engage in further notice and comment before it approved the 2025 extension." Mem. Op. 27. But that says nothing about whether EXIM was required to provide information in its possession. Indeed, monitoring reports could not only be created, and thus disclosed, the first time EXIM considers a loan; by definition, they are created later.

The D.C. Circuit concluded that Plaintiffs did "not allege" that Total has submitted any supplemental reports related to the 2025 approval. Slip Op. 26–27. Plaintiffs now allege that Total, or its agents, submitted supplemental reports in advance of the 2025 approval. Am. Compl. ¶¶ 263–64. [redacted].[35] FOE made multiple requests for these monitoring reports to no avail. FOE Decl. ¶¶ 43–44. EXIM's failure to disclose them deprives Plaintiffs and others of information that EXIM's own procedures require it to disclose, and was agency action "unlawfully withheld." 5 U.S.C. § 706(1). This Court should order EXIM to produce these documents.

[35] The D.C. Circuit stated that the ESPGs "limit[]" EXIM's "disclosure obligation" to "reports that the borrower is required to submit." Slip. Op. 25-26 (citing ESPG § I.9.3). The disclosure obligation includes information submitted by independent consultants, for two reasons. *First*, the Bank Act has no submitter-based limit; instead 12 U.S.C. § 635i-5(a)(1) requires EXIM to release "reports *required to be submitted to the Bank*." (emphasis added). EXIM's Procedures cannot limit a statutory right. *Second*, the ESPGs make clear that materials submitted by independent consultants *are* reports the borrower must submit. The next sentence states that "these reports [are] intended to reflect the project's level of compliance with EXIM Bank's environmental guidelines." ESPG § I.9(3). EXIM monitors compliance "through the review of information provided by . . . independent consultants," who EXIM specifically requires borrowers like Total to pay for or retain to "produce monitoring reports." *Id.* § V.

### G. EXIM's failure to consider new comments and new information was arbitrary and capricious.

Even if the Bank Act and EXIM's Procedures did not *require* notice and comment, new economic analysis, or new social analysis, failure to permit new comments or conduct new analyses—and reliance on outdated ones—was arbitrary.

The public must be given a new opportunity to comment if "the basis" for a decision "changed significantly," *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995), or on the "first occasion to offer new and different criticisms which the agency might find convincing." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) (citation omitted). This principle applies to the APA *and* other statutes' comment requirements. *See Idaho Farm*, 58 F.3d at 1401–02, 1404. EXIM is bound by APA standards barring unreasoned decisions. *See id*. at 1401; 5 U.S.C. § 706(2)(A).

Old comments addressing a different context cannot inform EXIM about current issues. Since EXIM's 2019 approval, an insurgency overran the Project area, forcing Total to shut down for years, and presenting new risks for the Project and local people. Changes to the global LNG market and the production timeline now make it clear that the Project will harm the U.S. economy and U.S. jobs. Any reasonable Board of any responsible lender would have sought comment about these issues. EXIM's Board did not.

Thus, EXIM approved funding despite necessarily lacking critical information and perspectives. For example, Plaintiffs would have informed EXIM about Total's failure to adequately compensate people whose land it took; the devastating impact on the environment and local people's livelihoods; the likelihood that the Project will exacerbate the conflict; the humanitarian crisis; the militarization of the region; the Project contractors and the thousands of

local people that had been killed; the alleged rapes and murders carried out by Project security; and the adequacy of any plans to address the Project's risks and impacts.

Others likely would have raised additional concerns. Members of Congress have views on the Project's substantial economic, trade, security, environmental and human rights impacts. Senator Sullivan, for example, has objected to U.S. tax dollars "underwriting a foreign [LNG] project that competes with American exports" and "undercuts" President Trump's policy of promoting U.S. energy dominance. Herz Decl. Ex. 9, Dkt. No. 13-15. Senator Merkley has criticized EXIM for failing to permit comment given material changes to the Project and its "impact on American jobs, the environment and human rights."[36] These are precisely the kinds of harms the Bank Act and the ESPGs direct EXIM to consider, with public input.[37] But EXIM shut out all of this information and argument, even while it accepted input from Total.

Reasoned decisionmaking required comments on whether to fund a Project, under new terms and conditions, in a war zone, that will hurt U.S. producers and workers. It is not enough that EXIM thought the Project was a good idea seven years ago.

EXIM also acted arbitrarily and capriciously in relying on outdated or plainly erroneous comments and analysis from 2019, when more accurate, up-to-date evidence was available. *Sierra Club v. EPA*, 671 F.3d 955, 965-66 (9th Cir. 2012) (overturning agency action where it failed to consider new data that "told a different story than . . . earlier data"). Courts should not "rubber stamp agency action that is arbitrary and capricious in its reliance on old data without meaningful comment on the significance of more current compiled data." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013).

---

[36] Merkley Slams EXIM Bank for Failing to Provide Congressional Notification of Mozambique LNG Project, Jeff Merkley Senator for Oregon (Aug. 5, 2025), https://bit.ly/4p5x2yn.

[37] ESPG Annex A § 4; Swain Decl. Ex. 2, 83–93; 12 U.S.C. §§ 635(b)(1)(B), 635i-5(a)(2).

It beggars belief that EXIM would make a multi-billion-dollar funding decision based on assessments of social harms and U.S. economic impacts that it must know are obsolete and inaccurate, and put local people and American producers at risk. No credible private-sector financier would put its capital at risk in such a slipshod manner. For EXIM to give such short shrift to protecting local people and American economic interests is arbitrary and capricious.

## III. Plaintiffs have suffered irreparable harm because EXIM's approval permitted the Project to restart.

A preliminary injunction is warranted where Plaintiffs show a likelihood of imminent, irreparable harm. *Newby*, 838 F.3d at 7–8. This Court previously concluded that this factor "slightly favors" Plaintiffs, Mem. Op. 29, and it decidedly favors Plaintiffs now.

As this Court noted, "Plaintiffs have made a strong showing that the Court's refusal to grant a preliminary injunction could be beyond remediation." *Id*. For one thing, EXIM's denial of Plaintiffs' right to comment and to influence the due diligence process are irreparable. Permitting comment after a decision "'is no substitute for the right of interested persons to make their views known to the agency in time to influence the [decision]'" and "would not, on its own, remedy those violations." *Id.* (quoting *Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981)). And the irreparability "is heightened given the risk that the funds for the loan—even if later determined to have been improperly approved—will be unrecoverable once withdrawn by Total." Mem. Op. 29.

The Court previously concluded that while this factor favors Plaintiffs, it "does not weigh too strongly in Plaintiffs' favor because it is less clear that Plaintiffs' injuries are certain and imminent," since *force majeure* was then in place and the restart had not commenced. Mem. Op. 30. But now that Total has lifted *force majeure* and began construction, the harms are so "imminen[t] that there is a clear and present need for equitable relief." *Chaplaincy of Full Gospel*

*Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation modified).

*First*, as a result of the Project restart that the loan allowed, local people including the Individual Plaintiffs, have suffered and will continue to suffer environmental harm, which "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). The Project has, and will continue to, escalate the conflict and increase human rights abuses. Conflict Decl. ¶¶ 7–8, 65–86; Second Conflict Decl. ¶¶ 23–24. Al-Shabab has attacked nearby villages, and will likely continue to do so. *Supra* Background § II, III. Farmers, including Individual Plaintiffs, have lost and likely will lose their farms; fisherpeople, including Individual Plaintiffs, have lost and likely will lose access to the sea. *Supra* Background § III. Thus, much of the harm is not just imminent, but ongoing. Since relief "requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *Newby*, 838 F.3d at 8–9 (citation omitted). Here, the sword has already fallen.

*Second*, this Court correctly held that Plaintiffs' harms were imminent because there was evidence that EXIM will disburse unrecoverable funds before the Court could rule on the merits. Mem. Op. 31. That is all the more likely now that construction has restarted. Thus, the "clear and present need for equitable relief" has only grown since this Court first considered the issue.

All of these risks and injuries are more substantial than harms courts have found merited relief. *See, e.g.*, *Fund for Animals v. Norton*, 281 F. Supp. 2d 231, 220 (D.D.C. 2003) (injury to plaintiffs' ability to view swans). And all of them are irreparable. The only way to prevent them while the Court decides the merits is to maintain the *status quo*, temporarily stopping EXIM from releasing these unrecoverable funds.

## IV. The balance of equities and public interest favor temporary relief because the harms to Plaintiffs outweigh the harms to EXIM and Total.

The balance of the equities and public interest favor a temporary pause on EXIM disbursing taxpayer funds while the Court considers whether the loan violates Congress's directives. This Court previously found the balance of equities to be equal. Mem. Op. 31. In fact, the equities favor temporary relief preserving the parties' positions until the merits can be resolved. *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 131 (D.D.C. 2020).

As this Court recognized, absent relief, Plaintiffs and local people "will likely be harmed." Mem. Op. 31. That is only more true now that the Project has restarted. Taxpayers would be harmed too, since they could not recover illegally disbursed funds. *Id*. at 29–30. So will domestic LNG producers and workers. *Supra* § II.D.

Moreover, temporary relief serves the public interest. The public has a substantial interest in government agencies abiding by federal law, and "no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. Where a statute "sets out a categorical requirement," the equities favor an injunction because "Congress has already done the relevant balancing." *N.D. v. Reykdal*, 102 F.4th 982, 996 (9th Cir. 2024). Here, EXIM ignored categorical statutory requirements. *Supra* § II.A, B, E, F. And EXIM would benefit from comment from parties knowledgeable about the conflict and the Project's risks to local people.

The only interest this Court found weighed against temporary relief was the alleged "reliance interests" of "countries and corporations" who assumed the loan would be available. Mem. Op. 31. But the U.K. and the Netherlands have since pulled their funding due to the Project's serious security and human rights issues. *Supra* Background § II. They have no reliance interests.

Nor do Total or EXIM. Defendants are sophisticated entities represented by expert counsel. They knew the risks of assuming the 2025 approval was valid despite its manifest conflicts with the Bank Act and EXIM's procedures. They cannot manufacture a defense to temporary relief from an illegal action by claiming they relied on it.[38]

Moreover, EXIM and Total cannot claim that temporarily preventing disbursements will harm them since there is no evidence EXIM has made any disbursements. It cannot: [redacted], including that [redacted] Swain Decl. Ex. 9, 4–5; *id.* Ap'x E, 6–7. None of that is true. Second Conflict Decl. ¶¶ 13–22.

Regardless, the burden on EXIM or Total—a multi-billion-dollar multi-national—will be minimal compared to the certain, grave, and irreparable harms to the environment, the U.S. economy, and local people, including Individual Plaintiffs. Those harms outweigh any short-term uncertainty or speculative injuries to Total and EXIM from a short pause on disbursement while the Court determines if the loan is legal. EXIM flouted its governing legislation and procedures; it cannot claim to be burdened by pausing its illegal act.[39]

---

[38] This Court suggested that Total's reliance interests increased because it assumed the loan was available until Plaintiffs sought preliminary relief. Mem. Op. 31. But sophisticated parties make such assumptions at their own risk. Moreover, it would have been premature for Plaintiffs to assert imminent harm until Total announced in July 2025 its intent to restart construction. Herz Decl. Ex. 6, Dkt. No. 13-12, 2. Plaintiffs filed the *same month*, and should not be penalized for not seeking relief prematurely. In any event, delay alone "is not a proper basis for denial of a preliminary injunction." *Gordon v. Holder*, 632 F.3d 722, 724 (2011).

[39] Plaintiffs respectfully ask the Court to exercise its broad discretion to require at most only a nominal bond. *Aviel v. Gor*, 780 F. Supp. 3d 1, 16 n.7 (D.D.C. 2025). Plaintiffs cannot post a substantial bond; requiring one would deny them access to judicial review, *id.*, risk deterring others from pursuing their right to judicial review of unlawful executive action, and contravene the interests of justice. *See LULAC v. Exec. Office of the President*, 780 F. Supp. 3d 135, 224 (D.D.C. 2025) (collecting cases). Organizations protecting the environment against agency

## CONCLUSION

EXIM claims it can hand billions of taxpayer dollars to a foreign project that will exacerbate a humanitarian crisis, degrade the environment, compete with U.S. producers, and harm the Project's neighbors, without allowing comment or considering the consequences. As set forth above, all of the factors—likelihood of success on the merits, irreparable harm and balance of the equities—favor temporary relief or, for balance of equities, is at worst neutral. To avoid irreparable harm from EXIM's illegal and arbitrary loan, this Court should maintain the *status quo* by preventing EXIM from disbursing unreleased funds while the Court conclusively determines whether EXIM's 2025 loan was lawful.

Date: October 15, 2026

Respectfully submitted

/s/ *Richard L. Herz*
Richard L. Herz* (admitted *pro hac vice*)
Lindsay A. Bailey (D.C. Bar No. 1723447)
EarthRights International
1400 K St. NW Suite 750,
Washington, DC 20005
(202) 466 5188
rick@earthrights.org

Steven B. Herz (admitted *pro hac vice*)
The Law Office of Steven Herz
1954 Mountain Blvd.
Oakland CA 94661
*Counsel for Plaintiffs*

---

action need only post, at most, a nominal bond. *E.g.*, *Natural Res. Def. Council v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971). Even if EXIM could show potential revenue loss, "[i]t would be a mistake to treat [that] the same as a pecuniary damage to a private party." *Id.* at 169.

* Based in CT; admitted in NY; does not practice in DC's courts.

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on Defendants in accordance with Federal Rule of Civil Procedure 5(a).

DATE: October 15, 2026

/s/ Richard L. Herz
Richard L. Herz